UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____ - CIV _____

FILED BY_____ D.C.

JAN 3 1 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**JURY TRIAL REQUESTED**

<u>**JANE KOE**</u>, an individual filing pseudonymously
                **Plaintiff**
**vs.**
<u>**AMAR CHANDER MAINI aliases GALLANTVK, AMARCM4, AMARCM_2, VIKRAM KMS, and VIKRAM KUMAR MANSINGH**</u>, an individual
<u>**GUARANTEED REMOVALS**</u>, a Canadian company
<u>**REPZE**</u>, a fraudulent LLC
<u>**EXPERT REMOVALS**</u>, a fraudulent LLC
<u>**INTERNET REMOVALS**</u>, an Australian company
<u>**MARCA GLOBAL, LLC. d/b/a InternetReputation.com**</u>, a Colorado LLC
<u>**AMARUTU TECHNOLOGY d/b/a KoDDOS**</u>, a Hong Kong limited company
<u>**MINC LAW**</u>, an Ohio Law firm
<u>**KEVIN ANGILERI**</u>, an individual
<u>**RONALD LINCO**</u>, an individual
<u>**MICHAEL SCHERN**</u>, an individual
<u>**JAMES JOHN**</u>, an individual
<u>**JIM BURNS**</u>, an individual
<u>**SCOTT BREITENSTEIN**</u>, an individual
<u>**ARMAN ALI d/b/a D4 SOLUTIONS BD**</u>, an individual
<u>**VIKRAM PARMAR aliases MATT HAMP and MARTIN HORAN**</u>, an individual
<u>**JOHN DOES 1-15**</u>, inclusive,
                **Defendants.**

## COMPLAINT AT LAW

NOW COMES plaintiff, JANE KOE ("Plaintiff"), a law student *pro se* proceeding under a pseudonym, and for her Complaint at Law against AMAR CHANDER MAINI aliases GALLANTVK, AMARCM4, AMARCM_2, VIKRAMKMS, and VIKRAM KUMAR MANSINGH ("Maini"), GUARANTEED REMOVALS ("Guaranteed Removals"), REPZE ("Repze"), IIRC ("IIRC"), EXPERT REMOVALS ("Expert Removals"), INTERNET REMOVALS ("InternetRemovals.com"), MARCA GLOBAL, LLC. ("Marca Global"), AMARUTU TECHNOLOGY d/b/a KoDDOS ("Amarutu Technology"), MINC LAW ("Minc Law"), KEVIN ANGILERI ("Angileri"), RONALD LINCO ("Linco"), MICHAEL SCHERN ("Schern"), JAMES JOHN ("John"), JIM BURNS ("Burns"), SCOTT BREITENSTEIN ("Breitenstein"), ARMAN ALI d/b/a D4 SOLUTIONS BD ("Ali"), VIKRAM PARMAR aliases MATT HAMP and MARTIN HORAN ("Parmar"), and JOHN DOES 1-15 (all defendants collectively, "Does"), she asserts the following:

## INTRODUCTION

1.  This case is about a country-wide extortion scheme being perpetrated by multiple Defendants against Plaintiff under various state and federal law theories of recovery listed below.

1

(1) Fraudulent Misrepresentation
(2) Defamation
(3) Invasion of Privacy
(4) Civil RICO § 1962(c)
(5) Civil RICO § 1962(a)
(6) Civil RICO § 1962(b)
(7) Civil RICO § 1962(d)
(8) Computer Fraud and Abuse
(9) Breach of the Implied Covenant of Good Faith and Fair Dealing
(10) Tortious Interference with Advantageous Business Relationship
(11) Deceptive Trade
(12) Civil Conspiracy

2. Plaintiff is a law student, fine artist, and couturier who is ranked at the top of her law school class. Prior to law school, she trained in fine painting and fine dressmaking in fashion capitols of London and Paris. Since 2017, she has run a fashion and art business that has won her numerous awards in the fashion industry and helped her get selected to show her designs on runways at New York Fashion Week and Paris Fashion Week. Plaintiff trades on her name, image, and likeness, as it is inextricably linked to her ability to sell her paintings and designs to her elite and discreet socialite clientele. Formerly active in wholesale boutique sales, Plaintiff now sells her artwork and fashion designs on her direct-to-consumer website and to a variety of luxury and big box retailers worldwide alongside pursuing her legal education.

3. Between February 2016 to February 2017, Plaintiff was betrothed via arranged marriage to Maini. Maini catfished her family and her matchmaker by pretending to be an age 28 investment banker named Vikram Kumar Mansingh when he was an age 37 unemployed former marketing assistant. Not only did Maini con Plaintiff into a romantic relationship by lying about his name, age, educational background, professional background, romantic background, and future goals, but also Maini stole Plaintiff's dowry prior to the February 2017 wedding date and has continued harassing, intimidating, defaming, and extorting Plaintiff's family since then. Plaintiff ended the relationship after discovering Maini is (1) addicted to alcohol despite going to alcohol rehabilitation centers in India throughout his 20s, (2) addicted to child pornography, (3) conned multiple families outside of her own for arranged marriage dowries, (4) sexually assaulted a large number of minor children under age 11, including grooming his then age 4 niece with verbal statements that he wanted to "smash her before getting titties at age 9," and (5) misrepresented his name, age, education, job, income, savings, and sheer magnitude of his brazen spoken and demonstrated sexual attraction to prepubescent girls ages 2 to 11.

4. Between July 2017 to September 2019, Maini has created original posts on dozens of websites filled with defamation and libel about Plaintiff. Between July 2017 to April 2019, Maini continued threatening, harassing, and extorting Plaintiff's parents over email and via untraceable phone numbers stating that he would post libel anonymously and he carried out his threats and intimidation efforts. Plaintiff has report his actions to Interpol and the FBI and now Maini faces charges for possession of child pornography, criminal defamation, and cyberstalking.

5. Maini began by authoring original libel about Plaintiff on a variety of WordPress and Blogspot blogs, accusing her of heinous actions ranging from "leaving him at the altar,"

being "a medium to low functioning Borderline," and "cheating on exams and her partner," when Plaintiff ended the engagement a month before the wedding date, returned his ring, is high functioning at an elite law school, and has neither cheated on exams nor on him. In reality, Maini cheated on Plaintiff throughout the relationship, including when Plaintiff was hospitalized. After not getting the desired response from terrorizing Plaintiff and her family for doing this from July 2017 to January 2019, Maini soon escalated his campaign of terror by posting further libel on "Bashing Websites."

6. The way the "Bashing Websites" work are that aggrieved suitors post libel or factual information about their ex-partner or ex-partners and then they are referred to "Removal Websites" to pay for the removal of said posts, which can range between $750 USD to $5,000 USD per post. The Bashing Websites are managed by a variety of individuals, ranging from Arizona attorney Schern to convicted felons Angileri and Breitenstein, and they have a relationship with convicted Bangladeshi/Indian felon Ali to repurpose material of those deemed of high enough net worth to continue paying for whack-a-mole removals. Based on information and belief, a partial list of the Bashing Websites and the Removal Websites are listed below in tabular format.

**BASHING WEBSITES**

| OWNER | WEBSITE |
|---|---|
| Defendant Michael Schern | TheDirty.com ShesAHomewrecker.com ExtortionInc.com |
| Defendant Kevin Angileri | ReportCheater.com CheaterXposed.us ComplaintRemovals.xyz BadGirlReports.date ConsumerComplaint.xyz ComplaintsRemoval.us YSwitchTech.com ComplaintsRemoval.in PredatorAlert.us DatingComplaints.us Tips-Dating.xyz DatingComplaints.stream TipsDating.us ExposeCheaters.online ReportCheatingWife.com InternetCheaters.com ExposeCheatersOnline.com DrivingSchoolWebsiteDesign.com |
| Defendant Scott Breitenstein | ComplaintLand.com CheatReport.com CheaterReport.com CheatingReport.com CheatBase.com |

|  | BadBizreport.is |
|--|--|
|  | CheatersBoard.com |
|  | CheaterDirectory.com |
|  | BlacklistReport.com |
|  | ReportMyEx.com |
|  | ComplaintsBureau.com |
|  | ScamBoard.com |
|  | ScamFound.com |
|  | STDRegistry.com |
|  | LiarsandCheaters.com |
|  | LiarsCheaters.com |
|  | ReportDeadbeats.com |
|  | WallOfJohns.com |
|  | FlushTheJohns.com |
|  | IHateHomewreckers.com |
|  | JailArrest.com |
|  | JailCase.org |
|  | BadrEnterReport.com |
|  | WikiScams.com |
|  | DatingPsychos.com |
|  | HoboLoco.org |
|  | ScornedLove.com |
|  | USHomewreckers.com |
|  | WTFComplaint.com |
|  | WTFRrus.com |
|  | CheaterBay.com |
|  | CheaterCentral.com |
|  | CheatLand.com |
|  | ExposeCheatingOnline.com |
|  | ReportAffairs.com |
|  | CheaterBoard.com |
|  | CheaterWatch.com |
|  | CheatFound.com |
|  | ReportCheatersOnline.com |
|  | CheaterRant.com |
|  | HeyHobo.com |
|  | VerifyCheater.com |
|  | WtfCheaters.com |
| Pierre Zarokian | ReportCheater.com |
| John Doe 1 | WikiCheaters.com |
| John Doe 2 | WorstHomewreckers.com |

**REMOVAL WEBSITES**

| OWNER | WEBSITE |
|--|--|

| Defendant Vikram Parmar alias Matt Hamp | RepZe.com |
|---|---|
| Defendant Vikram Parmar alias Martin Horan<br>Defendant Jim Burns<br>Defendant Marca Global | InternetReputation.com |
| Defendants Minc Law and Aaron Minc | MincLaw.com |
| Defendant Scott Breitenstein | 247Removals.com |
| Defendant James John | GuaranteedRemovals.com |
| Defendant Matt | ExpertRemovals.com |
| Defendant Jim Burns | InternetRemovals.com |

7. When Plaintiff and her parents initially discovered the extent to which Maini was out to get her with libellous blog posts, Plaintiff and her parents agreed to pay both Guaranteed Removals and Internet Removals to remove each subsequent post authored by Maini. Payments were made in good faith, but services were not fully rendered as posts continued to appear copied and pasted throughout the Internet due to the Bashing Websites, Removal Websites, and Maini's decision to continue writing libel in an effort to bully Plaintiff into suicide. Soon, the pattern of posting soon escalated to near-catastrophic levels, with new posts appearing daily and weekly, causing Plaintiff not only to attempt suicide multiple times but also to cancel all press publicity for her fashion shows during Paris Fashion Week for both Haute Couture in January and Prêt à Porter in March. Each post cost thousands of dollars to remove, and even after paying for one removal, Guaranteed Removals collaborated with Defendants Parmar, Angileri, Breitenstein, and Schern to continue a pattern of continual posting and thus requests for removal.

8. Based on information and belief, Maini has continued writing libel on various internet platforms, largely because Plaintiff achieved what he could not: a successful business, a new committed relationship, and current standing at a top law school. All feats Maini was unable to achieve due to his addictions to alcohol, gambling, clubbing, and child pornography.

9. When Plaintiff discovered that Guaranteed Removals was behind further re-posting, beyond what Maini did, Plaintiff refused to pay for two additional removals, which were ultimately not removed. Guaranteed Removals, working in concert with material authored by Maini, and the fraudulent company "Internet Reputation" and international felons, were responsible for the re-posting and re-hashing of libellous content about Plaintiff.

10. Plaintiff has spent $4,000 per month in SEO services since April 2019 and thousands of dollars in whack-a-mole removal services using GuaranteedRemovals.com. She contacted Repze.com only to discover that they are an illegitimate extortion scam "company." Further, Plaintiff had to cancel press for four Paris Fashion Week shows, lay off numerous members of her staff, and delay the launch of new products due to the extensive smear campaign initiated by Maini, exacerbated by the Removal Websites, and spread by the Bashing Websites (namely, all other Defendants).

11. Defendant's illegal operation has caused tremendous harm to Plaintiff financially and emotionally and to Plaintiff's fashion and art business. Accordingly, Plaintiff has brought this action and humbly and respectfully requests that the Court bring an end to Defendant's illegal conduct.

## PARTIES

12. Plaintiff Jane Koe, a pseudonym, is a private citizen who resides in Southern Florida when not attending law school. Her principal place of business is also in Southern Florida, where she creates custom couture and private artworks for her image conscious, well-heeled female clientele in the Miami, Coconut Grove, Delray Beach, Palm Beach, and Fisher Island areas. As noted above, Plaintiff is a law student, fine artist, and couturier. She aspires to practice law in Florida after completing her JD, LLM, and MBA degrees and taking the Florida Bar Exam.

13. Defendant Amar Chander Maini aliases Vikram Kumar Mansingh, gallantvk, amarcm4, amarcm_2, and vikramkms, is an individual Australian citizen currently residing in India.

14. Defendant Guaranteed Removals is a Canadian company.

15. Defendant RepZe is a fraudulent LLC based in the United States.

16. Defendant IIRC is a fraudulent LLC based in the United States.

17. Defendant Expert Removals is a fraudulent LLC based in the United States.

18. Defendant Internet Reputation is a fraudulent LLC based in the United States

19. Defendant Internet Removals is an Australian company.

20. Defendant Marca Global, LLC is a Colorado LLC.

21. Defendant Amarutu Technology d/b/a KoDDOS is a Hong Kong limited company.

22. Defendant Minc Law is an Ohio law firm.

23. Defendant Kevin Angileri is an individual resident in Arizona who was recently released from federal prison for possession of child pornography.

24. Defendant Ronald Linco is an individual of unknown residency.

25. Defendant Scott Breitenstein is an individual resident in Ohio.

26. Defendant Arman Ali d/b/a D4 Solutions BD is a company resident in Bangladesh.

27. Defendant Vikram Parmar aliases Matt Hamp and Martin Horan is an individual resident in Bangladesh.

28. Defendant John Does 1 to 15, inclusive, are either individuals or businesses or some combination thereof.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim against Defendants arises under both the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 to 1968 as well as 18 U.S.C.A. § 1964(c) and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, under the doctrine of supplemental jurisdiction.

30. All Defendants named herein are subject to personal jurisdiction in this judicial district because their conduct complained of herein emanates from a conspiracy that is directed, overseen, and driven by the list of Bashing Websites owned by Defendants Scott Breitenstein, Michael Schern, and Kevin Angileri. In addition, personal jurisdiction is appropriate over those Defendants engaged in the mining of personal information from Plaintiff's social media profiles and pageant award websites because, based on information and belief, they sell that content to other websites and mine Florida residents' personal identifying information, thereby expressly aiming or targeting their tortious conduct at Florida and this judicial district. Similarly, the Removal Sites generate "clients" from the

tortious acts of the Extortion Websites which stem from this judicial district and, based on information and belief, remit a portion of their profits back to the Extortion Websites. As such, this Court may exercise personal jurisdiction over all Defendants without offending traditional notions of fair play and substantial justice.

31. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred within this judicial district, substantial injury occurred in this district, and Defendants are otherwise subject to the Court's personal jurisdiction in this district.

32. Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to jurisdiction in this judicial district and do business in this district. Note that 18 U.S.C. § 1965(b) of RICO provides that process may be served in "any judicial district of the United States" when required by the "ends of justice." Courts have held that such "nationwide service of process" provisions also confer personal jurisdiction over a defendant in any judicial district as long as the defendant has minimum contacts with the United States. 18 U.S.C. § 1965(d) allows for process to be served "in any judicial district in which such a person resides, is found, has an agent, or transacts his affairs." As such, Courts have approved nationwide service of process under both 18 U.S.C. § 1965(b) and (d). Refer to *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006). Furthermore, in the case of *Heller v. Deutsche Bank AG*, No. 04-CV-3571, 2005 WL 281181, at *2-3 (E.D. Pa. Feb. 3, 2005), the Court held that even single claim-specific contact is sufficient to confer personal jurisdiction under RICO when the Defendant(s) injure(s) a Plaintiff through activities purposely directed at residents of the forum state and the Defendant(s) do(es) not present a compelling case that such jurisdiction is unreasonable. Finally, see the case of *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-77 (1985).

33. With regard to the fact that some Defendants are located outside the United States, it must be said that RICO and other claims in this suit apply extraterritorially because of the Florida long-arm statute and the fact that the U.S. Congress intends to "eliminate wrongful conduct wherever it occurs." *See United States v. Noriega*, 746 F. Supp. 1506, 1517 (S.D. Fla. 1990), "Given the Act's broad construction and equally broad goal of eliminating the harmful consequences of organized crime, it is apparent that Congress was concerned with the effects and not the locus of racketeering activities." *aff'd*, 117 F.3d 1206 (11th Cir. 1997). Irrespective of the application of the Morrison test post-2010, the Tenth Circuit has ruled that that Foreign Sovereign Immunities Act ("FSIA" confers subject-matter jurisdiction over civil RICO claims against all foreign states, their agencies, and their instrumentalities when the commercial activity exception, or another exception contained in the FSIA, applies. Plaintiff alleges that there is concurrent jurisdiction at play given that 18 U.S.C. § 1964(c) provides in part that "any person injured in his business or property by reason of a violation of § 1962 may sue therefore in any appropriate United States district court." This decision was upheld by the Supreme Court in the case of *Tafflin v. Levitt*, 493 U.S. 455 (1990).

## GENERAL ALLEGATIONS

34. Defendant Maini posted original posts about Plaintiff in July 2017, August 2017, September 2017, November 2018, December 2018, January 2019, February 2019, March 2019, April 2019, May 2019, and October 2019. Based on information and belief, he may have also posted in January 2020.

35. Plaintiff paid Guaranteed Removals to remove the defamatory and libellous posts in January 2019 and February 2019.  Plaintiff also spoke to removal companies RepZe.com, InternetReputation.com, MincLaw.com, 247Removals.com, and ExpertRemovals.com.

36. Shortly after the removal by Guaranteed Removals, new posts that were direct copies of the originally removed posts cropped up with increasing extortion costs.  Based on information and belief, such posts were then distorted and re-copied on a variety of websites by Defendants Maini, Ali, Parmar, Angileri, Linco, Schern, John, Breitenstein, and Matt.  Maini is an aggrieved suitor, con artist, catfish, and sociopath with a long history of abusing women and girls and stealing cash dowries.  The others—Ali, Parmar, Angileri, Linco, Schern, John, Breitenstein, and Matt—are extortionist business owners.

37. Plaintiff then retained Internet Removals for $1,000 to remove additional defamatory and libellous posts.  The company is run by defendant Burns and despite requesting a refund for failure to remove defamatory and libellous posts, no services were rendered.  In fact, new posts ended up appearing *post*-retainer, as early as October 2019.

38. Full screenshots and copies of all posts will be made available in discovery to opposing counsel; that said, date and website post information are available in tabular format below.

| DATE POSTED | WEBSITE | TITLE |
|---|---|---|
| July 22, 2017 | AllSortsofThingsSite.wordpress.com | The [Jane Koe] Story |
| July 23, 2017 | LiarsandCheaters.com | [Jane Koe] Left Me at the Altar |
| December 23, 2017 | CheaterLand.com | [Jane Koe] Runaway Bride Bitch |
| December 27, 2018 | Staytunedformore.blog | The [Jane Koe] Story |
| December 29, 2018 | Staytunedformore.blog | More [Jane Koe] Files |
| January 17, 2019 | LiarsandCheaters.com | [Jane Koe] United States |
| January 17, 2019 | ReportCheatingOnline.com | [Jane Koe] United States |
| January 17, 2019 | BadGirlReports.date | [Jane Koe] United States | Liars and Cheaters |
| January 17, 2019 | ReportCheatingOnline.com | Keep [Jane Koe] at a Safe Distance |
| January 17, 2019 | WTFCheater.com | Keep [Jane Koe] at a Safe Distance |
| January 17, 2019 | BadGirlReports.date | [Jane Koe] United States |
| February 11, 2019 | CheaterReport.com | [Jane Koe] USA |
| February 12, 2019 | CheaterLand.com | [Jane Koe] USA |
| February 21, 2019 | TheDirty.com | Dirty Filthy Skank [Jane Koe] |
| February 22, 2019 | CheaterBoard.com | [Jane Koe] Australia |
| February 22, 2019 | ExposingCheatingWife.com | [Jane Koe] Australia |
| February 22, 2019 | ReportAffairs.com | [Jane Koe] Australia |
| February 22, 2019 | WTFCheaters.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatersOnline.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterBlock.com | [Jane Koe] Australia |
| February 22, 2019 | DontDateACheater.com | [Jane Koe] Australia |
| February 22, 2019 | HeyHobo.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterHoe.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterExpose.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterRant.com | [Jane Koe] Australia |
| February 22, 2019 | WikiCheater.com | [Jane Koe] Australia |
| February 22, 2019 | InternetCheater.com | [Jane Koe] Australia |
| February 22, 2019 | VerifyCheater.com | [Jane Koe] Australia |
| February 22, 2019 | ExposeCheatingOnline.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterBot.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterList.com | [Jane Koe] Australia |

| February 22, 2019 | VerifyCheater.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterCase.com | [Jane Koe] Australia |
| February 22, 2019 | BadGirlReports.date | [Jane Koe] Australia – Cheater Board |
| February 22, 2019 | BadGirlReports.date | [Jane Koe] Australia – Report Cheating Wife |
| February 22, 2019 | InternetCheaters.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheater.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatingOnline.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatingWife.com | [Jane Koe] Australia |
| February 22, 2019 | ExposeCheatersOnline.com | [Jane Koe] Australia |
| February 22, 2019 | WTFCheater.com | [Jane Koe] Australia |
| February 22, 2019 | CheatandLie.com | [Jane Koe] Australia |
| February 22, 2019 | CheatersCaughtOnline.com | [Jane Koe] Australia |
| March 12, 2019 | LiarsandCheaters.com | [Jane Koe] USA |
| March 12, 2019 | PostCheatersPictures.com | [Jane Koe] USA |
| March 12, 2019 | WTFCheater.com | [Jane Koe] USA |
| March 12, 2019 | ReportCheatingWife.com | [Jane Koe] USA |
| March 12, 2019 | ReportCheatingOnline.com | [Jane Koe] USA |
| March 12, 2019 | InfidelityWebsite.com | [Jane Koe] USA |
| March 12, 2019 | BadGirlReports.date | [Jane Koe] United States Report Cheating Wife |
| March 12, 2019 | BadGirlReports.date | [Jane Koe], USA \| Liars and Cheaters |
| March 16, 2019 | CheaterXposed.us | Dirty Filthy Skank [Jane Koe] |
| April 13, 2019 | DatingComplaints.co | [Jane Koe] is a Dirty Filthy Skank |
| May 23, 2019 | ExposeCheaters.Online | Dirty Filthy Skank [Jane Koe] |

39. Defendant Maini and his extortionist co-conspirators have used the false names "Kat," "Jo," "Eki," "Anonymous," and "Sam" to make libellous and defamatory comments about Plaintiff. All comments will be available to counsel in discovery. Plaintiff intends to subpoena all websites where comments appear to discover the IP addresses of such posters writing on February 11, 2019, March 2, 2019, April 4, 2019, June 13, 2019, and November 30, 2019.

40. Plaintiff has sent Maini over 35 requests to "Cease and Desist," and has filed for restraining orders in Australia, New York, and Florida. Despite this, Maini continues posting libel about Plaintiff. Based on information and belief, Maini is determined to affect Plaintiff's ability to marry another suitor who is far richer, smarter, more virtuous, and more accomplished than he is. Based on information and belief, it seems Maini cannot move on in a healthy way; he remains unsuccessful.

41. Based on information and belief, Defendants' use one of the following three tactics to obtain personal identifying information or even false and libellous personal identifying information:

    a. Maini, a vexatious individual operating out of malicious disregard for the truth, posts libel on a number of his blogs and a variety of gripe websites that are then either "scraped" by additional Defendants to paste onto their own websites or "scraped" by Ali d/b/a D4 Solutions BD and copied and pasted onto other gripe websites.

    b. Some Defendants summarize libellous statements made by an aggrieved suitor on one or two websites and then copy and paste them on dozens and dozens of other websites.

    c. Some Defendants join LinkedIn.com and pose as legitimate members for the purpose of gathering personal identifying information, including members' websites, business pages, awards, photos, email addresses, phone numbers, and locations. For example, a Defendant may join LinkedIn.com and pose as a legitimate businessperson seeking

to connect with Plaintiff and then entice Plaintiff to provide certain personal identifying information. Defendant Vikram Parmar alias Martin Horan maintains a fake LinkedIn profile for expressly this purpose: to prey on successful, ethical students and professional to extort them.

42. Based on information and belief, the Bashing Scam essentially works as follows:

    a. After obtaining the personal identifying information or malicious libellous information, it is then posted to the Bashing Websites where Plaintiff has continued to be defamed and victimized by Defendants' ruse.

    b. Victims, including Plaintiff, are then referred to the Removal Sites where they are told that each individual posting can be removed for a fee, which generally ranges from $1,500 to $15,000. Such high extortive removal costs can quickly become prohibitive for a self-supported law student and creative young professional just beginning their career.

    c. As explained below, Plaintiff has also received harassing emails advising her that her information has been posted on the Bashing Websites and sometimes receive threats that the postings will be more widely disseminated on mainstream social media and on further Bashing Websites should she choose not to pay the Removal Sites to remove the postings. These emails have been sent in conjunction with a number of harassing phone calls to both Plaintiff and her mother.

43. Based on information and belief, the Communications Decency Act of 1996 ("CDA") provides no protection for Bashing Websites, Removal Websites, and the original poster of libellous content, Maini.

44. In spite of this, the Bashing Websites and the Removal Websites in question list the Communications Decency Act of 1996 ("CDA") as providing immunity from extortion for charging fees for the removal of any content. Again, the CDA does not provide any protection to the Defendants in this complaint.

45. Because the Bashing Websites manufacture and/or solicit all content, the CDA neither protects the content nor the communications, extortion threats, and request for money to take down extortive content for which it remains liable both directly and indirectly.

46. The CDA only offers protection to those websites who do not solicit or provide content, with the understanding that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" with the citation of 47 U.S.C. § 230(c)(1). According to 47 U.S.C. § 230(f)(3), an 'information content provider' is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." That is, 'information content providers' are not immunized by the CDA, with a further citation of 47 U.S.C. § 230(f)(3). More specifically, the visible extortive content on the Bashing Websites and the related communications and extortive acts in which Removal Websites engage, are exactly the type that remain fully excluded from CDA protection.

47. Websites soliciting unlawful content are excluded from CDA immunity. The Removal Websites and the Bashing Websites are both considered "information content providers" outside of CDA immunity because they collected information about Plaintiff (and countless other victims) and posted that information alongside multiple malicious defamatory accusations about Plaintiff and stole a copyrighted pageant headshot photograph. Furthermore, the Bashing Websites then copied and pasted the entire defamatory post and

pageant headshot photograph despite being notified that (a) the content is entirely defamatory and (b) a full and complete DMCA takedown notice for the pageant photograph was provided in full.

48. After Plaintiff refused to continue paying for whack-a-mole removals, the Bashing Websites, the Removal Websites, and Defendant Maini conspired to continue creating and/or soliciting unlawful content for the purpose of extorting Plaintiff and her parents. The situation heightened to the point Plaintiff attempted suicide multiple times and had to delay her final exams, take off a term from school due to worsening physical stress symptoms, and thus delay her law school graduation date by one year. These are facts all Defendants are fully aware of.

49. The Bashing Websites and Removal Websites are "information content providers" outside of CDA immunity as they collected extensive information about and pageant photographs of Plaintiff and posted *false* information about Plaintiff drawing from *defamatory per se* and *defamatory* posts with malicious intent originally created by Defendant Maini in retaliation for her rejecting his marriage offer, finding a more successful and ethical suitor, rebuilding her self-esteem, gaining her self-confidence after his extensive physical, verbal and emotional abuse, and earning admission into the law school of her choice.

50. It is apparent that Defendants Kevin Angileri, Scott Breitenstein, Michael Schern, GuaranteedRemovals, RepZe, InternetReputation, Vikram Parmar, and ExpertRemovals all played an important part in the reposting and spreading of this malicious libel originally posted by Defendant Maini and none retain any CDA immunity.

51. The Defendants who created and/or solicited unlawful content for the purpose of extorting Plaintiff, those participants are "information content providers" within the meaning of U.S.C. § 230(f)(3) and are not immunized from liability for the contents of those posts by the CDA. *See* 47 U.S.C. § 230(f)(3). The Bashing Websites and the Removal Websites are liable for their conduct as a conspirator with knowledge of the relevant portions of this blatant extortion scheme.

52. This extortion scheme meets the definition for **civil RICO** violations. To satisfy the necessary elements common to all RICO violations, Plaintiff will prove that all Bashing Websites and Removal Websites are: (a) a culpable person, who (b) conducts or acquires an "enterprise" (c) affecting interstate commerce (d) through a "pattern" (e) of "racketeering activity." In addition, a civil RICO plaintiff must show injury "by reason of" the RICO violation, which Plaintiff has already established above in terms of removal costs, SEO costs, missed opportunities in business, and more in the causes of action sections. In terms of definitions:

   a. An examination of § 1962(a), (b), or (c), as well as § 1961(3) of RICO defines a "**person**" as an "entity capable of holding a legal or beneficial interest in property." The Second Circuit has maintained that an organized crime "family" is not a "person" subject to § 1964(a) or (c), though acknowledges that it could be an association-in-fact enterprise used by a culpable person to commit racketeering. The Court has concluded that illegal organizations do not satisfy the statutory definition of a culpable "person," because it is not capable of holding an interest in property, while also acknowledging that an unincorporated association may be a RICO "person." See the cases *Jund v. Town of Hempstead*, 941 F.2d 1271, 1282 (2d Cir. 1991) (unincorporated political associations) and *Bank of N. Ill. v. Nugent*, 584 N.E.2d 948 (Ill. App. Ct. 1991) (an estate, through its executor, may be a "person" under RICO). That is, in cases arising under § 1962(c), the culpable person must be separate from the enterprise.

Plaintiff clearly is demonstrating below that the culpable individuals behind these websites are separate from the overall extortion scheme of Bashing Websites and Removal Websites.

b. With regards to the **mental state** of each Defendant, it is clear that RICO is predicated on criminal conduct and it is necessary to establish that each defendant intended to engage in the conduct with actual knowledge of the illegal activities. The mail and wire fraud extortion scheme is an *intent to defraud*. The Defendants in question intended to obtain money by means of materially false and fraudulent pretenses and representations. The recklessness with which both Bashing Websites and Removal Websites operates shows that the misleading was "so obvious that the actor must have been aware of it." There is no argument any Defendant can make for lack of knowledge, as both the Bashing Websites and the Removal Websites profit off of the removal fees.

c. With regards to the definition of **enterprise**, RICO defines enterprise as "any individual, partnership, corporation, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Courts have interpreted the term "enterprise" very broadly, and Plaintiff asserts that the Bashing Websites and Removal websites meet the definition of an association-in-fact-enterprise. In the seminal case *United States v. Bledsoe*, the Eighth Circuit held that an association-in-fact enterprise must exhibit three characteristics: (a) a common or shared purpose among its members; (b) some continuity of structure and personnel; and (c) an ascertainable structure distinct from that inherent in the pattern of racketeering. See here: 18 U.S.C.A. § 1961(4); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009), holding that "a group of individuals, corporations, and partnerships associated in fact can qualify as a RICO 'enterprise,' even though section 1961(4) nowhere expressly mentions this type of association."

d. In terms of **interstate commerce**, RICO requirements are satisfied if either the activity of the enterprise or the predicate acts of racketeering affect interstate commerce. The Bashing Websites and the Removal Websites are located in different states, and run by Defendants in different states, which sufficiently pleads the requirement for the nexus with interstate commerce required by RICO.

e. A **pattern of racketeering** has been established as outlined and defined in § 1961(5). Specifically, "at least two acts of racketeering activity…the last of which occurred within 10 years after the commission of a prior act of racketeering activity." The acts of posting on Bashing Websites and then requiring Plaintiff (and thousands of other victims) were related and continuous. "Related" defined means that "acts have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events." Bashing Site posting and then Removal Site de-posting meets the definition standard for "related." Further, continuity is demonstrated here via the close-ended scheme, consisting of a series of related predicate acts extending over a substantial period of time: the Removal Sites pay the Bashing Sites advertising fees to advertise services and charge removal fees to Plaintiff (and countless victims) to remove posts.

f. **Racketeering activity** is defined as any number of Florida state and US federal offenses enumerated in § 1961(1). Plaintiff alleges that wire fraud has occurred, with regard to the Removal Sites reposting defamatory and libellous content originally authored by Maini and then the Bashing Sites participating in the posting and reposting. This endless whack-a-mole cycle of wire fraud led to Plaintiff spending thousands of dollars in removal fees, only for a reposting. Plaintiff is aware of the requirements of Rule 9(b) in the Federal Rules of Civil

Procedure to specifcy the time, place, and content of all wire communication and the need to identify all parties to the communications. Plaintiff will release all receipts to opposing counsel during discovery, deposition, and trial. Due to the sake of protecting her privacy as her legal name appears on invoices and credit card statements, Plaintiff is not listing dates and receipt amounts in this complaint itself.

g. RICO standing requirements include a four-factor test: the Plaintiff must be (1) a "person" (2) who sustains **injury** (3) to his or her "business or property" (4) "by reason of" Defendants' violation of § 1962. Plaintiff is a "person" who has sustained severe injury to her business by the reason of Defendants' violation of § 1962. Plaintiff will elaborate on the injuries suffered in the relevant Causes of Action sections.

    *i.* Injury under § 1962(c) stems from the predicate acts.

    *ii.* Injury under § 1962(a) stems from the investment of racketeering income.

    *iii.* Injury under § 1962(b) stems from the acquisition of an interest on or control over an enterprise.

    *iv.* Injury under § 1962(d) stems from the overt acts committed in furtherance of the conspiracy.

h. Plaintiff is filing within the four-year **statute of limitations**.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION
*Against Amar Chander Maini*

53. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

54. To state a cause of action for fraudulent misrepresentation, Plaintiff will prove the following five elements: (a) a misrepresentation of a material fact; (b) which the person making the misrepresentation [Maini] knew to be false; (c) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (d) that the person relied on the misrepresentation to her detriment; and (e) that this reliance caused damages. Refer to *Standard Jury Instructions—Civil Cases (No. 99-2)*, 777 So.2d 378, 381 (Fla. 2000), *Standard Jury Instructions—Civil Cases (1.0, 6.1d, MI8)*, 613 So.2d 1316, 1317 (Fla. 1993), *American International Land Corp. v. Hanna*, 323 So.2d 567, 569 (Fla. 1975), and *Huffstetler v. Our Home Life Ins. Co.*, 65 So. 1 (Fla. 1914).

55. Plaintiff is a traditionally minded and family focused abstinent virgin of Indian origin who applied to a variety of professional matchmaking agencies starting at age 20 to find a suitable match from her caste and subcaste. After being told she was too young to marry and to wait until after graduation by over eight elite agencies, she waited until graduation and then immediately chose to sign on with Jasbina Ahluwalia, a "modern" arranged marriage matchmaker also of Indian origin. Plaintiff paid a fee of $2,500 to retain assistance with finding and growing a relationship with an Indian suitor in her caste and subcaste. Under the guidance of Ms. Ahluwalia, who is also an attorney, and her mother, plaintiff set up Indian matrimonial pages on Shaadi.com, ChristianMingle.com, OKCupid.com, and Match.com. Profiles were managed on a daily basis by plaintiff's mother, who oversaw all messages from suitors and passed on all pre-approved candidates to plaintiff. Plaintiff was in charge of

writing message responses, but any and all meets (the Indian term for "dates") were required to be pre-approved by plaintiff's mother and included both phone interview and email interview screeners. Plaintiff's father, a highly respected physician, also participated in the screening process and oversaw both dowry questions and issued final approval to any suitor(s) to pursue courtship.

56. On his profile page using the screennames "GallantVK," and "VikramKMS," Maini misrepresented his name, age, family background, life story, work history, profession, education, licensure, relationship history, prior engagement, financial status, and dowry requirements. He claimed to be an age 28 investment banker at UBS named Vikram Kumar Mansingh who completed an MBA in Finance at London Business School and had certification in Psychotherapy and Medicine from University of London. He was actually an age 37 unemployed former marketing assistant with an MA in History and a BSc in Economics. He never worked in investment banking and has no professional certifications in either psychotherapy or medicine. The University of London International Division does not even offer degrees in psychotherapy or medicine. Suffice it to say, Maini has no qualifications to practice psychotherapy or medicine, and is certainly not licensed to provide diagnostic or therapeutic services.

57. Plaintiff was under the impression that she was developing a relationship with an upstanding member of her caste and subcaste from the right astrological and numerological background. Her and her family were blindsided by the repeated fraudulent misrepresentations Maini presented about himself in order to obtain a substantial dowry of cash and gold as well as a US citizenship green card from Plaintiff and her family. In the cases *Arlington Pebble Creek, LLC v. Campus Edge Condo Ass'n,* 232 So.3d 502, 505 (Fla 1st DCA 2017), *Howard v. Murray,* 184 So.3d 155, n. 22 (Fla. 1st DCA 2015), Cohen v. Corbitt, 135 So.3d 527, 529 (Fla. 1st DCA 2014), *Connecticut Gen. Life Ins. Co. v. Jones,* 764 So.2d 677, 682 (Fla.1st DCA 2000), and *State of Florida, Department of Transportation v. Southern Bell Telephone and Telegraph Company, Inc.,* 635 So.2d 74, 78 (Fla. 1st DCA 1994), the Court has upheld the definition of fraudulent misrepresentation. That is, "Moreover, under certain circumstances, concealment or nondisclosure of a material fact may also form a basis for a claim in misrepresentation." Maini failed to disclose and in fact concealed his true identity in order to defraud Plaintiff and her family of both American citizenship and a dowry.

58. Maini is a pathological liar, 'catfish,' and con artist who duped Plaintiff into a relationship on false pretenses using the fake identity of an age 28 UBS investment banking analyst when he was really an age 37 unemployed former marketing assistant working at a no-name company.

   a. A screenshot of his OKCupid profile where he is blatantly lying about his name, age, profession, relationship status, and log in information is available in Exhibit A.

   b. A screenshot of his Plenty of Fish profile with username "gallantvk" where he is blatantly lying about his name, age, profession, relationship status, and log in information, obtained on the day of Plaintiff's 17-hour nerve damage surgery is available in Exhibit B. Plaintiff and Maini were exclusive from March 15, 2016 with a wedding date set for February 25, 2017. Plaintiff was receiving emergency reconstructive jaw surgery on May 1, 2 and 3 with famous Beverley Hills reconstructive surgeon Dr. Charles Lee, MD, in order to fix both nerve damage and tissue necrosis in her face following medical and dental malpractice. During this time, Maini continued pursuing other women despite writing Plaintiff love letters prior to using dating applications. Note that Maini sent Plaintiff a love letter at 5:32

AM and by 9:59 PM, he was on a dating app, after making multiple comments about how his intentions included a traditional, monogamous Indian arranged marriage.

    c. A screenshot of his Shaadi.com profile taken 26 August 2016 where he is posing as a medical doctor when he is not a medical doctor is available in Exhibit C. He remains an unemployed former marketing assistant.

    d. A screenshot of Maini's introduction to Plaintiff's family with the name Vikram is available in Exhibit D.

    e. A screenshot of Maini's fake social media profiles utilizing the names Vikram Kumar Mansingh, Vikram KMS, AmarCM4, AmarCM_2, and GallantVK are attached in Exhibit E.

    f. The pair had announced their engagement on November 1, 2016, with Maini proposing to Plaintiff after viewing *My Fair Lady* at the Sydney Opera House and promptly planned a wedding date of February 25, 2017. A screenshot and photos from the day—blurring out Plaintiff's identity—are provided in Exhibit F.

    g. The pair were in a supposedly committed and exclusive relationship from February 2016 to February 2017. During this time, they exchanged thousands of messages on Skype, all of which are available in unedited form to opposing counsel. Copies of his username pages are available in Exhibit G.

    h. Audio and video recordings of Maini engaging in illegal, nefarious activities and discussing his delusions of grandeur as a future politician in the Bharatiya Janata Party are available via permanent download links to opposing counsel. All of these files are available via MP3 and MP4 download.

59. Most disturbingly, Maini presented himself as a "savior and healer" to Plaintiff, touting his fake credentials as a supposed physician and psychotherapist. He spent hours daily "diagnosing" Plaintiff with random medical conditions and then began a course of action known as Dialectical Behavior Therapy, when he is not licensed in medicine or psychotherapy. Maini used a series of mind control tricks to hypnotize and manipulate Plaintiff into revealing her innermost fears and secrets and then ridiculed her for sharing said information. This caused severe damage with which Plaintiff has had to spend years coming to terms in therapy with an actual therapist and in spirituality in her Church community.

60. Upon Plaintiff opening up and confiding in Maini, he then began a vicious campaign to exacerbate her already fragile emotional state by gaslighting her and her family by claiming he cheated due to being an international spy working for the Indian government. It took Plaintiff and her father—a very traditional Indian head of household—over 6 months to find a private investigator to reveal that he is not an Indian citizen, and therefore is ineligible for any governmental or spy related services.

61. To be clear, Maini misrepresented his identity, which is a material fact, and knew it was false, knew it would cause Plaintiff's family to give permission to permit courtship, and knew it would cause Plaintiff's father to deliver an all-cash dowry. As if this were not enough, Maini also misrepresented his psychotherapy and medical credentials, causing near-permanent self esteem to Plaintiff who never had issues with suicidal ideation prior to meeting him. Maini repeatedly used his position as the older individual in the relationship to pressure Plaintiff into life-threatening surgical treatments that nearly disfigured her and to engage in mind control tactics. This damage caused over $187,000 in revision medical expenses with permanent nerve damage in Plaintiff's jaws, in addition to over $1,500,000 in cash dowry plus $500,000 in gold bricks, customary gifts in traditional arranged marriage.

62. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Five Hundred Thousand Dollars ($500,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional, mental, and physical well-being, and the foreseeable impact his conduct would have on Plaintiff's health and well-being in the future. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## SECOND CAUSE OF ACTION
## DEFAMATION
### *Against Amar Chander Maini*

63. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

64. To state a cause of action for defamation Plaintiff will prove the following five elements: (a) publication; (b) falsity; (c) actor must act with knowledge or reckless disregard as to the falsity or at least negligently on a matter concerning a private person; (d) actual damages; and (e) statements must be defamatory. Refer to the cases *Jew For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008) and *Cooper v. Miami Herald*, 31 So.2d 382, 384 (Fla. 1947).

65. To state a cause of action for libel, Plaintiff, a private person, will prove that the publication meets the following three elements: (a) false and defamatory statements of and concerning a private person, (b) without reasonable care as to the truth or falsity of those statements, and (c) resulting in actual damage to that private person. Refer to the cases *Hay v. Independent Newspapers, Inc.*, 450 So.2d 293, 295 (Fla. 2d DCA 1984), *Bass v. Rivera*, 826 So.2d 534, 535 (Fla. 2d DCA 2002), and *Tribune Company v. Levin*, 426 So.2d 45, 46 (Fla. 2d DCA 1982), *affirmed*, 458 So.2d 243 (Fla. 1984).

66. Plaintiff is a private figure. Though she has received limited media attention due to her work and academic accomplishments, she is still a private figure. Nevertheless, the cause of action demonstrates actual malice as it shows the publications by Maini were made with knowledge that it was false and with reckless disregard of whether it was false or not. Refer to the cases *Hoch v. Rissman, Weisberg, Barrett*, 742 So.2d 451, 460 (Fla. 5th DCA 1999), *rev. denied*, 760 So.2d 948 (Fla. 2000). *See also Mile Marker, Inc. v. Petersen Publishing, L.L.C.*, 811 So.2d 841, 845 (Fla. 4th DCA 2002); *Dockery v. Flor- ida Democratic Party*, 799 So.2d 291, 294 (Fla. 2d DCA 2001); *Scholz v. RDV Sports, Inc.*, 710 So.2d 618, 626 (Fla. 5th DCA 1998), *rev. denied*, 718 So.2d 170 (Fla. 1998).

67. The offending defamatory and libellous conduct began in February of 2016, when parties met, continued after engagement in November of 2016, and continued even after Plaintiff broke off the engagement in January of 2017. After a mere eleven-month relationship, defendant Maini has continued harassing, cyberstalking, and stalking Plaintiff and her family for over two and a half years. Plaintiff was unwilling to reconcile after coming to terms with Maini's misrepresentation of himself and his background alongside his frightening levels of violence including but not limited to regular beatings with belts and strangulation and polarizing mental instability with screaming matches in restaurants. Not long after, Plaintiff and her family discovered that he had been abusing illicit drugs ranging from cocaine to mushrooms, continuing to binge drink alcohol despite going to alcohol rehabilitation for over four years, continuing to use fake identification and several aliases to solicit sex from minors and prostitutes, and he had been exploiting women across the world for sport and sexual gratification throughout the relationship and the engagement. His methods of recruitment

involved using various online dating apps, in person shopping mall pickups, and in person university student pickups whenever Plaintiff was out of town presenting her academic research at conferences.

68. Since Plaintiff's decision to part ways with Defendant Maini in January of 2017, Maini has engaged in a deliberate campaign to destroy Plaintiff by spreading countless rumors, lies, and other falsities to members of Plaintiff's social and professional circles, as well as to people on the Internet who Plaintiff does not know. Maini has also hacked her email, Facebook, Instagram, and Twitter accounts on numerous occasions and attempted to sabotage Plaintiff's professional and academic career out of jealousy.

69. Maini is a misogynist with a deep hatred of women who has utilized multiple SIM cards to juggle his many side women, most of whom were married with children and few of whom were single. All such side women were pursued behind Plaintiff's back when Plaintiff and Maini were engaged to be married via traditional Indian arranged marriage matchmaking. Plaintiff was always faithful to Maini, but that same courtesy was not returned with Maini regularly chasing a former stripper in his economics program alongside dozens of uneducated waitresses and about seven different married women, one of whom was pregnant. Maini also had a prolonged affair with his flatmate, an uneducated Thai waitress who regularly undressed in front of him. Though Maini respected Plaintiff's abstinent virginity, he told her on more than one occasion, "I have needs you're not going to fulfill and there are girls happy to meet my needs in ways you refuse to." Maini continued with this line of reasoning even when Plaintiff reported him to all elders in the situation, including her parents and his parents. Some action was taken after reporting Maini to his mother, but no improvement steps were made.

70. Maini is a pedophile who watched about fifty hours of pornography per week, spanning hardcore child pornography of underaged girls, hentai pornography of underaged Japanese girls, and extensive pornography of Korean girls. The predominant search interests on Maini's laptop include the key terms "under age 10," "preteen," "braces," "toddler sex," "toddler spanking sex," "toddler corporal punishment," and "rough toddler sex."

71. In all cases Maini acted alone, to commit the following illicit and libellous postings in furtherance of his scheme to defame Plaintiff and to destroy her reputation:

    a. Publicized false accusations that Plaintiff was verbally and emotionally abusive to him, and that she was guilty of repeated "bar hopping." Plaintiff does not and has never imbibed alcohol due to her religious beliefs, does not attend bars, and is an abstinent virgin. The only person Plaintiff has ever kissed is Maini, and that was only after he announced his intentions to marry.

    b. Publicized false accusations that Plaintiff was guilty of a "white fetish" and "cheating with so many men he lost count." Plaintiff is an abstinent virgin with no fetishes, no experience "dating" white men, and has made a commitment to save herself for marriage from age 11. In reality, Defendant Maini cheated on Plaintiff repeatedly when she was hospitalized for nerve damage and throughout their engagement, most notably with one of his economics classmates. Plaintiff has been so traumatized by this experience that she has rejected countless arranged marriage offers since then.

    c. Publicized false accusations that Plaintiff "has a colorful history with gigolos" when Plaintiff is an abstinent virgin and has never struggled attracting genuine male attention.

    d.  Created imposter social media accounts to harass and intimidate Plaintiff, and also as a platform to disseminate falsehoods about Plaintiff to affect her ability to earn admission into academic fellowship programs.

    e.  Impersonated Plaintiff on Twitter, Facebook, Instagram, LinkedIn, SnapChat social media profiles using her likeness and personal information.

    f.  Impersonated Plaintiff on multiple female-seeking-transsexual dating sites using her likeness and personal information, including but not limited to her phone number and a demand for visitors to "get jiggy with it"—a phrase Plaintiff would never use.

    g.  Harassed plaintiff's family members, friends, business contacts, couture clients, artwork clients, and others.

    h.  Widely disseminated embarrassing childhood photos of Plaintiff without her consent to members of his pedophilia social circles, seeking to solicit "scaled 1 to 10 ratings" of Plaintiff's photographs taken from ages 3 to 12. Maini had an image of Plaintiff at age 3 set as his screensaver and as a blow-up image, ostensibly used for sexual fantasy purposes;

    i.  Interfered with Plaintiff's existing and prospective business relationships with the intent of impacting her livelihood and destroying her professional reputation;

    j.  Used extortion tactics to coerce Plaintiff and her family to pay a ransom on top of the existing their lump sum dowry payment which was not returned—considered a cultural transgression and a severe moral 'crime' in the traditional Hindu community.

    k.  Maini knowingly manipulated facts, lied, distorted reality when he made accusations of fraud against the Plaintiff in various Basher Websites between July 2017 to May 2019, calling her a range of names and accusing her of misconduct in academic, professional, and personal settings. Maini is a noted con artist who not only stole Plaintiff's dowry, but also stole the dowries of multiple other eligible young Indian women in the arranged marriage community. Maini, who regularly misrepresents his age as younger than he is to pursue much younger and much more attractive women, has a habit of pathological lying and obfuscating reality.

    l.  His delusions of grandeur of pursuing political office coupled with his insistence on belittling and degrading Plaintiff, who was a supportive partner to him, on a nearly daily basis led to Maini's creation of a fake Craigslist posting soliciting transsexual visitors to contact Plaintiff via text message. Maini posted Plaintiff's personal cell phone number and email address to an untold number of transsexual (male-to-female and female-to-male) visitors, in an effort to paint Plaintiff as someone interested in marrying a transsexual to the broader Indian community. This was done in large part to affect Plaintiff's arranged marriage prospects. In fact, the damage was so severe that Plaintiff and her family had to employ two Western arranged matchmaking company to continue fielding offers from eligible suitors empathetic to the incredibly distressing situation. Prior to this, Plaintiff was seen as the most desirable catch in the arranged marriage marketplace, with marriage offers from prominent Indian medical and business families around the world.

72.  Maini sent multiple harassing emails to Plaintiff's diabetic parents stating clearly that he would continue posting libel.

    a.  A copy of the exact text Defendant Maini used to harass and intimidate her parents on July 20, 2017, is posted below.

> *I am...giving you...a chance to handle this yourselves, before this situation gets out of control. Please take this opportunity. I am sure you do not want to have to deal with this type of thing day after day, week after week, month after month in the years to come. ... I can guarantee you that*

> *I will absolutely never post anything about [Koe] or her family online. That would be terrible. I will have nothing to do with it. Any action I take would be through official legal channels. However, there are so many people out there named "Anonymous". And these people named "Anonymous" are such unpredictable folks, you never know what they are going to do or say next. Every time there is an "Anonymous" post about me, there could be a similar post by "Anonymous" about [Koe] and her family. Nobody wants to see that happen. Things would spiral out of control, all hell would break loose.  Lawyers will not solve this issue. The internet is a lawless place.*

    b.  A copy of the exact text Defendant Maini used to harass and intimidate her father on January 24, 2019, after cybersmearing her and her family is posted below.  Upon receiving no response to this email, Maini proceeded to call Plaintiff's parents "child abusers."  Further, he called Plaintiff an "emancipated minor" who had a "sad childhood" where she experienced "difficult times at Country Day" on countless Bashing Websites.  Plaintiff was never an emancipated minor and transferred her legal guardianship with parental permission due to intensive bullying and cover-up activities that went on at the prep school in which she was enrolled.  This is an invasion of Plaintiff's right to privacy.  Intimidation is a crime.  Maini currently faces criminal charges for cyberstalking and intimidation due partly to his behavior and partly to this email below:

> *I would like to check with you before I proceed. Are you aware of, and do you support your daughter's legal action against me? If you do support it, that is fine, just let me know. I will file a cross claim in court next week. However, you should be aware that you, Mrs [Koe] and Horst will also be named and included in the cross claim. In addition, of course, your daughter's stories will be put to the test in an open court, and her life and times will become a permanent legal record, and I will also get to have my say. More importantly, I will also press homicide charges against your daughter for her role in the death of my father. You are the elder person in this situation and have the wisdom of many years of experience. I am sure that you have worked hard for everything that you have. I am making one more attempt to reach out to you to settle this matter between ourselves before the situation spirals out of control. ... Despite the fact that you and Mrs [Koe] have been rude to me, I still do not want to see your family ruined or humiliated in public on a global stage. It is not too late to settle the matter amongst ourselves.*

73. Maini first began placing Plaintiff's name on Bashing Websites in July 2017.  To address the libel in all such posts which will be made available in full form to opposing counsel in discovery:

    a.  Maini accused Plaintiff of using a false name, when she changed her name legally from in Portland, Oregon in June 2017.  Maini accused Plaintiff of "going by" the name that is her true, legal name.

    b.  Maini accused Plaintiff of "stalking a rapist."  The person Maini is referring to is Mr. McLeod, who is a personal friend of Plaintiff.  Plaintiff was friends with Mr. McLeod for many years.  After Mr. McLeod was falsely accused of rape at his university and unable to obtain his diploma, Plaintiff helped him with fundraising efforts for his nonprofit microlending organization Bunya Microfinance by personally donating to his cause and organizing a crowdfunding campaign.  When Plaintiff was in Sydney conducting groundbreaking medical research that has received patent pending status and is now in phase

1 clinical trials in both the United States and the United Kingdom, Mr. McLeod asked Plaintiff to "coffee" and "a bite to eat" on multiple occasions, which Plaintiff declined respectfully solely due to her existing commitment to Maini. Mr. McLeod also asked Plaintiff to dance at a mutual friend's birthday party, which she respectfully declined out of respect for her existing commitment to Maini.

c. Maini is the only person with whom Plaintiff has ever French kissed. On one occasion, after eating too much candy, Plaintiff accidentally said Mr. McLeod's name when Maini asked Plaintiff about who she defines as a "hot guy" in film and daily life as part of a dinner game. The innocuous comment, made entirely in jest, was not meant in any way as a slight to Maini. This comment led to Maini constantly accusing Plaintiff of cheating with Mr. McLeod—when the entirety of their friendship was online, and the fullest extent of their in person conversation was maybe 15 minutes—and then Maini escalated a pattern of disturbing stalking behavior of both Plaintiff and Mr. McLeod. Maini began using geo-location trackers on Plaintiff's cell phone and accusing Plaintiff of 'cheating' on him and of 'having a white fetish.' Furthermore, Maini also stalked, physically assaulted, and verbally threatened Mr. McLeod on security camera, accusing him of "going after" Plaintiff, when this never occurred. Mr. McLeod and Plaintiff were just friends and did not remain in any kind of contact after Plaintiff entered into a relationship with Maini. In fact, Mr. McLeod entered into a bisexual relationship not long after Plaintiff rebuffed his advances. Under no circumstances did Plaintiff ever have any kind of relationship with Mr. McLeod, and under no circumstances has Plaintiff ever had a fetish, let alone for white men. She is a complete abstinent virgin who does not have any fetishes. However, Maini has a strong fetish for underaged prepubescent girls between ages 2 to 11 as well as East Asian and Mediterranean women.

d. Maini accused Plaintiff of "moving next to the [residential] college" next to Mr. McLeod. Plaintiff was never enrolled in any academic coursework at any universities in Australia. She was in Australia on a temporary visitor visa, due to her scientific research commitments which have resulted in a medical supplement for patients with a rare disease that has already received patent pending status and has entered Phase 1 clinical trials. By contrast, Mr. McLeod was a full-time student in the law school, and by all accounts seemed happy to be pursuing a bisexual way of life with his committed male and female partners.

e. Maini accused Plaintiff of "contract cheating" and hiring men to "write her college essays and exams" when Plaintiff has always done her own work and graduated at the top of her academic class. This attack on Plaintiff's integrity comes after Maini has duped, cheated, and stolen millions of dowry dollars from highly eligible young Indian women and paid for *his* academic work on an outsource basis. Maini struggles with spelling, grammar, and punctuation, and is unable to use spell-check effectively in his libellous posts.

f. Maini accused Plaintiff of "flunking out of Georgetown" when Plaintiff is currently earning an LLM in international taxation law from Georgetown University Law Center. To the best of her knowledge, she has never "flunked out" of any institution of higher learning, though Maini has struggled academically and professionally for the entirety of his life.

g. Maini accused Plaintiff of receiving "plastic surgery," when Plaintiff has only received jaw surgery, reconstructive jaw surgery, and reconstructive nerve damage surgery, all of which she obtained due to verbal abuse and pressure from Maini. On a daily basis, Maini spent hours criticizing Plaintiff's appearance, particularly her jaw and chin and comparing her unfavorably to Bollywood actress Kareena Kapoor who has a strong chin and jawline. Maini

told Plaintiff to get jaw surgery to look more like Kareena Kapoor.  Plaintiff did not want to undergo a dangerous surgery and so agreed to jaw angle silastic implants and a sliding genioplasty surgery to give the Kareena Kapoor effect.  Unfortunately, there were issues with the silastic implants and the genioplasty was medical malpractice, so Plaintiff had them removed and reversed, respectively.

h.  Maini accused Plaintiff of not taking medical malpractice legal action against her jaw surgeon, when she filed a medical malpractice complaint against the surgeon in April of 2018 and has been running discovery and deposition strategy for the case in addition to her rigorous law school academic course-load.

i.  Maini accused Plaintiff of attending a host of universities she never attended as a student, but instead as a middle school and high school student going to summer camp academic enrichment programs, to malign Plaintiff's name in both the greater academic community and the greater Indian arranged marriage community.

j.  Maini accused Plaintiff of pursuing him, when he pursued her and her family relentlessly beginning on February 20, 2016, leading to an engagement on November 1, 2016, and setting and booking a wedding date for February of 2017.  During all stages of the relationship, Maini was the aggressor, and he cheated incessantly during the relationship, which is why Plaintiff ended the engagement prior to the wedding date.

k.  Maini accused Plaintiff of hypochondria due to her lactose intolerance and celiac disease medical conditions, causing her to vomit when on dinners with him when he force-fed her gluten-filled breads and soy-filled tofu, to malign her name in image-conscious fashion professional circles.

l.  Reasonably understood, Maini's statements amount to accusations of serious and reprehensible conduct, as well as the implication that he was guilty of academic, personal, and professional misconduct, notwithstanding her pending offer to become a faculty member at a top-ranked university.  Maini's conduct also imputed to Plaintiff a want of integrity and a lack of competency in her academics, arranged marriage pathway, and employment.

74. Maini was so intent on destroying Plaintiff's good name and reputation that he took painstaking efforts to make the false accusations and libel sound credible to those hearing them, even those close to Plaintiff who had no reason to believe Maini or to doubt the Plaintiff.  Maini's posts were crafted in such a way as to inspire belief and sympathy on the part of recipients of the false information.  Maini knew or should have expected that, upon reviewing these defamatory posts, others would retaliate against Plaintiff directly, distance themselves, and proceed with caution.  Maini specifically chose to raise his post rate in 2019 due to Plaintiff's family placing her in the hands of a more experienced Indian arranged marriage matrimonial service.

75. There is no physical or other tangible evidence to substantiate claims that the Plaintiff engaged in any of the egregious conduct Maini outlines.  Maini's statements were knowingly false and/or stated with such reckless disregard for the veracity of the accusations and the foreseeable, devastating harm they would cause to Plaintiff's reputation and arranged marriage prospects.

76. Maini has been relentless in his efforts to discredit and destroy the reputation of Plaintiff, and he continues to publish defamatory statements consistent with those stated therein as well as some that are inherently hidden and undiscoverable by Plaintiff.  Her investigation continues.

77. Plaintiff has no way of knowing who believed some or all of the false statements made by Maini, nor can she truly assess the identity, scope, and sheer number of people impacted by Maini's falsehoods to the detriment of Plaintiff.

78. Maini knew, or with substantial certainty should have known, that these accusations would be re-published by Bashing Websites and widely disseminated in the community where Plaintiff lived and worked, as well as throughout the United States and beyond. A disclaimer exists on LiarsandCheaters.com indicating that any posts made there can and will be spread to other sites. Maini signed a terms and conditions agreement indicating his awareness of this fact.

79. This false publicity invaded Plaintiff's personal and professional circles, caused undue ridicule, and will continue to have a demonstrable, adverse impact on Plaintiff's livelihood in fashion, her physical safety, her emotional well-being, and her arranged marriage prospects. Plaintiff was unable to invite press to three fashion shows as previously scheduled due to the enormous burdens as a result of this libel and abuse. Plaintiff became a hermit, avoiding social events, pausing all arranged marriage matchmaking efforts, and taking off time from her studies, delaying her graduation by an additional year.

80. Maini's publication of these false accusations impaired Plaintiff's personal and professional reputation during all-important Fashion Weeks and effectively eliminated her ability to pursue an arranged marriage, in the community where she lives and works and beyond, and has resulted in severe emotional distress, humiliation, embarrassment, mental suffering, and suicide attempts. The Plaintiff also suffered damages including SEO service fees, removal fees, lost income and opportunities, medical expenses, therapy expenses, and damage to her future earning capacity.

81. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional and physical well-being, and the foreseeable impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## THIRD CAUSE OF ACTION
## INVASION OF PRIVACY
### *Against Amar Chander Maini*

82. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

83. To state a cause of action for invasion of privacy, Plaintiff will prove the following three elements: (a) appropriation, the unauthorized use of a person's name or likeness to obtain some benefit; (b) electronic intrusion int one's private quarters; and (c) public disclosure of private facts, meaning the dissemination of truthful private information which a reasonable person would find objectionable.

84. Plaintiff confided a number of childhood traumas and personal secrets to Maini. Plaintiff trusted Maini would always keep her confidences, particularly about the false accusations and rumors at her private high school where she was subject to physical violence and emotional abuse at the hands of both faculty members and students. In one case, Plaintiff was shoved into a gym locker and had an asthma attack, and the school failed to intervene on her behalf. Plaintiff revealed to Maini the extent of her negative prior experiences, with the understanding that they would remain private and confidential at all times. Maini took this private information and published multiple tell-all

WordPress and Blogger posts about Plaintiff, mixing 15% of truth with 85% of libel, ridiculing her for what truly was a difficult childhood and a number of difficult experiences. The circumstances of her difficult high school educational experience and the sheer amount of slander she faced at the hands of sociopaths at that particular school are not in the public interest as Plaintiff is a private individual and is not—and has never been—a public individual.

85. Plaintiff decided to do a transfer to another private school during her first term of her senior year to protect her safety from aggressive individuals at her preparatory school without notifying her parents or her school in advance. Plaintiff packed her bags and left town. A successful author at a young age who published her first two books as a teenager, she received substantial enough royalties to become financially independent from age 17 and used this to her advantage. Despite the various adversities she faced, Plaintiff still graduated with a class rank of 2 out of 378 students in her high school class and earned a full scholarship to the guaranteed admission BS/MD university program of her choice. Maini twisted the experience around and labelled her as a "runaway" who "lived on the streets," when Plaintiff was living in a $3,000 per month apartment in an exclusive, gated community and her first car at age 16, given by her parents, was a brand new Lexus.

86. Plaintiff also confided that she was estranged from her mother from the period 2009 to 2011, when Plaintiff decided to initiate a school transfer by informing her father and not informing her mother until she made her decision. Plaintiff's mother and Plaintiff had disagreements about future college admission prospects with a senior year transfer, which has now been resolved; at all points, this dispute was a private one that never took away the deep love and affection the two have always shared. Ups and downs are normal parts of the mother-daughter relationship. Nevertheless, Maini invaded the privacy of Plaintiff and her mother by posting false accusations accusing Plaintiff's mother of being a "child abuser" on dozens and dozens of websites. Plaintiff is not a child; she is an adult of age 27. Plaintiff's mother never abused her as a child, and even if there was 'abuse' per se it is not in the public interest for that information to be public. Private disagreements and using phraseology of "abuse" is neither in the public interest nor of any concern to external third parties. Maini specifically posted this to gain the benefit of extortion fees from Plaintiff's family.

87. Information about Plaintiff not in the public interest and Maini invaded the privacy of both Plaintiff and her mother by posting her full married name on dozens of websites filled with libel.

88. Plaintiff accidentally left the password to her private digital diary and her private email on her laptop case. Under no circumstances would Plaintiff ever share her password with anyone. Between 13 to 17 August 2016, Maini hacked Plaintiff's email, downloaded private files and notes--none of which can be admitted into evidence due to the criminal hacking--and then began an email campaign to Plaintiff's residence, her research colleagues, and her laboratory research administrators making false and baseless claims about Plaintiff. Maini's objective was to further develop a side relationship with one of his many mistresses, one of whom he met in his economics program and met with whenever Plaintiff was out of town. To be specific, Plaintiff was in Seoul from 23 August to 27 August 2016, and during that time Maini arranged dinner and movie dates with his mistress. She declined his last-minute Friday night movie date but they ultimately met whenever Plaintiff was out of town, while Maini continued juggling his various additional side women. In particular, when Plaintiff was in Melbourne on a medical research trip from 19 to 22 September 2016, Maini met with his economics classmate behind Plaintiff's back and without her permission.

89. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional and physical well-being, and the foreseeable

impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## FOURTH CAUSE OF ACTION
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(c)
### *Against All Defendants Engaged in Bashing Websites and Removal Websites*

90. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

91. This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, and John Does 1-15. Hereafter, Count 4 Defendants.

92. Bashing Websites and Removal Websites, terms defined above, are association-in-fact enterprises engaged in and whose activities affect interstate commerce. The Cause 4 Defendants are associated with the enterprises.

93. The Count 4 Defendants agreed to and did conduct and participate in the conduct of the enterprise affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically: charging Plaintiff for removals of posts, copying and pasting those posts throughout the Internet, failing to remove all copies of posts, and then harassing Plaintiff to pay for still more posts.

94. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of extorting money from Plaintiff ostensibly to "remove" all posts only for them to later re-post posts and demand even higher extortion removal fees.

95. The acts of extortion set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

96. The Count 4 Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

97. As a direct and proximate result of the Count 4 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that fashion shows have had to be rescheduled, press has had to be cancelled, lookbooks have had to be kept hidden from media attention, and Plaintiff has had to reduce her profile as a top emerging designer. This injury stems from the predicate acts of racketeering. Per the Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact." The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.* The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

98. Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Plaintiff paid the extortion money over a

sustained period of time before deciding to take legal action. Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production. Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

99. Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

100.   WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 4 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## FIFTH CAUSE OF ACTION
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(a)
*Against All Defendants Engaged in Bashing Websites and Removal Websites*

101.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

102.   This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, and John Does 1-15. Hereafter, Count 5 Defendants.

103.   Bashing Websites and Removal Websites, terms defined above, are association-in-fact enterprises engaged in and whose activities affect interstate commerce. The Count 5 Defendants are associated with the enterprises.

104.   The Count 5 Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically: the Bashing Website Defendants accepted advertising fees from the Removal Website Defendants. The Removal Website Defendants then charge a base set fee to Plaintiff (and thousands of other victims) which went partially to the Bashing Websites Defendants and partially to themselves. The income derived was housed both in the United States and overseas and has already led to investigation by the U.S. Attorney's Office in Arizona as one Defendant, Kevin Angileri, was recently released from federal prison for child pornography and is back at racketeering.

105.   The racketeering activities listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

106.   As direct and proximate result of the Count 5 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in her business in that: she has had to cancel press at multiple fashion shows, reduce her presence at fashion networking events, change her business model, and take a term off of her law school studies. The injuries to her business specifically include thousands of dollars paid to Removal Websites on top of SEO services. The fact that Bashing Websites and Removal Websites are investing their illicit "income" into Bitcoin and other cryptocurrencies instead of discontinuing their nefarious activities speaks volumes about the poor character of these Defendants. Per the

Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact." The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.* The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

107.　Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Plaintiff paid the extortion money over a sustained period of time before deciding to take legal action. Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production. Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

108.　Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

109.　WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 5 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## SIXTH CAUSE OF ACTION
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(b)
*Against All Defendants Engaged in Bashing Websites and Removal Websites*

110.　Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

111.　This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, and John Does 1-15. Hereafter, Count 6 Defendants.

112.　Bashing Websites and Removal Websites, terms defined above, are association-in-fact enterprises engaged in and whose activities affect interstate commerce. The Count 6 Defendants are each associated with the enterprises.

113.　The Count 6 Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically: the Bashing Website Defendants accepted advertising fees from the Removal Website Defendants. The Removal Website Defendants then charge a base set fee to Plaintiff (and thousands of other victims) which went partially to the Bashing Websites Defendants and partially to themselves. The income derived was housed both in the United States and overseas and has already led to investigation by the U.S. Attorney's Office in Arizona as one Defendant, Kevin Angileri, was recently released from federal prison for child pornography and is back at racketeering.

114.    The racketeering activities listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

115.    Count 6 Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically: Removal Websites advertising their removal services on Bashing Websites and Removal Websites charging double fees for Plaintiff (and thousands of other victims) to remove posts. Some removal fees go directly to the Removal Websites and the majority of removal fees go directly to the Bashing Websites.

116.    The racketeering activity listed above of Bashing Website posts that charge exorbitant removal fees constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

117.    The Count 6 Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

118.    As direct and proximate result of the Count 6 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in her business in that: Plaintiff's credit card information has remained stored on file by both Bashing Websites and Removal Websites, on top of the severe injuries she has suffered enumerated elsewhere. The injury here stems from the acquisition of an interest on or control over an enterprise, and this is illustrated best by the fact that Defendants are constantly merging and acquiring new cheater assets. If any of them had put their business acumen in a healthy direction, then they might have become superstars in the mergers and acquisitions profession. Instead, they are defrauding consumers including Plaintiff because the ownership of websites constantly changes. As an example, Michael Schern is an attorney admitted to practice law in the state of Arizona, and he recently acquired full ownership of TheDirty.com from Nik Richie. He simultaneously runs his law firm and TheDirty.com from the same web server, making anywhere from $1,500 to $5,000 per removal from his site. This income supplements his law firm income. While it is not excusable for ex-convicts to engage in activities like this, it is much more understandable than a lawyer who is admitted to practice. Schern's behavior is in direct contrast to the rules all law students have to know to pass the Multistate Professional Responsibility Examination. It is unbecoming for an attorney to behave in this manner. Per the Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact." The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.* The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

119.    Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Plaintiff paid the extortion money over a sustained period of time before deciding to take legal action. Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production. Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

120.    Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

121.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 6 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable

damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

**SEVENTH CAUSE OF ACTION**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(d)**
*Against All Defendants Engaged in Bashing Websites and Removal Websites*

122.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

123.    This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, and John Does 1-15. Hereafter, Count 7 Defendants.

124.    Bashing Websites and Removal Websites, terms defined above, are association-in-kind enterprises engaged in and whose activities affect interstate commerce. The Count 7 Defendants are each associated with the enterprises.

125.    As set forth above, the Count 7 Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically: the Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)); and (3) conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)). Removal Websites achieved this through the use of advertising for seemingly legitimate removal services in advertisements on Bashing Websites. The Bashing Websites then charge a large sum, some of which goes to them and some of which goes to the Removal Websites. Plaintiff, and countless other victims, paid these scam removal companies only to find the posts reappear over the Internet. Once the Removal Websites determine someone is willing to pay for removal, they then repost all posts to extract and to extort further money from said individual.

126.    The Count 7 Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count 7 Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d). The Removal Websites and the Bashing Websites are co-conspirators keen to defraud any and all businesspeople and students they can. Per the Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact." The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v.*

28

*Tyson Foods, Inc.* The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

127.     As direct and proximate result of the Count 7 Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in her business in that she has had to change her business plan and to delay the launch of numerous projects, fashion collections, and fashion services. The injury under § 1962(d) stems from the overt acts committed in furtherance of the conspiracy, which include continuing to repost defamatory material about Plaintiff despite offering ample evidence and sending hundreds of emails requesting removal.

128.     Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner,* 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Plaintiff paid the extortion money over a sustained period of time before deciding to take legal action. Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production. Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

129.     Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

130.     WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 7 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## EIGHTH CAUSE OF ACTION
## COMPUTER FRAUD AND ABUSE
*Against Maini and All Defendants Engaged in Bashing Websites and Removal Websites*

131.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

132.     Based on information and belief, certain Defendants named herein and/or their agents followed and/or viewed Plaintiff's personal social media profiles, personal website pages, and pageant photo website pages for the purpose of gathering Plaintiff's personal identifying information and pageant headshot photograph.

133.     Based on information and belief, Defendants, especially Vikram Parmar aliases Matt Hamp and Martin Horan—a noted Indian felon—created a decoy profile on social media sites LinkedIn to mine Plaintiff's personal identifying information (photographs) without authorization. Parmar accessed her copyrighted pageant photograph and then posted it on various Bashing Websites. The pageant photograph of Plaintiff has remained online for months in spite of Plaintiff notifying said Bashing Websites that it was a DMCA violation to keep her photo in place on an obviously libelous "report"

authored by Maini. Furthermore, Defendants continued to post and repost libelous information with her copyrighted pageant photograph spread across the Internet.

134. Plaintiff's personal server, which hosts and operates her fashion and artwork websites, constitute "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2).

135. As described above, Defendants conspired to commit and attempted to commit violations of 18 U.S.C. § 1030(a)(7)(B) and 18 U.S.C. § 1030(a)(7)(C) in violation of 18 U.S.C. § 1030(b).

136. Defendants' conduct has caused loss as defined in U.S.C. § 1030(e)(11) of more than $5,000 to Plaintiff during a one-year period.

137. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## NINTH CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### *Against Guaranteed Removals and Internet Removals*

138. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

139. At all times relevant to this action, Plaintiff has had a contractual relationship with both Guaranteed Removals and Internet Removals, and a prospective contractual relationship with Minc Law, Aaron Minc, RepZe, and Vikram Parmar. This cause of action is centered on Guaranteed Removals and Internet Removals.

140. In order to plead a prima facie case of breach of the implied covenant of good faith and fair dealing, it must be proven that (a) the Plaintiff and the Defendants are parties to a written contract; (b) the contract is ambiguous about the permissibility or scope of the conduct in question; (c) the Defendants, through a series of conscious and deliberate acts, fail or refuse to discharge contractual responsibilities, which unfairly frustrates the contract's purpose and disappoints the Plaintiff's expectations; (d) the Defendants' breach deprives the Plaintiff of the contract's benefits; (e) the Plaintiff suffers damages. Case law support of this definition includes *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla. 1st DCA 1999), *Holmes v. Florida A&M Univ. by and through Board of Trustees*, 260 So.3d 400, 407 (Fla. 1st DCA 2018), *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 170 (Fla. 1st DCA 2015), and *Sobi v. First South Bank, Inc.*, 946 So.2d 615, 617 (Fla. 1st DCA 2007). In particular, the judge in the *Sobi v. First South Bank, Inc.* case argued as follows: "An implied covenant of good faith, fair dealing, and commercial reasonableness must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.

141. Plaintiff entered into contracts with Defendants Guarnateed Removals and Internet Removals in written contract form. The contracts are ambiguous about the permissibility of or scope of the conduct in question, merely stating "removals." The Defendants, through a series of conscious and deliberate acts, failed and refused to discharge contractual responsibilities, which unfairly frustrates the contract's purpose and disappoints the Plaintiff's expectations. The Defendants' breach deprives the Plaintiff of the contract's benefits. The Plaintiff has suffered tremendous damages emotionally, mentally, and spiritually.

142.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## TENTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### *Against All Defendants*

143.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

144.    At all times relevant to this action, Plaintiff has had a prospective contractual relationship with her private artwork and couture clientele and a reasonable probability in the continuation of those business relationships.

145.    In order to plead a prima facie case of tortious interference, it must be proven that (a) there is the existence of a business relationship, not necessarily evidenced by an enforceable contract; (b) knowledge of the relationship on the part of the defendant; (c) an intentional and unjustified interference with the relationship by the defendant; and (d) damage to the plaintiff as a result of the breach of the relationship. Case law support of this definition includes *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985), *Gossard v. Adia Services, Inc.*, 723 So.2d 182, 184 (Fla. 1998), and *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994).

146.    Defendants had knowledge of these relationships because they—or their agents and/or co-conspirators—visited her private website, her store website, her LinkedIn, her Instagram, her Facebook, and her SnapChat profiles and harassed her and her family by phone and email for the purpose of mining Plaintiff's personal identifying information.

147.    Defendants intentionally, or with substantial certainty, interfered with the relationship between Plaintiff and her clientele by stealing and libeling her and her family to Bashing Websites, causing many of her couture clientele and business award committees to end their relationship with Plaintiff and withdraw her name from award finalist lists.

148.    Defendants' above-described conduct has caused actual disruption to the relationship between Plaintiff and her clientele.

149.    Defendants' above-described conduct has caused actual disruption to the relationship between Plaintiff and various venture capital groups, many of whom offered verbal commitments to invest up to $50 Million in cash into her fashion business for a 25% equity stake, but later withdrew their offers or 'ghosted' Plaintiff due to the sheer amount of libel about her on various Bashing Websites. Plaintiff also faced tremendous hardship in traditional arranged marriage circles due to the sheer amount of libel about her and her family, necessitating her to retain two non-Indian matchmaking firms for $25,000 and $100,000 respectively, just to get suitors from the right background as it is now impossible for Plaintiff to receive a traditional arranged marriage.

150.    Defendants' above-described conduct has caused actual disruption to the relationship between Plaintiff and her immediate family, who were previously willing to invest up to $5 Million in cash into her fashion business for a 2.5% equity stake, alongside a larger venture capital fundraising round and withdrew their offer. Plaintiff's immediate family will only invest alongside professional venture capitalists, citing the need for investment objectivity.

151.    In the case of *Dade Enterprises v. Wometco Theatres,* 160 So. 209, 210 (Fla. 1935), the Court argued that "if one maliciously interferes with a contract between two persons, and induces one of them to breach the contract to the injury of the other, the injured party may maintain an action

against the wrongdoer, and where the act was intentional, malice will be inferred." Defendant Maini was well aware that his libel would cause Plaintiff to suffer tremendously in fundraising both with her immediate family and with venture capitalist groups that had expressed interest in Plaintiff's small business previously. Defendant Maini was also well aware that Plaintiff intended to pursue an arranged marriage to a suitable family, and his libelous actions—spread further by the malicious libel copy and pasting by Bashing Websites and Removal Websites—has impaired her ability to pursue arranged marriage as someone of her stature as an Ivy League educated beauty queen, former debutante, and abstinent virgin educated at a top cooking school would otherwise be able to obtain (that is, an Ivy League or Oxbridge educated, multimillionaire suitor who is also religious, traditional, and an abstinent virgin). Plaintiff has now had to pursue love marriage matchmaking largely against her will, requiring a down payment of over $50,000 to an elite matchmaker to obtain a love marriage instead of achieving the arranged marriage of her dreams which she worked hard and prayed to achieve since age 3.

152.    It is clear here that Defendants conduct both caused and induced the breach that resulted in Plaintiff's damages. Refer to cases *Univ. of West Florida Bd. of Trustees v. Habegger*, 125 So.3d 323, 326 (Fla. 1st DCA 2013), *Murtagh v. Hurley*, 40 So.3d 62, 66 (Fla. 2d DCA 2010), *Fernandez v. Haber & Ganguzza, LLP*, 30 So.3d 644, 646 (Fla. 3d DCA 2010), *James Crystal Licenses, LLC v. Infinity Radio Inc.*, 43 So.3d 68 (Fla. 4th DCA 2010), and *Southeastern Integrated Med., P.L. v. N. Fla. Women's Physicians*, 50 So.3d 21, 23 (Fla. 5th DCA 2010).

153.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## ELEVENTH CAUSE OF ACTION
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### *Against All Defendants*

154.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

155.    As described above, Plaintiff has lost couture and artwork customers as a result of the Defendants' conduct described herein.

156.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Section 501.204, Fla. Stat.

157.    At all relevant times, Defendant solicited, advertised, offered, and provided goods and services by unauthorized access to Plaintiff's social media profiles and thereby was engaged in trade or commerce as defined in Section 501.203, Fla. Stat. Defendants received revenue from advertising on their websites. Defendants' unauthorized access to Plaintiff's social media profiles, use of Plaintiff's identifying information, libel about Plaintiff, and then extortion of a fee to remove such information from the Bashing Websites is illegal and qualifies as "a deceptive act or unfair practice" that is both fraudulent and unlawful. Such unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

158.    Given that Florida places great weight to the interpretations of the Federal Trade Commission and federal courts with respect to § 5(a(1)of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) as of July 1, 2017 and Fla. Stat. § 501.204 (2017), Plaintiff restates her argument that

Bashing Websites are engaging in unfair and unlawful practices by permitting Removal Websites to extort victims like herself. Please refer to the case *State v. Beach Blvd Automotive Inc.*, 139 So.3d 380, 393 (Fla. 1st DCA 2014).

159.     Furthermore, Plaintiff reaffirms that Court finding fraud with Defendants is not necessary to sustain a violation under the Florida DUPTA. Please refer to the case *W.S. Badcock Corp. v. Myers,* 696 So.2d 776 (Fla. 1st DCA 1996) which found that "A finding of fraud is not necessary to sustain a violation under the DUTPA" when citing *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451, 453 (Fla. 1st DCA 1985).

160.     Finally, at all relevant times, Plaintiff was a consumer as defined by Section 501.203, Fla. Stat. Defendant's practice, as described in detail in paragraphs above, is unfair and deceptive.

161.     WHEREFORE, the Plaintiff demands a declaratory judgment that Defendants violated the Act and an injunction enjoining future violations of the Act pursuant to Section 501.211(1), Fla. Stat., actual damages for violation of the Act pursuant to Section 501.211(2), Fla. Stat., monetary damages in excess of $100,000, an award of attorneys' fees and costs pursuant to Sections 501.211(2) and 501.2105, Fla. Stat., and such other relief that this Court deems just and proper.

## TWELFTH CAUSE OF ACTION
## CIVIL CONSPIRACY
### *Against All Defendants*

162.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

163.     As described above, each of the Defendants agreed to participate in the extortive Bashing Websites and Removal Websites actions and joined therein with the intent to further their wrongful activity.

164.     As a result of Defendants' extortive actions, Plaintiff has suffered damages in an amount to be proven at trial, including damages arising from the costs of investigating and remediating Defendant's unlawful infiltration of her private social media profiles, lost awards from competitions where Plaintiff was slated to win, and lost revenue from clients that were diverted as a result of Defendants' illegal conduct.

165.     In *Patten v. Daoud*, 12 So.2d 299, 301 (Fla. 1943) and Carson in *Common Law Pleading* page 174, the essentials of a declaration for civil conspiracy are that (1) conspiracy between two or more persons to do an unlawful act or to do a lawful act by unlawful means and (2) the doing of some overt act in pursuance of the conspiracy, and (3) damage to the plaintiff as a result of the acts done in furtherance of the conspiracy. See also the following case law: *Phillip Morris USA, Inc. v. Russo*, 175 So.3d 681, 686 (Fla. 2015)., *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977), *Snipes v. West Flagler Kennel Club, Inc.*, 105 So.2d 164, 165 (Fla. 1958), *Loeb v. Geronemus*, 66 So.2d 241, 243 (Fla. 1953), *Liappas v. Augoustis*, 47 So.2d 582 (Fla. 1950), and *Dr. P. Phillips & Sons, Inc. v. Kilgore*, 12 So.2d 465, 466 (Fla. 1943).

166.     In this case, Plaintiff, a law student, has been abused and targeted as a victim of atrocious levels of civil conspiracy. The peculiar power of coercion possessed by the conspirators—all Defendants, with particular emphasis on Maini, Bashing Websites, and Removal Websites—by virtue of their combination could not have had the same impact if possessed solely by an individual. Please refer to cases *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) and *Accord, Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc.*, 629 So.2d 252, 257 (Fla. 3d DCA 1993).

167.     To sufficiently plead conspiracy, Plaintiff further explains that there is extensive tacit evidence of both understanding and agreement between Bashing Websites and Removal Websites to facilitate

a mutually beneficial financial arrangement. The Bashing Websites charge a set fee and the Removal Websites charge a set fee, which is presented as one base fee to the victim, in this case, Plaintiff. Evidence of this is the opacity with which the website owners suggest "arbitration." Each Bashing Website has a separate "arbitrator," which is, in fact, a Removal Website advertiser paying to be recommended to victims as a top-notch and ethical removal service. Defendant Maini knew he was putting Plaintiff in graver danger by placing her name and writing libel about her on several Bashing Websites than when he cheated on her with Malaysian prostitutes and underage retail workers during her hospitalization for nerve damage. To list a specific damage, Plaintiff lost close to $2,500,000 in prospective wholesale fashion orders as a direct and proximate cause of cybersmear efforts and spent well over $650,000 in a combination of stress management yoga retreat bills, depression therapy bills, SEO bills, and removal services bills.

168.    Agreement was made between the Bashing Websites and the Removal Websites long before Plaintiff's name was initially placed by Maini. This agreement, facilitated by advertisements for seemingly "arbitrative" services, served an unreasonable restraint on competition to the standard of *MYD Marine Distributor, Inc.*, 67 So.3d at 48. That is, legitimate Removal Websites not run by fraudsters are unable to get defamatory articles removed and are thus in a difficult position, placing them in direct competition with the various fraudsters committing civil conspiracy.

169.    As there were far more than two people involved to accomplish a lawful purpose by unlawful means—in this case, all Defendants—and these confederates committed acts unlawfully, willfully, and maliciously that resulted in severe injury to Plaintiff, this standard has been met.

170.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jane Koe, a pseudonym, prays for judgment against Defendants as follows:

1. A trial by jury;
2. Enter judgment against Defendants, jointly and severally, in favor of Plaintiff for each of the aforementioned causes of action;
3. Adjudge that Defendants and each of their agents (and subagents) and any other persons or entities working in concert or in participation with them be enjoined during the pendency of this action and thereafter permanently from:
    a. Extorting Plaintiff or Plaintiff's family;
    b. Emailing, calling, or otherwise mailing Plaintiff or Plaintiff's family, which includes but is not limited to her parents;
    c. Using any image, word, phone number, or other identifying information collected from award websites, personal websites, or news articles about Plaintiff for any purpose;
    d. Accessing any of Plaintiff's private social media profiles, including LinkedIn and Goodreads;
    e. Accessing any of Plaintiff's business social media profiles, including Facebook, Snapchat, and Instagram;
    f. Otherwise competing unfairly with Plaintiff's art and fashion business endeavors in any manner; and

       g.  Continuing to perform in any manner whatsoever any of the other acts complained of in this complaint.

4. Adjudge that Defendants, within fourteen (14) days after service of the judgment request herein, be required to file with this Court and to serve upon Plaintiff a written report under oath setting forth in detail the manner in which it has complied with the judgment;

5. Adjudge that Defendants remove Plaintiff's name, beauty pageant winner photograph, and all defamatory and libelous information from their websites immediately and refrain from reposting anything about Plaintiff in the future;

6. Adjudge that Defendants return to Plaintiff all expenses relating to removal of prior posts, SEO campaign services, and psychotherapy bills arising from suicide attempts as a result of this situation;

7. Adjudge that Plaintiffs recover from Defendants their actual damages and/or damages allowed by statute in an amount to be determined at trial;

8. Adjudge that Defendants be required to account for any profits that are attributable to their acts complained of herein;

9. Adjudge that Plaintiff recover both punitive and treble damages from Defendants;

10. Adjudge that Plaintiff be awarded its costs incurred in connection with this action, including reasonable investigative expenses and medical expenses;

11. Adjudge that Defendants jointly provide any costs and reasonable attorney fees as provided by 28 U.S.C. § 2412 or any other provision of law;

12. Impose a constructive trust on all of Defendants' funds and assets that arise out of the acts complained of herein;

13. Adjudge that Plaintiff recover all such other relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED, in West Palm Beach, Florida, this 31st day of January,

/s/ Jane Koe

Jane Koe, a pseudonym

Law Student *Pro Se*

7750 Okeechobee Blvd

Suite 4-481

West Palm Beach, FL 33411

Phone: (929) 400-7746

Email: janekoelitigation@icloud.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____ - CIV _____

### JURY TRIAL REQUESTED

<u>JANE KOE,</u> an individual filing pseudonymously
      **Plaintiff**
**vs.**
<u>AMAR CHANDER MAINI aliases GALLANTVK, AMARCM4, AMARCM_2, VIKRAM</u>
<u>KMS, and VIKRAM KUMAR MANSINGH</u>, an individual
<u>GUARANTEED REMOVALS</u>, a Canadian company
<u>REPZE</u>, a fraudulent LLC
<u>EXPERT REMOVALS</u>, a fraudulent LLC
<u>INTERNET REMOVALS</u>, an Australian company
<u>MARCA GLOBAL, LLC. d/b/a InternetReputation.com</u>, a Colorado LLC
<u>AMARUTU TECHNOLOGY d/b/a KoDDOS</u>, a Hong Kong limited company
<u>MINC LAW</u>, an Ohio Law firm
<u>KEVIN ANGILERI</u>, an individual
<u>RONALD LINCO</u>, an individual
<u>MICHAEL SCHERN</u>, an individual
<u>JAMES JOHN</u>, an individual
<u>JIM BURNS</u>, an individual
<u>SCOTT BREITENSTEIN</u>, an individual
<u>ARMAN ALI d/b/a D4 SOLUTIONS BD</u>, an individual
<u>VIKRAM PARMAR aliases MATT HAMP and MARTIN HORAN</u>, an individual
<u>JOHN DOES 1-15</u>, inclusive,
      **Defendants.**

### PLAINTIFF'S MOTION TO PROCEED UNDER A PSEUDONYM

NOW COMES the plaintiff, JANE KOE, a law student seeking to proceed pseudonymously, and for her Motion for Leave to File her Complaint Using a Pseudonym, *nun pro tunc,* she asserts as follows:

### FACTUAL BACKGROUND

Plaintiff, Jane Koe, is domiciled in West Palm Beach, Florida when not attending a dual degree US and UK law school program. She works as a couturier and fine artist painter when not attending school. Her Complaint, outlines how her reputation has been damaged, her privacy invaded through the publication and public disclosure of private information by Defendant Amar Chander Maini. Defendant Maini is a con artist catfish based in Mumbai, India who has placed Plaintiff's name and libellous information on dozens of blogs and gripe websites collectively termed Bashing Websites. Plaintiff has spent thousands of dollars on removal fees to Removal Websites, only to discover both Maini and the Bashing Websites themselves are engaged in copying and recopying each post to extort further money out of Plaintiff and other victims.

Plaintiff has thus filed a combination lawsuit against Maini and against the Bashing and Removal Websites.

The offending conduct began in July of 2017 after Plaintiff respectfully declined marriage to Defendant Maini on account of him conning her and her family with a false name, false age, false job, false resume, and false credentials. She promptly returned the engagement jewelry and engagement ring to his family via USPS certified mail which had a signature on delivery. Maini did not return the cash and gold dowry to Plaintiff and her family. Maini began a blog in July of 2017 where he began posting libellous information about Plaintiff written in a way to capture SEO attention. Maini connected with Koe's friends, family, work colleagues, classmates, and fashion/artwork clients using imposter social media profiles, registered her for female-seeking-transsexual dating sites and other online services so that she would be bombarded with calls, texts, and inappropriate advances. Maini's lies were given widespread publicity on Bashing Websites and made Koe look like a serial cheater and apathetic and unethical in her academic work, when she is an abstinent virgin and a top ranked student at her school. Maini's anger escalated to unreasonable proportions and he used the expansive reach of the Internet, travelled across country lines, and even solicited and conspired with others to disrupt and compromise Plaintiff's reputation, livelihood, and emotional well-being.

Plaintiff intiated proceedings in Australia as Maini is a citizen of Australia but withdrew the case due to bullying and increasing retaliation from Maini. Maini began sending death threats and posting more regularly with increasing vitriol and frequency when Plaintiff first filed, and as a result she withdrew her case. Plaintiff now is somewhat stronger thanks to support and encouragement from her therapist and is in a position to file again in her home country of the United States and her home district of West Palm Beach, Southern Florida. Maini continues to harass Plaintiff with late night messages and calls from untraceable phone numbers, vandalism of her belongings (including her Bernina and Juki sewing machines and her car), and insulting her parents by calling them horrific names.

This litigation will necessarily involve further publication, discussion of, and parsing of every statement, written post, and act depicting Jane Koe in a negative light. Plaintiff humbly requests this Court for permission to file the matter using a pseudonym for Plaintiff against Amar Chander Maini, Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali, Vikram Parmar, and John Does 1-15, inclusive for the following:

      (1) Fraudulent Misrepresentation
      (2) Defamation
      (3) Invasion of Privacy
      (4) Civil RICO § 1962(c)
      (5) Civil RICO § 1962(a)
      (6) Civil RICO § 1962(b)
      (7) Civil RICO § 1962(d)
      (8) Computer Fraud and Abuse
      (9) Breach of the Implied Covenant of Good Faith and Fair Dealing
      (10) Tortious Interference with Advantageous Business Relationship
      (11) Deceptive Trade
      (12) Civil Conspiracy.

The Defendants are well aware of Plaintiff's true identity and will not suffer any prejudice in their defense upon service of this action.

## LEGAL ANALYSIS

The Federal Rules of Civil Procedure 10(a) lists that "the title of the complaint must name all the parties" and the Federal Rules of Civil Procedure 17(a) lists that "an action must be prosecuted in the name of the real party in interest." Certain exceptions have been recognized under which parties may access the Courts using fictitious names (e.g., "John Doe," "Jane Koe"). Fictitious names have been permitted to protect the privacy of children, rape victims, and other particularly vulnerable parties or witnesses. See *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997) and *Doe v. City of Chicago*, 360 F.3d 667, 669-670 (7th Cir. 2004). In both cases, the Court acknowledges its duty to determine whether circumstances "justify the departure from the normal method of proceeding in federal courts."

When weighing whether to permit a party to proceed pseudonymously, Courts consider discretionary factors that include:
(1) Risk of retaliatory physical or mental harm to innocent non-parties. See See *Roe v. Bernabei & Wachtel PLLC*, 85 F. Supp. 3d 89, 96 (D.D.C. 2015) (quoting *Nat'l Ass'n of Waterfront Employers v. Chao*, 587 F. Supp. 2d 90, 99 (D.D.C. 2008)).
(2) The extent to which the identity of the litigant has been kept confidential. See *Doe v. Oshrin*, 299 F.R.D. 100, 103 (D.N.J. 2014).
(3) The magnitude of the public interest in maintaining the confidentiality of the litigant's identity; or whether, because of the subject matter of the litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained. See *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) and *Doe v. Oshrin*, 299 F.R.D. 100 (D.N.J. 2014).
(4) Whether the Plaintiff is particularly vulnerable. See *John Doe v. Trustees of Dartmouth Coll.*, No. 18-CV-690-JD, 2018 WL 5801532, at *3 (D.N.H. Nov. 2, 2018).
(5) Whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities. See *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) and *Doe v. Oshrin*, 299 F.R.D. 100 (D.N.J. 2014).
(6) The undesirability of an outcome adverse to the pseudonymous party and attributable to the party's refusal to pursue the case at the price of being publicly identified. See *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) and *Doe v. Oshrin*, 299 F.R.D. 100 (D.N.J. 2014).
(7) Whether the motivations of the party seeking to proceed pseudonymously, or those opposing the use of a pseudonym, are illegitimate. See *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) and *Doe v. Oshrin*, 299 F.R.D. 100 (D.N.J. 2014).
(8) Whether the Plaintiff risks prosecution for admitting to engage in illegal activity. See *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981).
(9) Possible disclosure by Plaintiff of information of "the utmost intimacy." See *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) and *Doe v. Oshrin*, 299 F.R.D. 100 (D.N.J. 2014).
(10) Risk of injury to Plaintiff if identified. See *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) and *Doe v. Oshrin*, 299 F.R.D. 100 (D.N.J. 2014).
(11) Possible prejudice of Defendants by Plaintiff's use of a pseudonym. See *Doe v. Shakur*, 164 F.R.D. 359, 361 (S.D.N.Y. 1996).

(12) Degree of economic harm to the Plaintiff if her identity is known.  See *Does I thru XXIII*, 214 F.3d 1058 (9th Cir. 2000).

(13) Whether less drastic means of preserving the Plaintiff's interests are available.  See *Doe v. Ind. Black Expo, Inc.*, 923 F. Supp. 137, 140 (S.D. Ind. 1996).

      With regard to the risk of retaliatory physical or mental harm to innocent non-parties, Plaintiff is escaping an abusive and toxic arranged marriage set-up to a con artist catfish named Amar Chander Maini.  He has threatened Plaintiff and her diabetic parents to make counter-lawsuits and to sue them and their employees if Plaintiff sues.  He has also committed multiple acts of physical violence towards Plaintiff's dog, Champ, including one instance where he tried to murder her dog.  Plaintiff is in tremendous fear for her physical safety as Defendant Maini has not stopped despite her sending him multiple cease and desist notices on official letterhead. Plaintiff even retained a solicitor in Australia to send him a cease and desist notice and did not achieve her desired result.  He has been relentless in attacking Plaintiff and her family for over two and a half years on end, going so far as to brandish her mother—an accounting professional—a "child abuser" on hundreds of websites, which has already affected her mother's reputation and accounting employment prospects.  Plaintiff's mother is now receiving psychological treatment for depression.

      The identity of Plaintiff has remained confidential to date and there is no need for the public to know the identity of Plaintiff.  While Plaintiff cannot argue that the case will attract "atypically weak" public interest, as the matters at hand cover internet defamation and are certain to attract at least some public interest, Plaintiff is a patient being treated for depression and it is not in her best interest medically for her identity to be revealed.

      Plaintiff is incredibly vulnerable personally, professionally, and psychologically.  She will suffer reputational harm, damage to her career, and hindrance in future legal employment prospects if her true identity is revealed, particularly because this case is sure to receive media attention as it touches on the relevancy of the Communications Decency Act 230 and involves both civil RICO and extortion claims.  Such cases invariably attract media attention as these are relevant and pertinent issues affecting millions of women escaping abusive relationships.  But most importantly, Plaintiff will suffer psychological harm if her name is disclosed publicly. Plaintiff is currently undergoing Dialectical Behavior Therapy as a result of the abuse she has faced from Defendant Maini and Cognitive Behavior Therapy as a result of the cyberstalking she has faced from Defendants running Bashing Websites and Removal Websites.  After over twenty six suicide attempts in the 2019 year, Plaintiff is at severe risk of another suicide attempt should her name be revealed as it would be detrimental to her progress out of depression and into a healthy mode of life.  Prior to meeting Defendant Maini, Plaintiff was a happy, well-adjusted young woman, but meeting him and being abused by him psychologically and emotionally sent her to multiple suicide watches and resulted in traumatic surgeries she is only now recovering from.  Plaintiff has been put in such a dire position financially due to the impact of libel about her online affecting her small business that she could not pay the $450,000 retainer fee quoted to her by a top litigation boutique to represent her.  As a result, Plaintiff is representing herself. Losing her anonymity will only exacerbate her situation as a young woman just starting her career.  In the case of *Doe v. Cabrera*, 307 F.R.D. 1, 6 (D.D.C. 2014), the Court ruled that forcing a litigant who is currently undergoing psychological treatment to reveal their true identity may be detrimental to their progress.  Plaintiff has suffered tremendous psychological harm as it is and it has taken tremendous courage for her to bring forth this lawsuit in an attempt to protect

herself. In particular, Plaintiff will have to disclose information of "the utmost intimacy" in discovery, including but not limited to records of her suicide attempts, and it is in the best interest of her psychological health that this information be shielded from public consumption.

Furthermore, compelling Plaintiff to identify her name on every court filing would make the Plaintiff's name available to the public indefinitely. In the age of the Internet, where the Streisand Effect is forever at play, could subject the Plaintiff to further psychological trauma. In the case of *Doe v. Cabrera*, 307 F.R.D. 1, 6 (D.D.C. 2014), the Court determined that litigating in the Plaintiff's name would cause the Plaintiff further psychological harm.

Finally, Courts have permitted parties to proceed under a pseudonym where the litigation would publicize an allegation, whether true or false, so heinous that it constitutes a "badge of infamy or humiliation in the modern world that its presence should be an automatic ground for concealing the identity of a party to a federal suit." See *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997) and see *Doe v. Smith*, 412 F.Supp.2d 944, 945 (C.D. Ill. 2006).

In this case, Plaintiff's suit includes allegations that Defendant Maini created a female-seeking-transsexual dating profile which listed Plaintiff's phone number, physical address, make and model of her car, and place of school, on top of multiple libellous posts on dozens of cheater gripe websites, accusing Plaintiff of heinous acts of fraud. Defendant Maini also accused Plaintiff of "flunking out" of "numerous" universities, having a "colorful history with gigolos," "cheating her way in" to universities, hiring people to "write all her papers and help her get good enough grades to squeak by and graduate," "goes to bars," "cheating with so many men [he] lost count," having a "white fetish," and more.

Plaintiff is an abstinent virgin from a very conservative and traditional Indian family. She graduated at the top of her class of every university she attended, has only kissed one man in her entire life—Maini—has always been a woman of integrity, and has authored numerous books for children and adults, all her own work. As a law student seeking employment as a judicial clerk after graduation, she has been laser focused from day 1 on making the grades to write on to her school's *Law Review* and volunteering at her law school's legal aid clinic. Her ambition is to one day become a media lawyer and work in a large law firm setting. These accusations not only characterize Plaintiff in the wrong light, but also they are defamation and libel. Maini cheated on Plaintiff throughout their relationship with strippers and waitresses and conned her family out of a multimillion-dollar dowry. Under no circumstances did Plaintiff ever cross any lines with various suitors who approached her. In fact, Plaintiff even rejected a dinner offer from a handsome young man who was not a con artist, merely because of Maini's obsession with controlling everything about what she wore, ate, read, and spoke. Plaintiff relies on her good name and reputation in school to obtain a federal judicial clerkship and she has big ambitions to make a name for herself in the legal field. These false accusations and despicable acts put Plaintiff in a difficult position to obtain legal employment after law school, which has been an expensive undertaking as Plaintiff has put herself through school by selling her paintings and fashion designs. Defendant Maini and the various extortionist scammers have also published headshots of Plaintiff's state beauty pageant win, where Plaintiff won scholarship money to continue her education, on top of distributing childhood toddler photos of Plaintiff to various pedophile groups without Plaintiff's knowledge or consent. Plaintiff has written to the FBI and informed them that Maini is in possession of her childhood photographs.

Plaintiff is in tremendous fear that Maini will continue badgering her about her autoimmune disorder and attacking her parents and their employees. He has labelled her "dirty,

filthy skank" in a number of website postings in an attempt to reduce Plaintiff's ability to obtain an arranged marriage to a suitable boy in her caste and subcaste.

The truth or falsity of Maini's accusations and allegations will be a critical component of Plaintiff's defamation action and Maini's defense thereof. Plaintiff's ability to pursue these claims of defamation, invasion of privacy, and fraudulent misrepresentation against Maini, in addition to claims of civil RICO, computer fraud, and more against the Bashing Websites and Removal Websites Maini has placed her on, relies necessarily upon being able to proceed under a pseudonym, at least through discovery. In the case of *Doe v. Smith*, 412 F.Supp.2d 944, 947 (C.D. Ill. 2006), the Court permitted the Plaintiff to proceed anonymously through discovery noting (1) "at this early stage of the litigation, it would be difficult for the plaintiff to do anything more than simply allege in a conclusory fashion that such [exceptional] circumstances exist;" and that (2) anonymity may be warranted where disclosure of her identity would add to her humiliation by admitting it was her on the referenced sex tape.

Plaintiff has been humiliated tremendously by Maini's actions and his placement of her in the middle of an extortion ring during a very stressful time of year for law school. The Southern District has allowed Plaintiffs to proceed anonymously where allegations are of "the utmost intimacy" with leeway for the possibility of revisiting the anonymous designation later on in the litigation process.

In light of these circumstances, with particular emphasis on Plaintiff's current psychological treatment progress and Plaintiff's cultural background, Plaintiff very humbly requests the Court to permit her to proceed anonymously through the completion of discovery. After this point, this issue may be revisited, bearing in mind that revealing Plaintiff's name will severely hinder her progress in therapy.

WHEREFORE, the Plaintiff, Jane Koe, respectfully requests leave to file the attached Complaint at Law, *nunc pro tunc*, against Defendants Amar Chander Maini, Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali, Vikram Parmar, and John Does 1-15, inclusive, using a pseudonym. Plaintiff recognizes that the anonymous designation may be revisited at the close of discovery.

RESPECTFULLY SUBMITTED, in West Palm Beach, Florida, this 31st day of January,

/s/ Jane Koe
Jane Koe, a pseudonym
Law Student *Pro Se*
7750 Okeechobee Blvd
Suite 4-481
West Palm Beach, FL 33411
Phone: (929) 400-7746
Email: janekoelitigation@icloud.com
