# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.C.

APR 29 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

### CASE NO. 9:20-CV-80147-RLR

### JURY TRIAL REQUESTED

**JANE KOE,** an individual filing pseudonymously
      **Plaintiff**
**vs.**
**AMAR CHANDER MAINI aliases GALLANTVK, AMARCM4, AMARCM_2, VIKRAM KMS, and VIKRAM KUMAR MANSINGH,** an individual
**GUARANTEED REMOVALS,** a Canadian company
**REPZE,** a fraudulent LLC
**EXPERT REMOVALS,** a fraudulent LLC
**INTERNET REMOVALS,** an Australian company
**MARCA GLOBAL, LLC. d/b/a InternetReputation.com,** a Colorado LLC
**AMARUTU TECHNOLOGY d/b/a KoDDOS,** a Hong Kong limited company
**MINC LAW,** an Ohio Law firm
**KEVIN ANGILERI,** an individual
**RONALD LINCO,** an individual
**MICHAEL SCHERN,** an individual
**JAMES JOHN,** an individual
**JIM BURNS,** an individual
**SCOTT BREITENSTEIN,** an individual
**ARMAN ALI d/b/a D4 SOLUTIONS BD,** an individual
**VIKRAM PARMAR aliases MATT HAMP and MARTIN HORAN,** an individual
**PIERRE ZAROKIAN,** an individual
**DEFAMATION DEFENDERS,** a fraudulent LLC
**WEB PRESENCE, LLC. d/b/a NET REPUTATION**
**JOHN DOES 1-14,** inclusive,
      **Defendants.**

### SECOND AMENDED COMPLAINT AT LAW

NOW COMES Plaintiff, JANE KOE ("Plaintiff"), a law student *pro se* proceeding under a pseudonym. As the Clerk of Court and the back office failed to scan all 52 pages of her First Amended Complaint and only put in 44 pages onto the docket, Plaintiff is resubmitting her Second Amended Complaint at Law with color photographs in the attached exhibits that will scan better at the Clerk's office. The Complaint is against AMAR CHANDER MAINI aliases GALLANTVK, AMARCM4, AMARCM_2, VIKRAMKMS, and VIKRAM KUMAR MANSINGH ("Maini"), GUARANTEED REMOVALS ("Guaranteed Removals"), REPZE

("RepZe"), IIRC ("IIRC"), EXPERT REMOVALS ("Expert Removals"), INTERNET REMOVALS ("InternetRemovals.com"), MARCA GLOBAL, LLC. ("Marca Global"), AMARUTU TECHNOLOGY d/b/a KoDDOS ("Amarutu Technology"), MINC LAW ("Minc Law"), KEVIN ANGILERI ("Angileri"), RONALD LINCO ("Linco"), MICHAEL SCHERN ("Schern"), JAMES JOHN ("John"), JIM BURNS ("Burns"), SCOTT BREITENSTEIN ("Breitenstein"), ARMAN ALI d/b/a D4 SOLUTIONS BD ("Ali"), VIKRAM PARMAR aliases MATT HAMP and MARTIN HORAN ("Parmar"), PIERRE ZAROKIAN ("Zarokian"), DEFAMATION DEFENDERS ("Defamation Defenders"), WEB PRESENCE LLC. d/b/a NET REPUTATION ("Net Reputation"), and JOHN DOES 1-14 (all Defendants collectively, "Does," who have all been served with subpoenas), she asserts the following:

## INTRODUCTION

1. This case is about a country-wide extortion scheme being perpetrated by multiple Defendants against Plaintiff under various state and federal law theories of recovery listed below.

    (1) Fraudulent Misrepresentation

    (2) Defamation

    (3) Invasion of Privacy

    (4) Civil Racketeering Influenced and Corrupt Organizations (RICO) § 1962(c)

    (5) Civil Racketeering Influenced and Corrupt Organizations (RICO) § 1962(a)

    (6) Civil Racketeering Influenced and Corrupt Organizations (RICO) § 1962(b)

    (7) Civil Racketeering Influenced and Corrupt Organizations (RICO) § 1962(d)

    (8) Computer Fraud and Abuse

    (9) Breach of the Implied Covenant of Good Faith and Fair Dealing

    (10) Tortious Interference with Advantageous Business Relationship

    (11) Deceptive Trade

    (12) Civil Conspiracy

2. Plaintiff is a law student, fine artist, and couturier who is ranked at the top of her law school class. Prior to law school, she trained in fine painting and fine dressmaking in fashion capitols of London and Paris. Since 2017, she has run a fashion and art business that has won her numerous awards in the fashion industry and helped her get selected to show her designs on runways at New York Fashion Week and Paris Fashion Week. Plaintiff trades on

her name, image, and likeness, as it is inextricably linked to her ability to sell her paintings and designs to her elite and discreet socialite clientele. Formerly active in wholesale boutique sales, Plaintiff now sells her artwork and fashion designs on her direct-to-consumer website and to a variety of luxury and big box retailers worldwide alongside pursuing her legal education.

3. Between February 2016 to January 2017—with a final ending in February 2017—Plaintiff was betrothed via arranged marriage to Maini. Maini catfished her family and her matchmaker by pretending to be an age 28 investment banker named Vikram Kumar Mansingh when he was an age 37 unemployed former marketing assistant. Not only did Maini con Plaintiff into a romantic relationship by lying about his name, age, educational background, professional background, romantic background, and future goals, but also Maini stole Plaintiff's dowry prior to the February 2017 wedding date and has continued harassing, intimidating, defaming, and extorting Plaintiff's family since then. Plaintiff ended the relationship after discovering Maini is (1) addicted to alcohol despite going to alcohol rehabilitation centers in India throughout his 20s, (2) addicted to child pornography, (3) conned multiple families outside of her own for arranged marriage dowries, (4) sexually assaulted a large number of minor children under age 11, including grooming his then age 4 niece with verbal statements that he wanted to "smash her before getting titties at age 9," and (5) misrepresented his name, age, education, job, income, savings, and sheer magnitude of his brazen spoken and demonstrated sexual attraction to prepubescent girls ages 2 to 11.

4. Between July 2017 to September 2019, Maini has created original posts on dozens of websites filled with defamation and libel about Plaintiff. Between July 2017 to April 2019, Maini continued threatening, harassing, and extorting Plaintiff's parents over email and via untraceable phone numbers stating that he would post libel anonymously and he carried out his threats and intimidation efforts. Plaintiff has report his actions to Interpol and the FBI and now Maini faces charges for possession of child pornography, criminal defamation, and cyberstalking.

5. Maini began by authoring original libel about Plaintiff on a variety of WordPress and Blogspot blogs, accusing her of heinous actions ranging from "leaving him at the altar," being "a medium to low functioning Borderline," and "cheating on exams and her partner," when Plaintiff ended the engagement a month before the wedding date, returned his ring, is

high functioning at an elite law school, and has neither cheated on exams nor on him.  In reality, Maini cheated on Plaintiff throughout the relationship, including when Plaintiff was hospitalized.  After not getting the desired response from terrorizing Plaintiff and her family for doing this from July 2017 to January 2019, Maini soon escalated his campaign of terror by posting further libel on "Bashing Websites."

6.   The way the "Bashing Websites" work are that aggrieved suitors post libel or factual information about their ex-partner or ex-partners and then they are referred to "Removal Websites" to pay for the removal of said posts, which can range between $750 USD to $5,000 USD per post.  The Bashing Websites are managed by a variety of individuals, ranging from Arizona attorney Schern to convicted felons Angileri and Breitenstein, and they have a relationship with convicted Bangladeshi/Indian felon Ali to repurpose material of those deemed of high enough net worth to continue paying for whack-a-mole removals. Based on information and belief, a partial list of the Bashing Websites and the Removal Websites are listed below in tabular format.

**BASHING WEBSITES**

| OWNER | WEBSITE |
|---|---|
| Defendant Michael Schern | TheDirty.com<br>ShesAHomewrecker.com<br>ExtortionInc.com |
| Defendant Kevin Angileri | ReportCheater.com<br>CheaterXposed.us<br>ComplaintRemovals.xyz<br>BadGirlReports.date<br>ConsumerComplaint.xyz<br>ComplaintsRemoval.us<br>YSwitchTech.com<br>ComplaintsRemoval.in<br>PredatorAlert.us<br>DatingComplaints.us<br>Tips-Dating.xyz<br>DatingComplaints.stream<br>TipsDating.us<br>ExposeCheaters.online<br>ReportCheatingWife.com<br>InternetCheaters.com<br>ExposeCheatersOnline.com<br>DrivingSchoolWebsiteDesign.com |
| Defendant Scott Breitenstein<br>Defendant Pierre Zarokian | ComplaintLand.com<br>CheatReport.com<br>CheaterReport.com<br>CheatingReport.com |

|  | CheatBase.com |
|---|---|
|  | BadBizreport.is |
|  | CheatersBoard.com |
|  | CheaterDirectory.com |
|  | BlacklistReport.com |
|  | ReportMyEx.com |
|  | ComplaintsBureau.com |
|  | ScamBoard.com |
|  | ScamFound.com |
|  | STDRegistry.com |
|  | LiarsandCheaters.com |
|  | LiarsCheaters.com |
|  | ReportDeadbeats.com |
|  | WallOfJohns.com |
|  | FlushTheJohns.com |
|  | IHateHomewreckers.com |
|  | JailArrest.com |
|  | JailCase.org |
|  | BadrEnterReport.com |
|  | WikiScams.com |
|  | DatingPsychos.com |
|  | HoboLoco.org |
|  | ScornedLove.com |
|  | USHomewreckers.com |
|  | WTFComplaint.com |
|  | WTFRrus.com |
|  | CheaterBay.com |
|  | CheaterCentral.com |
|  | CheatLand.com |
|  | ExposeCheatingOnline.com |
|  | ReportAffairs.com |
|  | CheaterBoard.com |
|  | CheaterWatch.com |
|  | CheatFound.com |
|  | ReportCheatersOnline.com |
|  | CheaterRant.com |
|  | HeyHobo.com |
|  | VerifyCheater.com |
|  | WtfCheaters.com |
| Defendant Pierre Zarokian | ReportCheater.com |
|  | WikiCheaters.com |
| John Doe 2 | WorstHomewreckers.com |
| Defendant Internet Removals Australia Defendant Jim Burns | Exposes.Net |

## REMOVAL WEBSITES

| OWNER | WEBSITE |
|---|---|
| Defendant Vikram Parmar alias Matt Hamp | RepZe.com |
| Defendant Vikram Parmar alias Martin Horan Defendant Marca Global | InternetReputation.com RepZe.com |
| Defendants Minc Law and Aaron Minc | MincLaw.com |

| Defendant Scott Breitenstein Defendant Pierre Zarokian | 247Removals.com |
| Defendant James John | GuaranteedRemovals.com |
| Defendant Matt | ExpertRemovals.com |
| Defendant Jim Burns | InternetRemovals.com |
| Defendant Pierre Zarokian | SubmitExpress.com ReputationStars.com 247Removals.com |

### SELECTED ADVERTISED REMOVAL WEBSITES ON EACH CHEATER WEBSITE

| CHEATER WEBSITE | REMOVAL WEBSITE ADVERTISED |
| --- | --- |
| TheDirty.com | RepZe |
| CheaterXposed.us | RepZe |
| BadGirlReports.date | RepZe |
| PredatorAlert.us | RepZe |
| DatingComplaints.us | RepZe |
| DatingComplaints.stream | RepZe |
| ExposeCheaters.online | RepZe |
| ReportCheatersOnline.com | RepZe |
| ReportCheater.com | RepZe, Minc Law, Remove Reports, Reputation Lawyer |
| Exposes.Net | Internet Removals |
| VerifyCheater.com | Internet Removals |
| WallOfJohns.com | Internet Removals |
| ExposeCheatingOnline.com | Internet Removals |
| ComplaintLand.com | 247 Removals |
| CheaterBoard.com | 247 Removals |
| CheatersBoard.com | 247 Removals |
| IHateHomewreckers.com | 247 Removals |
| ReportAffairs.com | 247 Removals |
| CheaterBoard.com | 247 Removals |
| CheaterRant.com | 247 Removals |
| WtfCheaters.com | 247 Removals |
| WorstHomewreckers.com | 247 Removals |
| WikiCheater.com | 247 Removals |
| ShesAHomewrecker.com | 247 Removals |

7. When Plaintiff and her parents initially discovered the extent to which Maini was out to get her with libelous blog posts, Plaintiff and her parents agreed to pay both Guaranteed Removals and Internet Removals to remove each subsequent post authored by Maini. Payments were made in good faith, but services were not fully rendered as posts continued to appear copied and pasted throughout the Internet due to a combination of the Bashing Websites, Removal Websites, and Maini's decision to continue writing libel working together. Soon, the pattern of posting soon escalated to near-catastrophic levels, with new posts appearing daily and weekly, causing Plaintiff not only to attempt suicide multiple times but also to cancel all press publicity for her fashion shows during Paris Fashion Week and to

take time off of her law school studies, delaying her graduation and her life by an entire year. Each post cost thousands of dollars to remove, and even after paying for one removal, Guaranteed Removals collaborated with Defendants Parmar, Angileri, Breitenstein, and Schern to continue a pattern of continual posting and thus requests for removal.

8. Based on information and belief, Maini has continued writing libel on various Internet platforms, largely because Plaintiff has achieved feats Maini could not due to his addictions to alcohol, poker gambling, clubbing, and child pornography.

9. When Plaintiff discovered that Guaranteed Removals was behind further reposting, beyond what Maini did, Plaintiff refused to pay for two additional removals, which were ultimately not removed.  Guaranteed Removals, working in concert with material authored by Maini, and the fraudulent company "Internet Reputation" and international felons, were responsible for the reposting and re-hashing of libelous content about Plaintiff.

10. Plaintiff has spent $4,000 per month in SEO services since April 2019 and thousands of dollars in whack-a-mole removal services using GuaranteedRemovals.com.  She contacted RepZe.com only to discover that they are an illegitimate extortion scam "company."  Further, Plaintiff had to cancel press for four Paris Fashion Week shows, lay off numerous members of her staff, and delay the launch of new products due to the extensive smear campaign initiated by Maini, exacerbated by the Removal Websites, and spread by the Bashing Websites (namely, all other Defendants).

11. Defendants' illegal operation has caused tremendous harm to Plaintiff financially and emotionally and to Plaintiff's fashion and art business.  Accordingly, Plaintiff has brought this action and humbly and respectfully requests that the Court bring an end to Defendants' illegal conduct.

## PARTIES

12. Plaintiff Jane Koe, a pseudonym, is a private citizen who resides in Southern Florida when not attending law school.  Her principal place of business is also in Southern Florida, where she creates custom couture and private artworks for her image-conscious, well-heeled female clientele in the Miami, Coconut Grove, Delray Beach, Palm Beach, and Fisher Island areas. As noted above, Plaintiff is a law student, fine artist, and couturier.  She has helped her parents secure a spot in an Indian retirement community in Florida, aspires to settle down in

Florida, seeks to build her future family in Florida, and to practice law in Florida after completing her JD, LLM, and MBA degrees and passing the Florida Bar Exam.  Plaintiff is already studying her BarBri Conviser alongside school provided textbooks.

13. Defendant Amar Chander Maini aliases Vikram Kumar Mansingh, gallantvk, amarcm4, amarcm_2, and vikramkms, is an individual Australian citizen currently residing in India.

14. Defendant Guaranteed Removals is a Canadian company.

15. Defendant RepZe is a fraudulent LLC based in the United States.

16. Defendant IIRC is a fraudulent LLC based in the United States.

17. Defendant Expert Removals is a fraudulent LLC based in the United States.

18. Defendant Internet Reputation is a fraudulent LLC based in the United States

19. Defendant Internet Removals is an Australian company.

20. Defendant Marca Global, LLC is a Colorado LLC.

21. Defendant Amarutu Technology d/b/a KoDDOS is a Hong Kong limited company.

22. Defendant Minc Law is an Ohio law firm.

23. Defendant Kevin Angileri is an individual resident in Arizona who was recently released from US federal prison for possession of child pornography (*USA v. Angileri* in Case No. 2:12-cr-00755-ROS-1).

24. Defendant Ronald Linco is an individual of unknown residency.

25. Defendant Scott Breitenstein is an individual resident in Dayton, Ohio, who has been labelled by the popular press as "the most hated man on the Internet."

26. Defendant Arman Ali d/b/a D4 Solutions BD is a company resident in Bangladesh.

27. Defendant Vikram Parmar aliases Matt Hamp and Martin Horan is an individual resident in Bangladesh, who was recently released from Indian federal prison for racketeering.  The Central Bureau Agency in Ahemedabad arrested him in 2014 for creating fake job posts.

28. Defendant Pierre Zarokian is an individual resident in Nevada, United States who is involved in the extortion line of work.

29. Defendant Defamation Defenders is a fraudulent LLC believed to be based in the United States.

30. Defendant Net Reputation is the d/b/a name of Web Presence, LLC, which is an Inc. 5000 company which has made all of its money off of scamming people and is already facing

another federal lawsuit in Nevada from Reflex Media for scraping data from one of their business technology websites.

31. Defendant John Does 1 to 14, inclusive, are either individuals or businesses or some combination thereof.

## JURISDICTION AND VENUE

32. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim against Defendants arises under both the RICO, 18 U.S.C. § 1961 to 1968 as well as 18 U.S.C.A. § 1964(c) and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, under the doctrine of supplemental jurisdiction.

33. All Defendants named herein are subject to personal jurisdiction in this judicial district because their conduct complained of herein emanates from a conspiracy that is directed, overseen, and driven by the list of Bashing Websites owned by Defendants Scott Breitenstein, Michael Schern, and Kevin Angileri. In addition, personal jurisdiction is appropriate over those Defendants engaged in the mining of personal information from Plaintiff's social media profiles and pageant award websites because, based on information and belief, they sell that content to other websites and mine Florida residents' personal identifying information, thereby expressly aiming or targeting their tortious conduct at Florida and this judicial district. Similarly, the Removal Sites generate "clients" from the tortious acts of the Bashing Websites which stem from this judicial district and, based on information and belief, remit a portion of their profits back to the Bashing Websites. As such, this Court may exercise personal jurisdiction over all Defendants without offending traditional notions of fair play and substantial justice.

34. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred within this judicial district, substantial injury occurred in this district, and Defendants are otherwise subject to the Court's personal jurisdiction in this district.

35. Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to jurisdiction in this judicial district and do business in this district. Note that 18 U.S.C. § 1965(b) of RICO provides that process may be served in "any judicial district of the United States" when required by the "ends of justice." Courts

have held that such "nationwide service of process" provisions also confer personal jurisdiction over a Defendant in any judicial district as long as the Defendant has minimum contacts with the United States.  18 U.S.C. § 1965(d) allows for process to be served "in any judicial district in which such a person resides, is found, has an agent, or transacts his affairs."  As such, Courts have approved nationwide service of process under both 18 U.S.C. § 1965(b) and (d).  Refer to *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006).  Furthermore, in the case of *Heller v. Deutsche Bank AG*, No. 04-CV-3571, 2005 WL 281181, at *2-3 (E.D. Pa. Feb. 3, 2005), the Court held that even single claim-specific contact is sufficient to confer personal jurisdiction under RICO when the Defendant(s) injure(s) a Plaintiff through activities purposely directed at residents of the forum state and the Defendant(s) do(es) not present a compelling case that such jurisdiction is unreasonable. Finally, see the case of *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-77 (1985).

36. With regard to the fact that some Defendants are located outside the United States, it must be said that RICO and other claims in this suit apply extraterritorially because of the Florida long-arm statute and the fact that the U.S. Congress intends to "eliminate wrongful conduct wherever it occurs."  *See United States v. Noriega*, 746 F. Supp. 1506, 1517 (S.D. Fla. 1990), "Given the Act's broad construction and equally broad goal of eliminating the harmful consequences of organized crime, it is apparent that Congress was concerned with the effects and not the locus of racketeering activities."  *aff'd*, 117 F.3d 1206 (11th Cir. 1997). Irrespective of the application of the Morrison test post-2010, the Tenth Circuit has ruled that that Foreign Sovereign Immunities Act ("FSIA") confers subject matter jurisdiction over civil RICO claims against all foreign states, their agencies, and their instrumentalities when the commercial activity exception, or another exception contained in the FSIA, applies. Plaintiff alleges that there is concurrent jurisdiction at play given that 18 U.S.C. § 1964(c) provides in part that "any person injured in his business or property by reason of a violation of § 1962 may sue therefore in any appropriate United States District Court."  This decision was upheld by the Supreme Court in the case of *Tafflin v. Levitt*, 493 U.S. 455 (1990).

## **GENERAL ALLEGATIONS**

37. Defendant Maini posted original posts about Plaintiff in July 2017, August 2017, September 2017, November 2018, December 2018, January 2019, February 2019, March 2019, April

2019, May 2019, and October 2019. Based on information and belief, he may have also posted in January 2020.

38. Plaintiff paid Guaranteed Removals to remove the defamatory and libelous posts in January 2019 and February 2019. Plaintiff also spoke to removal companies RepZe.com, InternetReputation.com, MincLaw.com, 247Removals.com, and ExpertRemovals.com.

39. Shortly after the removal by Guaranteed Removals, new posts that were direct copies of the originally removed posts cropped up with increasing extortion costs. Based on information and belief, such posts were then distorted and re-copied on a variety of websites by Defendants Maini, Ali, Parmar, Angileri, Linco, Schern, John, Breitenstein, and Matt. Maini is an aggrieved suitor, con artist, catfish, and sociopath with a long history of abusing women and girls and stealing cash dowries. The others—Ali, Parmar, Angileri, Linco, Schern, John, Breitenstein, and Matt—are extortionist business owners.

40. Plaintiff then retained Internet Removals for $1,000 to remove additional defamatory and libelous posts. The company is run by Defendant Burns and despite requesting a refund for failure to remove defamatory and libelous posts, no services were rendered. In fact, new posts ended up appearing *post*-retainer, as early as October 2019.

41. Full screenshots and copies of all posts will be made available in discovery to opposing counsel; that said, date and website post information are available in tabular format below.

| DATE POSTED | WEBSITE | TITLE |
|---|---|---|
| July 22, 2017 | AllSortsofThingsSite.wordpress.com | The [Jane Koe] Story |
| July 23, 2017 | LiarsandCheaters.com | [Jane Koe] Left Me at the Altar |
| December 23, 2017 | CheaterLand.com | [Jane Koe] Runaway Bride Bitch |
| December 27, 2018 | Staytunedformore.blog | The [Jane Koe] Story |
| December 29, 2018 | Staytunedformore.blog | More [Jane Koe] Files |
| January 17, 2019 | LiarsandCheaters.com | [Jane Koe] United States |
| January 17, 2019 | ReportCheatingOnline.com | [Jane Koe] United States |
| January 17, 2019 | BadGirlReports.date | [Jane Koe] United States | Liars and Cheaters |
| January 17, 2019 | ReportCheatingOnline.com | Keep [Jane Koe] at a Safe Distance |
| January 17, 2019 | WTFCheater.com | Keep [Jane Koe] at a Safe Distance |
| January 17, 2019 | BadGirlReports.date | [Jane Koe] United States |
| February 11, 2019 | CheaterReport.com | [Jane Koe] USA |
| February 12, 2019 | CheaterLand.com | [Jane Koe] USA |
| February 21, 2019 | TheDirty.com | Dirty Filthy Skank [Jane Koe] |
| February 22, 2019 | CheaterBoard.com | [Jane Koe] Australia |
| February 22, 2019 | ExposingCheatingWife.com | [Jane Koe] Australia |
| February 22, 2019 | ReportAffairs.com | [Jane Koe] Australia |
| February 22, 2019 | WTFCheaters.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatersOnline.com | [Jane Koe] Australia |

| February 22, 2019 | CheaterBlock.com | [Jane Koe] Australia |
|---|---|---|
| February 22, 2019 | DontDateACheater.com | [Jane Koe] Australia |
| February 22, 2019 | HeyHobo.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterHoe.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterExpose.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterRant.com | [Jane Koe] Australia |
| February 22, 2019 | WikiCheater.com | [Jane Koe] Australia |
| February 22, 2019 | InternetCheater.com | [Jane Koe] Australia |
| February 22, 2019 | VerifyCheater.com | [Jane Koe] Australia |
| February 22, 2019 | ExposeCheatingOnline.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterBot.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterList.com | [Jane Koe] Australia |
| February 22, 2019 | VerifyCheater.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterCase.com | [Jane Koe] Australia |
| February 22, 2019 | BadGirlReports.date | [Jane Koe] Australia – Cheater Board |
| February 22, 2019 | BadGirlReports.date | [Jane Koe] Australia – Report Cheating Wife |
| February 22, 2019 | InternetCheaters.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheater.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatingOnline.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatingWife.com | [Jane Koe] Australia |
| February 22, 2019 | ExposeCheatersOnline.com | [Jane Koe] Australia |
| February 22, 2019 | WTFCheater.com | [Jane Koe] Australia |
| February 22, 2019 | CheatandLie.com | [Jane Koe] Australia |
| February 22, 2019 | CheatersCaughtOnline.com | [Jane Koe] Australia |
| March 12, 2019 | LiarsandCheaters.com | [Jane Koe] USA |
| March 12, 2019 | PostCheatersPictures.com | [Jane Koe] USA |
| March 12, 2019 | WTFCheater.com | [Jane Koe] USA |
| March 12, 2019 | ReportCheatingWife.com | [Jane Koe] USA |
| March 12, 2019 | ReportCheatingOnline.com | [Jane Koe] USA |
| March 12, 2019 | InfidelityWebsite.com | [Jane Koe] USA |
| March 12, 2019 | BadGirlReports.date | [Jane Koe] United States Report Cheating Wife |
| March 12, 2019 | BadGirlReports.date | [Jane Koe], USA | Liars and Cheaters |
| March 16, 2019 | CheaterXposed.us | Dirty Filthy Skank [Jane Koe] |
| April 13, 2019 | DatingComplaints.co | [Jane Koe] is a Dirty Filthy Skank |
| May 23, 2019 | ExposeCheaters.Online | Dirty Filthy Skank [Jane Koe] |
| January-July, 2019 | AmarChanderMaini.Wordpress.com AmarChanderMaini.Blogspot.com | Fuck [Jane Koe] [Jane Koe] Runaway Bride Bitch Obnoxious Bitch [Jane Koe] and Family I hate [Jane Koe] I want to kill [Jane Koe] [Jane Koe] Needs to Die [Jane Koe] Heartbreaking Goddamn Bitch |
| October 19, 2019 | Exposes.net | [Jane Koe] Australia |
| November 30, 2019 | CheaterBoard.com | [Jane Koe] …flunked out…hired gigolos |
| December 1, 2019 | Reportcheater.com | [Jane Koe] …flunked out…hired gigolos |
| January 28, 2020 | Instagram.com | [Jane Koe] Has a History #[JaneKoe] |
| January 28, 2020 | Twitter.com | I found this very interesting – reportcheater.com [link redacted]  *In response to a post on someone else's thread* |
| February 23, 2020 | Twitter.com | Reportcheater.com [link redacted] |

| | | |
|---|---|---|
| | | *In response to an industry blogger's tweet with details about Plaintiff's fashion week show* |
| March 16, 2020 | Twitter.com | [Jane Koe]- a world renowned academic fraudster?<br><br>*In response to a post advertising a product on Plaintiff's business page* |
| March 16, 2020 | Twitter.com | Your books have about 2 confirmed sales and have been translated into 0 languages.<br><br>*In response to a post advertising a product on Plaintiff's business page* |
| March 16, 2020 | Twitter.com | [Jane Koe]…2016 kicked out for fraud. Am I getting warm?<br><br>*In response to a post advertising a product on Plaintiff's business page* |
| March 16, 2020 | Twitter.com | There are dozens of sites detailing [Jane Koe]'s record of cheating.<br><br>*In response to a post advertising a product on Plaintiff's business page* |
| March 16, 2020 | Twitter.com | I just did the smallest bit of digging. The American/British/Australian authorities should really look into [Jane Koe]'s history of academic fraud. Would have a ball!<br><br>*In response to a post advertising a product on Plaintiff's business page* |
| March 16, 2020 | Twitter.com | [Jane Koe] admissions scandal 2020?<br><br>*In response to a post advertising a product on Plaintiff's business page* |
| March 16, 2020 | Twitter.com | Don't mess with Mancunians.  Wtfcheaters.com [link redacted]<br><br>*In response to a post advertising a product on Plaintiff's business page* |

42. Plaintiff lives full-time in neither Australia nor the United States.  She has been studying law abroad in the United Kingdom since January of 2019, as a part of a dual degree program with her United States law school, and she expects to complete her U.K. studies in 2021 and her U.S. studies in 2023.  She is studying to be a trial lawyer in the U.S. and a barrister in the U.K.  Plaintiff has been in Australia only four (4) times in her life: in 2006, as an age 14 tourist visiting her cousins, in 2016, from June to December, where she was on a temporary work and visitor visa doing scientific research at a university medical hospital doing pharmaceutical research for a rare disease, in 2017 from February to March, where she applied for patent protection for her invention, and in 2019, for a week in January, to file for a restraining and protective order against Maini.  During her trips in 2016 and 2017 she was

living in all-female temporary accommodation and during her trips in 2006 and 2019 she was staying with her female cousin, who was a law topper at Sydney and Oxford and is now a complex commercial barrister in New South Wales representing big-name companies. Plaintiff left her all-female accommodation at her own volition solely due to dress code violations for wearing tube tops and flip flop sandals at formal meals; ironically, they are the bestselling designs Plaintiff is now known for designing and selling wholesale.

43. Defendant Maini and his extortionist co-conspirators have used the false names "Kat," "Jo," "Eki," "Anonymous," "Sam," "Amar Chander," "Anthony Balderon," and more recently, "Then Victoria," to make libelous and defamatory comments about Plaintiff in social media channels and various cheater blog posts. All comments will be available to counsel in discovery. Plaintiff intends to subpoena all websites where comments appear to discover the IP addresses of such posters writing on February 11, 2019, March 2, 2019, April 4, 2019, June 13, 2019, November 30, 2019, December 1, 2019, January 28, 2020, February 28, 2020, and March 16, 2020.

44. Maini has continued stalking Plaintiff's LinkedIn profile on a daily basis using names "Amar C," "Amar Chander," and "Anthony Balderon." Plaintiff gets daily notifications informing her of profile views, and over 50% of her total profile views are from Maini. As a result, Plaintiff has disguised her physical location and removed her email address and physical address from public view, lest Maini attempt to follow through on his threat to "throw acid all over Kaura's face." Maini is jealous of Plaintiff's level academic and professional success which far surpasses his own level.

45. Plaintiff has sent Maini over 45 requests to "cease and desist" on her official letterhead and has filed for restraining orders in Australia, New York, and Florida. Despite this, Maini continues posting libel about Plaintiff and interfering with her business activities in design. Based on information and belief, Maini is determined to affect Plaintiff's ability to marry another suitor who is far richer, smarter, more virtuous, and more accomplished than he is. Based on information and belief, it seems Maini cannot move on in a healthy way; he remains unsuccessful personally and professionally. Without Plaintiff's assistance with editing his resumes and guiding his steps, Maini is incapable of navigating or building a successful career for himself in politics or business.

46. Based on information and belief, Defendants' use one of the following three tactics to obtain personal identifying information or even false and libelous personal identifying information:

    a. Maini, a vexatious individual operating out of malicious disregard for the truth, posts libel on a number of his blogs and a variety of gripe websites that are then either "scraped" by additional Defendants to paste onto their own websites or "scraped" by Ali d/b/a D4 Solutions BD and copied and pasted onto other gripe websites.

    b. Some Defendants summarize libelous statements made by an aggrieved suitor on one or two websites and then copy and paste them on dozens and dozens of other websites.

    c. Some Defendants join LinkedIn.com and pose as legitimate members for the purpose of gathering personal identifying information, including members' websites, business pages, awards, photos, email addresses, phone numbers, and locations. For example, a Defendant may join LinkedIn.com and pose as a legitimate businessperson seeking to connect with Plaintiff and then entice Plaintiff to provide certain personal identifying information. Defendant Vikram Parmar alias Martin Horan maintains a fake LinkedIn profile for expressly this purpose: to prey on successful, ethical students and professionals to extort them.

47. Based on information and belief, the Bashing Scam essentially works as follows:

    a. After obtaining the personal identifying information or malicious, libelous information, it is then posted to the Bashing Websites where Plaintiff has continued to be defamed and victimized by Defendants' ruse.

    b. Victims, including Plaintiff, are then referred to the Removal Sites where they are told that each individual posting can be removed for a fee, which generally ranges from $1,500 to $15,000. Such high extortive removal costs can quickly become prohibitive for a self-supported law student and creative young professional just beginning their career.

    c. As explained below, Plaintiff has also received harassing emails advising her that her information has been posted on the Bashing Websites and sometimes receive threats that the postings will be more widely disseminated on mainstream social media and on further Bashing Websites should she choose not to pay the Removal Sites to

remove the postings.  These emails have been sent in conjunction with a number of harassing phone calls to both Plaintiff and her mother.

48. Based on information and belief, the Communications Decency Act of 1996 ("CDA") provides no protection for Bashing Websites, Removal Websites, and the original poster of libelous content, Maini.

49. In spite of this, the Bashing Websites and the Removal Websites in question list the Communications Decency Act of 1996 ("CDA") as providing immunity from extortion for charging fees for the removal of any content.  Again, the CDA does not provide any protection to the Defendants in this Complaint.

50. Because the Bashing Websites manufacture and/or solicit all content, the CDA neither protects the content nor the communications, extortion threats, and request for money to take down extortive content for which it remains liable both directly and indirectly.

51. The CDA only offers protection to those websites who do not solicit or provide content, with the understanding that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"  with the citation of 47 U.S.C. § 230(c)(1).  According to 47 U.S.C. § 230(f)(3), an 'information content provider' is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  That is, 'information content providers' are not immunized by the CDA, with a further citation of 47 U.S.C. § 230(f)(3).  More specifically, the visible extortive content on the Bashing Websites and the related communications and extortive acts in which Removal Websites engage, are exactly the type that remain fully excluded from CDA protection.

52. Websites soliciting unlawful content are excluded from CDA immunity.  The Removal Websites and the Bashing Websites are both considered "information content providers" outside of CDA immunity because they have collected information about Plaintiff (and countless other victims) and posted that information alongside multiple malicious defamatory accusations about Plaintiff and stole a copyrighted pageant headshot photograph.  Furthermore, the Bashing Websites then copied and pasted the entire defamatory post and pageant headshot photograph despite being notified that (a) the content is entirely defamatory

and (b) a full and complete DMCA takedown notice for the pageant photograph was provided in full.

53. After Plaintiff refused to continue paying for whack-a-mole removals, the Bashing Websites, the Removal Websites, and Defendant Maini conspired to continue creating and/or soliciting unlawful content for the purpose of extorting Plaintiff and her parents.  The situation heightened to the point Plaintiff attempted suicide multiple times and had to delay her final exams, take off a term from school due to worsening physical stress symptoms, and thus delay her law school graduation date by one-year.  These are facts of which all Defendants are fully aware.

54. The Bashing Websites and Removal Websites are "information content providers" outside of CDA immunity as they collected extensive information about and pageant photographs of Plaintiff and posted *false* information about Plaintiff drawing from *defamatory per se* and *defamatory* posts with malicious intent originally created by Defendant Maini in retaliation for her rejecting his marriage offer, finding a more successful and ethical suitor, rebuilding her self-esteem, gaining her self-confidence after his extensive physical, verbal and emotional abuse, and earning admission into the law school of her choice.

55. It is apparent that Defendants Kevin Angileri, Scott Breitenstein, Michael Schern, Guaranteed Removals, RepZe, Internet Reputation, Internet Removals, Defamation Defenders, Net Reputation, Vikram Parmar, and Expert Removals all played an important part in the reposting and spreading of this malicious libel.  All libel was originally posted by Defendant Maini and due to statutory guidance, none of the aforementioned defendants retain any CDA immunity.

56. The Defendants who created and/or solicited unlawful content for the purpose of extorting Plaintiff, those participants are "information content providers" within the meaning of U.S.C. § 230(f)(3) and are not immunized from liability for the contents of those posts by the CDA. *See* 47 U.S.C. § 230(f)(3).  The Bashing Websites and the Removal Websites are liable for their conduct as a conspirator with knowledge of the relevant portions of this blatant extortion scheme.

57. The Removal Websites send harassing, solicitous emails even when told to cease and desist and to remove Plaintiff's email address from their email list.  As an example, WEB PRESENCE, LLC. d/b/a Net Reputation has sent Plaintiff dozens of emails between 2019

and 2020 despite Plaintiff telling them to cease and desist and to remove her information in light of data privacy protection laws.  They continue their pattern of harassment.

> *[Jane],*
> *Googled yourself lately?  If you haven't, you may be surprised by what you find. Nearly 50% of US adults say the results aren't positive and that's not something to be taken lightly. We live in a world where your online reputation can be your strongest asset or your biggest liability. What shows up in your search results could mean the difference between success or failure.*
>> *There's no excuse for being unaware of your online footprint. In fact, it's downright irresponsible.*
>> *The Power Of Search Results*
>>> *1.  91% of online adults use search engines to find information on the web.*
>>> *2.  65% of people see online search as the most trusted source of information about people and companies. That's a higher level of trust than any other online or offline source.*
>>> *3.  93% of searchers never go past the first page, instead using only the first 10 search results to form their impression.*
> *Call us now: (844) 461-3632*
> *Learn More: https://www.netreputation.com/free-assessment/*

   b.  In a press statement after winning the Inc. 5000 Award, Net Reputation CEO Adam Petrilli claims that their "goal is to provide world-class online reputation management services to our clients by utilizing the latest technology and processes.  Through various methods, we work to restore, improve, or create a positive web presence for businesses and individuals."  They achieve this through working in close collaboration with federal parolee Defendant Kevin Angileri in Arizona and hiring Defendant Arman Ali in Bangladesh to scrape website content and then work hand in hand with Bashing Websites to overcharge customers spanning doctors, lawyers, accountants, professors, entrepreneurs, and other private citizens without fact-checking the veracity.  Anyone can make any bogus claim on a Bashing Website and see it spread, but the professionals that Net Reputation identifies as having disposable income get targeted most.  As an example, an Honors College Professor at the University of South Florida named Dr. Catherine Wilkins, who is in charge of writing medical school recommendation letters for undergraduates, remains subject to hundreds of posts from a disgruntled premed angry about their grades in a class; this student has libeled Dr. Wilkins and labelled her a "fraud."  Net Reputation participated in the spreading of information about Dr. Wilkins.  As another example,

Fahrin Jaffer, an attorney in Toronto working at biglaw firm Cooley, faces hundreds of posts about her on various cheater websites, merely for fighting for her client. Other lawyers from top law firms located conspicuously and geographically close to the Guaranteed Removals headquarters have also been targeted with names including "frauds," "scammers," "floozy," "greedy" and "incompetent." Even Alan Dershowitz, a famous Harvard Law professor, has been listed. A lawyer named Mark L. Smith from Smith Washburn in Los Angeles has also been targeted with someone clearly projecting all of their own character flaws towards him. What's concerning here is that all lawyers and law students irrespective of geographic location are held to the highest character and fitness standards, not just for the Bar Exam but for their entire careers whether they practice or not. Physicians are also held to high standards from the medical licensing boards. These websites are so sophisticated that they ensure the most commonly posted individuals are professionals who the Bashing Websites and Cheater Websites determine have the assets to pay thousands of dollars for each removal. Plaintiff was at the point of cashing her entire Roth IRA retirement savings account which she has had since age 2 to pay for further removals when her parents stopped her and instructed her to focus all energy on preparing for her final exams worth 100% of her overall grade.

    c. Furthermore, Defendant Guaranteed Removals has made threatening and harassing phone calls to Plaintiff's mother, as well as sending numerous frightening, threatening email messages to Plaintiff which put both Plaintiff and her mother in genuine fear for their physical safety.

58. This extortion scheme meets the definition for **civil RICO** violations. To satisfy the necessary elements common to all RICO violations, Plaintiff will prove that all Bashing Websites and Removal Websites are: (a) a culpable person, who (b) conducts or acquires an "enterprise" (c) affecting interstate commerce (d) through a "pattern" (e) of "racketeering activity." In addition, a civil RICO plaintiff must show injury "by reason of" the RICO violation, which Plaintiff has already established above in terms of removal costs, SEO costs, missed opportunities in business, and more in the Causes of Action sections. In terms of definitions:

a. An examination of § 1962(a), (b), or (c), as well as § 1961(3) of RICO defines a "**person**" as an "entity capable of holding a legal or beneficial interest in property." The Second Circuit has maintained that an organized crime "family" is not a "person" subject to § 1964(a) or (c), though acknowledges that it could be an association-in-fact enterprise used by a culpable person to commit racketeering. The Court has concluded that illegal organizations do not satisfy the statutory definition of a culpable "person," because it is not capable of holding an interest in property, while also acknowledging that an unincorporated association may be a RICO "person." See the cases *Jund v. Town of Hempstead*, 941 F.2d 1271, 1282 (2d Cir. 1991) (unincorporated political associations) and *Bank of N. Ill. v. Nugent*, 584 N.E.2d 948 (Ill. App. Ct. 1991) (an estate, through its executor, may be a "person" under RICO). That is, in cases arising under § 1962(c), the culpable person must be separate from the enterprise. Plaintiff clearly is demonstrating below that the culpable individuals behind these websites are separate from the overall extortion scheme of Bashing Websites and Removal Websites.

b. With regards to the **mental state** of each Defendant, it is clear that RICO is predicated on criminal conduct and it is necessary to establish that each Defendant intended to engage in the conduct with actual knowledge of the illegal activities. The mail and wire fraud extortion scheme is an *intent to defraud*. The Defendants in question intended to obtain money by means of materially false and fraudulent pretenses and representations. The recklessness with which Bashing Websites and Removal Websites operates shows that the misleading was "so obvious that the actor must have been aware of it." There is no argument any Defendant can make for lack of knowledge, as both the Bashing Websites and the Removal Websites profit off of the removal fees.

c. With regards to the definition of **enterprise**, RICO defines enterprise as "any individual, partnership, corporation, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Courts have interpreted the term "enterprise" very broadly, and Plaintiff asserts that the Bashing Websites and Removal Websites meet the definition of an association-in-fact-enterprise. In the seminal case *United States v. Bledsoe*, the Eighth Circuit held that an association-in-fact enterprise must exhibit three characteristics: (a) a common or shared purpose amongst its members; (b) some continuity of structure and personnel; (c) an ascertainable structure distinct from that inherent in the pattern of racketeering. See here: 18 U.S.C.A. § 1961(4); *see also United States v. Philip*

*Morris USA Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009), holding that "a group of individuals, corporations, and partnerships associated in fact can qualify as a RICO 'enterprise,' even though Section 1961(4) nowhere expressly mentions this type of association."

d.   In terms of **interstate commerce**, RICO requirements are satisfied if either the activity of the enterprise or the predicate acts of racketeering affect interstate commerce. The Bashing Websites and the Removal Websites are located in different states, and run by Defendants in different states, which sufficiently pleads the requirement for the nexus with interstate commerce required by RICO.

e.   A **pattern of racketeering** has been established as outlined and defined in § 1961(5). Specifically, "at least two acts of racketeering activity...the last of which occurred within 10 years after the commission of a prior act of racketeering activity." The acts of posting on Bashing Websites and then requiring Plaintiff (and thousands of other victims) were related and continuous. "Related" defined means that "acts have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events." Bashing Site posting and then Removal Site de-posting meets the definition standard for "related." Further, continuity is demonstrated here via the close-ended scheme, consisting of a series of related predicate acts extending over a substantial period of time: the Removal Sites pay the Bashing Sites advertising fees to advertise services and charge removal fees to Plaintiff (and countless victims) to remove posts.

f.   **Racketeering activity** is defined as any number of Florida state and U.S. federal offenses enumerated in § 1961(1). Plaintiff alleges that wire fraud has occurred, with regard to the Removal Sites reposting defamatory and libelous content originally authored by Maini and then the Bashing Sites participating in the posting and reposting. This endless whack-a-mole cycle of wire fraud led to Plaintiff spending thousands of dollars in removal fees, only for a reposting. Plaintiff is aware of the requirements of Rule 9(b) in the Federal Rules of Civil Procedure to specify the time, place, and content of all wire communication and the need to identify all parties to the communications. Plaintiff will release all receipts to opposing counsel during discovery, deposition, and trial. Due to the sake of protecting her privacy as her legal name appears on invoices and credit card statements, Plaintiff is not listing dates and receipt amounts in this Complaint itself.

g. RICO standing requirements include a four-factor test: the Plaintiff must be (1) a "person" (2) who sustains **injury** (3) to his or her "business or property" (4) "by reason of" Defendants' violation of § 1962. Plaintiff is a "person" who has sustained severe injury to her business by the reason of Defendants' violation of § 1962. Plaintiff will elaborate on the injuries suffered in the relevant Causes of Action sections.

   i. Injury under § 1962(c) stems from the predicate acts.

   ii. Injury under § 1962(a) stems from the investment of racketeering income.

   iii. Injury under § 1962(b) stems from the acquisition of an interest on or control over an enterprise.

   iv. Injury under § 1962(d) stems from the overt acts committed in furtherance of the conspiracy.

h. Plaintiff is filing within the four-year **statute of limitations**.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION
*Against Amar Chander Maini*

59. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

60. To state a cause of action for fraudulent misrepresentation, Plaintiff will prove the following five elements: (a) a misrepresentation of a material fact; (b) which the person making the misrepresentation [Maini] knew to be false; (c) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (d) that the person relied on the misrepresentation to her detriment; (e) that this reliance caused damages. Refer to *Standard Jury Instructions—Civil Cases (No. 99-2)*, 777 So.2d 378, 381 (Fla. 2000), *Standard Jury Instructions—Civil Cases (1.0, 6.1d, MI8)*, 613 So.2d 1316, 1317 (Fla. 1993), *American International Land Corp. v. Hanna*, 323 So.2d 567, 569 (Fla. 1975), and *Huffstetler v. Our Home Life Ins. Co.*, 65 So. 1 (Fla. 1914).

61. Plaintiff is a traditionally minded and family-focused abstinent virgin of Indian origin who applied to a variety of professional matchmaking agencies starting at age 20 to find a suitable

match from her caste and subcaste. Full copies of her applications to Kelleher International, It's Just Lunch, Selective Search, Intersections Match, and eight other agencies will be made available in discovery. After being told by every matchmaker she met with that she was too young to marry and to wait until after graduation by over eight elite agencies, she waited until graduation and then immediately chose to sign on with Jasbina Ahluwalia, a "modern" arranged marriage matchmaker also of Indian origin. Plaintiff paid a fee of $2,500 to retain assistance with finding and growing a relationship with an Indian suitor in her caste and subcaste. Under the guidance of Ms. Ahluwalia, who is also an attorney, and her mother, Plaintiff set up Indian matrimonial pages on Shaadi.com, ChristianMingle.com, OKCupid.com, and Match.com. Profiles were managed on a daily basis by Plaintiff's mother, who oversaw all messages from suitors and passed on all pre-approved candidates to Plaintiff. Plaintiff was in charge of writing message responses, but any and all meets (the Indian term for "dates") were required to be pre-approved by Plaintiff's mother and included both phone interview and email interview screeners. Plaintiff's father, a highly respected physician, also participated in the screening process and oversaw both dowry questions and issued final approval to any suitor(s) to pursue courtship.

62. On his profile page using the screennames "GALLANTVK," and "VikramKMS," Maini misrepresented his name, age, family background, life story, work history, profession, education, licensure, relationship history, prior engagement, financial status, and dowry requirements. He claimed to be an age 28 investment banker at UBS named Vikram Kumar Mansingh who completed an MBA in Finance at London Business School and had certification in Psychotherapy and Medicine from University of London. He was actually an age 37 unemployed former marketing assistant with an MA in History and a BSc in Economics. He never worked in investment banking and has no professional certifications in either psychotherapy or medicine. The University of London International Division does not even offer degrees in psychotherapy or medicine. Suffice it to say, Maini has no qualifications to practice psychotherapy or medicine, and is certainly not licensed to provide diagnostic or therapeutic services.

63. Plaintiff was under the impression that she was developing a relationship with an upstanding member of her caste and subcaste from the right astrological and numerological background. Her and her family were blindsided by the repeated fraudulent misrepresentations Maini

presented about himself in order to obtain a substantial dowry of cash and gold as well as a U.S. citizenship green card from Plaintiff and her family. In the cases *Arlington Pebble Creek, LLC v. Campus Edge Condo Ass'n,* 232 So.3d 502, 505 (Fla 1st DCA 2017), *Howard v. Murray,* 184 So.3d 155, n. 22 (Fla. 1st DCA 2015), Cohen v. Corbitt, 135 So.3d 527, 529 (Fla. 1st DCA 2014), *Connecticut Gen. Life Ins. Co. v. Jones*, 764 So.2d 677, 682 (Fla.1st DCA 2000), and *State of Florida, Department of Transportation v. Southern Bell Telephone and Telegraph Company, Inc.*, 635 So.2d 74, 78 (Fla. 1st DCA 1994), the Court has upheld the definition of fraudulent misrepresentation. That is, "Moreover, under certain circumstances, concealment or nondisclosure of a material fact may also form a basis for a claim in misrepresentation." Maini failed to disclose and concealed his true identity in order to defraud Plaintiff and her family of both American citizenship and a dowry.

64. Maini is a pathological liar, 'catfish,' and con artist who duped Plaintiff into a relationship on false pretenses using the fake identity of an age 28 UBS investment banking analyst when he was really an age 37 unemployed former marketing assistant working at a no-name company.

   a. A screenshot of his OKCupid profile where is blatantly lying about his name, age, profession, relationship status, and log in information is available in Exhibit A.

   b. A screenshot of his Plenty of Fish profile with username "gallantvk" where he is blatantly lying about his name, age, profession, relationship status, and log in information, obtained on the day of Plaintiff's 17-hour nerve damage surgery is available in Exhibit B. Plaintiff and Maini were exclusive from March 15, 2016 with a wedding date set for February 25, 2017. Plaintiff was receiving emergency reconstructive jaw surgery on May 1, 2 and 3, 2016 with famous Beverly Hills reconstructive surgeon Dr. Charles Lee, MD, in order to fix both nerve damage and tissue necrosis in her face following medical and dental malpractice. During this time, Maini continued pursuing other women despite writing Plaintiff love letters prior to using dating applications. Note that Maini sent Plaintiff a love letter at 5:32 AM and by 9:59 PM, he was on a dating app, after making multiple comments about how his intentions included a traditional, monogamous Indian arranged marriage.

   c. A screenshot of his Shaadi.com profile taken on August 26, 2016 where he is posing as a medical doctor when he is not a medical doctor is available in Exhibit C. He remains an unemployed former marketing assistant.

    d.  A screenshot of Maini's introduction to Plaintiff's family with the name Vikram is available in Exhibit D.

    e.  A screenshot of Maini's fake social media profiles utilizing the names Vikram Kumar Mansingh, Vikram KMS, AmarCM4, AmarCM_2, and GALLANTVK are attached in Exhibit E.

    f.  The pair had announced their engagement on November 1, 2016, with Maini proposing to Plaintiff after viewing *My Fair Lady* at the Sydney Opera House he forced Plaintiff to plan a wedding date of February 25, 2017. A photograph from the day—blurring out Plaintiff's identity—is provided in Exhibit F.

    g.  The pair were in a supposedly committed and exclusive relationship from February 2016 to February 2017; Plaintiff ended the relationship in January 2017 and finalized the ending in February 2017. During this time, they exchanged thousands of messages on Skype, all of which are available in unedited form to opposing counsel. Copies of his username pages are available in Exhibit G.

    h.  Audio and video recordings of Maini engaging in illegal, nefarious activities and discussing his delusions of grandeur as a future politician in the Bharatiya Janata Party are available via permanent download links to opposing counsel. All of these files are available via MP3 and MP4 download.

65. Most disturbingly, Maini presented himself as a "savior and healer" to Plaintiff, touting his fake credentials as a supposed physician and psychotherapist. He spent hours daily "diagnosing" Plaintiff with random medical conditions and then began a course of action known as Dialectical Behavior Therapy, when he is not licensed in medicine or psychotherapy. Maini used a series of mind control tricks to hypnotize and manipulate Plaintiff into revealing her innermost fears and secrets and then ridiculed her for sharing said information. This caused severe damage with which Plaintiff has had to spend years coming to terms with an actual certified therapist, who has described Maini as a "full-on sociopath."

66. Upon Plaintiff opening up and confiding in Maini, he then began a vicious campaign to exacerbate her already fragile emotional state by gaslighting her and her family by claiming he cheated due to his supposed status as an international spy working for the Indian government. It took Plaintiff and her father—a very traditional Indian head of household— over 6 months to find another Indian private investigator to reveal that he is not an Indian

citizen, and therefore is ineligible for any governmental or spy related services. This was the sole reason Plaintiff and her family considered Maini after discovering he was still using dating profiles despite offering written commitment to Plaintiff and Maini's family talking to Plaintiff's family about the match.

67. To be clear, Maini misrepresented his identity, which is a material fact, and knew it was false, knew it would cause Plaintiff's family to give permission to permit courtship, and knew it would cause Plaintiff's father to deliver an all-cash dowry. As if this were not enough, Maini also misrepresented his psychotherapy and medical credentials, causing near-permanent self-esteem damage to Plaintiff who never had issues with suicidal ideation prior to meeting him. Maini repeatedly used his position as the older individual in the relationship to pressure Plaintiff into life-threatening surgical treatments that nearly disfigured her and to engage in mind control tactics. This damage caused over $187,000 in revision medical expenses with permanent nerve damage in Plaintiff's jaws, in addition to over $1,500,000 in cash dowry plus $500,000 in gold bricks, customary gifts in traditional arranged marriage.

68. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Five Hundred Thousand Dollars ($500,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional, mental, and physical well-being, and the foreseeable impact his conduct would have on Plaintiff's health and well-being in the future. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## SECOND CAUSE OF ACTION
## DEFAMATION
### *Against Amar Chander Maini*

69. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

70. To state a cause of action for defamation Plaintiff will prove the following five elements: (a) publication; (b) falsity; (c) actor must act with knowledge or reckless disregard as to the falsity or at least negligently on a matter concerning a private person; (d) actual damages; (e) statements must be defamatory. Refer to the cases *Jew For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008) and *Cooper v. Miami Herald,* 31 So.2d 382, 384 (Fla. 1947).

71. To state a cause of action for libel, Plaintiff, a private person, will prove that the publication meets the following three elements: (a) false and defamatory statements of and concerning a private person, (b) without reasonable care as to the truth or falsity of those statements, and (c) resulting in actual damage to that private person.  Refer to the cases *Hay v. Independent Newspapers, Inc.,* 450 So.2d 293, 295 (Fla. 2d DCA 1984), *Bass v. Rivera*, 826 So.2d 534, 535 (Fla. 2d DCA 2002), and *Tribune Company v. Levin,* 426 So.2d 45, 46 (Fla. 2d DCA 1982), *affirmed*, 458 So.2d 243 (Fla. 1984).

72. Plaintiff is a private figure.  Though she has received limited media attention due to her work and academic accomplishments, she is still a private figure.  Nevertheless, the cause of action demonstrates actual malice as it shows the publications by Maini were made with knowledge that it was false and with reckless disregard of whether it was false or not.  Refer to the cases *Hoch v. Rissman, Weisberg, Barrett*, 742 So.2d 451, 460 (Fla. 5th DCA 1999), *rev. denied*, 760 So.2d 948 (Fla. 2000). *See also Mile Marker, Inc. v. Petersen Publishing, L.L.C.*, 811 So.2d 841, 845 (Fla. 4th DCA 2002); *Dockery v. Florida Democratic Party*, 799 So.2d 291, 294 (Fla. 2d DCA 2001); *Scholz v. RDV Sports, Inc.*, 710 So.2d 618, 626 (Fla. 5th DCA 1998), *rev. denied*, 718 So.2d 170 (Fla. 1998).

73. The offending defamatory and libelous conduct began in February of 2016, when parties met, continued after engagement in November of 2016, and continued even after Plaintiff broke off the engagement at the end of January of 2017.  After a mere eleven-month relationship, Defendant Maini has continued harassing, cyberstalking, and stalking Plaintiff and her family for over two and a half years.  Plaintiff was unwilling to reconcile after coming to terms with Maini's misrepresentation of himself and his background alongside his frightening levels of violence including but not limited to regular beatings with belts and strangulation and polarizing mental instability with screaming matches in restaurants.  Not long after, Plaintiff and her family discovered that he had been abusing illicit drugs ranging from cocaine to mushrooms, continuing to binge drink alcohol despite going to alcohol rehabilitation for over four years, continuing to use fake identification and several aliases to solicit sex from minors and prostitutes, and he had been exploiting women across the world for sport and sexual gratification throughout the relationship and the engagement.  His methods of recruitment involved using various online dating apps, in person shopping mall pickups, and in person

university student pickups whenever Plaintiff was out of town presenting her academic research at conferences.

74. Since Plaintiff's decision to part ways with Defendant Maini at the end of January of 2017, and finalizing it at the start of February of 2017, Maini has engaged in a deliberate campaign to destroy Plaintiff by spreading countless rumors, lies, and other falsities to members of Plaintiff's social and professional circles, as well as to people on the Internet who Plaintiff does not know.  Maini has also hacked her email, Facebook, Instagram, and Twitter accounts on numerous occasions and attempted to sabotage Plaintiff's professional and academic career out of jealousy.

75. Maini is a misogynist with a deep hatred of women who has utilized multiple SIM cards to juggle his many side women, most of whom were married with children and few of whom were single.  All such side women were pursued behind Plaintiff's back when Plaintiff and Maini were engaged to be married via traditional Indian arranged marriage matchmaking. Plaintiff was always faithful to Maini, but that same courtesy was not returned with Maini regularly chasing a former stripper in his economics program alongside dozens of uneducated waitresses and about seven different married women, one of whom was pregnant.  Maini also had a prolonged affair with his flatmate, an uneducated Thai waitress who regularly undressed in front of him.  Though Maini respected Plaintiff's abstinent virginity, he told her on more than one occasion, "I have needs you're not going to fulfill and there are girls happy to meet my needs in ways you refuse to."  Maini continued with this line of reasoning even when Plaintiff reported him to all elders in the situation, including her parents and his parents.  Some action was taken after reporting Maini to his mother, but no improvement steps were made.

76. Maini is a pedophile who watched about 50 hours of pornography per week, spanning hardcore child pornography of underaged girls, hentai pornography of underaged Japanese girls, and extensive pornography of Korean girls.  The predominant search interests on Maini's laptop include the key terms "under age 10," "preteen," "braces," "toddler sex," "toddler spanking sex," "toddler corporal punishment," and "rough toddler sex."

77. In almost all cases Maini acted alone, to commit the following illicit and libelous postings in furtherance of his scheme to defame Plaintiff and to destroy her reputation:

a.  Publicized false accusations that Plaintiff was verbally and emotionally abusive to him, and that she was guilty of repeated "bar hopping." Plaintiff does not and has never imbibed alcohol due to her religious beliefs, does not attend bars, and is an abstinent virgin. The only person Plaintiff has ever kissed is Maini, and that was only after he announced his intentions to marry.

b.  Publicized false accusations that Plaintiff "met with [a man] in Australia," was guilty of a "white fetish" and "cheating with so many men he lost count." Plaintiff has only been to Australia a few times in her life and lived with both her family and in an all-female accommodation. Plaintiff is an abstinent virgin with no fetishes, no experience "dating" white men—indeed, she has *never* dated as she only interacts with suitors who have been vetted and approved to court her by her parents and her matchmakers—and has made a commitment to save herself for marriage from age 11 that she has upheld. In reality, Defendant Maini cheated on Plaintiff repeatedly when she was hospitalized for nerve damage and throughout their engagement, most notably with one of his economics classmates. Plaintiff has been so traumatized by this experience that she has rejected countless arranged marriage offers since then.

c.  Publicized false accusations that Plaintiff "has a colorful history with gigolos" when Plaintiff is an abstinent virgin and has never struggled attracting genuine male attention. She is a former beauty queen, beautiful inside and out. Maini has employed the services of countless bar girls, prostitutes, child prostitutes, and more in his travels throughout Asia and in his career. Where Plaintiff has stayed on the right track and pursued her legal education, Maini dropped out of law school after failing multiple classes and became a formal bartender and professional alcoholic who spent five years in alcohol rehabilitation centers in India. In spite of his years in 'rehab,' he remains an alcoholic, a con artist, a gambler, and a pornography addict. In fact, it is Maini who has a colorful history with prostitutes; Plaintiff has numerous private investigator-obtained photographs of him in bed soliciting prostitutes.

d.  Publicized false accusations that Plaintiff "has mail order husbands" when Plaintiff has never been married and barely has enough time to manage her multiple entrepreneurial interests and her rigorous academic coursework. By contrast, Maini has a "girl in every port" allowing him to maintain dalliances whenever he travels, which explains his three (3)

separate Skype accounts.  He uses different accounts and fake names to juggle various women.  His lack of career success makes it easier for him to focus on "achieving" women instead of achieving actual degrees and accomplishments necessary to build a good life.

e.  Accused Plaintiff of being a "fraudster," plagiarist, relationship "cheater" "with so many men [he] lost count" when Plaintiff has the highest integrity and is a 100% abstinent virgin.  It is Maini's projections depicting his real behavior: Maini is a fraudster, Maini is an academic cheater, and Maini is a relationship cheater who went behind Plaintiff and her family's back to arrange dinner and coffee dates with random lower middle class and working class women and girls from dating apps, restaurants, and various retail shops behind Plaintiff's back including when she was in the hospital on life support.  Maini is so jealous that Plaintiff got into law school and is becoming a barrister through hard work—one of *his* biggest dreams and family expectations was to be a barrister, but he didn't earn high enough grades or win the right oratory competitions to be competitive—that he is deliberately attempting to sabotage her career and her marriage options.  Instead of putting his anger towards bettering his own life and positioning himself to be a provider, nearly every waking hour of every day is spent harassing Plaintiff, insulting Plaintiff, harassing Plaintiff's elderly parents, and insulting Plaintiff's elderly parents.  Plaintiff is at her wit's end because Maini is doing this consciously with malicious intent and reckless disregard for the truth.

f.  Created imposter social media accounts to harass and intimidate Plaintiff—LinkedIn, Instagram, Twitter, and likely more Plaintiff has yet to discover—and also as a platform to disseminate falsehoods about Plaintiff to affect her ability to earn admission into academic fellowship programs and to secure tenure-track employment after graduation.

g.  Impersonated Plaintiff on Twitter, Facebook, Instagram, LinkedIn, SnapChat social media profiles using her likeness and personal information.  Plaintiff found multiple such accounts on Instagram and Twitter and seeks a subpoena to attain registration and IP information.

h.  Impersonated Plaintiff on multiple female-seeking-transsexual dating sites using her likeness and personal information, including but not limited to her phone number and a demand for visitors to "get jiggy with it"—a phrase Plaintiff would never use.  These posts led to Plaintiff and her family receiving harassing and frightening phone calls from strange numbers in geographic areas where Plaintiff does not even reside.  Furthermore, Maini stole photographs of Plaintiff and plastered them on numerous fake profiles, catfishing people into

thinking he represented her.  In these profiles, Maini claimed Plaintiff is "lesbian" and "interested in transsexuals" when Plaintiff is neither lesbian nor interested in transsexuals. Maini did this specifically to affect Plaintiff's image in the arranged marriage community. Under no circumstances has Plaintiff ever been attracted to lesbians or transsexuals, though she is and remains a supporter of LGBTQ rights and gay marriage—causes Maini disagrees with due to his pronounced extremist right-wing views and homophobia.  On many occasions, Maini has made it clear that "fags go to Hell" and pointing the finger at Plaintiff, accusing her of being "a fag who will go to Hell," when Plaintiff is neither a fag and nor in a position to make a decision that is in God's hands.

i.   Harassed Plaintiff's family members, friends, business contacts, couture clients, artwork clients, and others.

j.   Widely disseminated embarrassing childhood photos of Plaintiff without her consent to members of his pedophilia social circles, seeking to solicit "scaled 1 to 10 ratings" of Plaintiff's photographs taken from ages 3 to 12.  Maini had an image of Plaintiff at age 3 set as his screensaver and as a blow-up image, ostensibly used for sexual fantasy purposes.

k.   Interfered with Plaintiff's existing and prospective business relationships with the intent of impacting her livelihood and destroying her professional reputation.

l.   Used extortion tactics to coerce Plaintiff and her family to pay a ransom on top of the existing their lump sum dowry payment which was not returned—considered a cultural transgression and a severe moral 'crime' in the traditional arranged marriage community. The Maini family may have 'prestige' and 'old wealth' but they have neither class nor values.  Plaintiff returned all jewelry to Anjana Maini, Maini's mother, and even sent a card. Maini has failed to return either the dowry paid in cash, the gold bricks delivered in person, or the deposit to the baker for the custom cake.  Plaintiff and her family covered all wedding-related expenses.

m.   Maini knowingly manipulated facts, lied, distorted reality when he made accusations of fraud against the Plaintiff in various Basher Websites between July 2017 to May 2019, calling her a range of names and accusing her of misconduct in academic, professional, and personal settings.  Maini is a noted con artist who not only stole Plaintiff's dowry, but also stole the dowries of multiple other eligible young Indian women in the arranged marriage community. Maini, who regularly misrepresents his age as younger than he is to pursue much younger

and much more attractive women, has a habit of pathological lying and obfuscating reality. Maini lied to Plaintiff, Plaintiff's family, and Plaintiff's matchmaker, constantly changing his story about why he initially misrepresented his name. Plaintiff's father had to contact authorities in India to discover, once and for all, that Maini was never employed by the Indian government whatsoever.

n. His delusions of grandeur of eventually pursuing political office despite his horrible track record of duping people out of their dowries speaks volumes about Maini's poor character.

o. On a near daily basis, Maini belittled, degraded, and insulted Plaintiff, who was always a supportive partner to him and prepared multiple Excel spreadsheets for him to map out a campaign strategy. In spite of her research work, Maini created a fake Craigslist posting soliciting transsexual visitors to contact Plaintiff via text message. Maini posted Plaintiff's personal cell phone number and email address to an untold number of transsexual (male-to-female and female-to-male) visitors, in an effort to paint Plaintiff as someone interested in marrying a transsexual to the broader Indian community. Plaintiff reported this to the New York Police Department. Maini's objective was to ruin Plaintiff's arranged marriage prospects and to intimidate her with creepy phone calls and text messages from random transsexuals in the Upper West Side area. In fact, the damage was so severe that Plaintiff and her family had to employ two Western arranged matchmaking company to continue fielding offers from eligible suitors empathetic to the incredibly distressing situation facing Plaintiff. Prior to this, Plaintiff was seen as the most desirable catch in the arranged marriage marketplace, with marriage offers from prominent Indian medical and business families around the world.

78. Maini sent multiple harassing emails to Plaintiff's diabetic parents stating clearly that he would continue posting libel.

a. A copy of the exact text Defendant Maini used to harass and intimidate her parents on July 20, 2017, is posted below.

> *I am…giving you…a chance to handle this yourselves, before this situation gets out of control. Please take this opportunity. I am sure you do not want to have to deal with this type of thing day after day, week after week, month after month in the years to come. … I can guarantee you that I will absolutely never post anything about [Koe] or her family online. That would be terrible. I will have nothing to do with it. Any action I take would be through official legal channels. However, there are so many*

> *people out there named "Anonymous". And these people named "Anonymous" are such unpredictable folks, you never know what they are going to do or say next. Every time there is an "Anonymous" post about me, there could be a similar post by "Anonymous" about [Koe] and her family. Nobody wants to see that happen. Things would spiral out of control, all hell would break loose. Lawyers will not solve this issue. The internet is a lawless place.*

b. A copy of the exact text Defendant Maini used to harass and intimidate her father on January 24, 2019, after cybersmearing her and her family is posted below. Upon receiving no response to this email, Maini proceeded to call Plaintiff's parents "child abusers." Further, he called Plaintiff an "emancipated minor" who had a "sad childhood" where she experienced "difficult times at Country Day" on countless Bashing Websites. Plaintiff was never an emancipated minor and transferred her legal guardianship with parental permission due to intensive bullying and cover-up activities that went on at the prep school in which she was enrolled. This is an invasion of Plaintiff's right to privacy. Intimidation is a crime. Maini currently faces criminal charges for cyberstalking and intimidation due partly to his behavior and partly to this email below:

> *I would like to check with you before I proceed. Are you aware of, and do you support your daughter's legal action agßainst me? If you do support it, that is fine, just let me know. I will file a cross claim in court next week. However, you should be aware that you, Mrs [Koe] and Horst will also be named and included in the cross claim. In addition, of course, your daughter's stories will be put to the test in an open court, and her life and times will become a permanent legal record, and I will also get to have my say. More importantly, I will also press homicide charges against your daughter for her role in the death of my father. You are the elder person in this situation and have the wisdom of many years of experience. I am sure that you have worked hard for everything that you have. I am making one more attempt to reach out to you to settle this matter between ourselves before the situation spirals out of control. ... Despite the fact that you and Mrs [Koe] have been rude to me, I still do not want to see your family ruined or humiliated in public on a global stage. It is not too late to settle the matter amongst ourselves.*

> a. It must be stated that the only interaction Plaintiff had with Maini's late father was two in person dinner meetings.

> b. Plaintiff emailed Maini's mother complete evidence of his various dalliances and a more complete picture of his lies between February to April of 2017. She never once emailed Maini's father and had nothing to do with his mother after April of 2017.

      c.  Maini's father died of a heart attack in November of 2017 not long after bedding his Indian mistress of 25 years.  Plaintiff was neither in Australia nor in any communication with Maini.

      d.  Maini attempts to use intimidation and pressure tactics with Plaintiff's family on a regular basis, even after Plaintiff sent him multiple cease and desist notices.

c.  Maini has continued his harassment as recent as March 16, 2020.

79. Maini first began placing Plaintiff's name on Bashing Websites in July 2017.  To address the libel in all such posts which will be made available in full form to opposing counsel in discovery:

      a.  Maini accused Plaintiff of using a false name, when she changed her name legally from in Portland, Oregon in June 2017.  Maini accused Plaintiff of "going by" the name that is her true, legal name.

      b.  Maini accused Plaintiff of "stalking a rapist."  The person Maini is referring to is L.M., who was a personal friend of Plaintiff.  Plaintiff and L.M. were friends for many years.  After L.M. was falsely accused of rape at his university and unable to obtain his diploma, Plaintiff helped him with fundraising efforts for his non-profit microlending organization Bunya Microfinance by personally donating to his cause and organizing a crowdfunding campaign. When Plaintiff was in Sydney conducting ground-breaking medical research that has received patent pending status and is now in Phase 1 clinical trials in both the United States and the United Kingdom, L.M. asked Plaintiff to "coffee" and "a bite to eat" on multiple occasions, which Plaintiff declined respectfully solely due to her existing commitment to Maini.  L.M. also asked Plaintiff to dance at a mutual friend's birthday party, which she respectfully declined out of respect for her existing commitment to Maini.

      c.  Maini is the only person with whom Plaintiff has ever French kissed.  During dinner at a restaurant, Maini gave Plaintiff too much candy and asked her about how she considered a "hot guy" in film and daily life.  The question was a part of a dinner game whereby Maini and Plaintiff asked each other questions.  Due to the amount of candy Plaintiff ate, and the fact that she is predisposed to diabetes on her maternal side, she accidentally said she considers L.M. a "hot guy."  This innocuous comment, made entirely in jest, was not meant in any way as a slight to Maini.  This comment led to Maini constantly accusing Plaintiff of cheating with L.M.—when the entirety of their friendship was online, and the fullest extent

of their in person conversation was maybe 15 minutes—and then Maini escalated a pattern of disturbing stalking behavior of both Plaintiff and L.M.  Maini began using geo-location trackers on Plaintiff's cell phone and accusing Plaintiff of 'cheating' on him and of 'having a white fetish.'  Furthermore, Maini also stalked, physically assaulted, and verbally threatened L.M. on security camera, accusing him of "going after" Plaintiff, when this never occurred.  L.M. and Plaintiff were just friends—Plaintiff felt bad for him for being bullied online as she went through bullying in high school—and did not remain in any kind of contact after Plaintiff entered into a relationship with Maini.  In fact, L.M. entered into a committed bisexual relationship not long after Plaintiff rebuffed his advances.  Under no circumstances did Plaintiff ever have any kind of relationship with L.M., and under no circumstances has Plaintiff ever had a fetish, let alone for white men.  She is a complete abstinent virgin who does not have any fetishes.  However, Maini has a strong fetish for underaged prepubescent girls between ages 2 to 11 as well as East Asian and Mediterranean women.

d.  Maini accused Plaintiff of "moving next to the [residential] college" next to L.M.  Plaintiff was never enrolled in any academic coursework at any universities in Australia and she took the only housing spot with included meals she could obtain as a foreign national.   She was in Australia on a temporary visitor visa, due to her scientific research commitments which have resulted in a medical supplement for patients with a rare disease that has already received patent pending status and has entered Phase 1 clinical trials.  By contrast, L.M. was then a full-time student in the law school, and by all accounts seemed happy to be pursuing a bisexual way of life.

e.  Maini accused Plaintiff of "contract cheating" and hiring men to "write her college essays and exams" when Plaintiff has always done her own work and graduated at the top of her academic class.  This attack on Plaintiff's integrity comes after Maini has duped, cheated, and stolen millions of dowry dollars from highly eligible young Indian women and paid for *his* academic work on an outsource basis.

f.  Maini accused Plaintiff of "flunking out of Georgetown" when Plaintiff is currently earning an LLM in international taxation law from Georgetown University Law Center.  To the best of her knowledge, she has never "flunked out" of any institution of higher learning, though Maini has struggled academically and professionally for the entirety of his life.  Maini struggled academically at the University of Sydney Law School and behaviorally at his

residential college, St. Andrew's, where he committed both theft of college property and sexual assault towards his female classmates in the university setting.

g. Maini accused Plaintiff of receiving "plastic surgery," when Plaintiff has only received jaw surgery, reconstructive jaw surgery, and reconstructive nerve damage surgery, all of which she obtained due to verbal abuse and pressure from Maini. On a daily basis, Maini spent hours criticizing Plaintiff's appearance, particularly her jaw and chin and comparing her unfavorably to Bollywood actress Kareena Kapoor who has a strong chin and jawline. Maini told Plaintiff to get jaw surgery to look more like Kareena Kapoor. Plaintiff did not want to undergo a dangerous surgery and so agreed to jaw angle silastic implants and a sliding genioplasty surgery to give the Kareena Kapoor effect, even though prior to this, Plaintiff won a statewide beauty pageant with her natural chin and her natural jawline. Unfortunately, there were issues with the silastic implants and the genioplasty was medical malpractice, so Plaintiff had them removed and reversed, respectively in reconstructive surgeries that took over three months.

h. Maini accused Plaintiff of not taking medical malpractice legal action against her jaw surgeon, when she filed a medical malpractice Complaint against the surgeon in April of 2018 and has been running discovery and deposition strategy for the case in addition to her rigorous law school academic course-load.

i. Maini accused Plaintiff of attending a host of universities she never attended as a student, but instead as a middle school and high school student going to summer camp academic enrichment programs, to malign Plaintiff's name in both the greater academic community and the greater Indian arranged marriage community.

j. Maini accused Plaintiff of pursuing him, when he pursued her and her family relentlessly beginning on February 20, 2016, leading to an engagement on November 1, 2016, and setting and booking a wedding date for February of 2017. During all stages of the relationship, Maini was the aggressor, and he cheated incessantly during the relationship. His misrepresentations and abuse led Plaintiff to end the engagement well in advance of the wedding date. Plaintiff's family covered all expenses, which is why it is surprising for Maini to accuse Plaintiff of "using him for money," when Plaintiff is not only self made but also from a much more successful family than he is.

k. Maini accused Plaintiff of hypochondria due to her lactose intolerance and celiac disease medical conditions, causing her to vomit when on dinners with him when he force-fed her gluten-filled breads and soy-filled tofu, to malign her name in image-conscious fashion professional circles where few have food allergies. Maini knew from the start that Plaintiff is deathly, deathly allergic to gluten, yet he constantly accused her of having bulimia and "crash dieting" when Plaintiff has always been health and fitness oriented with a slim build.

l. Reasonably understood, Maini's statements amount to accusations of serious and reprehensible conduct, as well as the implication that he was guilty of academic, personal, and professional misconduct, notwithstanding her pending offer to become a faculty member at a top-ranked university. Maini's conduct also imputed to Plaintiff a want of integrity and a lack of competency in her academics, arranged marriage pathway, and employment.

80. Maini was so intent on destroying Plaintiff's good name and reputation that he took painstaking efforts to make the false accusations and libel sound credible to those hearing them, even those close to Plaintiff who had no reason to believe Maini or to doubt the Plaintiff. Maini's posts were crafted in such a way as to inspire belief and sympathy on the part of recipients of the false information. Maini knew or should have expected that, upon reviewing these defamatory posts, others would retaliate against Plaintiff directly, distance themselves, and proceed with caution. Maini specifically chose to raise his post rate in 2019 due to Plaintiff's family placing her in the hands of a more experienced Indian arranged marriage matrimonial service. More recently, in 2020, Maini and/or his associates posted dozens of posts on Instagram and Twitter calling Plaintiff a "world renowned academic fraudster," mocking her bestselling books authored as a teenager, and mocking her for dressing celebrities for red carpet events.

81. Maini spent the duration of the long distance component relationship on an Instagram designed to dupe Plaintiff and her family that his true name was Vikram Kumar Mansingh. Screenshot records, email records, and ample subpoena evidence all indicate he used username @gallantvk to con Plaintiff into a relationship.

82. There is no physical or other tangible evidence to substantiate claims that the Plaintiff engaged in any of the egregious conduct Maini outlines. Maini's statements were knowingly false and/or stated with such reckless disregard for the veracity of the accusations and the foreseeable, devastating harm they would cause to Plaintiff's reputation, business relationships, and arranged marriage prospects.

83. Maini has been relentless in his efforts to discredit and destroy the reputation of Plaintiff, and he continues to publish defamatory statements consistent with those stated therein as well as some that are inherently hidden and undiscoverable by Plaintiff.  Her investigation continues.

84. Plaintiff has no way of knowing who believed some or all of the false statements made by Maini, nor can she truly assess the identity, scope, and sheer number of people impacted by Maini's falsehoods to the detriment of Plaintiff.

85. Maini knew, or with substantial certainty should have known, that these false accusations would be re-published by Bashing Websites and widely disseminated in the community where Plaintiff lived and worked, as well as throughout the United States and beyond.  A disclaimer exists on LiarsandCheaters.com, indicating that any posts made there can and will be spread to other sites. Maini signed a terms and conditions agreement acknowledging his awareness of this fact.  Maini also signed a legal disclaimer on TheDirty.com, indicating that he was fully aware of the legal repercussions of writing libel.  TheDirty.com has already been subpoenaed, though they have not responded, likely because attorney owner of the website, Michael Schern, is well aware that he's listed as a Defendant in this case.  Plaintiff has now cashed a substantial portion of her 401K savings to retain a more aggressive Arizona process server.

86. In fact, the false accusations have invaded Plaintiff's business pages of a direct to consumer product she started with her friend to make additional money outside of selling products with her name. Within one day of joining Twitter, Maini and/or his associates bombarded hate and libel towards Plaintiff on all of her business posts advertising her books and product.

87. This false publicity invaded Plaintiff's personal and professional circles, caused undue ridicule, and will continue to have a demonstrable, adverse impact on Plaintiff's livelihood in fashion, her physical safety, her emotional well-being, and her arranged marriage prospects.  Plaintiff was unable to invite press to multiple fashion shows as previously scheduled due to the enormous burdens as a result of this libel and abuse.  Plaintiff became a hermit, avoiding social events, pausing all arranged marriage matchmaking efforts, and taking off time from her studies, delaying her graduation by an additional year.

88. Maini's publication of these false accusations impaired Plaintiff's personal and professional reputation during all-important Fashion Weeks and effectively eliminated her ability to pursue an arranged marriage, in the community where she lives and works and beyond, and has resulted in severe emotional distress, humiliation, embarrassment, mental suffering, and suicide attempts.  The

Plaintiff also suffered damages, including SEO service fees, removal fees, lost income and opportunities, medical expenses, therapy expenses, and damage to her future earning capacity. More recently, on February 28, 2020, Maini and/or his associates shared the libelous website with an industry fashion blogger reporting Plaintiff's Paris Fashion Week show, in an attempt to sabotage Plaintiff's success at the show. As a direct and proximate result of this post, Plaintiff closed her presentation and birthday party to the majority of the fashion industry and only invited her friends and loved ones, when it was supposed to be a wonderful day celebrating her birthday and her latest collection.

89. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional and physical well-being given his posing as a "therapeutic leader" and "medical healer," and the foreseeable impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending social media profiles or posts, including Koe's professional art and fashion business Twitter account that he hacked in January-February of 2020. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

**THIRD CAUSE OF ACTION**

**INVASION OF PRIVACY**

*Against Amar Chander Maini*

90. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

91. To state a cause of action for invasion of privacy, Plaintiff will prove the following three elements: (a) appropriation, the unauthorized use of a person's name or likeness to obtain some benefit; (b) electronic intrusion int one's private quarters; (c) public disclosure of private facts, meaning the dissemination of truthful private information which a reasonable person would find objectionable.

92. Plaintiff confided a number of childhood traumas and personal secrets to Maini. Plaintiff trusted Maini would always keep her confidences, particularly about the false accusations and rumors at her

private high school where she was subject to physical violence and emotional abuse at the hands of both faculty members and students. In one case, a lesbian women's basketball player angry at Plaintiff for rejecting her advances shoved Plaintiff into a poorly ventilated gym locker. Plaintiff was there for over 28 hours before a security guard let her out, suffered a severe asthma attack, and the school failed to intervene on her behalf by reprimanding said lesbian women's basketball player. Plaintiff revealed to Maini the extent of her negative prior experiences, both with the lesbian women's basketball player and others, with the understanding that they would remain private and confidential at all times. Maini took this private information and published multiple tell-all WordPress and Blogger posts about Plaintiff, mixing 15% of truth with 85% of libel, ridiculing her for what truly was a difficult childhood and a number of difficult experiences. The circumstances of her difficult high school educational experience and the sheer amount of slander she faced at the hands of sociopaths at that particular school are not in the public interest as Plaintiff is a private individual and is not—and has never been—a public individual.

93. Plaintiff decided to do a transfer to another school during the first term of her senior year of high school to protect her physical safety from aggressive individuals attacking her physically at her preparatory school. She made this decision without notifying her parents or her school in advance. Plaintiff packed her bags and left town. A successful author at a young age who published her first two books as a teenager, she received substantial enough royalties to become financially independent from age 17 and used this to her advantage. Despite the various adversities she faced, Plaintiff still graduated with a high class rank and earned a full scholarship to the guaranteed admission BS/MD university program of her choice. Maini twisted the experience around and labelled her as a "runaway" who "lived on the streets," when Plaintiff was living in a $3,000 per month apartment in an exclusive, gated community and her first car at age 16, given by her parents, was a brand-new Lexus.

94. Plaintiff also confided that she was estranged from her mother from the period 2009 to 2011, when Plaintiff decided to initiate a school transfer by informing her father and not informing her mother until she made her decision. Plaintiff's mother and Plaintiff had disagreements about future college admission prospects with a senior year transfer, which has now been resolved; at all points, this dispute was a private one that never took away the deep love and affection the two have always shared. Ups and downs are normal parts of the mother-daughter relationship. Nevertheless, Maini invaded the privacy of Plaintiff and her mother by posting false accusations accusing Plaintiff's

mother of being a "child abuser" on dozens and dozens of websites.  Plaintiff is not a child; she is an adult of age 27.  Plaintiff's mother never abused her as a child, and even if there was 'abuse' per se it is not in the public interest for that information to be public.  Private disagreements and using phraseology of "abuse" is neither in the public interest nor of any concern to external third parties. Maini specifically posted this to gain the benefit of extortion fees from Plaintiff's family.

95. Information about Plaintiff not in the public interest and Maini invaded the privacy of both Plaintiff and her mother by posting her full married name on dozens of websites filled with libel.

96. Plaintiff accidentally left the password to her private digital diary and her private email on her laptop case.  Under no circumstances would Plaintiff ever share her password with anyone.  Based on information and belief, Maini hacked Plaintiff's email between August 13 to 17, 2016, downloaded private files and notes—none of which can be admitted into evidence due to the criminal hacking— and then began an email campaign to Plaintiff's residence, her research colleagues, and her laboratory research administrators making false and baseless claims about Plaintiff.  Maini's objective was to develop further a side relationship with one of his many mistresses, one of whom he met in his economics program and met with whenever Plaintiff was out of town.  To be specific, Plaintiff was in Seoul from 23 August to 27 August 2016, and during that time Maini arranged dinner and movie dates with his mistress.  She declined his last-minute Friday night movie date but they ultimately met whenever Plaintiff was out of town, while Maini continued juggling his various additional side women.  In particular, when Plaintiff was in Melbourne on a medical research trip from 19 to 22 September 2016, Maini met with his economics classmate behind Plaintiff's back and without her permission.

97. Most recently, Maini has hacked Plaintiff's business Twitter account and infringed upon her copyright and trademarks.  Though Twitter has suspended the account, Plaintiff is now in a position of petitioning Twitter to restore access to her company business account that she has owned in full for years on end.  Maini also used the fake name "Victoria" solely to attack Plaintiff on social media sites Twitter and Instagram in various posts in January and February 2020, which only became aware to Plaintiff in March 2020.

98. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional and physical well-being, and the foreseeable

impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## FOURTH CAUSE OF ACTION

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(c)

*Against All Defendants Engaged in Bashing Websites and Removal Websites*

99. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

100.   This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, Pierre Zarokian, Defamation Defenders, Net Reputation, and John Does 1-14. Hereafter, Count 4 Defendants.

101.   Bashing Websites and Removal Websites, terms defined above, are association-in-fact enterprises engaged in and whose activities affect interstate commerce. The Count 4 Defendants are associated with the enterprises.

102.   The Count 4 Defendants agreed to and did conduct and participate in the conduct of the enterprise affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically: charging Plaintiff for removals of posts, copying and pasting those posts throughout the Internet, failing to remove all copies of posts, and then harassing Plaintiff to pay for still more posts.

103.   Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of extorting money from Plaintiff ostensibly to "remove" all posts only for them to later repost posts and demand even higher extortion removal fees.

104.   The acts of extortion set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

105.   The Count 4 Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

106.    As a direct and proximate result of the Count 4 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that fashion shows have had to be rescheduled, press has had to be canceled, lookbooks have had to be shielded from media attention, and Plaintiff has had to reduce her profile as a top emerging designer.  The Streisand Effect is so pervasive that Plaintiff's only option has been to shift and change her entire business plan.  This injury stems from the predicate acts of racketeering.  Per the Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact."  The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.*  The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

107.    Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner,* 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).  Plaintiff paid the extortion money over a sustained period of time before deciding to take legal action.  Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production.  Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

108.    Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

109.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 4 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community.  Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## FIFTH CAUSE OF ACTION

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(a)

*Against All Defendants Engaged in Bashing Websites and Removal Websites*

110.    Plaintiff incorporates by reference each and every allegation contained in the preceding
paragraphs of this Complaint as if fully set forth herein.

111.    This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet
Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael
Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram
Parmar a/k/a Matt Hamp and Martin Horan, Pierre Zarokian, Defamation Defenders, Net Reputation,
and John Does 1-14.  Hereafter, Count 5 Defendants.

112.    Bashing Websites and Removal Websites, terms defined above, are association-in-fact
enterprises engaged in and whose activities affect interstate commerce. The Count 5 Defendants are
associated with the enterprises.

113.    The Count 5 Defendants used and invested income that was derived from a pattern of
racketeering activity in an interstate enterprise. Specifically: the Bashing Website Defendants
accepted advertising fees from the Removal Website Defendants.  The Removal Website
Defendants then charge a base set fee to Plaintiff (and thousands of other victims) which
went partially to the Bashing Websites Defendants and partially to themselves.  The income
derived is housed both in the United States and overseas and has already led to investigation
by the U.S. Attorney's Office in Arizona as one Defendant, Kevin Angileri, was recently
released from federal prison for child pornography and is back at racketeering.

114.    The racketeering activities listed above constitutes a pattern of racketeering activity
pursuant to 18 U.S.C. § 1961(5).

115.    As direct and proximate result of the Count 5 Defendants' racketeering activities and
violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in her business in that: she has
had to cancel press at multiple fashion shows, reduce her presence at fashion networking
events, change her business model, and take a term off of her law school studies.  The
injuries to her business specifically include thousands of dollars paid to Removal Websites
on top of SEO services.  The fact that Bashing Websites and Removal Websites are investing
their illicit "income" into Bitcoin and other cryptocurrencies instead of discontinuing their
nefarious activities speaks volumes about the poor character of these Defendants.  Per the

Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact." The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.* The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

116.    Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Plaintiff paid the extortion money over a sustained period of time before deciding to take legal action. Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production. Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

117.    Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

118.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 5 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## SIXTH CAUSE OF ACTION

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(b)

*Against All Defendants Engaged in Bashing Websites and Removal Websites*

119.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

120.    This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, Pierre Zarokian, Defamation Defenders, Net Reputation, and John Does 1-14. Hereafter, Count 6 Defendants.

121.    Bashing Websites and Removal Websites, terms defined above, are association-in-fact enterprises engaged in and whose activities affect interstate commerce. The Count 6 Defendants are each associated with the enterprises.

122.    The Count 6 Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically: the Bashing Website Defendants accepted advertising fees from the Removal Website Defendants. The Removal Website Defendants then charge a base set fee to Plaintiff (and thousands of other victims), which went partially to the Bashing Websites Defendants and partially to themselves. The income derived was housed both in the United States and overseas and has already led to an investigation by the U.S. Attorney's Office in Arizona as one Defendant, Kevin Angileri, was recently released from federal prison for child pornography and is back at racketeering.

123.    The racketeering activities listed above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

124.    Count 6 Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically: Removal Websites advertising their removal services on Bashing Websites and Removal Websites charging double fees for Plaintiff (and thousands of other victims) to remove posts. Some removal fees go directly to the Removal Websites and the majority of removal fees go directly to the Bashing Websites.

125.    The racketeering activity listed above of Bashing Website posts that charge exorbitant removal fees constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

126.    The Count 6 Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

127.    As direct and proximate result of the Count 6 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in her business in that: Plaintiff's credit card information has remained stored on file by both Bashing Websites and Removal

Websites, on top of the severe injuries she has suffered enumerated elsewhere. The injury here stems from the acquisition of an interest on or control over an enterprise, and this is illustrated best by the fact that Defendants are constantly merging and acquiring new cheater assets. If any of them had put their business acumen in a healthy direction, then they might have become superstars in the mergers and acquisitions profession. Instead, they are defrauding consumers, including Plaintiff, because the ownership of websites changes constantly. As an example, Michael Schern is an attorney admitted to practice law in the state of Arizona, and he recently acquired full ownership of TheDirty.com from Nik Richie. He simultaneously runs his law firm and TheDirty.com from the same web server, making anywhere from $1,500 to $5,000 per removal from his site. This income supplements his law firm income. While it is not excusable for ex-convicts to engage in activities like this, it is much more understandable than a lawyer who is admitted into practice in Arizona. Schern's behavior is in direct contrast to the rules all law students have to know to pass the Multistate Professional Responsibility Examination and to practice law for a living. It is unbecoming for an attorney to behave in this manner. Per the Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate cause" and "injury in fact." The Defendants must be held legally liable for the damage they have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.* The injuries Plaintiff suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

128.   Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51 F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner,* 879 F.2d 1290, 1299 (6th Cir. 1989), *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Plaintiff paid the extortion money over a sustained period of time before deciding to take legal action. Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production. Plaintiff is not attaching receipts to this publicly available lawsuit in order to protect her privacy.

129.   Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

130.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 6 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community.  Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

**SEVENTH CAUSE OF ACTION**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS: 18 U.S.C. § 1962(d)**

*Against All Defendants Engaged in Bashing Websites and Removal Websites*

131.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

132.    This Count is against Defendants: Guaranteed Removals, RepZe, Expert Removals, Internet Removals, Marca Global, Amarutu Technology, Minc Law, Kevin Angileri, Ronald Linco, Michael Schern, James John, Jim Burns, Scott Breitenstein, Arman Ali d/b/a D4 Solutions BD, Vikram Parmar a/k/a Matt Hamp and Martin Horan, Pierre Zarokian, Defamation Defenders, Net Reputation, and John Does 1-14.  Hereafter, Count 7 Defendants.

133.    Bashing Websites and Removal Websites, terms defined above, are association-in-kind enterprises engaged in and whose activities affect interstate commerce. The Count 7 Defendants are each associated with the enterprises.

134.    As set forth above, the Count 7 Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c).  Specifically: the Defendants conspired to: (1) use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)); (3) conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)).  Removal Websites achieved this through the use of advertising for seemingly legitimate removal services in advertisements on Bashing Websites.  The Bashing Websites then charge a large sum, some of which goes to them and

some of which goes to the Removal Websites.  Plaintiff, and countless other victims, paid
these scam removal companies only to find the posts reappear over the Internet.  Once the
Removal Websites determine someone is willing to pay for removal, they then repost all
posts to extract and to extort further money from said individual.

135.    The Count 7 Defendants have intentionally conspired and agreed to directly and
indirectly use or invest income that is derived from a pattern of racketeering activity in an
interstate enterprise, acquire or maintain interests in the enterprise through a pattern of
racketeering activity, and conduct and participate in the conduct of the affairs of the
enterprise through a pattern of racketeering activity.  The Count 7 Defendants knew that their
predicate acts were part of a pattern of racketeering activity and agreed to the commission of
those acts to further the schemes described above

136.    That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in
violation of 18 U.S.C. § 1962(d).  The Removal Websites and the Bashing Websites are co-
conspirators keen to defraud any and all businesspeople and students they can.  Per the
Supreme Court decisions in *Holmes v. Secs. Investor Prot. Corp.*, *Anza v. Ideal Steel Supply
Corp.*, and *Bridge v. Phoenix Bond & Indem. Co.*, Plaintiff has shown both "proximate
cause" and "injury in fact."  The Defendants must be held legally liable for the damage they
have done to Plaintiff; see the case *Trollinger v. Tyson Foods, Inc.*  The injuries Plaintiff
suffered were not reasonably foreseeable, per *Trollinger*, 370 F.3d at 615.

137.    As direct and proximate result of the Count 7 Defendants' conspiracy, the overt acts
taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has
been injured in her business in that she has had to change her business plan and to delay the
launch of numerous projects, fashion collections, and fashion services.  The injury under §
1962(d) stems from the overt acts committed in furtherance of the conspiracy, which includes
continuing to repost defamatory material about Plaintiff despite offering ample evidence and
sending hundreds of emails requesting removal.

138.    Plaintiff paid extortion fees to the Removal Websites, which meets the Court standard for
demonstrating a "concrete financial loss" as per the cases *Taxable Mun. Bond Secs.Litig.*, 51
F.3d 518, 523 (5th Cir. 1995); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989),
*Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), and *Berg v. First
State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).  Plaintiff paid the extortion money over a

sustained period of time before deciding to take legal action.  Receipts will be made available to opposing counsel immediately upon sending out the first set of interrogatories and requests for production.  Plaintiff is not attaching receipts to this publicly available lawsuit to protect her privacy.

139.   Plaintiff relied upon the "but-for" causation in paying the Removal Websites.

140.   WHEREFORE, the Plaintiff prays that a judgment be entered against the Count 7 Defendants in an amount fair and just, but no less than One Hundred Thousand Dollars ($100,000) in compensable damages, as well as exemplary damages in the amount of One Hundred Thousand Dollars ($100,000) for the willful and contumacious disregard for the Plaintiff's business and the foreseeable impact this conduct would have on Plaintiff's reputation as a respected, upstanding member of her community.  Plaintiff further requests that Defendants remove her name and photo from all associate websites free of charge, be issued a permanent injunction and enjoined from any future, similar conduct, and that be ordered to remove any existing, offending social media profiles or posts.  Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

### EIGHTH CAUSE OF ACTION
### COMPUTER FRAUD AND ABUSE

*Against Maini and All Defendants Engaged in Bashing Websites and Removal Websites*

141.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

142.   Based on information and belief, certain Defendants named herein and/or their agents followed and/or viewed Plaintiff's personal social media profiles, personal website pages, and pageant photo website pages for the purpose of gathering Plaintiff's personal identifying information and pageant headshot photograph.

143.   Based on information and belief, Defendants, especially Vikram Parmar aliases Matt Hamp and Martin Horan—a noted Indian felon—created a decoy profile on social media sites LinkedIn to mine Plaintiff's personal identifying information (photographs) without authorization.  Parmar accessed her copyrighted pageant photograph and then posted it on various Bashing Websites.  The pageant photograph of Plaintiff has remained online for months in spite of Plaintiff notifying said Bashing Websites that it was a DMCA violation to keep her photo in place on an obviously libelous "report"

authored by Maini.  Furthermore, Defendants continued to post and repost libelous information with her copyrighted pageant photograph spread across the Internet.

144.    Plaintiff's personal e-commerce website server, which hosts and operates her fashion and artwork websites, constitutes "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2).

145.    As described above, Defendants conspired to commit and attempted to commit violations of 18 U.S.C. § 1030(a)(7)(B) and 18 U.S.C. § 1030(a)(7)(C) in violation of 18 U.S.C. § 1030(b).

146.    Defendants' conduct has caused loss as defined in U.S.C. § 1030(e)(11) of more than $5,000 to Plaintiff during a one-year period.

147.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial.  Plaintiff alleges this amount is in excess of $100,000.  Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

### NINTH CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
*Against Guaranteed Removals and Internet Removals*

148.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

149.    At all times relevant to this action, Plaintiff has had a contractual relationship with both Guaranteed Removals and Internet Removals, and a prospective contractual relationship with Minc Law, Aaron Minc, RepZe, and Vikram Parmar.  This cause of action is centered on Guaranteed Removals and Internet Removals.

150.    In order to plead a prima facie case of breach of the implied covenant of good faith and fair dealing, it must be proven that (a) the Plaintiff and the Defendants are parties to a written contract; (b) the contract is ambiguous about the permissibility or scope of the conduct in question; (c) the Defendants, through a series of conscious and deliberate acts, fail or refuse to discharge contractual responsibilities, which unfairly frustrates the contract's purpose and disappoints the Plaintiff's expectations; (d) the Defendants' breach deprives the Plaintiff of the contract's benefits; (e) the Plaintiff suffers damages.  Case law support of this definition includes *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla. 1st DCA 1999), *Holmes v. Florida A&M Univ. by and through Board of*

*Trustees*, 260 So.3d 400, 407 (Fla. 1st DCA 2018), *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 170 (Fla. 1st DCA 2015), and *Sobi v. First South Bank, Inc.,* 946 So.2d 615, 617 (Fla. 1st DCA 2007). In particular, the judge in the *Sobi v. First South Bank, Inc.* case argued as follows: "An implied covenant of good faith, fair dealing, and commercial reasonableness must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.

151.     Plaintiff entered into contracts with Defendants Guaranteed Removals and Internet Removals in written contract form. The contracts are ambiguous about the permissibility of or scope of the conduct in question, merely stating "removals." The Defendants, through a series of conscious and deliberate acts, failed and refused to discharge contractual responsibilities, which unfairly frustrates the contract's purpose and disappoints the Plaintiff's expectations. The Defendants' breach deprives the Plaintiff of the contract's benefits. The Plaintiff has suffered tremendous damages emotionally, mentally, and spiritually.

152.     WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## TENTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### *Against All Defendants*

153.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

154.     At all times relevant to this action, Plaintiff has had a prospective contractual relationship with her private artwork and couture clientele and a reasonable probability in the continuation of those business relationships.

155.     In order to plead a prima facie case of tortious interference, it must be proven that (a) there is the existence of a business relationship, not necessarily evidenced by an enforceable contract; (b) knowledge of the relationship on the part of the Defendant; (c) an intentional and unjustified interference with the relationship by the Defendant; (d) damage to the Plaintiff as a result of the

breach of the relationship.  Case law support of this definition includes *Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126, 1127 (Fla. 1985); *Gossard v. Adia Services, Inc.*, 723 So.2d 182, 184 (Fla. 1998), and *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994).

156.   Defendants had knowledge of these relationships because they—or their agents and/or co-conspirators—visited her private website, her store website, her LinkedIn, her Instagram, her Facebook, and her SnapChat profiles and harassed her and her family by phone and email for the purpose of mining Plaintiff's personal identifying information.

157.   Defendants intentionally, or with substantial certainty, interfered with the relationship between Plaintiff and her clientele by stealing and libeling her and her family to Bashing Websites, causing many of her couture clientele and business award committees to end their relationship with Plaintiff and withdraw her name from award finalist lists.

158.   Defendants' above-described conduct has caused actual disruption to the relationship between Plaintiff and her clientele.

159.   Defendants' above-described conduct has caused actual disruption to the relationship between Plaintiff and various venture capital groups, many of whom offered verbal commitments to invest up to $50 Million in cash into her fashion business for a 25% equity stake, but later withdrew their offers or 'ghosted' Plaintiff due to the sheer amount of libel about her on various Bashing Websites. Plaintiff also faced tremendous hardship in traditional arranged marriage circles due to the sheer amount of libel about her and her family, necessitating her to retain two non-Indian matchmaking firms for $25,000 and $100,000 respectively, just to get suitors from the right background as it is now impossible for Plaintiff to receive a traditional arranged marriage.

160.   Defendants' above-described conduct has caused actual and severe disruption to the relationship between Plaintiff, her immediate family, and her family's trustees.  Her family was willing to invest up to $5 Million in cash into her business for a 2.5% equity stake, alongside a larger venture capital fundraising round, and withdrew their offer as a result of this situation.  Plaintiff's immediate family will only invest alongside professional venture capitalists.

161.   In the case of *Dade Enterprises v. Wometco Theatres,* 160 So. 209, 210 (Fla. 1935), the Court argued that "if one maliciously interferes with a contract between two persons, and induces one of them to breach the contract to the injury of the other, the injured party may maintain an action against the wrongdoer, and where the act was intentional, malice will be inferred." Defendant Maini was well aware that his libel would cause Plaintiff to suffer tremendously in fundraising both with

her immediate family and with venture capitalist groups that had expressed interest in Plaintiff's small business previously. Defendant Maini was also well aware that Plaintiff intended to pursue an arranged marriage to a suitable family, and his libelous actions—spread further by the malicious libel copy and pasting by Bashing Websites and Removal Websites—has impaired her ability to pursue arranged marriage as someone of her stature as an Ivy League educated beauty queen, former debutante, and abstinent virgin educated at a top cooking school would otherwise be able to obtain: a well-educated, handsome, successful suitor working in corporate finance or corporate law who is also religious, traditional, and an abstinent virgin. Plaintiff has now had to pursue the Western approach to marriage matchmaking largely against her will, requiring over $125,000 in fees to two elite matchmaking companies in the U.K. and the U.S. to obtain a modern arranged marriage based on love instead of achieving the traditional arranged marriage of her dreams which she worked hard and prayed to achieve since age 3.

162.    It is clear here that Defendants conduct both caused and induced the breach that resulted in Plaintiff's damages. Refer to cases *Univ. of West Florida Bd. of Trustees v. Habegger*, 125 So.3d 323, 326 (Fla. 1st DCA 2013), *Murtagh v. Hurley*, 40 So.3d 62, 66 (Fla. 2d DCA 2010), *Fernandez v. Haber & Ganguzza, LLP*, 30 So.3d 644, 646 (Fla. 3d DCA 2010), *James Crystal Licenses, LLC v. Infinity Radio Inc.*, 43 So.3d 68 (Fla. 4th DCA 2010), and *Southeastern Integrated Med., P.L. v. N. Fla. Women's Physicians*, 50 So.3d 21, 23 (Fla. 5th DCA 2010).

163.    Maini and/or one of his associates, in particular, set up Instagram and Twitter accounts under the anonymous name "Then Victoria" in order to attack Plaintiff in front of her clients and customers. As a direct to consumer brand making its entire revenue off of the support of adult women who are the decision makers in any household, these attacks with libelous content have a direct impact on sales. Plaintiff had to make other posts with links to the lawsuit, solely to save her client base. Plaintiff only started this other product to make additional money without Maini interfering, yet Maini and/or one of his associates has continued posting whenever Plaintiff's name is mentioned on Twitter. The account holder "Then Victoria" has an entire page devoted to bashing Plaintiff; indeed, the only posts in question are focused on Plaintiff and her alleged "history" using libelous links from the bashing websites as "evidence." This has resulted in tremendous cyberbullying and has caused Plaintiff further post-traumatic stress disorder symptoms and calls to the national suicide hotline.

164.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at

trial.  Plaintiff alleges this amount is in excess of $100,000.  Plaintiff also seeks all other relief this
Court deems appropriate and just under the circumstances.

## ELEVENTH CAUSE OF ACTION
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
*Against All Defendants*

165.    Plaintiff incorporates by reference each and every allegation contained in the preceding
paragraphs of this Complaint as if fully set forth herein.

166.    As described above, Plaintiff has lost couture and artwork customers as a result of the
Defendants' conduct described herein.

167.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair
methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in
the conduct of any trade or commerce. Section 501.204, Fla. Stat.

168.    At all relevant times, Defendant solicited, advertised, offered, and provided goods and services
by unauthorized access to Plaintiff's social media profiles and thereby was engaged in trade or
commerce as defined in Section 501.203, Fla. Stat.  Defendants received revenue from advertising
on their websites.  Defendants' unauthorized access to Plaintiff's social media profiles, use of
Plaintiff's identifying information, libel about Plaintiff, and then extortion of a fee to remove such
information from the Bashing Websites is illegal and qualifies as "a deceptive act or unfair practice"
that is both fraudulent and unlawful.  Such unfair methods of competition, unconscionable acts or
practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are
unlawful.

169.    Given that Florida places great weight to the interpretations of the Federal Trade Commission
and federal courts with respect to § 5(a(1)of the Federal Trade Commission Act, 15 U.S.C. §
45(a)(1) as of July 1, 2017 and Fla. Stat. § 501.204 (2017), Plaintiff restates her argument that
Bashing Websites are engaging in unfair and unlawful practices by permitting Removal Websites to
extort victims like herself.  Please refer to the case *State v. Beach Blvd Automotive Inc.*, 139 So.3d
380, 393 (Fla. 1st DCA 2014).

170.    Furthermore, Plaintiff reaffirms that Court finding fraud with Defendants is not necessary to
sustain a violation under the Florida DUPTA.  Please refer to the case *W.S. Badcock Corp. v. Myers*,
696 So.2d 776 (Fla. 1st DCA 1996) which found that "A finding of fraud is not necessary to sustain

a violation under the DUTPA" when citing *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451, 453 (Fla. 1st DCA 1985).

171.   Finally, at all relevant times, Plaintiff was a consumer as defined by Section 501.203, Fla. Stat. Defendants' practice, as described in detail in paragraphs above, is unfair and deceptive.

172.   WHEREFORE, the Plaintiff demands a declaratory judgment that Defendants violated the Act and an injunction enjoining future violations of the Act pursuant to Section 501.211(1), Fla. Stat., actual damages for violation of the Act pursuant to Section 501.211(2), Fla. Stat., monetary damages in excess of $100,000, an award of attorneys' fees and costs pursuant to Sections 501.211(2) and 501.2105, Fla. Stat., and such other relief that this Court deems just and proper.

## TWELFTH CAUSE OF ACTION
## CIVIL CONSPIRACY
*Against All Defendants*

173.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

174.   As described above, each of the Defendants agreed to participate in the extortive Bashing Websites and Removal Websites actions and joined therein with the intent to further their wrongful activity.

175.   As a result of Defendants' extortive actions, Plaintiff has suffered damages in an amount to be proven at trial, including damages arising from the costs of investigating and remediating Defendants' unlawful infiltration of her private social media profiles, lost awards from competitions where Plaintiff was slated to win, and lost revenue from clients that were diverted as a result of Defendants' illegal conduct.

176.   In *Patten v. Daoud*, 12 So.2d 299, 301 (Fla. 1943) and Carson in *Common Law Pleading* page 174, the essentials of a declaration for civil conspiracy are that (1) conspiracy between two or more persons to do an unlawful act or to do a lawful act by unlawful means and (2) the doing of some overt act in pursuance of the conspiracy, and (3) damage to the Plaintiff as a result of the acts done in furtherance of the conspiracy.  See also the following case law: *Phillip Morris USA, Inc. v. Russo*, 175 So.3d 681, 686 (Fla. 2015)., *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977), *Snipes v. West Flagler Kennel Club, Inc.*, 105 So.2d 164, 165 (Fla. 1958), *Loeb v. Geronemus*, 66

So.2d 241, 243 (Fla. 1953), *Liappas v. Augoustis*, 47 So.2d 582 (Fla. 1950), and *Dr. P. Phillips & Sons, Inc. v. Kilgore*, 12 So.2d 465, 466 (Fla. 1943).

177.     In this case, Plaintiff, a law student, has been abused and targeted as a victim of atrocious levels of civil conspiracy. The peculiar power of coercion possessed by the conspirators—all Defendants, with particular emphasis on Maini, Bashing Websites, and Removal Websites—by virtue of their combination could not have had the same impact if possessed solely by an individual. Please refer to cases *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) and *Accord, Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc.*, 629 So.2d 252, 257 (Fla. 3d DCA 1993).

178.     To sufficiently plead conspiracy, Plaintiff further explains that there is extensive tacit evidence of both understanding and agreement between Bashing Websites and Removal Websites to facilitate a mutually beneficial financial arrangement. The Bashing Websites charge a set fee and the Removal Websites charge a set fee, which is presented as one base fee to the victim; in this case, Plaintiff. Evidence of this is the opacity with which the website owners suggest "arbitration." Each Bashing Website has a separate "arbitrator," which is, in fact, a Removal Website advertiser paying to be recommended to victims as a top-notch and ethical removal service. Defendant Maini knew he was putting Plaintiff in graver danger by placing her name and writing libel about her on several Bashing Websites than when he cheated on her with Malaysian prostitutes and underage retail workers during her hospitalization for nerve damage. To list a specific damage, Plaintiff lost close to $2,500,000 in prospective wholesale fashion orders as a direct and proximate cause of cybersmear efforts and spent well over $650,000 in a combination of stress management yoga retreat bills, depression therapy bills, search engine optimization (SEO) bills, and removal services bills.

179.     Agreement was made between the Bashing Websites and the Removal Websites long before Plaintiff's name was initially placed by Maini. This agreement, facilitated by advertisements for seemingly "arbitrative" services, served an unreasonable restraint on competition to the standard of *MYD Marine Distributor, Inc.*, 67 So.3d at 48. That is, legitimate Removal Websites not run by fraudsters are unable to get defamatory articles removed and are thus in a difficult position, placing them in direct competition with the various fraudsters committing civil conspiracy.

180.     As there were far more than two people involved to accomplish a lawful purpose by unlawful means—in this case, all Defendants—and these confederates committed acts unlawfully, willfully, and maliciously that resulted in severe injury to Plaintiff, this standard has been met.

181.   WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial.  Plaintiff alleges this amount is in excess of $100,000.  Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jane Koe, a pseudonym, prays for judgment against Defendants as follows:

1.  A trial by jury;

2.  Enter judgment against Defendants, jointly and severally, in favor of Plaintiff for each of the aforementioned Causes of Action;

3.  Adjudge that Defendants and each of their agents (and subagents) and any other persons or entities working in concert or in participation with them be enjoined during the pendency of this action and thereafter permanently from:

    a.  Extorting Plaintiff or Plaintiff's family;

    b.  Emailing, calling, or otherwise mailing Plaintiff or Plaintiff's family, which includes but is not limited to her parents;

    c.  Using any image, word, phone number, or other identifying information collected from award websites, personal websites, news articles, or any websites whatsoever about Plaintiff for any purpose;

    d.  Accessing any of Plaintiff's private social media profiles, including but not limited to LinkedIn and Goodreads;

    e.  Accessing any of Plaintiff's business social media profiles now and in the future, including but not limited to LinkedIn, Facebook, SoundCloud, Twitter, Vero, TikTok, SnapChat, and Instagram;

    f.  Otherwise competing unfairly with Plaintiff's art and fashion business endeavors in any manner;

    g.  Continuing to perform in any manner whatsoever any of the other acts complained of in this Complaint.

4.  Adjudge that Defendants, within fourteen (14) days after service of the judgment request herein, be required to file with this Court and to serve upon Plaintiff a written report under oath setting forth in detail the manner in which it has complied with the judgment

5. Adjudge that Defendants remove Plaintiff's name, beauty pageant winner photograph, and all defamatory and libelous information from their websites immediately and refrain from reposting anything about Plaintiff in the future;

6. Adjudge that Defendants return to Plaintiff all expenses relating to removal of prior posts, SEO campaign services, and psychotherapy bills arising from suicide attempts as a result of this situation;

7. Adjudge that Plaintiffs recover from Defendants their actual damages and/or damages allowed by statute in an amount to be determined at trial;

8. Adjudge that Defendants be required to account for any profits that are attributable to their acts complained of herein;

9. Adjudge that Plaintiff recover both punitive and treble damages from Defendants;

10. Adjudge that Plaintiff be awarded its costs incurred in connection with this action, including reasonable investigative expenses and medical expenses;

11. Adjudge that Defendants jointly provide any costs and reasonable attorney fees as provided by 28 U.S.C. § 2412 or any other provision of law;

12. Impose a constructive trust on all of Defendants' funds and assets that arise out of the acts complained of herein;

13. Adjudge that Plaintiff recover all such other relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED, in West Palm Beach, Florida, this 29th day of April, 2020, as the Clerk of Court did not file the last several pages of her First Amended Complaint despite Plaintiff handing in everything in person with two eyewitnesses—both of whom gave her business cards.  To be clear, there are 61 pages total in this complaint; quadruple checked.


/s/ Jane Koe
Jane Koe, a pseudonym
Law Student *Pro Se*
7750 Okeechobee Blvd
Suite 4-481
West Palm Beach, FL 33411
Phone: (929) 400-7746
Email: janekoelitigation@icloud.com

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served in person by process server on April 29, 2020 at the Southern District of Florida West Palm Beach Clerk of Court Office.  I have retained a process service to serve all Defendants on the Service List below. Some Defendants will need to be served using the Hague Convention, which requires both location tracking and process serving according to international law standards.  Certainly, this process will take longer than a mere four business days in the middle of a global pandemic. There are 61 pages total in this complaint; quadruple checked.

/s/ Jane Koe
Jane Koe, a pseudonym
Law Student *Pro Se*
7750 Okeechobee Blvd
Suite 4-481
West Palm Beach, FL 33411
Phone: (929) 400-7746
Email: janekoelitigation@icloud.com

# SERVICE LIST

Amar Chander Maini
9 Jamberoo Ave
Baulkham Hills, NSW 2153
Australia
Email: amarcm@outlook.com
Email: amarchandermaini@gmail.com
Email: vikramkms@outlook.com

Guaranteed Removals
3425 Harvester Road
Suite #200
Burlington, Ontario L7N 3M7
Canada

RepZe
9615 E County Line Road
Suite B#444
Centennial, CO 80112
United States of America
Phone: (970) 458-8143
Email: removal@repze.com

Marca Global, LLC. d/b/a InternetReputation.com
7100 East Belleview Avenue
Suite 310
Greenwood Village, CO 80111
United States of America

Amarutu Technology
One Island East
Level 23,
18 Westlands Road
Hong Kong, Hong Kong

Minc Law
200 Park Avenue
Suite 200
Orange Village, OH 44122
United States of America

Michael Schern
1640 South Stapely Drive
Suite 132
Mesa, AZ 85204
United States of America

Internet Removals
130 Bundall Road, Level 3
Bundall, QLD 4217
Australia

Kevin Angileri
6391 W Shannon St.
Chandler, AZ 85226
United States of America

James John
Unknown Address – subpoenaing Minc Law

Denise Ann Faulk – Assistant US Attorney (Arizona State
Bar No. 12700) who prosecuted Kevin Angileri
Financial Litigation Unit
405 W Congress Suite 4900
Tuscon, AZ 85701-5041
Email: denise.faulk@usdoj.gov

Amanda Aguirre – Parole Officer for Kevin Angileri
Tuscon, AZ
Email: amanda_aguirre@azd.uscourts.gov
Phone: +1-520-205-4417

Jim Burns
130 Bundall Road, Level 3
Bundall, QLD 4217
Australia
Email: jim@link360inc.com
Phone: (864) 362-2207

Scott Breitenstein
29 Bidleman St, Dayton, OH 45410
22 W Mumma Ave, Dayton, OH 45405
1949 Drill Ave, Dayton, OH 45414
United States of America

Web Presence, LLC d/b/a Net Reputation
150 SW 12th Ave, Suite 340
Pompano Beach, FL 33069-3238
United States of America

Expert Removals
Unknown Address
United States of America
Phone: (888) 447-4949

Ronald Linco
Unknown Address – subpoenaing Minc Law
United States of America

Arman Ali d/b/a/ D4 Solutions BD
Unknown Address – subpoenaing Minc Law
Dhaka, Bangladesh or Rajshahi, Bangladesh

Pierre Zarokian
Unknown Address – subpoenaing Minc Law
Nevada
United States of America

Vikram Parmar *aliases Matt Hamp and Martin Horan*
Unknown Address – subpoenaing Minc Law
Bangladesh

Defamation Defenders, LLC.
4845 Pearl Crest Circle, Suite 101
Boulder, CO 80301
United States of America