# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:20-CV-80147-RLR

### JURY TRIAL REQUESTED

**JANE KOE,** an individual law student filing pseudonymously

      **Plaintiff**

**vs.**

**AMAR CHANDER MAINI,** an individual con artist

      **Defendant.**

FILED BY _meg_ D.C

JAN 0 4 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

### PLAINTIFF'S THIRD AMENDED COMPLAINT AT LAW

NOW COMES Plaintiff, JANE KOE ("Plaintiff"), a law student *pro se* proceeding under a pseudonym.  This Complaint is against AMAR CHANDER MAINI aliases GALLANTVK, AMARCM4, AMARCM_2, VIKRAMKMS, VIKRAM KUMAR MANSINGH, VIKRAM KUMAR, KAT, JO, JO SMITH, BILLY BOB THORNTON, EKI, ANONYMOUS, SAM, AMAR CHANDER, ANTHONY BALDERON, THEN VICTORIA, etc. ("Maini"), a con artist who is a citizen of Australia and believed to be temporarily based in India.  She asserts the following:

### INTRODUCTION

1.  The Plaintiff brings this lawsuit under various state and federal law theories of recovery listed below.
    (1) Fraudulent Misrepresentation
    (2) Defamation
    (3) Libel
    (4) Invasion of Privacy
    (5) Computer Fraud and Abuse
    (6) Tortious Interference with Advantageous Business Relationship
2.  Plaintiff is a law student studying international business law in the United Kingdom and international taxation law in the United States.  She supports her legal educational pursuits

through running a small business that sells research-based, ultra-luxurious, designed goods. Prior to entering law school, Plaintiff worked in finance for four years while moonlighting in various pharmaceutical labs after work. Between June 2016 to December 2016, and then again from February 2017 to March 2017, she shifted her equity research work at Fidelity Investments online to pursue a pharmaceutical chemistry contract work opportunity in Sydney, Australia.

3. Plaintiff is a traditionally minded, career oriented, and family focused abstinent virgin of Kshatriya, Khatri, Indian origin who applied to a variety of professional matchmaking agencies starting at age 20 to find a suitable match from her caste and subcaste. Full copies of her applications to Kelleher International, It's Just Lunch, Selective Search, Intersections Match, and eight other agencies will be made available in discovery. After being told by every matchmaker she met with that she was too young to marry and to wait until after graduation by over eight elite agencies, she waited until graduation and then immediately chose to sign on with Jasbina Ahluwalia, a "modern" arranged marriage matchmaker also of Indian origin. Plaintiff paid a fee of $2,500 to retain assistance with finding and growing a relationship with an Indian suitor in her caste and subcaste. Under the guidance of Ms. Ahluwalia, who is also an attorney, and her mother, Plaintiff set up Indian matrimonial pages on Shaadi.com, ChristianMingle.com, OKCupid.com, and Match.com. Profiles were managed on a daily basis by Plaintiff's mother, who oversaw all messages from suitors and passed on all pre-approved candidates to Plaintiff. Plaintiff was in charge of writing message responses, but any and all meets (the Indian term for "dates") were required to be pre-approved by Plaintiff's mother and included both phone interview and email interview screeners. Plaintiff's father, a highly respected physician, also participated in the screening process and oversaw both dowry questions and issued final approval to any suitor(s) to pursue courtship.

4. Maini's offending conduct began in November 2016 while Plaintiff and Maini were still in a relationship and has continued nonstop even after the 11-month arranged relationship between the parties ended. Plaintiff was unwilling to reconcile with Maini after realizing the extent of his fraudulent misrepresentations about his name, age, profession, mental stability, alcoholic tendencies, illicit drug abuse habits, pornography watching habits, and history of abusing women of South Asian origin. Indeed, all of Maini's exes except Plaintiff have

wound up in domestic violence shelters, often using the services of Sakhi for South Asian Women to escape. Plaintiff's attempts to convince Maini to reduce his offending conduct include obtaining restraining orders, notifying police, threatening to write a book, changing her residence on a near-constant basis, avoiding him in public places, deactivating her personal social media profiles, and attempting suicide. She spent years attempting various methods of alternative dispute resolution, both with retained lawyers and without, none of which were effective at stopping Maini from his nonstop, simultaneous campaigns of terror.

5. Maini has never taken responsibility over any area of his life. He suffers from an anti-growth, external locus of control mindset, which means that he attributes failures or mishaps in his life to other people, most often the primary woman with whom he is in a relationship. Plaintiff bore the brunt of Maini's anger at his lack of career success. Out of compassion, even after discovering that he catfished her, Plaintiff continued to go out of her way to assist Maini with improving his career success. She helped him by strategizing how to become a Shashi Tharoor-level public intellectual and then transitioning into a party-supported candidate. To this end, Plaintiff did everything from improving his resume drafts, coaching him on succeeding in job interviews, supporting him emotionally through his mood swings, securing invitations to events attended by well-connected politicians and their wives who could help him get elected, finding a sponsor for him to join the elite Australian Club, memorizing district characteristics, to plotting potential campaign moves and strategies. Maini became dependent on Plaintiff for the emotional, social, and strategic political support she provided during their relationship. Without a calendar full of dinner party and gala invitations secured entirely by Plaintiff, Maini fell back on his rampant partyboy drinking habits and desired to retaliate against Plaintiff for what he perceived to be "abandonment" and "giving up on [him]."

6. Maini's anger is explosive, volatile, and frightening, and is only tempered by his victim mentality and manipulative tendencies. He is accustomed to getting his way, and when he fails to do so, he retaliates. When Plaintiff reported his offending catfishing conduct to his parents in February 2017 and April 2017, in an effort to inspire them to help Maini start living a life of integrity, Maini then blamed Plaintiff for his father dying of a heart attack—in November 2017. The type of coercive control Maini exerts is centered around holding

women responsible for the mistakes and misdeeds of men, as opposed to taking personal responsibility and ownership over his mistakes and failings.

7. Maini posted dozens of blog pages filled with death threats targeted at Plaintiff. He also authored original libel about Plaintiff on 'Bashing Websites,' which Plaintiff had to spend hundreds of thousands of dollars to remove. Maini's libel reached Plaintiff's friends, family, work colleagues, clients, and classmates, many of whom stalked her, harassed her, and bombarded her with inappropriate advances in person. Maini even solicited random posters on 'Bashing Websites' to join in bashing Plaintiff, leading to thousands of viewers to stalk, harass, and retaliate against Plaintiff for conduct Maini completely fabricated. Plaintiff had no choice but to inform her Dean and relevant university administrators about Maini's libel, as two external law examiners marking her papers in Equity and Trusts Law believed what Maini wrote at face value. Maini's libel was given widespread publicity and made Plaintiff look like a serial cheater in her personal, professional, and academic pursuits.

8. In doing so, Maini invaded Plaintiff's circles and caused her undue and unjust ridicule and humiliation. Plaintiff had no choice but to focus on damage control, first by paying 'Removal Websites,' followed by suing and subpoenaing Removal Websites and 'Bashing Websites,' and then keeping a search engine optimization (SEO) firm on a $4,000 per month retainer. Maini's conduct took over Plaintiff's life, making it difficult for her to work or study, given the sheer magnitude and whack-a-mole nature of his abusive cyberstalking and libel. Whenever Plaintiff paid a Removal Site to remove one of Maini's postings on a Bashing Site, another popped up instantly. After having fun with Bashing Websites, Maini then decided to pursue posting still more libel about Plaintiff on social media pages including Instagram, Skype, Facebook, LinkedIn, Twitter, Quora, and SnapChat, and dozens of other apps.

9. Maini's libel and harassment campaigns have been ceaseless since November 2016, targeting not only Plaintiff but also Plaintiff's mother. Even more concerning, Maini's cruel libel efforts in 2019 and 2020 led to several further instances of libel and harassment both on and offline from equally sadistic and narcissistic individuals. Plaintiff had to spend $890,000 in therapy expenses to overcome emotional distress caused by Maini, compounded further by others who read his libel and then recreated and expanded upon original libel.

a. *January to March 2020.* Jessica Dunderdale, a salon secretary who stole Plaintiff's credit card to buy dresses, forged emails, and wrote libel based entirely on original libel authored by Maini. Plaintiff had no choice but to retain counsel to serve Jessica Dunderdale a cease and desist notice and letter of claim for harassment and defamation.

b. *November 2019 to October 2020.* Edward Lucas, a lawyer who violated privacy rights and attorney-client privilege to repost and rephrase Maini's original libel to his well-heeled legal professional network. Plaintiff had the misfortune of seeing him living a double life with his age 36 concert pianist mistress N.D., while his long-suffering, solicitor wife Yasmine held down the fort and protected his image as a serial cheater who abandoned her for N.D. mere months after marriage in June 2018 until it became untenable for her emotionally. Edward Lucas based his smear campaign entirely on Maini's smear campaign. Plaintiff had no choice but to retain counsel to serve Edward Lucas a cease and desist notice and letter of claim for harassment and defamation.

c. *November 2020 to December 2020.* Chloe Colson, a graduate student serving as a student government representative, oversaw and orchestrated a student-wide smear campaign to isolate Plaintiff on what she read Maini say to Plaintiff. Chloe Colson widely disseminated copies of Maini's libel to classmate contacts to cause Plaintiff undue ridicule, orchestrated a 100+ email attack on Plaintiff in an effort to trigger Plaintiff into suicide, and abused her position of situational power in student to harass Plaintiff for attending star-studded galas instead of small-time student wine and cheese parties. Plaintiff had no choice but to retain counsel to serve Chloe Colson a cease and desist notice and letter of claim for harassment and defamation.

10. Plaintiff reported all incidents to the police, authored a book about domestic violence, initiated proceedings in Australia, deleted her social media presence, stopped giving media interviews, and filed for restraining orders in the hope that they would deter Maini from further abuse. Restraining orders, police reports, and civil lawsuits have not given Plaintiff any relief. Maini continues using keylogger stored information to hack into Plaintiff's email accounts, bank accounts, financial accounts, and business accounts. Despite her best efforts, Plaintiff has been unsuccessful in securing an alternative dispute resolution agreement with

Maini.  As a result, Plaintiff is no longer willing to settle this civil dispute and has initiated private criminal proceedings against Maini outside of this jurisdiction.

11. Based on information and belief, Maini has continued writing libel on various Internet platforms.  He has no interest in ceasing his coercive control pattern of abusive conduct and has stated, in writing, that he intends "to murder [Plaintiff]."

## **NOTA BENE**

12. Throughout discovery and trial, Plaintiff will rely on the testimony, experience, and knowledge of the following expert witnesses.  She is continuing to interview and secure expert witnesses.

   a.  Dr. Paul Ekman, PhD, an expert on facial microexpressions.

   b.  Dr. George Simon, PhD, an expert on character disturbance.

   c.  Dr. Anna Salter, PhD, an expert on predators and serial sexual offenders.

   d.  Dr. Willard Harley, PhD, an expert on building strong, affair-proof marriages.

   e.  Dr. Marsha Linehan, PhD, an expert on Dialectical Behavior Therapy for patients with complex post-traumatic stress disorder and severe situational depression.

   f.  Ms. Vanessa Van Edwards, an expert on duping delight and contempt expressions.

   g.  Ms. Donna Anderson, an expert on sociopaths in romantic relationships and the Founder of LoveFraud.

   h.  Mrs. Kim Evazians, a digital nomad and expert on healthy relationships who runs a private relationship coaching company.

   i.  Mrs. Heather Collins Grattan Floyd, a Florida resident, Biblical relationships expert, and dear friend of Plaintiff.

13. Given that Maini has remained belligerent and abusive despite Plaintiff's best efforts to encourage him to participate in discovery efforts, Plaintiff has created a new, litigation-only Dropbox account that is divided into Exhibits and Discovery.

   a.  Color copies of all exhibits are available at this link from January 6, 2020: https://cutt.ly/8jajPCf

   b.  Discovery is available at this link from January 6, 2020: https://cutt.ly/SjajIzh

## PARTIES

14. Plaintiff Jane Koe, a pseudonym, is a United States citizen with a primary residence in Singer Island, West Palm Beach, Florida. Though attending law school in both the United Kingdom and the United States, she is a Florida citizen for tax purposes and conducts her principal place of small business in Palm Beach and the surrounding areas of Miami, Delray Beach, Coconut Grove, and Fisher Island. Plaintiff rents out her Palm Beach condominium via Airbnb and Vrbo to ensure she can graduate without having to take out a law school loan.

15. Defendant Amar Chander Maini, born July 15, 1979, is an Australian citizen who is believed to divide his time between India and Australia. He also uses the aliases Vikram Kumar Mansingh, Billy Bob, Jo, Kat, gallantvk, amarcm4, amarcm_2, and vikramkms, among dozens of others. Despite being age 41, he is believed to reside principally in a small room at his mother's house, located at 9 Jamberoo Avenue, Baulkham Hills, NSW 2153, in Australia. It is believed he sleeps overnight in the private residences of the many women and girls in his narcissistic harem. Maini is believed to travel regularly throughout the world, with uneducated mistresses located throughout his primary travel destinations: South Korea, Malaysia, Australia, Nepal, and India.

## JURISDICTION and VENUE

16. This Court has jurisdiction over the federal subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim against Maini arises under both 18 U.S.C.A. § 1964(c) and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq.

17. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, under the doctrine of supplemental jurisdiction.

18. This Court has personal jurisdiction over Amar Chander Maini under 28 U.S.C. § 1391(b)(2), given that Maini targeted Plaintiff in her domicile state of Florida, and that the principal harm to Plaintiff's reputation occurred within this judicial district.

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) given that (1) there is complete diversity between Plaintiff Koe (Florida) and Maini (Australia), and (2) that the

matter in controversy exceeds a damage amount of seventy-five thousand dollars ($75,000.000), exclusive of interest and costs.

20. As per the finding in *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001)., "a party seeking to invoke diversity jurisdiction should be able to allege affirmatively the actual citizenship of the relevant parties," Maini is a citizen of Australia and Plaintiff is a citizen of Florida in the United States.

21. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred within this judicial district, substantial injury occurred in this district, and Maini is otherwise subject to the Court's personal jurisdiction in this district.

22. Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Maini is subject to jurisdiction in this district. Maini continues to sell marijuana and other illicit drugs to multiple Miami-area residents. While Maini's illicit business activities do not have a formal LLC registration in the State of Florida, he has profited tremendously from expanding from Australia and India to the United States.

23. Though the finding in *King v Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Circ. 2009) suggests that "an alternative forum is adequate if it provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiff's injuries," and Courts are to ask "only whether some remedy exists" as per *Neuralstem, Inc. v. ReNeuron, Ltd.*, 365 F. App'x 770, 771 (9th Circ. 2010), Plaintiff argues that no foreign court can assert jurisdiction over this litigation. The primary place of reputational damage occurred in Plaintiff's primary residence on Singer Island in Palm Beach, Florida. Plaintiff is on a temporary visa to the United Kingdom for her legal studies, and has neither an e-visa nor authorization to re-enter Australia. The *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001) finding that an alternative forum can be used by a plaintiff is only "when the foreign court can assert jurisdiction over the litigation sought to be transferred." There is no foreign court available to hear this specific case. Even if the forum of United Kingdom or Australia was open to Plaintiff, who lacks permanent residency in either location, the remedy available in either forum is not identical and not clearly available. Libel laws are much more claimant-friendly in both the United Kingdom and Australia, but Plaintiff does not qualify to file suit there as her primary residence is on Singer Island in Palm Beach, Florida. Neither Australia nor the

United Kingdom are adequate and available forums with equitable remedies available for non-citizens.

## **GENERAL ALLEGATIONS**

24. Plaintiff met Amar Chander Maini on February 20, 2016, when using Intersections Match matchmaking services via Jasbina Ahluwalia.  At the time, she divided her time between her condominium in Palm Beach, Florida, and her apartment in Salt Lake City, Utah for business.

25. The two embarked on a traditional courtship for approximately eleven (11) months beginning in February 2016 and ending in January 2017.  The two lived separately and did not travel together.  While on a temporary visa to Sydney, Australia with work authorization to conduct innovative archaebacteria and dermatogenetics research, Plaintiff lived in both Women's College and Sancta Sophia College on a casual accommodation basis.

26. Plaintiff was in a vulnerable position emotionally due to her difficulties with Chinese chemical importation laws to cure a rare disease, insecurity issues with how her family was treated by her former prep school headmaster, and the suicide of her former best friend who was raped by her former prep school headmaster.  She found some solace and what she thought was a trusting ear in Maini, to whom she confided her personal and work-related challenges.

27. Between February 2016 to January 2017—with a final ending in February 2017—Plaintiff was betrothed via arranged marriage to Maini.  Maini catfished her family and her matchmaker by pretending to be an age 28 investment banker named Vikram Kumar Mansingh when he was an age 37 unemployed former marketing assistant.  Not only did Maini con Plaintiff into a romantic relationship by lying about his name, age, educational background, professional background, romantic background, and future goals, but also Maini stole Plaintiff's dowry prior to the February 2017 wedding date and has continued harassing, intimidating, defaming, and extorting Plaintiff's family since then.

28. Plaintiff ended the relationship after discovering Maini is (1) addicted to alcohol despite going to alcohol rehabilitation centers in India throughout his 20s, (2) addicted to child pornography, (3) conned multiple families outside of her own for arranged marriage dowries, (4) sexually assaulted a large number of minor children under age 11, including grooming his

then age 4 niece with verbal statements that he wanted to "smash her before getting titties at age 9," and (5) misrepresented his name, age, education, job, income, savings, and sheer magnitude of his brazen spoken and demonstrated sexual attraction to prepubescent girls ages 2 to 11.

29. Over time, Plaintiff became suspicious of Maini as his story failed to add up. As a result, she began retaining a private investigator service called Elite Surveillance in New South Wales to discover the real identity of "Vikram Kumar Mansingh." "Vikram" created and filled out a Pinterest page, Skype page, private Instagram page, all to 'long con' Plaintiff into settling for a relationship with and future marriage to him. For months, Plaintiff believed she was building a future with an investment banker from an equally traditional family. She was horrified to discover Maini lacks an MBA in Finance from London Business School, let alone any training or degree in finance whatsoever.

30. Plaintiff entrusted Maini with information about how she felt called to cure both variants of a rare metabolic disorder.

   a. When on winter break in grade 6, Plaintiff and her family went on a cruise trip to the Bahamas. During this trip, Plaintiff developed a severe case of strep throat that was treated inappropriately by Bahamian doctors. In lieu of standard penicillin or amoxicillin, Plaintiff was prescribed Neomycin, a dangerous antibiotic that wiped out her digestive system to the point that she was left with permanent gut microflora disruption. When Plaintiff and her family returned to Florida, Plaintiff was transferred to the Intensive Care Unit of five different hospitals, and then airlifted to the Cleveland Clinic in Jacksonville. Despite being the daughter of a doctor, and all doctor's best efforts, Plaintiff was left with severe vomiting symptoms and permanent allergies.

   b. As a result of the interaction of Neomycin on her developing body, Plaintiff developed a secondary, non-genetic form of a rare metabolic disorder. The interaction of Plaintiff's genetic Celiac Disease, in combination with a new host of allergies thanks to Neomycin, caused her to vomit immediately after eating lactose-containing, soy-containing, or artificial ingredient-containing foods. Mild cases of her condition result from antibiotics, but severe, genetic cases result in liver failure and premature death. While Neomycin is often prescribed to help the body

metabolize choline for patients with the genetic form of the disease, even one week of Neomycin has been shown to prevent the body from metabolizing choline permanently.  In Plaintiff's case, the adult-size dose she was given over the course of a two-week vacation resulted in tragic, permanent metabolic damage.

c.  Plaintiff was placed on a highly restricted diet and prohibited from eating gluten-containing, lactose- containing, soy-containing, meat-containing, or artificial ingredient-containing foods for life.  Plaintiff sometimes went against the restrictive code away from her protective mother's watchful eye as she hated eating only egg whites and jello day in and day out, which naturally led to vomiting in bathrooms throughout her school years.  Many incorrectly labeled Plaintiff as bulimic.

d.  Plaintiff has always loved eating pizza and the idea of being forced into settling for Daiya cheese pizza instead of New York mozzarella cheese pizza inspired Plaintiff to research ways she could enjoy her favorite foods once again.  Plaintiff benefited enormously from the extensive and strong science class offerings in her prep school, sixth form, college, and graduate studies, and learned how microbiology, organic chemistry, and biochemistry could help her get back to eating real pizza again.

e.  Throughout college and after graduating, Plaintiff gained extensive lab experience in both pharmaceutical chemistry and microbiology while working in top labs including at the Cincinnati Children's Hospital and the National Institutes of Health. Immediately after completing undergraduate-level organic chemistry, Plaintiff rented labs on almost a dozen college campuses and hired undergraduate and graduate students in the natural sciences to assist her in her research objectives.

f.  Thanks to a serendipitous influx of funds from inheriting her grandmother's estate in 2015, Plaintiff was in the extraordinarily fortunate position to pool together proceeds from her trust and self-made earnings to meet a $10 Million research and development requirement to cure her vomiting condition inducted by the antibiotic Neomycin as well as the more extreme case for patients with the genetic variant.

g.  After learning everything possible about drug development and FDA protocols at top labs in the U.S., Plaintiff decided to focus on developing an archaebacteria supplement based on the pioneering medical genetics work of Dr. John Christodoulou, then based at the Westmead Institute for Medical Research in Sydney.

Plaintiff decided to secure a temporary work visa to be at the center of ground-breaking work in nutritional supplements, at the Charles Perkins Centre, and in dermatogenetics enzymatic opportunities at the Westmead Institute for Medical Research, both in Sydney.

h. Plaintiff decided the future must include dual treatments: an over-the-counter supplement for others like her with immediate vomiting symptoms and an enzyme replacement therapy similar to diabetic insulin therapy for those with the more serious genetic symptoms. To achieve this end, she became interested the chemical properties of $C_6H_{14}O$—commonly known as DMB or 3,3-Dimethyl-1-butanol—which is the structural analog of choline. She started importing large quantities of DMB from China at a reduced rate and built a small purification chemical apparatus in her room. While DMB is volatile and flammable, Plaintiff had noble intentions of seeing whether complete purification could be of potential therapeutic use. While Plaintiff did demonstrate creativity in thinking outside of the box, she also recognizes that student accommodation administrators clearly had a problem with her evading doormen, building managers, and fellow young professionals to perform organic syntheses in her apartment to save on costs whenever and wherever possible.

i. Concurrent to her independent efforts, Plaintiff spent roughly $8 Million total hiring contract scientists, contract professors, and contract graduate students to find a suitable enzyme to cure the genetic form of the condition. Most industry estimates put the rare/orphan drug development at twenty (20) years on average. Plaintiff achieved her objectives in a little over four (4) years, using entrepreneurial, unconventional, and innovative approaches. The enzyme replacement therapy whose development she outsourced to other scientists meets all requirements to secure fast-track FDA and MRC approval post-phase III. She has seven workable enzymes. Her sole competitor at the Cleveland Clinic, a middle-aged MD/PhD, lacks even *one* workable enzyme despite his $150 Million financial cushion and his networking skills which netted him a relationship with P&G. Plaintiff's team already has seven (7) papers that reflect her out-of-the-box approach to clinical trials management accepted in several top journals, beating his output by a considerable margin. Her winning enzyme has been valued at $397 Million in M&A by a big pharmaceutical company.

31. Plaintiff entrusted Maini with information about how her former headmaster at Detroit Country Day School, Mr. Glen Shilling raped Shannon Marie Packer in grade 9.

   a. Plaintiff was close to Packer from middle school. When Shilling saw Plaintiff watching him choke and rape Packer, he began a multi-year smear campaign against Plaintiff culminating in a two-day dress code suspension for the 'crime' of wearing a turtleneck, a five-day suspension for the 'crime' of exercising her First Amendment rights in a blog post about her classmates with fake extracurriculars, and enlisting and entrusting teachers to make Plaintiff's life difficult. Shilling has a history of targeting, isolating, and abusing teachers, administrators, and students who speak out about his toxicity. Some examples follow.

   b. Plaintiff began telling classmates and teachers that Shilling raped Packer starting from 10th grade. When Shilling suspected Plaintiff might go to the police and report his statutory rape of a then-age 14 student who ultimately committed suicide due to his actions, he belittled, humiliated, and targeted Plaintiff and her family into silence. Specifically, Shilling declared Plaintiff's family is "violent" and enlisted teachers at every level from the Middle School to the Upper School to attack Plaintiff and her siblings. This was administrator-level sadistic bullying, not student-level bullying. Plaintiff has always been well-liked and admired by her peers, with the exception of a group of toxic Indian mean girls led by sociopathic ringleaders Priya Badhwar and Reejuta Joshi.

   c. Shilling encouraged Mrs. Julia Winter, a chemistry teacher, to make a false accusation of plagiarism about Plaintiff to give him grounds for suspension or expulsion, to which she reluctantly complied out of desire to keep her employment as she had to work to support her son's college tuition. Winter eventually dropped the false accusation of her own volition because her code of ethics prohibits false accusations. Shilling constantly asked Winter to go against her code of ethics to target "disruptive, problem students," through false accusations and she resisted in light with her code of ethics. Sensing her inability to be controlled, Shilling fired Winter without notice when Winter started an education technology company called Alchemie on top of her normal work hours.

d. Shilling bullied Mr. Bradley Gilman, the Upper School principal, into silence when he voiced his concerns about Shilling's reprehensible conduct towards Plaintiff. Years later, when Gilman expressed ongoing concerns to Shilling about bullying students sadistically, Gilman was fired without notice and forced to seek employment at another prep school out-of-state.

e. Shilling enlisted Mr. Gene Menton, Plaintiff's homeroom advisor, Mrs. Sara Armbruster, a random history teacher who never interacted with Plaintiff, Mr. James Davis, a creepy and corrupt theatre tech leader who barely knew Plaintiff, to spread teacher to student rumors about "violence" entirely to discredit Plaintiff's honest report of Shilling committing statutory rape of Shannon Marie Packer.

f. Shilling manipulated a grade 11 basketball player into shoving Plaintiff into a locker with promises of "help obtaining a full-ride basketball scholarship to Stanford" if she complied. Said basketball player complied extremely reluctantly and went out of her way to explain and apologize in-person to Plaintiff in late 2020. Shilling has always been well aware that Plaintiff suffers from acute bronchitis and asthma. He also took advantage of the fact that said basketball player is originally from a single-parent family in the inner city of Detroit, was cash-conscious on a scholarship to the school, and was working toward playing basketball at a good college and eventually in the WNBA. She never intended the event to be traumatic for Plaintiff, and merely was acting in compliance with the then-headmaster's instructions. Said basketball player also printed out an email from Shilling detailing rewards available to her upon her compliance. Shilling has since been fired, as he deserves.

g. Shilling then instructed Mrs. Jane Pohl, a 6th grade math teacher, to have her sons instigate a fight with Plaintiff's younger brother, Shawn Koe, a black belt in Tae Kwon Do, and to arrange for a sleepover. Both of Pohl's sons slept over at Koe's house and planted a Pohl-owned gun in Shawn Koe's backpack that Dr. Koe, Plaintiff's father, caught before Shawn Koe entered the school. Later, both of Pohl's sons insulted Monika Koe, Plaintiff and Shawn Koe's mother, and falsely accused Shawn Koe of attempted violence given his black belt in Tae Kwon Do. Shilling scapegoated and orchestrated a malicious attack on an innocent age 12 boy, solely to suspend him for five days, bar him from entering campus to take his exams, and

smearing him to prevent him from transferring to another area prep school. As if that wasn't enough, Shilling then rigged a trial when Koe's parents filed suit against both Shilling and Detroit Country Day School by obfuscating the evidence. Koe's parents dropped their case. Gilman tried to protect Shawn Koe, but Shilling was utterly determined to undermine Shawn Koe's life.

h. Fortunately, the Board of Trustees took appropriate action in 2019 after hundreds of complaints about Shilling and forced Shilling to retire. A much better suited candidate is now in charge, and Plaintiff has full confidence this new candidate will act in an appropriate manner toward all students. Plaintiff received an excellent education at her former preparatory school which positioned her well for A Level success, college success, and life success. It's unfortunate that one administrator's power trip led to so much despair and sadness in Plaintiff's life for years on end.

i. Plaintiff confided in Maini about how experiencing a massive abuse of power affected her life after it was clear that the pair were going to marry.

32. Between July 2017 to September 2019, Maini has created original posts on dozens of websites filled with defamation and libel about Plaintiff. Between July 2017 to April 2019, Maini continued threatening, harassing, and extorting Plaintiff's parents over email and via untraceable phone numbers stating that he would post libel anonymously and he carried out his threats and intimidation efforts. Plaintiff has report his actions to Interpol and the FBI and now Maini faces a privately prosecuted criminal trial outside of the United States.

33. Maini began posting verbal rants online as early as November 25, 2016, followed shortly thereafter by authoring original libel about Plaintiff on a variety of WordPress and Blogspot blogs. Maini accused Plaintiff of heinous actions ranging from "leaving him at the altar," being "a medium to low functioning Borderline," and "cheating on exams and her partner," when Plaintiff ended the engagement a month before the wedding date, returned his ring, is high functioning at an elite law school, and has neither cheated on exams nor on him. In reality, Maini cheated on Plaintiff throughout the relationship, including when Plaintiff was hospitalized with nerve damage. After not getting the desired response from terrorizing Plaintiff and her family for doing this from July 2017 to January 2019, Maini soon escalated his campaign of terror by posting further libel on "Bashing Websites."

34. The way the "Bashing Websites" work are that aggrieved suitors post libel or factual information about their ex-partner or ex-partners and then they are referred to "Removal Websites" to pay for the removal of said posts, which can range between $750 USD to $5,000 USD per post. The Bashing Websites are managed by a variety of individuals, including convicted felons Angileri and Breitenstein, and they have a relationship with convicted Bangladeshi/Indian felon Ali to repurpose material of those deemed of high enough net worth to continue paying for whack-a-mole removals.

35. When Plaintiff and her parents initially discovered the extent to which Maini was out to get her with libelous blog posts, Plaintiff and her parents agreed to pay both Guaranteed Removals and Internet Removals to remove each subsequent post authored by Maini. Payments were made in good faith, but services were not fully rendered as posts continued to appear copied and pasted throughout the Internet due to a combination of the Bashing Websites, Removal Websites, and Maini's decision to continue writing libel working together. Soon, the pattern of posting soon escalated to near-catastrophic levels, with new posts appearing daily and weekly, causing Plaintiff not only to attempt suicide multiple times but also to cancel all press publicity for her fashion shows during Paris Fashion Week and to take time off of her law school studies, delaying her graduation and her life by an entire year. Each post cost thousands of dollars to remove, and even after paying for one removal, new posts popped up immediately by Maini.

36. The offending defamatory and libelous conduct began in February of 2016, when parties met, continued after engagement in November of 2016, and continued even after Plaintiff broke off the engagement at the end of January of 2017. After a mere eleven-month relationship, Defendant Maini has continued harassing, cyberstalking, and stalking Plaintiff and her family for over two and a half years. Plaintiff was unwilling to reconcile after coming to terms with Maini's misrepresentation of himself and his background alongside his frightening levels of violence including but not limited to regular beatings with belts and strangulation and polarizing mental instability with screaming matches in restaurants. Not long after, Plaintiff and her family discovered that he had been abusing illicit drugs ranging from cocaine to mushrooms, continuing to binge drink alcohol despite going to alcohol rehabilitation for over four years, continuing to use fake identification and several aliases to solicit sex from minors and prostitutes, and he had been exploiting women across the world for sport and sexual

gratification throughout the relationship and the engagement. His methods of recruitment involved using various online dating apps, in person shopping mall pickups, and in person university student pickups whenever Plaintiff was out of town presenting her academic research at conferences.

37. Since Plaintiff's decision to part ways with Defendant Maini at the end of January of 2017, and finalizing it at the start of February of 2017, Maini has engaged in a deliberate campaign to destroy Plaintiff by spreading countless rumors, lies, and other falsities to members of Plaintiff's social and professional circles, as well as to people on the Internet who Plaintiff does not know. Maini has also hacked her email, Facebook, Instagram, and Twitter accounts on numerous occasions and attempted to sabotage Plaintiff's professional and academic career out of jealousy.

38. Maini is a misogynist with a deep hatred of women who has utilized multiple SIM cards to juggle his many side women, most of whom were married with children and few of whom were single. All such side women were pursued behind Plaintiff's back when Plaintiff and Maini were engaged to be married via traditional Indian arranged marriage matchmaking. Plaintiff was always faithful to Maini, but that same courtesy was not returned with Maini regularly chasing a former stripper in his economics program alongside dozens of uneducated waitresses and about seven different married women, one of whom was pregnant. Maini also had a prolonged affair with his flatmate, an uneducated Thai waitress who regularly undressed in front of him. Though Maini respected Plaintiff's abstinent virginity, he told her on more than one occasion, "I have needs you're not going to fulfill and there are girls happy to meet my needs in ways you refuse to." Maini continued with this line of reasoning even when Plaintiff reported him to all elders in the situation, including her parents and his parents. Some action was taken after reporting Maini to his mother, but no improvement steps were made.

39. Maini is a pedophile who watched about 50 hours of pornography per week, spanning hardcore child pornography of underaged girls, hentai pornography of underaged Japanese girls, and extensive pornography of Korean girls. The predominant search interests on Maini's laptop include the key terms "under age 10," "preteen," "braces," "toddler sex," "toddler spanking sex," "toddler corporal punishment," and "rough toddler sex.

40. In almost all cases, Maini acted alone to commit the following illicit and libelous postings in furtherance of his scheme to defame Plaintiff and to destroy her reputation.

   a. Publicized false accusations that Plaintiff was verbally and emotionally abusive to him, and that she was guilty of repeated "bar hopping." Plaintiff does not and has never imbibed alcohol due to her religious beliefs, does not attend bars, and is an abstinent virgin. The only person Plaintiff has ever kissed is Maini, and that was only after he announced his intentions to marry.

   b. Publicized false accusations that Plaintiff "met with [a man] in Australia," was guilty of a "white fetish" and "cheating with so many men he lost count." Plaintiff has only been to Australia a few times in her life and lived with both her family and in an all-female accommodation. Plaintiff is an abstinent virgin with no fetishes, no experience "dating" white men—indeed, she has *never* dated as she only interacts with suitors who have been vetted and approved to court her by her parents and her matchmakers—and has made a commitment to save herself for marriage from age 11 that she has upheld. In reality, Defendant Maini cheated on Plaintiff repeatedly when she was hospitalized for nerve damage and throughout their engagement, most notably with one of his economics classmates. Plaintiff has been so traumatized by this experience that she has rejected countless arranged marriage offers since then.

   c. Publicized false accusations that Plaintiff "has a colorful history with gigolos" when Plaintiff is an abstinent virgin and has never struggled attracting genuine male attention. She is a former beauty queen, beautiful inside and out. Maini has employed the services of countless bar girls, prostitutes, child prostitutes, and more in his travels throughout Asia and in his career. Where Plaintiff has stayed on the right track and pursued her legal education, Maini dropped out of law school after failing multiple classes and became a formal bartender and professional alcoholic who spent five years in alcohol rehabilitation centers in India. In spite of his years in 'rehab,' he remains an alcoholic, a con artist, a gambler, and a pornography addict. In fact, it is Maini who has a colorful history with prostitutes; Plaintiff has numerous private investigator-obtained photographs of him in bed soliciting prostitutes.

   d. Publicized false accusations that Plaintiff "has mail order husbands" when Plaintiff has never been married and barely has enough time to manage her multiple

entrepreneurial interests and her rigorous academic coursework.  By contrast, Maini has a "girl in every port" allowing him to maintain dalliances whenever he travels, which explains his three (3) separate Skype accounts.  He uses different accounts and fake names to juggle various women.  His lack of career success makes it easier for him to focus on "achieving" women instead of achieving actual degrees and accomplishments necessary to build a good life.

e.  Accused Plaintiff of being a "fraudster," plagiarist, relationship "cheater" "with so many men [he] lost count" when Plaintiff has the highest integrity and is a 100% abstinent virgin.  It is Maini's projections depicting his real behavior: Maini is a fraudster, Maini is an academic cheater, and Maini is a relationship cheater who went behind Plaintiff and her family's back to arrange dinner and coffee dates with random lower middle class and working class women and girls from dating apps, restaurants, and various retail shops behind Plaintiff's back including when she was in the hospital on life support.  Maini is so jealous that Plaintiff got into law school and is becoming a barrister through hard work—one of *his* biggest dreams and family expectations was to be a barrister, but he didn't earn high enough grades or win the right oratory competitions to be competitive—that he is deliberately attempting to sabotage her career and her marriage options.  Instead of putting his anger towards bettering his own life and positioning himself to be a provider, nearly every waking hour of every day is spent harassing Plaintiff, insulting Plaintiff, harassing Plaintiff's elderly parents, and insulting Plaintiff's elderly parents.  Plaintiff is at her wit's end because Maini is doing this consciously with malicious intent and reckless disregard for the truth.

f.  Created imposter social media accounts to harass and intimidate Plaintiff—LinkedIn, Instagram, Twitter, and likely more Plaintiff has yet to discover—and also as a platform to disseminate falsehoods about Plaintiff to affect her ability to earn admission into academic fellowship programs and to secure tenure-track employment after graduation.

g.  Impersonated Plaintiff on Twitter, Facebook, Instagram, LinkedIn, SnapChat social media profiles using her likeness and personal information.  Plaintiff found multiple

such accounts on Instagram and Twitter and seeks a subpoena to attain registration and IP information.

h. Impersonated Plaintiff on multiple female-seeking-transsexual dating sites using her likeness and personal information, including but not limited to her phone number and a demand for visitors to "get jiggy with it"—a phrase Plaintiff would never use. These posts led to Plaintiff and her family receiving harassing and frightening phone calls from strange numbers in geographic areas where Plaintiff does not even reside. Furthermore, Maini stole photographs of Plaintiff and plastered them on numerous fake profiles, catfishing people into thinking he represented her. In these profiles, Maini claimed Plaintiff is "lesbian" and "interested in transsexuals" when Plaintiff is neither lesbian nor interested in transsexuals. Maini did this specifically to affect Plaintiff's image in the arranged marriage community. Under no circumstances has Plaintiff ever been attracted to lesbians or transsexuals, though she is and remains a supporter of LGBTQ rights and gay marriage—causes Maini disagrees with due to his pronounced extremist right-wing views and homophobia. On many occasions, Maini has made it clear that "fags go to Hell" and pointing the finger at Plaintiff, accusing her of being "a fag who will go to Hell," when Plaintiff is neither a fag and nor in a position to make a decision that is in God's hands.

i. Hacked Plaintiff's email accounts, bank accounts, private servers, and e-commerce website, forcing Plaintiff to invest in new firewalled privacy infrastructure.

j. Installed keyloggers and GPS tracking and monitoring devices to follow Plaintiff's movements on her devices and in person, forcing Plaintiff to invest in new technology devices.

k. Harassed Plaintiff's family members, friends, business contacts, couture clients, artwork clients, and others.

l. Widely disseminated embarrassing childhood photos of Plaintiff, naked in a bathtub, without her consent, to members of his pedophilia social circles. He sought to solicit "scaled 1 to 10 ratings" of Plaintiff's photographs taken from ages 3 to 12. Maini had an image of Plaintiff at age 3 set as his screensaver and as a blow-up image, ostensibly used for sexual fantasy purposes.

m. Interfered with Plaintiff's existing and prospective business relationships with the intent of impacting her livelihood and destroying her professional reputation.

n. Used extortion tactics to coerce Plaintiff and her family to pay a ransom on top of the existing their lump sum dowry payment which was not returned—considered a cultural transgression and a severe moral 'crime' in the traditional arranged marriage community. The Maini family may have 'prestige' and 'old wealth' but they have neither class nor values. Plaintiff returned all jewelry to Anjana Maini, Maini's mother, and even sent a card. Maini has failed to return either the dowry paid in cash, the gold bricks delivered in person, or the deposit to the baker for the custom cake. Plaintiff and her family covered all wedding-related expenses.

41. Maini knowingly manipulated facts, lied, distorted reality when he made accusations of fraud against the Plaintiff in various Basher Websites between July 2017 to May 2019, calling her a range of names and accusing her of misconduct in academic, professional, and personal settings. Maini is a noted con artist who not only stole Plaintiff's dowry, but also stole the dowries of multiple other eligible young Indian women in the arranged marriage community. Maini, who regularly misrepresents his age as younger than he is to pursue much younger and much more attractive women, has a habit of pathological lying and obfuscating reality. Maini lied to Plaintiff, Plaintiff's family, and Plaintiff's matchmaker, constantly changing his story about why he initially misrepresented his name. Plaintiff's father had to contact authorities in India to discover, once and for all, that Maini was never employed by the Indian government whatsoever.

42. His delusions of grandeur of eventually pursuing political office despite his horrible track record of duping people out of their dowries speaks volumes about Maini's poor character.

43. On a near daily basis, Maini belittled, degraded, and insulted Plaintiff, who was always a supportive partner to him and prepared multiple Excel spreadsheets for him to map out a campaign strategy. In spite of her research work, Maini created a fake Craigslist posting soliciting transsexual visitors to contact Plaintiff via text message. Maini posted Plaintiff's personal cell phone number and email address to an untold number of transsexual (male-to-female and female-to-male) visitors, in an effort to paint Plaintiff as someone interested in marrying a transsexual to the broader Indian community. Plaintiff reported this to the New York Police Department. Maini's objective was to ruin Plaintiff's arranged marriage

prospects and to intimidate her with creepy phone calls and text messages from random transsexuals in the Upper West Side area. In fact, the damage was so severe that Plaintiff and her family had to employ two Western arranged matchmaking company to continue fielding offers from eligible suitors empathetic to the incredibly distressing situation facing Plaintiff. Prior to this, Plaintiff was seen as the most desirable catch in the arranged marriage marketplace, with marriage offers from prominent Indian medical and business families around the world.

44. Maini sent multiple harassing emails to Plaintiff's diabetic parents stating clearly that he would continue posting libel.

    a. A copy of the exact text Defendant Maini used to harass and intimidate her parents on July 20, 2017, is posted below.

        i. *I am…giving you…a chance to handle this yourselves, before this situation gets out of control. Please take this opportunity. I am sure you do not want to have to deal with this type of thing day after day, week after week, month after month in the years to come. … I can guarantee you that I will absolutely never post anything about [Koe] or her family online. That would be terrible. I will have nothing to do with it. Any action I take would be through official legal channels. However, there are so many people out there named "Anonymous". And these people named "Anonymous" are such unpredictable folks, you never know what they are going to do or say next. Every time there is an "Anonymous" post about me, there could be a similar post by "Anonymous" about [Koe] and her family. Nobody wants to see that happen. Things would spiral out of control, all hell would break loose. Lawyers will not solve this issue. The internet is a lawless place.*

    b. A copy of the exact text Defendant Maini used to harass and intimidate her father on January 24, 2019, after cybersmearing her and her family is posted below. Upon receiving no response to this email, Maini proceeded to call Plaintiff's parents "child abusers." Further, he called Plaintiff an "emancipated minor" who had a "sad childhood" where she experienced "difficult times at Country Day" on countless Bashing Websites. Plaintiff was never an emancipated minor and transferred her legal guardianship with parental permission due to intensive bullying and cover-up activities that went on at the prep school in which she was enrolled. This is an invasion of Plaintiff's right to privacy. Intimidation is a crime. Maini currently faces criminal charges for cyberstalking and intimidation due partly to his behavior and partly to this email below:

i. *I would like to check with you before I proceed. Are you aware of, and do you
support your daughter's legal action against me? If you do support it, that is
fine, just let me know. I will file a cross claim in court next week. However,
you should be aware that you, Mrs [Koe] and Horst will also be named and
included in the cross claim. In addition, of course, your daughter's stories will
be put to the test in an open court, and her life and times will become a
permanent legal record, and I will also get to have my say. More importantly,
I will also press homicide charges against your daughter for her role in the
death of my father. You are the elder person in this situation and have the
wisdom of many years of experience. I am sure that you have worked hard for
everything that you have. I am making one more attempt to reach out to you to
settle this matter between ourselves before the situation spirals out of control.
... Despite the fact that you and Mrs [Koe] have been rude to me, I still do not
want to see your family ruined or humiliated in public on a global stage. It is
not too late to settle the matter amongst ourselves.*

45. It must be stated that the only interaction Plaintiff had with Maini's late father was two in
person dinner meetings. Plaintiff emailed Maini's mother complete evidence of his various
dalliances and a more complete picture of his lies between February to April of 2017.  She
never once emailed Maini's father and had nothing to do with his mother after April of 2017.
Maini's father died of a heart attack in November of 2017 not long after bedding his Indian
mistress of 25 years.  Plaintiff was neither in Australia nor in any communication with Maini.

46. Maini attempts to use intimidation and pressure tactics with Plaintiff's family on a regular
basis, even after Plaintiff sent him multiple cease and desist notices on her official letterhead.

47. Maini has continued stalking Plaintiff's LinkedIn profile on a daily basis using names "Amar
C," "Amar Chander," and "Anthony Balderon."  Plaintiff gets daily notifications informing
her of profile views, and over 50% of her total profile views are from Maini.  As a result,
Plaintiff has disguised her physical location and removed her email address and physical
address from public view, lest Maini attempt to follow through on his threat to "throw acid
all over Kaura's face."  Maini is jealous of Plaintiff's level academic and professional
success which far surpasses his own level.

48. Plaintiff has sent Maini over 45 requests to "cease and desist" on her official letterhead and
has filed for restraining orders in Australia, New York, and Florida.  Despite this, Maini
continues posting libel about Plaintiff and interfering with her business activities in design.
Based on information and belief, Maini is determined to affect Plaintiff's ability to marry
another suitor who is far richer, smarter, more virtuous, and more accomplished than he is.
Based on information and belief, it seems Maini cannot move on in a healthy way; he

remains unsuccessful personally and professionally.  Without Plaintiff's assistance with editing his resumes and guiding his steps, Maini is incapable of navigating or building a successful career for himself in politics or business.

49. Maini and his extortionist co-conspirators have used the false names "Kat," "Jo," "Jo Smith," "Billy Bob Thornton," "Eki," "Anonymous," "Sam," "Amar Chander," "Amar Mansingh," "Anthony Balderon," and more recently, "Then Victoria," to make libelous and defamatory comments about Plaintiff in social media channels and various cheater blog posts.  All comments will be available to counsel in discovery.  Plaintiff has subpoenaed all websites where comments appear on February 11, 2019, March 2, 2019, April 4, 2019, June 13, 2019, November 30, 2019, December 1, 2019, January 28, 2020, February 28, 2020, March 16, 2020, March 23, 2020, August 18, 2020, and December 9, 2020 and has definitive proof that Maini authored all comments in question.

50. Maini has continued writing libel on various Internet platforms, largely because Plaintiff has achieved feats Maini could not due to his addictions to alcohol, poker gambling, clubbing, and child pornography.

51. Maini has continued his harassment as recent as December 22, 2020, forcing Plaintiff to leave her secure quarantine facility to find new arrangements abroad.  Indeed, Maini carried out his threat of harassing Plaintiff and her family "day after day, week after week, month after month in the years to come."

52. Plaintiff has spent $4,000 per month in SEO services since April 2019, hundreds of thousands of dollars in both whack-a-mole removal services, and situational depression therapy bills, and a significant amount in Zen meditation classes.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION

53. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

54. To state a cause of action for fraudulent misrepresentation, Plaintiff will prove the following five elements: (a) a misrepresentation of a material fact; (b) which the person making the misrepresentation [Maini] knew to be false; (c) that the misrepresentation was made with the

purpose of inducing another person to rely upon it; (d) that Plaintiff relied on the misrepresentation to her detriment; (e) that this reliance caused damages.  Refer to *Standard Jury Instructions—Civil Cases (No. 99-2)*, 777 So.2d 378, 381 (Fla. 2000), *Standard Jury Instructions—Civil Cases (1.0, 6.1d, MI8)*, 613 So.2d 1316, 1317 (Fla. 1993), *American International Land Corp. v. Hanna*, 323 So.2d 567, 569 (Fla. 1975), and *Huffstetler v. Our Home Life Ins. Co.*, 65 So. 1 (Fla. 1914).

**Misrepresentations of material facts.**

55. Maini claimed, on profiles, and elsewhere, that his name is Vikram Kumar Mansingh, that he is an age 28 investment banker working at UBS, and that the photos in his profile and on his social media handles were accurate and fair representations of his actual looks level.

**Misrepresentations of material facts which Maini knew to be false.**

56. Maini made countless social media profiles to entrap Plaintiff and her family into believing he worked as an investment banker.  He fabricated a world of lies to manipulate Plaintiff into settling for him, via private profiles on Pinterest, Skype, and Instagram, where he told lie after lie to con Plaintiff about his supposedly glamorous, jet-setting life as an investment banker.

57. On his profile page using the screennames "GALLANTVK," and "VikramKMS," Maini misrepresented his name, age, family background, life story, work history, profession, education, licensure, relationship history, prior engagement, financial status, and dowry requirements.  He claimed to be an age 28 investment banker at UBS named Vikram Kumar Mansingh who completed an MBA in Finance at London Business School and had certification in Psychotherapy and Medicine from University of London.  He was actually an age 37 unemployed former marketing assistant with an MA in History and a BSc in Economics.  He never worked in investment banking and has no professional certifications in either psychotherapy or medicine.  The University of London International Division does not even offer degrees in psychotherapy or medicine.  Suffice it to say, Maini has no qualifications to practice psychotherapy or medicine, and is certainly not licensed to provide diagnostic or therapeutic services.

**Misrepresentations were made with the purpose of inducing Plaintiff to rely upon it.**

58. Maini is a pathological liar, 'catfish,' and con artist who duped Plaintiff into a relationship on false pretenses using the fake identity of an age 28 UBS investment banking analyst when he was really an age 37 unemployed former marketing assistant working at a no-name company.

   a. A screenshot of his OKCupid profile where is blatantly lying about his name, age, profession, relationship status, and log in information is available in Exhibit A.

   b. A screenshot of his Plenty of Fish profile with username "gallantvk" where he is blatantly lying about his name, age, profession, relationship status, and log in information, obtained on the day of Plaintiff's 17-hour nerve damage surgery is available in Exhibit B.  Plaintiff and Maini were exclusive from March 15, 2016 with a wedding date set for February 25, 2017.  Plaintiff was receiving emergency reconstructive jaw surgery on May 1, 2 and 3, 2016 with famous Beverly Hills reconstructive surgeon Dr. Charles Lee, MD, in order to fix both nerve damage and tissue necrosis in her face following medical and dental malpractice.  During this time, Maini continued pursuing other women despite writing Plaintiff love letters prior to using dating applications.  Note that Maini sent Plaintiff a love letter at 5:32 AM and by 9:59 PM, he was on a dating app, after making multiple comments about how his intentions included a traditional, monogamous Indian arranged marriage.

   c. A screenshot of his Shaadi.com profile taken on August 26, 2016 where he is posing as a medical doctor when he is not a medical doctor is available in Exhibit C.  He remains an unemployed former marketing assistant.

   d. A screenshot of Maini's introduction to Plaintiff's family with the name Vikram is available in Exhibit D.

   e. A screenshot of Maini's fake social media profiles utilizing the names Vikram Kumar Mansingh, Vikram KMS, AmarCM4, AmarCM_2, and GALLANTVK are attached in Exhibit E.

   f. The pair had announced their engagement on November 1, 2016, with Maini proposing to Plaintiff after viewing *My Fair Lady* at the Sydney Opera House he forced Plaintiff to plan a wedding date of February 25, 2017.  A photograph from the day—blurring out Plaintiff's identity—is provided in Exhibit F.

   g. The pair were in a supposedly committed and exclusive relationship from February 2016 to February 2017; Plaintiff ended the relationship in January 2017 and finalized

the ending in February 2017. During this time, they exchanged thousands of messages on Skype, all of which are available in unedited form to opposing counsel. Copies of his username pages are available in Exhibit G.

h.  Audio and video recordings of Maini engaging in illegal, nefarious activities and discussing his delusions of grandeur as a future politician in the Bharatiya Janata Party are available via permanent download links to opposing counsel. All of these files are available via MP3 and MP4 download.

59. From February 20, 2016 to July 4, 2016, Maini claimed to be Vikram Kumar Mansingh working at UBS in investment banking. Then, from July 4, 2016, Maini claimed to be Amar Chander Maini who works secretly as an international spy for the Indian Government while maintaining daytime employment as sales and marketing coordinator of a no-name sports equipment company. Then, from August 16, 2016, Maini also claimed to have credentials in therapy and that from then on, he would be in charge of Plaintiff's supposed "deep seated issues."

60. Plaintiff quieted her doubts due to Maini's silver tongue, while he continued conning her into believing he was in her age range, in a suitable profession, and capable of providing for Plaintiff in the manner in which she was raised. Maini knew that Plaintiff would never be with a suitor of his accomplishment level without lying, so he studied her and then fabricated a glamorous life designed to appeal to her unique sensibilities.

***Plaintiff relied on the misrepresentations to her detriment.***

61. Plaintiff was under the impression that she was developing a relationship with an upstanding member of her caste and subcaste from the right astrological and numerological background. Her and her family were blindsided by the repeated fraudulent misrepresentations Maini presented about himself in order to obtain a substantial dowry of cash and gold as well as a U.S. citizenship green card from Plaintiff and her family.

62. Maini presented himself as a "savior and healer" to Plaintiff, touting his fake credentials as a supposed physician and psychotherapist. He spent hours daily "diagnosing" Plaintiff with random medical conditions and then began a course of action known as Dialectical Behavior Therapy, when he is not licensed in medicine or psychotherapy. Maini used a series of mind control tricks to hypnotize and manipulate Plaintiff into revealing her innermost fears, dreams, and secrets and then ridiculed her for sharing said information. This caused severe

damage with which Plaintiff has had to spend years coming to terms with an actual certified therapist, who has described Maini as a "full-on sociopath."

63. Due entirely to Maini's wrongful guidance on Skype and in person, Plaintiff nearly died when seeing an oral maxillofacial surgeon Maini recommended who left her with permanent nerve damage and tissue necrosis. Plaintiff went in due to ongoing issues with TMJ and 'jaw locking' and paid for a procedure called a genioplasty to assist with her bite development. She woke up with jaw surgery wires in her mouth, strange scars on the side of her forehead and implants in her cheeks—none of which she paid for or signed up to get. The surgeon in question was sued in 2018 and he is being investigated by the medical review board for moving her chin 11 mm when the medically appropriate amount to align her lower and upper jaw was 3 mm. Plaintiff spent months getting revision treatments coordinated by Dr. Lee of California who was able to reverse the jaw surgery and fix Plaintiff's chin, and Dr. Urban of Utah who fixed her tissue necrosis issue in her cheeks.

***The aforementioned reliance caused damages.***

64. In the cases *Arlington Pebble Creek, LLC v. Campus Edge Condo Ass'n*, 232 So.3d 502, 505 (Fla 1st DCA 2017), *Howard v. Murray*, 184 So.3d 155, n. 22 (Fla. 1st DCA 2015), Cohen v. Corbitt, 135 So.3d 527, 529 (Fla. 1st DCA 2014), *Connecticut Gen. Life Ins. Co. v. Jones*, 764 So.2d 677, 682 (Fla.1st DCA 2000), and *State of Florida, Department of Transportation v. Southern Bell Telephone and Telegraph Company, Inc.*, 635 So.2d 74, 78 (Fla. 1st DCA 1994), the Court has upheld the definition of fraudulent misrepresentation. That is, "Moreover, under certain circumstances, concealment or nondisclosure of a material fact may also form a basis for a claim in misrepresentation." Maini failed to disclose and concealed his true identity in order to defraud Plaintiff and her family of both American citizenship and a dowry. To be clear, Maini misrepresented his identity, which is a material fact, and knew it was false, knew it would cause Plaintiff's family to give permission to permit courtship, and knew it would cause Plaintiff's father to deliver an all-cash dowry.

65. Upon Plaintiff opening up and confiding in Maini, he then began a vicious campaign to exacerbate her already fragile emotional state by gaslighting her and her family by claiming he cheated due to his supposed status as an international spy working for the Indian government. It took Plaintiff and her father—a traditional Indian head of household—over 6 months to find another Indian private investigator to reveal that he is not an Indian citizen,

and therefore is ineligible for any governmental or spy related services. The only reason Plaintiff and her family considered Maini after discovering he lied about his name still used dating and matrimonial profiles despite offering written commitment to Plaintiff and Maini's family talking to Plaintiff's family about the match.

66. As if this were not enough, Maini also misrepresented his psychotherapy and medical credentials, causing near-permanent self-esteem damage to Plaintiff who never had issues with suicidal ideation prior to meeting him. Maini repeatedly used his position as the older individual in the relationship to pressure Plaintiff into life-threatening surgical treatments that nearly disfigured her and to engage in mind control tactics. This damage caused over $187,000 in revision medical expenses with permanent nerve damage in Plaintiff's jaws, in addition to over $1,500,000 in cash dowry plus $500,000 in gold bricks, customary gifts in traditional arranged marriage.

67. Topping it off, Maini also convinced Plaintiff that her future is brighter in business than in medicine. Plaintiff was on the fence between returning to medical school or starting law school, and Maini told her that going back to medical school would mean Plaintiff would have "more status than [Maini]" so she could only pursue business. Plaintiff thus scrapped her idea of returning to medicine and made plans to apply to business school in order to do her part to make the relationship work.

*Prayer for Relief*

68. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Five Hundred Thousand Dollars ($500,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional, mental, and physical well-being, and the foreseeable impact his conduct would have on Plaintiff's health and well-being in the future. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

## SECOND CAUSE OF ACTION: DEFAMATION

69. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

70. To state a cause of action for defamation, Plaintiff will prove the following five elements: (a) publication; (b) falsity; (c) actor must act with knowledge or reckless disregard as to the falsity or at least negligently on a matter concerning a private person; (d) actual damages; (e) statements must be defamatory.  Refer to the cases *Jew For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008) and *Cooper v. Miami Herald*, 31 So.2d 382, 384 (Fla. 1947).

71. Since Plaintiff's decision to end the relationship with Maini in January 2017, Maini has engaged in a deliberate, malicious campaign to hurt Plaintiff by starting and spreading countless rumors, lies, and falsities to members of Plaintiff's network as well as to random bystanders on the Internet.

72. In all cases of original defamation, Maini acted alone, though Bashing Websites did spread the original content posted by Maini on countless websites, in furtherance of his scheme to defame Plaintiff "on a global stage" and to destroy her reputation.

***Publication.***

73. Maini published audio rants to InboxBand.com as well as verbal rants on Bashing Websites and social media pages listed in the table below.

| DATE POSTED | WEBSITE | TITLE |
| --- | --- | --- |
| November 25, 2016 | InboxBand.com | [Jane Koe] Georgetown |
| July 22, 2017 | AllSortsofThingsSite.wordpress.com | The [Jane Koe] Story |
| July 23, 2017 | LiarsandCheaters.com | [Jane Koe] Left Me at the Altar |
| December 23, 2017 | CheaterLand.com | [Jane Koe] Runaway Bride Bitch |
| December 27, 2018 | Staytunedformore.blog | The [Jane Koe] Story |
| December 29, 2018 | Staytunedformore.blog | More [Jane Koe] Files |
| January 17, 2019 | LiarsandCheaters.com | [Jane Koe] United States |
| January 17, 2019 | ReportCheatingOnline.com | [Jane Koe] United States |
| January 17, 2019 | BadGirlReports.date | [Jane Koe] United States | Liars and Cheaters |
| January 17, 2019 | ReportCheatingOnline.com | Keep [Jane Koe] at a Safe Distance |
| January 17, 2019 | WTFCheater.com | Keep [Jane Koe] at a Safe Distance |
| January 17, 2019 | BadGirlReports.date | [Jane Koe] United States |
| February 11, 2019 | CheaterReport.com | [Jane Koe] USA |
| February 12, 2019 | CheaterLand.com | [Jane Koe] USA |
| February 21, 2019 | TheDirty.com | Dirty Filthy Skank [Jane Koe] |

| February 22, 2019 | CheaterBoard.com | [Jane Koe] Australia |
|---|---|---|
| February 22, 2019 | ExposingCheatingWife.com | [Jane Koe] Australia |
| February 22, 2019 | ReportAffairs.com | [Jane Koe] Australia |
| February 22, 2019 | WTFCheaters.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatersOnline.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterBlock.com | [Jane Koe] Australia |
| February 22, 2019 | DontDateACheater.com | [Jane Koe] Australia |
| February 22, 2019 | HeyHobo.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterHoe.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterExpose.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterRant.com | [Jane Koe] Australia |
| February 22, 2019 | WikiCheater.com | [Jane Koe] Australia |
| February 22, 2019 | InternetCheater.com | [Jane Koe] Australia |
| February 22, 2019 | VerifyCheater.com | [Jane Koe] Australia |
| February 22, 2019 | ExposeCheatingOnline.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterBot.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterList.com | [Jane Koe] Australia |
| February 22, 2019 | VerifyCheater.com | [Jane Koe] Australia |
| February 22, 2019 | CheaterCase.com | [Jane Koe] Australia |
| February 22, 2019 | BadGirlReports.date | [Jane Koe] Australia – Cheater Board |
| February 22, 2019 | BadGirlReports.date | [Jane Koe] Australia – Report Cheating Wife |
| February 22, 2019 | InternetCheaters.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheater.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatingOnline.com | [Jane Koe] Australia |
| February 22, 2019 | ReportCheatingWife.com | [Jane Koe] Australia |
| February 22, 2019 | ExposeCheatersOnline.com | [Jane Koe] Australia |

| | | |
|---|---|---|
| February 22, 2019 | WTFCheater.com | [Jane Koe] Australia |
| February 22, 2019 | CheatandLie.com | [Jane Koe] Australia |
| February 22, 2019 | CheatersCaughtOnline.com | [Jane Koe] Australia |
| March 12, 2019 | LiarsandCheaters.com | [Jane Koe] USA |
| March 12, 2019 | PostCheatersPictures.com | [Jane Koe] USA |
| March 12, 2019 | WTFCheater.com | [Jane Koe] USA |
| March 12, 2019 | ReportCheatingWife.com | [Jane Koe] USA |
| March 12, 2019 | ReportCheatingOnline.com | [Jane Koe] USA |
| March 12, 2019 | InfidelityWebsite.com | [Jane Koe] USA |
| March 12, 2019 | BadGirlReports.date | [Jane Koe] United States Report Cheating Wife |
| March 12, 2019 | BadGirlReports.date | [Jane Koe], USA | Liars and Cheaters |
| March 12, 2019 | InfidelityWebsite.online | [Jane Koe], USA | |
| March 16, 2019 | CheaterXposed.us | Dirty Filthy Skank [Jane Koe] |
| April 13, 2019 | DatingComplaints.co | [Jane Koe] is a Dirty Filthy Skank |
| May 23, 2019 | ExposeCheaters.Online | Dirty Filthy Skank [Jane Koe] |
| January-July, 2019 | AmarChanderMaini.Wordpress.com AmarChanderMaini.Blogspot.com | Fuck [Jane Koe] [Jane Koe] Runaway Bride Bitch Obnoxious Bitch [Jane Koe] and Family I hate [Jane Koe] I want to kill [Jane Koe] [Jane Koe] Needs to Die [Jane Koe] Heartbreaking Goddamn Bitch |
| October 19, 2019 | Exposes.net | [Jane Koe] Australia |
| November 30, 2019 | CheaterBoard.com | [Jane Koe] …flunked out…hired gigolos |
| December 1, 2019 | Reportcheater.com | [Jane Koe] …flunked out…hired gigolos |
| January 28, 2020 | Instagram.com | [Jane Koe] Has a History #[JaneKoe] |
| January 28, 2020 | Twitter.com | I found this very interesting – reportcheater.com [link redacted] |
| February 23, 2020 | Twitter.com | Reportcheater.com [link redacted] |
| March 16, 2020 | Twitter.com | [Jane Koe]- a world renowned academic fraudster? |
| March 16, 2020 | Twitter.com | Your books have about 2 confirmed sales and have been translated into 0 languages. |
| March 16, 2020 | Twitter.com | [Jane Koe]…2016 kicked out for fraud. Am I getting warm? |
| March 16, 2020 | Twitter.com | There are dozens of sites detailing [Jane Koe]'s record of cheating. |
| March 16, 2020 | Twitter.com | I just did the smallest bit of digging. The American/British/Australian authorities should really look into [Jane Koe]'s history of academic fraud. Would have a ball! |
| March 16, 2020 | Twitter.com | [Jane Koe] admissions scandal 2020? |
| March 16, 2020 | Twitter.com | Don't mess with Mancunians. Wtfcheaters.com [link redacted] |

| March 23, 2020 | Quora.com | Have you ever met a pedophile before? |
| May 17, 2020 | Eco | [Jane Koe] – Australia |
| August 18, 2020 | CheatersPalace.com | [Jane Koe] Australia |
| December 9, 2020 | PredatorAlert.Us | [Jane Koe] – Australia – Report Cheater |

**Falsity.**

74. Maini accused Plaintiff of using a false name, when she changed her name legally from in Portland, Oregon in June 2017.  Maini accused Plaintiff of "going by" the name that is her true, legal name.

75. Maini accused Plaintiff of "stalking a rapist."  The person Maini is referring to is L.M., who was a personal friend of Plaintiff.  Plaintiff and L.M. were friends for many years.  After L.M. was falsely accused of rape at his university and unable to obtain his diploma, Plaintiff helped him with fundraising efforts for his non-profit microlending organization Bunya Microfinance by personally donating to his cause and organizing a crowdfunding campaign.  When Plaintiff was in Sydney conducting ground-breaking medical research that has received patent pending status and is now in Phase 1 clinical trials in both the United States and the United Kingdom, L.M. asked Plaintiff to "coffee" and "a bite to eat" on multiple occasions, which Plaintiff declined respectfully solely due to her existing commitment to Maini.  L.M. also asked Plaintiff to dance at a mutual friend's birthday party, which she respectfully declined out of respect for her existing commitment to Maini.

76. Maini is the only person with whom Plaintiff has ever French kissed.  During dinner at a restaurant, Maini gave Plaintiff too much candy and asked her about how she considered a "hot guy" in film and daily life.  The question was a part of a dinner game whereby Maini and Plaintiff asked each other questions.  Due to the amount of candy Plaintiff ate, and the fact that she is predisposed to diabetes on her maternal side, she accidentally said she considers L.M. a "hot guy."  This innocuous comment, made entirely in jest, was not meant in any way as a slight to Maini.  This comment led to Maini constantly accusing Plaintiff of cheating with L.M.—when the entirety of their friendship was online, and the fullest extent of their in-person conversation was maybe 15 minutes—and then Maini escalated a pattern of disturbing stalking behavior of both Plaintiff and L.M.  Maini began using geo-location trackers on Plaintiff's cell phone and accusing Plaintiff of 'cheating' on him and of 'having a white fetish.'  Furthermore, Maini also stalked, physically assaulted, and verbally threatened L.M. on security camera, accusing him of "going after" Plaintiff, when this never occurred.  L.M. and Plaintiff were just friends—Plaintiff felt bad for him for being bullied online and did not remain in any kind of contact after Plaintiff entered into a relationship with Maini.  In fact, L.M. entered into a

committed bisexual relationship not long after Plaintiff rebuffed his advances.  Under no circumstances did Plaintiff ever have any kind of relationship with L.M., and under no circumstances has Plaintiff ever had a fetish, let alone for white men.  She is a complete abstinent virgin who does not have any fetishes.  However, Maini has a strong fetish for underaged prepubescent girls between ages 2 to 11 as well as East Asian and Mediterranean women.  In fact, Maini is insecure about his attraction to East Asian and Mediterranean women because his parents demand he only marry an Indian woman.  Plaintiff's parents are much more open minded.

77. Maini accused Plaintiff of "moving next to the [residential] college" next to L.M.  Plaintiff was never enrolled in any academic coursework at any universities in Australia and she took the only housing spot with included meals she could obtain as a foreign national.   She was in Australia on a temporary visitor visa, due to her scientific research commitments which have resulted in a medical supplement for patients with a rare disease that has already received patent pending status and has entered Phase 1 clinical trials.  By contrast, L.M. was then a full-time student in the law school, and by all accounts seemed happy to be pursuing a bisexual way of life.

78. Maini accused Plaintiff of "contract cheating" and hiring men to "write her college essays and exams" when Plaintiff has always done her own work and graduated at the top of her academic class.  This attack on Plaintiff's integrity comes after Maini has duped, cheated, and stolen millions of dowry dollars from highly eligible young Indian women and paid for *his* academic work on an outsource basis.  Plaintiff hired contract scientists, mostly tenured professors, to get a rare disease drug developed.

79. Maini accused Plaintiff of "flunking out of Georgetown" when Plaintiff is currently earning an LLM in international taxation law from Georgetown University Law Center.  To the best of her knowledge, she has never "flunked out" of any institution of higher learning, though Maini has struggled academically and professionally for the entirety of his life.  Maini struggled academically at the University of Sydney Law School and behaviorally at his residential college, St. Andrew's, where he committed both theft of college property and sexual assault of multiple female classmates in his residence hall room.

80. Maini accused Plaintiff of receiving "plastic surgery," when Plaintiff has only received jaw surgery, reconstructive jaw surgery, and reconstructive nerve damage surgery, all of which she obtained due to verbal abuse and pressure from Maini.  On a daily basis, Maini spent hours criticizing Plaintiff's appearance, particularly her jaw and chin and comparing her unfavorably to Bollywood actress

Kareena Kapoor who has a strong chin and jawline. Maini told Plaintiff to get jaw surgery to look more like Kareena Kapoor. Plaintiff did not want to undergo a dangerous surgery and so agreed to jaw angle silastic implants and a sliding genioplasty surgery to give the Kareena Kapoor effect, even though prior to this, Plaintiff won a statewide beauty pageant with her natural chin and her natural jawline. Unfortunately, there were issues with the silastic implants and the genioplasty performed was so extreme that the surgeon faces a medical malpractice lawsuit. Plaintiff had them removed and reversed, respectively in reconstructive surgeries that took over three months.

81. Maini accused Plaintiff of not taking medical malpractice legal action against her jaw surgeon, when she filed a medical malpractice Complaint against the surgeon in April of 2018 and has been running discovery and deposition strategy for the case in addition to her rigorous law school academic course-load.

82. Maini accused Plaintiff of attending a host of universities she never attended as a student, but instead as a middle school and high school student going to summer camp academic enrichment programs, to malign Plaintiff's name in both the greater academic community and the greater Indian arranged marriage community.

83. Maini also accused Plaintiff of meeting him in a bar, which never happened. The two met online.

84. Maini accused Plaintiff of pursuing him, when he pursued her and her family relentlessly beginning on February 20, 2016, leading to an engagement on November 1, 2016, and setting and booking a wedding date for February of 2017. During all stages of the relationship, Maini was the aggressor, and he cheated incessantly during the relationship. His misrepresentations and abuse led Plaintiff to end the engagement well in advance of the wedding date. Plaintiff's family covered all expenses, which is why it is surprising for Maini to accuse Plaintiff of "using him for money," when Plaintiff is not only self-made but also from a much more successful family than he is.

85. Maini accused Plaintiff of hypochondria due to her medical conditions, causing her to vomit when on dinners with him when he force-fed her gluten-filled breads and soy-filled tofu, to malign her name in image-conscious fashion professional circles where few have food allergies. Maini knew from the start that Plaintiff is deathly, deathly allergic to gluten, yet he constantly accused her of having bulimia and "crash dieting" when Plaintiff has always been health and fitness oriented with a slim build.

***Maini acted with knowledge and reckless disregard as to the falsity or at least negligently on a matter concerning a private person.***

86. Maini has been relentless in his efforts to discredit and destroy the reputation of Plaintiff, and he continues to publish defamatory statements consistent with those stated therein as well as some that are inherently hidden and undiscoverable by Plaintiff. Her investigation of Maini's whack-a-mole defamatory content continues.

87. There is no physical or other tangible evidence to substantiate any of the claims that the Plaintiff engaged in any of the egregious conduct Maini outlines. Maini's statements were knowingly false and/or stated with such reckless disregard for the veracity of the accusations and the foreseeable, devastating harm they would cause to Plaintiff's reputation, business relationships, and arranged marriage prospects.

88. Maini is so intent on destroying Plaintiff's good name and reputation that he has taken painstaking efforts to make his false accusations and libel sound credible to those hearing them, even those close to Plaintiff who had no reason to believe Maini or to doubt the Plaintiff. Maini's posts were crafted in such a way as to inspire belief and sympathy on the part of recipients of the false information. Maini knew or should have expected that, upon reviewing these defamatory posts, others would retaliate against Plaintiff directly, distance themselves, and proceed with caution. Maini specifically chose to raise his post rate in 2019 due to Plaintiff's family placing her in the hands of a more experienced Indian arranged marriage matrimonial service. More recently, in 2020, Maini and/or his associates posted dozens of posts on Instagram and Twitter calling Plaintiff a "world renowned academic fraudster," mocking her bestselling books authored as a teenager, and mocking her for dressing celebrities for red carpet events.

*Actual damages.*

89. The false accusations have invaded Plaintiff's business pages of a direct to consumer product she started with her friend to make additional money outside of selling products with her name. Within one day of joining Twitter, Maini and/or his associates bombarded hate and libel towards Plaintiff on all of her business posts advertising her books and product. This caused Plaintiff to lose well over $6,000,000 in potential sales.

90. Maini's publication of these false accusations impaired Plaintiff's personal and professional reputation during all-important Fashion Weeks and effectively eliminated her ability to pursue an arranged marriage, in the community where she lives and works and beyond, and has resulted in severe emotional distress, humiliation, embarrassment, mental suffering, and suicide attempts. The Plaintiff also suffered damages, including SEO service fees, removal fees, lost income and

opportunities, medical expenses, therapy expenses, and damage to her future earning capacity.  More recently, on February 28, 2020, Maini and/or his associates shared the libelous website with an industry fashion blogger reporting Plaintiff's Paris Fashion Week show, in an attempt to sabotage Plaintiff's success at the show.  As a direct and proximate result of this post, Plaintiff closed her presentation and birthday party to the majority of the fashion industry and only invited her friends and loved ones, when it was supposed to be a wonderful day celebrating her birthday and her latest collection.  Plaintiff lost many millions of potential sales due to this; a conservative estimate places the damage at $9,000,000 as Plaintiff owns her entire supply chain.

91. Several fashion industry collectors and businesses distanced themselves from Plaintiff as a direct result of this libel.  A longstanding Swedish client cancelled $350,000 in custom couture dresses due entirely to Maini's libel.  Numerous department stores cut Plaintiff's label from their stores, causing tremendous damage to Plaintiff's small business which relies on strong business-to-business (B2B) relationships.

92. Plaintiff has no way of knowing who believed some or all of the false statements made by Maini, nor can she truly assess the identity, scope, and sheer number of people impacted by Maini's falsehoods to the detriment of Plaintiff.

93. Maini knew, or with substantial certainty should have known, that these false accusations would be re-published by Bashing Websites and widely disseminated in the community where Plaintiff lived and worked, as well as throughout the United States and beyond.  Plaintiff has spent thousands and countless hours trying to get all defamatory content removed from the Internet.

*Statements must be defamatory.*

94. Maini's accusations are defamatory per se.  Reasonably understood, Maini's statements amount to accusations of serious and reprehensible conduct, as well as the implication that he was guilty of academic, personal, and professional misconduct.  Maini's conduct also imputed to Plaintiff a want of integrity and a lack of competency in her academics, arranged marriage pathway, and employment.

95. This false publicity invaded Plaintiff's personal and professional circles, caused undue ridicule, and will continue to have a demonstrable, adverse impact on Plaintiff's livelihood in fashion, her physical safety, her emotional well-being, and her arranged marriage prospects.  Plaintiff was unable to invite press to multiple fashion shows as previously scheduled due to the enormous burdens as a result of this libel and abuse.  Plaintiff became a hermit, avoiding social events, pausing all arranged

marriage matchmaking efforts, and taking off time from her studies, delaying her graduation by an additional year.

96. Reasonably understood, Maini's statements amount to an accusation of serious and reprehensible conduct, as well as the implication that she was guilty of fraud. Maini's conduct also imputes to Plaintiff a want of integrity and a lack of competency in her academic pursuits.

*Prayer for relief.*

97. WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional and physical well-being given his posing as a "therapeutic leader" and "medical healer," and the foreseeable impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending social media profiles or posts, including Koe's professional art and fashion business Twitter account that he hacked in January-February of 2020. Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.

### THIRD CAUSE OF ACTION: LIBEL

98. To state a cause of action for libel, Plaintiff, a private person, will prove that the publication meets the following three elements: (a) false and defamatory statements of and concerning a private person, (b) without reasonable care as to the truth or falsity of those statements, and (c) resulting in actual damage to that private person. Refer to the cases *Hay v. Independent Newspapers, Inc.*, 450 So.2d 293, 295 (Fla. 2d DCA 1984), *Bass v. Rivera*, 826 So.2d 534, 535 (Fla. 2d DCA 2002), and *Tribune Company v. Levin*, 426 So.2d 45, 46 (Fla. 2d DCA 1982), *affirmed*, 458 So.2d 243 (Fla. 1984).

*False and defamatory statements of and concerning a private person.*

99. Plaintiff is a private figure. Though she has received limited media attention due to her work and academic accomplishments, she is still a private figure. Nevertheless, the cause of action

demonstrates actual malice as it shows the publications by Maini were made with knowledge that it was false and with reckless disregard of whether it was false or not.

100.    Refer to the cases *Hoch v. Rissman, Weisberg, Barrett*, 742 So.2d 451, 460 (Fla. 5th DCA 1999), *rev. denied*, 760 So.2d 948 (Fla. 2000). *See also Mile Marker, Inc. v. Petersen Publishing, L.L.C.*, 811 So.2d 841, 845 (Fla. 4th DCA 2002); *Dockery v. Florida Democratic Party*, 799 So.2d 291, 294 (Fla. 2d DCA 2001); *Scholz v. RDV Sports, Inc.*, 710 So.2d 618, 626 (Fla. 5th DCA 1998), *rev. denied*, 718 So.2d 170 (Fla. 1998).

101.    Four examples of Maini's libel follow:

   a. There will be a regular series of installments detailing the life and times of one [Jane Koe] right here- so stay tuned. A brief outline is provided below. "Tales" of a sad childhood in Bloomfield Hills-meet the wicked witch of the Michigan suburbs. Strange days at Country Day. Flunking out of freshman year at college. More strange days at the University of Chicago, the University of Toronto etc. An invisible hand pulls some strings and buys her an undergraduate degree in the wheat fields or corn fields or some fields of Ohio. … [redacted due to obscene content].

   b. Watch out for "[Jane Koe]" she is a serial cheater, she will also use you for your money and anything else she can get out of you. She has even told so many lies on her poor mother at our collage UNSW in Australia [Jane Koe] even has mail order husbands while she is in a relationship with you. When [Jane Koe] was in college I wrote all her assignments and did all her school work for her out of love and now I know I was just used the whole time. She only loves and dates white men and how judgemental is that. She hurt me and cheated with so many men I lost count.

   c. I am a student at UNSW in Australia. I got into a relationship with [Jane Koe], an American a while ago. We met late one night in a bar. [Jane Koe] promised that she would help pay my educational debts if I wrote her assignments and online exams and tests for her and attended to her needs when she was in town. [Jane Koe] has a strong preference (some might say a fetish) for white men, so I am able to fulfil that desire. [Jane Koe] also told me stories about how she was abused by her mother, [Jane Koe's Mother] as a child. [Jane Koe] made me feel really special- I thought she was confiding in me. However, recently I realised that [Jane Koe] tells these child abuse stories to just about everyone she meets and has "mail order" husbands in other

countries as well. [Jane Koe] promised that our relationship would be exclusive so I feel cheated on. I am in a better financial situation now so I can get out of this relationship with [Jane Koe]. All I can say is that other guys should not be cheated by [Jane Koe] in this way!

d. I have known a pedophile named [Jane Koe], formerly [Jane Koe]. She preys on little girls, usually pre-teens, and lures them with inducements of dresses and jewellery. She is 28, but likes girls in the 11-12 age bracket. She was caught in a compromising position with a middle school girl in her graduate school residence at Georgetown but the whole matter was hushed up. I have tried to report her a few times in various states, including Michigan, but she fled to Europe. Her mom, [Jane Koe's Mother] aids and abets her operations.

102.   All further instances of libel will be shared in Discovery and admitted into evidence well before trial.

***Maini acted without reasonable care as to the truth and falsity of those statements.***

103.   Maini has authored absolute libel designed to denigrate and attack Plaintiff in her personal, academic, and professional pursuits.

104.   Plaintiff was born in Dearborn, Michigan, and grew up in West Bloomfield, Michigan, not Bloomfield Hills, Michigan.

105.   Plaintiff did not have "strange days at Country Day." She dealt with a sadistic headmaster named Glen Shilling who raped her friend and then bullied her into silence. Shilling was voted out by his Board of Directors, all of whom maintained serious concerns about his mental capacity for leadership and his long history of pursuing inappropriate relationships with teenaged students. Members of his administration have conspired to ensure he leaves the toxic legacy he 'built,' as well.

106.   Plaintiff earned a 3.9 GPA in her freshman year of college and did so well that she secured sophomore transfer admission into four Ivy League colleges—including Yale, Cornell, Brown, and Columbia—two elite design schools, and a number of private liberal arts colleges, including the University of Chicago, Northwestern, Duke, Smith, Mount Holyoke, and Kenyon. She ultimately decided to prioritize her health and medical research—Plaintiff applied only to see if she was good enough to get in, and she did.

107.    Plaintiff pursued a study abroad opportunity in microbiology at a Toronto-based lab, and
        focused on earning her degree within driving distance of her lab supervisor, while also
        maintaining her BS/MD guaranteed acceptance and scholarship requirements.  It made more
        sense for her to remain in Ohio, where she was in proximity to her parents, mastering lab
        skills, and building the foundation for a pharmaceutical chemistry breakthrough.  Judging by
        her professional success and scientific innovations—curing two variants of a rare disease by
        age 25 and securing M&A deals by age 27, executed by age 28—Plaintiff was destined to
        succeed at a high level irrespective of where she earned her first undergraduate degree.
        Clearly, Maini's elite Sydney degree earned via St. Andrew's has not guaranteed him success
        in any endeavor.  He's an age 41 bully.

108.    Plaintiff attended the University of Chicago as a high school student in an educational
        enrichment program the summer before her senior year.  She never attended UChicago as a
        degree-seeking candidate, had a wonderful experience there, but realized that the secular
        campus culture was not the right fit for her undergraduate experience.

109.    Plaintiff is a self-made entrepreneur, who has never cheated, let alone serially cheated, let
        alone "use[d] [anyone] for money and anything else she can get out of [people]."  She is an
        abstinent virgin who cured two variants of a disease worth a respective $477,000,000 in
        formal M&A fees.  As far as she is aware, the early sacrifices for 'prestige' Plaintiff made
        early in her academic career only helped her get to patent rights and licensing rights
        opportunities later on, with two large pharmaceutical companies.

110.    Plaintiff has never "told lies on her poor mother," and attended college, not collage.

111.    Plaintiff and Maini met online, not "late one night in a bar."

112.    Plaintiff was exclusive with Maini.  Attached exhibits detail and prove Maini's record of
        affairs by secretly using apps throughout their relationship, when Plaintiff is richer, smarter,
        better connected, better educated, significantly more successful, and much more attractive
        than Maini.  Plaintiff is the real deal and the total package.

113.    Plaintiff did hire undergraduate students, graduate students, and professors to assist her
        with her goal of curing a rare metabolic disease; she paid them on short-term contracts and
        this approach saved her close to $50 Million in research and development costs, cut her time
        to market by 10 years, and extended her personal life expectancy by 30 years.  Most

importantly, Plaintiff never has to eat Daiya fake cheese again and regularly enjoys New York-style pizza every Friday—a privilege she worked hard to obtain.

114.    Plaintiff is an abstinent virgin who has no fetishes as she has never had any form of sex in line with her religious beliefs.  Maini is the only suitor with whom Plaintiff has been in a serious relationship; she was single by choice for several years post-breakup and talking casually to suitors selected by her parents.  At the moment, plaintiff is causally going on dinners with various suitors arranged by her matchmaker and screened via full background checks, offering her a piece of mind she never had with Maini.

115.    Plaintiff did not live on campus at any Georgetown residence hall.  She lived in Arlington, Virginia, and commuted to school.  As well, she dropped out within two months of starting.  The libel Maini accuses Plaintiff of is so extraordinary and farfetched that Quora complied with Plaintiff's subpoena and promptly removed the post.  That Maini would project his history of raping prepubescent girls on Plaintiff underscores, yet again, his low moral character and warped personal value system.  Maini has raped multiple prepubescent girls.  Plaintiff's business has always been focused on dressing women over age 35—her entire brand identity is focused on helping older women have an equal aesthetic experience so they maintain their competitive aesthetic edge even after childbirth and have great marriages.

***Resulting in actual damage to a private person.***

116.    Plaintiff has lost many millions in potential business, along with public ridicule on social media from Jessica Dunderdale, Edward Lucas, Chloe Colson, and others all based entirely on Maini's libel.  She estimates total losses due to libel to exceed $8,000,000.

117.    Plaintiff has demonstrated extraordinary courage and resilience in the face of adversity by curing the disease in question that Maini's abusive libel appears to be more about his jealousy.  Instead of Maini appreciating how nice it is that he never had to struggle to enjoy a lifestyle of freedom where he can eat whatever he wants without worrying about if he will vomit in public, Maini is attacking Plaintiff for having the audacity to want more out of life and then taking action steps to create the life of her choice.  More pizza, more egg yolks, more prime rib eye steak, more happiness, and most importantly, more freedom.  Plaintiff has always been a foodie and is grateful her hard work means she can now enjoy almost anything

on any menu anywhere in the world without fear of vomiting in public and ruining her clothes.

118.   Maini is well aware of Plaintiff's history of vomiting due to food allergies. It's why he used to call her "dirty" and "filthy," because when he force fed her soy tofu, Plaintiff vomited three minutes later and had to be sent to the emergency room of a major hospital. Maini enjoys poking fun at Plaintiff's food allergies.

119.   Plaintiff has suffered tremendous damage emotionally, psychologically, and financially as a direct and proximate result of Maini's abusive, cruel libel. By making indirect statements about the fact that Plaintiff involuntarily vomits if she eats any 'forbidden food,' and talking about 'contract cheating,' Maini forced Plaintiff to disclose a chronic medical illness she overcame years ago. Plaintiff trusted Maini with her secret—that she refused to be limited by a stroke of bad medical luck—and expected him to maintain her confidence post-breakup.

120.   By writing libel around the elephant in the room, that Plaintiff continues to be embarrassed that she now has to disclose a medical condition she overcame to live the glamorous life she currently lives, Maini induced a period of severe situational depression in Plaintiff. The only way for Plaintiff to prove her innocence was to 'out herself' as having overcome a severe adversity by sheer force of will that most would not have the strength to overcome, let alone to talk about—and that Plaintiff remains insecure about.

121.   As a result of Maini's libel, Plaintiff now has to preface conversations with strangers about how she escaped an abusive Australian ex and cured a rare disease. Plaintiff still doesn't feel comfortable talking about what she overcame and is deeply saddened that Maini's libel has forced her to disclose how she overcame adversity at social events instead of talking about lighthearted topics. Indeed, people are now more interested in hearing about the 'overcoming adversity' aspect than they are about Plaintiff's favorite opera or book, for example. Plaintiff now spends a considerable amount of time doing damage control, dodging invasive personal questions about her health and eating habits from random strangers, etc.

*Prayer for relief.*

122.   WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for the

foreseeable impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community. Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending profiles and posts.

## FOURTH CAUSE OF ACTION: INVASION OF PRIVACY

123. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

124. To state a cause of action for invasion of privacy, Plaintiff will prove the following three elements: (a) appropriation, the unauthorized use of a person's name or likeness to obtain some benefit; (b) electronic intrusion into one's private quarters; (c) public disclosure of private facts, meaning the dissemination of truthful private information which a reasonable person would find objectionable.

*Appropriation of Plaintiff's name and likeness to obtain some benefit.*

125. Maini misappropriated Plaintiff's name and photograph to make jokes at Plaintiff's expense and to make it easier to extort Plaintiff's father for extra removal fees.

126. Based on information and belief, Maini may or may not own some of the Bashing Websites and at least one of the Removal Websites.

*Electronic intrusion into Plaintiff's private quarters.*

127. Maini has hacked Plaintiff's email illegally since August 12, 2016, to download her patent application to prevent her from profiting off of her two cures for a rare metabolic disease. The patents themselves are worth $80 Million for the supplement and $397 Million for the enzyme replacement therapy, respectively.

128. By shifting the focus away from Plaintiff's scientific achievements to Maini's libel via his defamation and libel, Maini has continued to get away with continued keylogging and hacking into Plaintiff's private server, private e-commerce website, and over twelve (12) different financial accounts. These accounts include:

    a. PNC Bank

    b. Wells Fargo Bank

    c. Goldman Sachs

    d.  Fidelity Investments

    e.  HSBC Bank

    f.  Revolut

    g.  TransferWise

    h.  Barclays

    i.  PayPal

    j.  Venmo

    k.  Chime Bank

    l.  Simple Bank

129.    Plaintiff accidentally left the password to her private digital diary and her private email on her laptop case. Under no circumstances would Plaintiff ever share her password with anyone. Based on information and belief, Maini hacked Plaintiff's email between August 13 to 17, 2016, downloaded private files and notes—none of which can be admitted into evidence due to the criminal hacking—and then began an email campaign to Plaintiff's residence, her research colleagues, and her laboratory research administrators making false and baseless claims about Plaintiff. Maini's objective was to develop further a side relationship with one of his many mistresses, one of whom he met in his economics program and met with whenever Plaintiff was out of town. To be specific, Plaintiff was in Seoul from August 23 to 27, 2016, and during that time Maini arranged dinner and movie dates with his mistress. She declined his last-minute Friday night movie date but they ultimately met whenever Plaintiff was out of town, while Maini continued juggling his various additional side women. In particular, when Plaintiff was in Melbourne on a medical research trip from September 19 to 22, 2016, Maini met with his economics classmate behind Plaintiff's back and without her permission.

130.    Most recently, Maini has hacked Plaintiff's business Twitter account and infringed upon her copyright and trademarks. Though Twitter has suspended the account, Plaintiff is now in a position of petitioning Twitter to restore access to her company business account that she has owned in full for years on end.

***Public Disclosure of Private Facts***

131.    Plaintiff confided a number of childhood traumas and personal secrets to Maini. Plaintiff trusted Maini would always keep her confidences. Plaintiff revealed to Maini the extent of her negative prep school experience with the understanding that such confidential information would remain

private and confidential at all times. Maini took this private information and published multiple tell-all WordPress and Blogger posts about Plaintiff, mixing 15% of truth with 85% of libel, ridiculing her for what truly was a difficult childhood and a number of difficult experiences

132.    Plaintiff decided to do a transfer to another school during the first term of her senior year of high school to protect her physical safety from aggressive individuals attacking her physically at her preparatory school. She made this decision without notifying her parents or her school in advance. Plaintiff packed her bags and left town. Maini twisted the experience around and labelled her as a "runaway" who "lived on the streets," when Plaintiff was living in a $3,000 per month apartment in an exclusive, gated community and her first car at age 16, given by her parents, was a brand-new Lexus.

133.    Plaintiff also confided that she was estranged from her mother from the period 2009 to 2011, when Plaintiff decided to initiate a school transfer by informing her father and not informing her mother until she made her decision. Plaintiff's mother and Plaintiff had disagreements about future college admission prospects with a senior year transfer, which has now been resolved; at all points, this dispute was a private one that never took away the deep love and affection the two have always shared. Ups and downs are normal parts of the mother-daughter relationship. Nevertheless, Maini invaded the privacy of Plaintiff and her mother by posting false accusations accusing Plaintiff's mother of being a "child abuser" on dozens of websites. Plaintiff is not a child; she is an adult of age 28. Plaintiff's mother never abused her as a child. Private disagreements and using phraseology of "abuse" is neither in the public interest nor of any concern to external third parties. Maini specifically posted this to continue to extort Plaintiff's family.

134.    As well, Plaintiff confided in Maini her mother refused to let her eat whatever she wants, whenever she wants. Even at age 23 and age 24, when Plaintiff and Maini were in a relationship, Plaintiff struggled with feeling jealous of her siblings who have no food allergies or restrictions. Plaintiff explained to Maini that while her heart has always been bent on curing both variants of a rare disease for altruistic reasons, the selfish underlying reason is that Plaintiff loves pizza and eggs benedict and couldn't eat either due to her allergies. Maini twisted this around and painted Plaintiff's mother as a "child abuser" who "neglected to feed" Plaintiff, when that is not true. Plaintiff's other has always acted in accordance with nutritionist advice. As well, the issue is moot as Plaintiff is in great health, has been cured for over four years, and now enjoys eating everything

she likes without fear of vomiting.  Nevertheless, food allergies and dietary restrictions are not in the public interest.

135.    Information about Plaintiff not in the public interest and Maini invaded the privacy of both Plaintiff and her mother.  This private information could never be reasonably interpreted as newsworthy or necessary to the discourse of a legitimate public concern.  Plaintiff is not running for office.  Maini is planning on running for office.

136.    Maini's conduct is so outrageous, methodical, expansive, that Plaintiff has suffered severe emotional damages far beyond the extensive business damages this invasion of her privacy has caused.  Maini has been relentless in his effort to shame, humiliate, and destroy Plaintiff and upon information and belief, has continued to disseminate private secrets shared with the understanding of comfort.  Indeed, Maini told Plaintiff, "you will only ever get love from me" to encourage her to share her secrets.

137.    Plaintiff has no way of knowing who heard the audio clip Maini uploaded, let alone who read all the posts online, but Maini is well-aware that such information would be re-published by others and disseminated widely in the greater Palm Beach, Florida community and beyond.  Maini's efforts to publicly humiliate Plaintiff were so expansive that they invaded her personal, academic, and professional circles, causing her undue ridicule.  As well, such libel led to further whack-a-mole issues from other people whom Plaintiff had to take legal action against and will continue to have a demonstrable, adverse impact on Plaintiff's livelihood and emotional wellbeing.

*Prayer for relief.*

138.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendant in an amount fair and just, but no less than Two Hundred Thousand Dollars ($200,000) in compensable damages, as well as exemplary damages in the amount of One Million Dollars ($1,000,000) for his willful and contumacious disregard for the Plaintiff's emotional and physical well-being, and the foreseeable impact his conduct would have on Plaintiff's reputation as a respected, upstanding member of her community.  Plaintiff further requests that Defendant Maini be issued a permanent injunction and enjoined from any future, similar conduct, and that he be ordered to remove any existing, offending social media profiles or posts.  Plaintiff seeks all other relief this Court deems appropriate and just under the circumstances.


**FIFTH CAUSE OF ACTION: COMPUTER FRAUD AND ABUSE**

139.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

**Details.**

140.    Based on information and belief, Maini followed and/or viewed Plaintiff's personal social media profiles, personal website pages, and pageant photo website pages for the purpose of gathering Plaintiff's personal identifying information and pageant headshot photograph to post on Bashing Websites.

141.    Based on information and belief, Maini remotely hacked into Plaintiff's private email accounts on Google and Google Admin for the purpose of ruining her ability to run her business. Plaintiff had to open a new Proton Mail account for her personal use as well as her small business use.

142.    Based on information and belief, Maini remotely hacked into Plaintiff's business and personal bank accounts for the purpose of causing her emotional distress. His determination to keep tabs on Plaintiff by hacking her bank accounts and stealing her money has resulted in Plaintiff's banks restricting her access and, in the case of PNC Bank, closing her access. Being shut out of banking has put Plaintiff in the uncomfortable position of opening new accounts, only for Maini to find them thanks to keyloggers.

143.    Based on information and belief, Maini bought a fake email account named feistycoed[at]gmail[dot]com to impersonate Plaintiff and to defraud random people under Plaintiff's name. It is believed Maini is using the account to distribute his private PornHub collection.

144.    Based on IP records, Maini continues hacking into Plaintiff's personal e-commerce website server, which hosts and operates her fashion and artwork websites. Her private server constitutes "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2).

145.    As described above, Defendants conspired to commit and attempted to commit violations of 18 U.S.C. § 1030(a)(7)(B) and 18 U.S.C. § 1030(a)(7)(C) in violation of 18 U.S.C. § 1030(b).

146.    Defendants' conduct has caused loss as defined in U.S.C. § 1030(e)(11) of more than $5,000 to Plaintiff during a one-year period.

**Prayer for Relief.**

147.    WHEREFORE, the Plaintiff prays that a judgment be entered against Maini in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff

alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

## SIXTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP

148.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

149.    At all times relevant to this action, Plaintiff has had a prospective contractual relationship with her private artwork and couture clientele and a reasonable probability in the continuation of those business relationships.

150.    In order to plead a prima facie case of tortious interference, it must be proven that (a) there is the existence of a business relationship, not necessarily evidenced by an enforceable contract; (b) knowledge of the relationship on the part of the Defendant; (c) an intentional and unjustified interference with the relationship by the Defendant; (d) damage to the Plaintiff as a result of the breach of the relationship. Case law support of this definition includes *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985), *Gossard v. Adia Services, Inc.*, 723 So.2d 182, 184 (Fla. 1998), and *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994).

*A Business Relationship Exists*

151.    Plaintiff and Maini started a men's fashion reselling business focusing on used, luxury men's ties and used, luxury men's suiting in June 2016.

152.    They continued their reseller business relationship after the relationship soured, splitting all profits 50-50, until Plaintiff severed this arrangement in writing in early March 2017.

153.    Plaintiff started a separate women's fashion selling business, focusing on new luxury women's products designed under her name, six months after the breakup in January 2017, where she owns 100% equity.

*Knowledge of the Business Relationship from Maini*

154.    Maini has knowledge of the new relationships Plaintiff has built in the business to consumer (B2C) and business to business (B2B) markets.

155.    Maini—or his agents and/or co-conspirators—visit her private website, her store website, her LinkedIn, her Instagram, her Facebook, and her SnapChat profiles daily. As well, Maini harasses

her and her family by phone and email for the purpose of mining Plaintiff's personal identifying information.

### *Intentional, Unjustified Interference with the Relationship by Maini*

156.   Maini intentionally, or with substantial certainty, interfered with the relationship between Plaintiff and her clientele by stealing and libeling her and her family to Bashing Websites, causing many of her couture clientele and business award committees to end their relationship with Plaintiff and withdraw her name from award finalist lists.

### *Damage to the Plaintiff*

157.   It is clear here that Defendants conduct both caused and induced the breach that resulted in Plaintiff's damages.  Refer to cases *Univ. of West Florida Bd. of Trustees v. Habegger*, 125 So.3d 323, 326 (Fla. 1st DCA 2013), *Murtagh v. Hurley*, 40 So.3d 62, 66 (Fla. 2d DCA 2010), *Fernandez v. Haber & Ganguzza, LLP*, 30 So.3d 644, 646 (Fla. 3d DCA 2010), *James Crystal Licenses, LLC v. Infinity Radio Inc.*, 43 So.3d 68 (Fla. 4th DCA 2010), and *Southeastern Integrated Med., P.L. v. N. Fla. Women's Physicians*, 50 So.3d 21, 23 (Fla. 5th DCA 2010).

158.   Maini's above-described conduct has caused actual disruption to the relationship between Plaintiff and her clientele.

159.   Maini's above-described conduct has caused actual disruption to the relationship between Plaintiff and various venture capital groups.  Many of said groups verbal commitmed to invest up to $50 Million in a Series A in exchange for a 25% equity stake, but later withdrew their offers or 'ghosted' Plaintiff due to the sheer amount of libel about her on various Bashing Websites.

160.   Plaintiff also faced tremendous hardship in traditional arranged marriage circles due to the sheer amount of libel about her and her family, necessitating her to retain five non-Indian matchmaking firms for a total fee of $250,000, just to get suitors from the right background, educational level, and financial level, as it is now impossible for Plaintiff to receive a traditional arranged marriage.

161.   Defendants' above-described conduct has caused actual and severe disruption to the relationship between Plaintiff, her immediate family, and relevant trustees.  Her family was willing to invest up to $5 Million in cash into her business for a 2.5% equity stake, alongside a larger venture capital fundraising round, and withdrew their offer as a result of Maini's libel and the resulting family name and honor nightmare in Plaintiff's caste.  Plaintiff's immediate family will only invest alongside professional venture capitalists.

162.    In the case of *Dade Enterprises v. Wometco Theatres,* 160 So. 209, 210 (Fla. 1935), the Court argued that "if one maliciously interferes with a contract between two persons, and induces one of them to breach the contract to the injury of the other, the injured party may maintain an action against the wrongdoer, and where the act was intentional, malice will be inferred." Defendant Maini was well aware that his libel would cause Plaintiff to suffer tremendously in fundraising both with her immediate family and with venture capitalist groups that had expressed interest in Plaintiff's small business previously. Defendant Maini was also well aware that Plaintiff intended to pursue an arranged marriage to a suitable family, and his libelous actions—spread further by the malicious libel copy and pasting by Bashing Websites and Removal Websites—has impaired her ability to pursue arranged marriage as someone of her stature would otherwise be able to obtain. Plaintiff has now had to pursue the Western approach to marriage matchmaking largely against her will, requiring over $250,000 in fees to two elite matchmaking companies in the U.K. and the U.S. to obtain a modern arranged marriage based on love instead of achieving the traditional arranged marriage of her dreams which she worked hard to achieve from a young age.

163.    Maini and/or one of his associates, in particular, set up Instagram and Twitter accounts under the anonymous name "Then Victoria" in order to attack Plaintiff in front of her clients and customers. As a direct to consumer brand making its entire revenue off of the support of adult women who are the decision makers in any household, these attacks with libelous content have a direct impact on sales. Plaintiff had to make other posts with links to the lawsuit, solely to save her client base. Plaintiff only started this other product to make additional money without Maini interfering, yet Maini and/or one of his associates has continued posting whenever Plaintiff's name is mentioned on Twitter. The account holder "Then Victoria" has an entire page devoted to bashing Plaintiff; indeed, the only posts in question are focused on Plaintiff and her alleged "history" using libelous links from the Bashing Websites as "evidence." This has resulted in tremendous cyberbullying and has caused Plaintiff further post-traumatic stress disorder symptoms and calls to the national suicide hotline.

**Prayer for Relief.**

164.    WHEREFORE, the Plaintiff prays that a judgment be entered against the Defendants in an amount fair and just, to be determined at trial, as well as exemplary damages to be determined at trial. Plaintiff alleges this amount is in excess of $100,000. Plaintiff also seeks all other relief this Court deems appropriate and just under the circumstances.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jane Koe, a pseudonym, prays for judgment against Defendants as follows:

1. A trial by jury;

2. Enter judgment against Maini in favor of Plaintiff for each of the aforementioned Causes of Action;

3. Adjudge that Maini and any other persons or entities working in concert or in participation with him be enjoined during the pendency of this action and thereafter permanently from:

   a. Extorting Plaintiff or Plaintiff's family;

   b. Emailing, calling, or mailing Plaintiff or Plaintiff's family;

   c. Using any image, word, phone number, or other identifying information collected from award websites, personal websites, news articles, or any websites whatsoever about Plaintiff for any purpose;

   d. Accessing any of Plaintiff's private and business social media profiles now and in the future, including but not limited to LinkedIn, Facebook, SoundCloud, Twitter, Vero, TikTok, SnapChat, Goodreads, and Instagram;

   e. Otherwise competing unfairly with Plaintiff's design business endeavors in any manner;

   f. Continuing to perform in any manner whatsoever any of the other acts complained of in this Complaint.

4. Adjudge that Maini, within fourteen (14) days after service of the judgment request herein, be required to file with this Court and to serve upon Plaintiff a written report under oath setting forth in detail the manner in which it has complied with the judgment;

5. Adjudge that Maini compensate Plaintiff for all costs relating to paying for Removal Websites between 2017 to the present;

6. Adjudge that Maini refrain from posting and reposting anything about Plaintiff in the future;

7. Adjudge that Maini return to Plaintiff all expenses relating to removal of prior posts, SEO campaign services, and psychotherapy bills arising from suicide attempts as a result of this situation;

8. Adjudge that Plaintiff recover from Maini all actual damages and/or damages allowed by statute in an amount to be determined at trial;

9. Adjudge that Maini be required to account for any profits that are attributable to his acts complained of herein;

10. Adjudge that Plaintiff recover punitive damages from Maini;

11. Adjudge that Plaintiff be awarded her costs incurred in connection with this action, including reasonable investigative expenses, private investigator expenses, and medical expenses;

12. Adjudge that Maini cover all costs as provided by 28 U.S.C. § 2412 or any other provision of law;

13. Adjudge that Plaintiff recover all such other relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED, in West Palm Beach, Florida, this 4th day of January, 2021.

Jane Koe, a pseudonym
Law Student *Pro Se*
The Honourable Society of Lincoln's Inn #20200819
7750 Okeechobee Blvd, Suite 4-481
West Palm Beach, Florida 33411
Phone: (929) 400-7746
Email: janekoelitigation@icloud.com

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served in person by process server on January 4, 2021 at the Southern District of Florida West Palm Beach Clerk of Court Office.  I have retained a process service to serve Defendant Amar Maini at 9 Jamberoo Avenue, Baulkham Hills, NSW 2153, in Australia.  He is also being served using the Hague Convention, which requires both location tracking and process serving according to international law standards.

Jane Koe, a pseudonym
Law Student *Pro Se*
The Honourable Society of Lincoln's Inn #20200819
7750 Okeechobee Blvd, Suite 4-481
West Palm Beach, Florida 33411
Phone: (929) 400-7746
Email: janekoelitigation@icloud.com

## SERVICE LIST

Amar Chander Maini
9 Jamberoo Avenue
Baulkham Hills, NSW 2153
Australia
Email: amarchandermaini@gmail.com