# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:20-CV-80147-ROSENBERG/REINHART

JANE KOE,
  *Plaintiff,*

v.

AMAR CHANDER MAINI,
  *Defendant.*

_____/



### PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
### ON THE THIRD AMENDED COMPLAINT

COMES NOW Plaintiff Jane Koe ("Plaintiff"), *pro se*, a recent LLM graduate in International Commercial Law. A private figure, Plaintiff respectfully moves the Court to enter a default judgment against sole remaining defendant Amar Chander Maini ("Maini") pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and Rule 7.1 of the Southern District of Florida Local Rules. Maini also uses the aliases Kenneth W., GallantVK, AmarCM4, AmarCM_2, VikramKMS, Vikram Kumar Mansingh, Vikram Kumar, Vikram Kumar Mansingh, Kat, Jo, Jo Smith, Billy Bob Thornton, Eki, Anonymous, Sam, Amar Chander, Anthony Balderon, PadThaiFanboy, IEatSoyDaily, etc.

### EXHIBIT DIRECTORY

| Exhibit A | Service |
|---|---|
| Exhibit B | Unanswered Discovery Questions |
| Exhibit C | Haute Couture Invitation and Example Embroidery |
| Exhibit D | Affidavit of Sum Certain |
| Exhibit E | Metabolic Health Concerns |
| Exhibit F | Dyslexia |
| Exhibit G | Fraudulent Misrepresentation Social Media Profiles |
| Exhibit H | Plaintiff supported Maini emotionally when he was unemployed |
| Exhibit I | Plaintiff supported Maini by surprising him at work with her cooking |
| Exhibit J | Evidence of Unhappiness |
| Exhibit K | Death Threats |
| Exhibit L | Matchmaking Contracts |
| Exhibit M | Revised List of Expert Witnesses |
| Exhibit N | Receipt from Sancta Sophia College |

## INTRODUCTION

Plaintiff commenced this action on January 31, 2020, with the Complaint filed January 31, 2021 (Docket No. 1), the First Amended Complaint filed February 3, 2021 (Docket No. 7), the Second Amended Complaint filed April 29, 2021 (Docket No. 15), and the Third Amended Complaint filed January 4, 2021 (Docket No. 74). Plaintiff served Maini on January 29, 2021 with the Summons and all filings, including the Third Amended Complaint and First Set Discovery, via process service company ServeDoc Pty Ltd of Australia (Docket Nos. 76, 77, 78, 79). See Exhibits A and B. Plaintiff's Third Amended Complaint alleged, *inter alia*, that Amar Chander Maini engaged in horrific domestic violence against Plaintiff including fraudulent misrepresentation catfishing, emotional abuse, physical abuse at restaurants, food-related abuse by intentional peanut and gluten poisoning, health abuse by stealing her EpiPens and inducing Metronidazole antibiotic resistance, computer hacking, horrific financial abuse spanning years post-breakup, and traumatic psychological abuse that has forced Plaintiff to reveal her rare metabolic disease that she overcame, her many food allergies which require EpiPen usage in emergencies, and her lifelong dyslexia to the world. See Exhibit C. Despite acknowledging he downloaded all filings from PACER and from a DropBox link sent to him over a Google Voice exchange in November 2020 and again in January 2021, Maini failed to timely appear and till date has neither entered any appearance in this case nor otherwise responded to the Third Amended Complaint. The Clerk entered a default on Amar Chander Maini on June 23, 2021 (Docket No. 83); see Exhibit A.

Plaintiff requests that the Court enter the proposed Default Judgment and Order for Permanent Injunction, Civil Monetary Penalties, and Equitable Relief ("Default Judgment") against Amar Chander Maini. The Default Judgment award should include (1) a civil monetary penalty, (2) an equitable monetary judgment, (3) civil penalties, (4) injunctive relief, and (5) costs against Amar Chander Maini.

## ARGUMENT

### 1. STANDARD OF REVIEW

According to Rule 12(a)(1)(A)(i) of the Federal Rules of Civil Procedure, a defendant must file an appearance and ideally also a responsive pleading within twenty-one days after being served with both a summons and a complaint. Rule 55 of the Federal Rules of Civil Procedure and Southern District of Florida Local Rule 7 explain the two-part process for

obtaining default judgment against a nonresponsive party or parties: (1) clerk's entry of default and (2) entry of default judgment.

Rule 55(a) of the Federal Rules of Civil Procedure states, "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." This process occurs by the Clerk of Court, without the Judge. Plaintiff provided notice to the Clerk of Court on June 23, 2021 (Docket No.) that she complied with Rule 4 of the Federal Rules of Civil Procedure when serving Amar Chander Maini (Docket No. and Exhibit A), and the Clerk entered a Default on June 23, 2021 (Docket No.)

After obtaining a Clerk's Entry of Default, only then may a Plaintiff file a separate motion for default judgment. As per Rule 7.1(a)(1) of the Southern District of Florida Local Rules, last updated on December 1, 2020, a Memorandum at Law is not required when seeking a Motion for Default Judgment. Plaintiff has followed the proper procedure for Clerk-obtained entry of default outlined in Rule 55(a) the Court-obtained motion for default judgment outlined in Rule 55(b), as well as an Order from the Judge mandating that Plaintiff enter a Motion for Default Judgment to avoid a dismissal without prejudice (Docket No.) See Exhibit A.

As per *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) obtained at https://casetext.com/case/buchanan-v-bowman, "by defaulting, the [defendant is] deemed to have 'admit[ted] the plaintiff's well-pleaded allegations of fact' for purposes of liability." The case set a precedent for *Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1307 (M.D. Fla. 2010), *Tyco Fire & Sec., LLC v. Alcocer*, 218 Fed. App'x 860, 863 (11th Cir. 2007), *Shandong Airlines Co. v. CAPT, LLC*, 650 F. Supp. 2d 1202, 1206 (M.D. Fla. 2009), and others.

## 2. STATUTORY AND REGULATORY PROVISIONS

Plaintiff's Third Amended Complaint asserts well-pled and meritorious claims against Amar Chander Maini for: (1) fraudulent misrepresentation, (2) defamation, (3) libel, (4) invasion of privacy, (5) computer fraud and abuse, and (6) tortious interference with advantageous business relationship. As a result, the Court should proceed to determine appropriate damages for each of those claims.

### (A) Fraudulent Misrepresentation

In her Third Amended Complaint, Plaintiff proved the following five elements of fraudulent misrepresentation: (a) a misrepresentation of a material fact; (b) which the person

making the misrepresentation [Maini] knew to be false; (c) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (d) that Plaintiff relied on the misrepresentation to her detriment; (e) that this reliance caused damages. See also *Standard Jury Instructions—Civil Cases (No. 99-2)*, 777 So.2d 378, 381 (Fla. 2000), *Standard Jury Instructions—Civil Cases (1.0, 6.1d, MI8)*, 613 So.2d 1316, 1317 (Fla. 1993), *American International Land Corp. v. Hanna*, 323 So.2d 567, 569 (Fla. 1975), and *Huffstetler v. Our Home Life Ins. Co.*, 65 So. 1 (Fla. 1914).

By catfishing and conning Plaintiff and her parents with the alias Vikram Kumar Mansingh, Maini pretended to be an age 28 investment banker at UBS with an MBA obtained from the elite London Business School. Maini knew these material facts were false, and as everything in Exhibit G shows clearly, he fabricated a world of lies to manipulate Plaintiff into settling for him, via private profiles on Pinterest, Skype, and Instagram. Maini made all of these misrepresentations with the purpose of inducing Plaintiff to rely upon them to settle for marrying him when she deserves the best and he is not it. Plaintiff relied on these misrepresentations to her detriment, thinking she was building a relationship with an upstanding member of her caste and subcaste from the right background. Maini knowingly and maliciously misrepresented his identity—a material fact—on top of knowing doing so would cause Plaintiff's Dad to give permission to permit courtship, and Maini also knew it would cause Plaintiff's father to deliver an all-cash dowry and eventually green card citizenship.

## *(B) Defamation*

In her Third Amended Complaint, Plaintiff proved the following five elements of defamation: (a) publication; (b) falsity; (c) actor must act with knowledge or reckless disregard as to the falsity or at least negligently on a matter concerning a private person; (d) actual damages; (e) statements must be defamatory. Refer to the cases *Jew For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008) and *Cooper v. Miami Herald,* 31 So.2d 382, 384 (Fla. 1947). Since Plaintiff's decision to end the relationship with Maini in January 2017, Maini has engaged in a deliberate, malicious campaign to hurt Plaintiff by starting and spreading countless rumors, lies, and falsities to members of Plaintiff's network as well as to random bystanders on the Internet. These rumors, lies, and falsities have spread like wildfire and have caused Plaintiff to be retriggered and retraumatized by thousands of trolls. Plaintiff's life has been on hold for years as a result of Maini's contumacious disregard for the truth.

Maini wrote his defamation to force Plaintiff to 'out' herself for two health matters: (1) her dyslexia and (2) her rare dermatology disease that she developed as a result of absolutely horrific, life altering medical malpractice that occurred when she was in middle school.  Plaintiff is now 'out of the health cabinet,' so to speak, as a result of the pathetic Amar Chander Maini and the grotesque Mahima Chablani.  Plaintiff has struggled with dyslexia her entire life, and before she handed in her senior thesis—a requirement at her school to graduate with departmental honors—she hired GradeSaver to edit it.  GradeSaver (www.gradesaver.com) is a reputable essay editing company that helped Plaintiff correct punctuation, date, etc. related mistakes that arise as a result of her dyslexia.  Plaintiff's talent and skillset has always been in other areas—painting, drawing, sewing, embroidery, etc.—but she still wanted a liberal arts education for the challenge of overcoming her dyslexia, and she wanted to get a good grade on her senior thesis which was a requirement to graduate.  Her departmental advisor was aware that she paid GradeSaver for their editing services and supported her decision.  Hiring a reputable essay *editing* company is neither "contract cheating" nor having anyone fall in love with her and/or date her.  Maini hacked Plaintiff's email account during their relationship and he acted with knowledge and reckless disregard as to the falsity about Plaintiff, a private person.

### (C) Libel

In her Third Amended Complaint, Plaintiff has proven that the publication of all of Maini's libel exceeds the elements: (a) false and defamatory statements of and concerning a private person, (b) without reasonable care as to the truth or falsity of those statements, and (c) resulting in actual damage to that private person.  Most concerning to Plaintiff on an emotional level is the accusation of "will use you for your money and anything else she can get out of you," when Plaintiff stood by Maini throughout unemployment and helped him get ahead professionally by helping him earn entry into elite private clubs.  Refer to Exhibit H.  Plaintiff lived in both Women's College and Sancta Sophia College (Exhibit N) and is an abstinent virgin (Exhibit M, Exhibit O).  Maini acted without reasonable care as to the truth and falsity of all of his statements.  He hacked Plaintiff's email during the relationship and after the relationship.  He knows it's all libel.  Plaintiff has suffered a lot in life, but nothing has been more painful than the *absolute* betrayal caused by Maini, who has never deserved a girl of her stature at any point.  Plaintiff suffered tremendous, actual damage in business in the millions.  She works in a highly image-oriented related profession, and the fact that she has had to 'out' herself for her dyslexia

and her various food allergies and metabolic digestion issues speaks volumes about the particular kind of scumbag that is Amar Chander Maini.

### (D) Invasion of Privacy

In Plaintiff's Third Amended Complaint, she proved the following three elements for invasion of privacy: (a) appropriation, the unauthorized use of a person's name or likeness to obtain some benefit; (b) electronic intrusion into one's private quarters; (c) public disclosure of private facts, meaning the dissemination of truthful private information which a reasonable person would find objectionable. Plaintiff has lost her medical privacy for the rest of her life due to Amar Chander Maini. She will never know what it feels like to achieve fame and fortune within the fashion industry with a 'normal' image, and his libel, defamation, and related domestic violence abuse has forced her to share her story on a global scale. Behind-the-scenes sabotage from Mahima Chablani hasn't helped. Plaintiff will never know what it feels like to have absolute normalcy. Not even three months after she got her health back under control in 2017, Maini started attacking and sabotaging her. Not to mention, over 4.5 years after Plaintiff left Maini, he can't let go: he continues to electronically intrude into Plaintiff's private quarters, shifting the focus away from Plaintiff's achievements and resilience to managing his abuse.

### (E) Computer Fraud and Abuse

In Plaintiff's Third Amended Complaint, she proved that Maini conspired to commit and attempted to commit violations of 18 U.S.C. § 1030(a)(7)(B) and 18 U.S.C. § 1030(a)(7)(C) in violation of 18 U.S.C. § 1030(b). His conduct has caused a loss as defined in U.S.C. § 1030(e)(11) of more than $5,000 to Plaintiff during a one-year period. Maini has hacked and spied on all of Plaintiff's technology for years, ranging from her email to her laptop to her mobile phone. Changing her SIM cards has not given her any measure of privacy, nor has moving across the world, hiding out in hotels, etc. He always manages to find her, which is why Plaintiff had to switch to Proton Mail and start educating herself on the computer science world.

### (F) Tortious Interference with Advantageous Business Relationship

In Plaintiff's Third Amended Complaint, she proved that (a) there is the existence of a business relationship, not necessarily evidenced by an enforceable contract; (b) knowledge of the relationship on the part of the Defendant; (c) an intentional and unjustified interference with the relationship by the Defendant; (d) damage to the Plaintiff occurred as a result of the breach of the relationship. Maini

intentionally, or with substantial certainty, interfered with the relationship between Plaintiff and her clientele by stealing and libeling her and her family to Bashing Websites, causing many of her couture clientele and business award committees to end their relationship with Plaintiff and withdraw her name from award finalist lists. Maini is the reason Plaintiff has not yet entered Guest Member status in the Chambre Syndicale de la Haute Couture.

## 3. THE FACTS ALLEGED IN THE THIRD AMENDED COMPLAINT ESTABLISH MAINI'S LIABILITY

### A) *Professional Sabotage*

In March 2019, Plaintiff became the youngest American in history and the first Indian American in history to be invited to become a Guest Member of the Chambre Syndicale de la Haute Couture. Her two-year invitation timeline--2017 to 2019--remains faster than any other couture designer in all of fashion (Exhibit C). To give a point of reference, it took Tamara Ralph of Ralph and Russo over eight years to be considered; Plaintiff had no senior-level connections at the time of her invitation and still surpassed her closest competitor in couture. The Chambre discovered Plaintiff two weeks after her 27th birthday in March 2019 out of her talent and skill in both painting and embroidery while she was presenting quietly at Paris Fashion Week. Plaintiff mastered traditional Indian techniques from an early age, preserving her caste and family traditions of tambour embroidery savoir faire, particularly with beads, sequins, and feathers. Maini's torture campaign and sabotage efforts have prevented Plaintiff from assuming her rightful place within haute couture from the AW 2019 season. Plaintiff sought to raise additional investment to ensure she could compete with other designers on all fronts as luxury goods is a fiercely competitive, winner-take-all market. Maini's unyielding sabotage efforts from 2017 to 2021 have affected Plaintiff's ability to fundraise all of what she needs for her goals within luxury goods as well as her nonprofit funding progress in support of her updated approach to enzyme replacement therapy.

### B) *Health Sabotage*

*Food Allergy Abuse.* During their courtship from Hell, Maini had a pattern of abusing Plaintiff with food, specifically peanuts and gluten. While Maini did invest a tremendous amount of money taking Plaintiff to all the most exclusive restaurants in Sydney on their dinner outings, Maini never let Plaintiff order her own meals and intentionally, maliciously sneaked

peanuts into dishes, on top of ordering her soy-containing and gluten-containing foods. Maini knew from the start of their courtship that Plaintiff is deathly allergic to peanuts, soy, and gluten, and in spite of awareness about her need for EpiPens and a specific diet (see Exhibits E and N) and continued to flaunt her health concerns for his enjoyment. Maini stole over 85 of Plaintiff's EpiPens (epinephrine), causing Plaintiff to be escorted out of restaurants in ambulances and admitted to numerous hospital emergency rooms throughout the entire courtship. Maini promised Plaintiff's parents to take care of her, and he consistently failed to protect her food allergies.

*Metabolic Health Abuse.* Plaintiff disclosed her metabolic health condition to Maini after they discussed marriage on the second dinner outing. She explained that she managed her condition through the use of supplements from her naturopath, Dr. Alexis Shields, ND, and one antibiotic called Metronidazole used exclusively during her menstrual cycles. Plaintiff also disclosed that she had worked in multiple top labs from age 12 to find a supplement that could help her digest cheese, egg yolks, and other choline and carnitine-containing foods. Maini appeared to understand the importance of Plaintiff following a specific diet all the time, taking her supplements at precise times three times per day, and taking Metronidazole during her period cycles to eliminate all symptoms. He also claimed to be supportive of her scientific research goals and lab work, conducted on a voluntary basis for years—i.e. since 2004—prior to their courtship. Maini knew from the beginning of courtship that Plaintiff's parents nurtured more than just her artistic talent: they put her in labs to develop hard science research skills and training from middle school. He understood the personal importance Plaintiff places on good health.

Despite Maini's vocal claims of "caring about her wellbeing," he interfered with Plaintiff's health in a life-threatening and life-endangering way by stealing her entire supply of Metronidazole. Plaintiff's condition was fully under control from early 2016 thanks to the introduction of Metronidazole beyond the NIH protocol of supplements. After manipulating Plaintiff into helping him with his econometrics problem set at the library, Maini went in her backpack and stole all of her Metronidazole medication prescribed by her dermatologist in Utah. His selfish, malicious action led Plaintiff to develop a severe case of antibiotic resistance (Exhibit E). Metronidazole is the only medication on the market that can address Plaintiff's specific symptoms present only on her period cycles. Plaintiff was left in a terrible position of

having to create a supplement using archaebacteria much faster than anticipated out of necessity due to permanent, lifelong gut microflora damage caused by Maini.  After she noticed her symptoms declining, Plaintiff had absolutely nowhere to turn as there was no treatment available: her condition is so rare, so ignored by the medical establishment, that Plaintiff had no choice but to help herself.

Initially, Plaintiff imported DMB from China, thinking drinking a purified version of the structural analog would solve her menstrual symptoms, but she soon discovered that achieving 99.9999% pharmaceutical-grade purity from her tiny room was impossible.  The disruption she caused to her casual accommodation—DMB is highly flammable—led her to have to move to Sancta Sophia College, another casual accommodation provider open to foreigners.  After Plaintiff nearly died in December 2016 due to complications from her specific health-related diet and ongoing complications with her metabolic health (Exhibit C), she chose to adapt a non-funded proposal from Dr. John Christodoulou, MD (Exhibit E) to create a private label use of the archaebacteria *Methylophilus methylotrophus*, on top of continuing to acquire enzymes from relevant academic researchers (Exhibit E).  She achieved outcomes quickly, within months, and returned to Sydney to initiate a patent application procedure.

If Maini had left her Metronidazole alone, Plaintiff never would have had to reach for archaebacteria in the first instance.  She was researching use for commercial reasons for patients other than herself, and a relaxed R&D timeline was stolen from her.  Plaintiff can no longer take any amount of Metronidazole to control menstrual symptoms; she is resistant for the rest of her life due entirely to Maini's abuse and has to spend thousands a month on a personal supplement made just for her by a university-based, compounding pharmacy.  While Plaintiff is highly resilient and resourceful and took care of the obstacle Maini put in her life, what he did was beyond unethical and cost Plaintiff months of her life testing out solutions when she could have been at the beach surfing and enjoying her life like other 20-somethings.  See Exhibit E.

*Post-Relationship Disclosure Abuse.*  Due to the nature of Maini's libel, Plaintiff has had to disclose her two biggest embarrassing health conditions to the world at large: her rare dermatology disease that she overcame years ago (Exhibit E) and her dyslexia (Exhibit F) right at the start of her career.  Plaintiff trusted Maini would guard her two biggest health secrets even after the conclusion of their courtship and that violation of her right to absolute medical privacy is something that will remain with her for the rest of her life.  While Plaintiff is no longer

ashamed of speaking about what she has had to deal with, she suffered intense emotional distress for years before 'coming out of the health cabinet,' so to speak.  Being 'forced out' in the manner Maini orchestrated was incredibly traumatic and required 200 hours of Yoga Teacher Training to handle effectively.  Plaintiff has come to terms with the reality that her medical privacy is gone for the rest of her life and she will play the cards she has been dealt as she has done her entire life, but it does not change the fact that Maini invaded her privacy.  Maini promised her, looking in her eyes, that he would never disclose her dyslexia to anyone.

### C)  *Financial Sabotage*

Plaintiff has lost her reputation, standing, and multiple relationships in the business world as a result of Maini's nonstop financial sabotage and computer hacking.  Plaintiff has also lost her name, financial identity, and good credit score standing of 11 years of adulthood, having to use Federal Trade Commission services, Social Security Administration services, domestic violence victim advocacy services, Address Confidentiality Program services, and more to help her rebuild her credit history from ground zero due to nonstop hacking.  Briefly, these bank accounts include, but are not limited to:

- PNC Bank
- Wells Fargo Bank
- Goldman Sachs
- Fidelity Investments
- HSBC Bank
- Revolut
- TransferWise
- Barclays
- PayPal
- Venmo
- Chime Bank
- Simple Bank

Given the nature of Plaintiff's FTC and domestic violence protections, she has elected to not disclose further information regarding account numbers etc.  Further evidence can be made privately to the Court under seal.

### D)  *Arranged Marriage Sabotage*

Maini's libel has prevented Plaintiff from obtaining an arranged marriage with parental support and sponsorship—as is custom in her caste and tradition in both sides of her family—

causing Plaintiff to seek out external matchmaking agencies in contracts exceeding $560,000 in value (Exhibit L).  Plaintiff's wife skill achievements surpass everyone in her caste in every area where women are judged: (1) virtue, (2) cooking skill, (3) general domestic skill, (4) knowledge of Hindu prayers and Kshatriya caste traditions, (5) cultural achievement, (6) educational attainment, (7) professional achievement, (8) family loyalty and dharma, and (9) appearance.

| | |
|---|---|
| **Virtue** | 1. 100% abstinent virgin<br>2. Personal courage and honor<br>3. Volunteer record in the Junior League and Amnesty International<br>4. Founded a health-focused human rights non-profit at age 18 |
| **Cooking Skill** | 1. Valedictorian of Professional Cooking Diploma (number 1 school)<br>2. Valedictorian of Vegetarian Cooking Diploma (number 1 school)<br>3. Certificates in Sushi, Hibachi, Seafood, Paella, Pastry, etc.<br>4. Volunteer Chef at the Ronald McDonald House since 2010<br>5. Won numerous bake sales and cooking competitions since age 6<br>6. In charge of prasad making and distribution at all Ramayan events since age 7<br>7. Catered multiple parties hosted by Mom to rave reviews<br>8. Catered multiple Democratic Party fundraisers hosted by both parents<br>9. Authored a kosher paleo cookbook for rare disease patients at age 25 |
| **General Domestic Skill** | 1. Assisted with household management from age 3<br>2. Graduated from finishing school<br>3. Certificate in International Etiquette (20 countries)<br>4. Certificate in International Protocol (20 countries)<br>5. Hosted galas to support the opera of all sizes from 2016 |
| **Knowledge of Hindu prayers and Kshatriya caste traditions** | 1. Mastered the *Bhagvad Gita* from age 5<br>2. Mastered the *Vedas* from age 6<br>3. Mastered all chalisas from age 9<br>4. Mastered the *Ramayana* from age 12<br>5. Co-hosted community-wide Ramayans with Mom from age 10 |
| **Cultural Achievement in Indian Dance and Music** | 1. Bharatanatyam – Arangetram 2010<br>2. Kathak – Kanya 2017<br>3. Bhangra – Recreational at Weddings<br>4. Gazals |
| **Educational Attainment** | 1. Fashion Design<br>2. Accessory Design<br>3. Jewelry Design<br>4. Law<br>5. Business Management<br>6. Microbiology<br>7. Political Philosophy and Economics |
| **Professional Achievement** | 1. Authored multiple books from an early age<br>2. Forbes 30 Under 30<br>3. World Economic Forum Global Shaper<br>4. Fellow of the Royal Society of the Arts<br>5. TEDx Speaker<br>6. Nominated to become a Fulbright Scholar in Fashion<br>7. Invited to become a Guest Member of the Chambre Syndicale de la Haute Couture and a member of the British Fashion Council<br>8. Member of multiple elite private member clubs |
| **Family Loyalty and Dharma** | 1. Reduced family tax burden to 12% (from 39%)<br>2. Improved family business EBITDA by 4x for M&A purposes |

|  | 3. | Increased family commercial and residential real estate valuations 40% on average through self-taught interior design skillset and school-taught financial modeling savoir faire |
|  | 4. | Helping parents retire from 2019 |
|  | 5. | Caregiving to parents from 2021 |
| **Appearance** | 1. | Impeccable personal style, flawless grooming, and photogenic face |
|  | 2. | Named Debutante of the Year in 2012 |
|  | 3. | Modeled one-piece swimsuits professionally in 2016 |
|  | 4. | Won a statewide beauty pageant in 2016 |
|  | 5. | Cured a rare disease in 2017 due to Maini inducing antibiotic resistance |
|  | 6. | Invited to be the cover girl of 10 UK magazines due to talent and looks |

Despite tremendous libel from Maini in the Bashing Sites and Removal Sites racketeering ring (see relevant Affidavit), she remains the most eligible bachelorette in her caste due to her excellence in each of the nine categories.  No other girl has excelled at the top of each category.  Plaintiff was driven to be number 1 from age 11 and strategized accordingly when her Dad explained how important it is that she succeed in arranged marriage.  Maini does not have achievements that correspond to wife of Plaintiff's level, which makes his catfishing and fraudulent misrepresentation much more unacceptable, since she is above him and she deserves an MBA husband educated at one of the top two schools.  All Indian-origin beauty queens uniformly achieve MBA husbands from top business families in arranged marriage.  The only reason Plaintiff participated in beauty pageants in the first place was to win in arranged marriage.  Notwithstanding the emotional distress toll of Maini's actions on Plaintiff personally, both of her parents are at a point where they seek to retire soon and require Plaintiff, the firstborn, to marry as per her cultural customs and traditions.  Maini wrote libel designed to 'lower' Plaintiff's ranking and estimation in the eyes of her caste community to manipulate her into settling for him, despite him being ranked much, much lower than what she deserves objectively and subjectively.  His net worth *is* in the eight figures, but it is not from reputable, honest business acumen; the majority of Maini's net worth is from con artistry, rendering the 'value' of all luxury goods gifts he gave to Plaintiff worthless from an honor standpoint.  Maini has neither earned a top MBA nor achieved enough in business or in politics to deserve a wife at Plaintiff's level.  He knows this, which is why it remains out of line that Maini continues to abuse and stalk her and her family in the hope she might settle for him out of option losses.  Plaintiff has had to avail herself of numerous domestic violence resources from the larger South Asian community, a state-based domestic violence advocate, and her family just to survive his relentless torment.  Maini's pattern of abuse left Plaintiff in a fragile, vulnerable position, open to further rounds of

re-traumatization abuse from narcissists other than him: Jess Dunderdale, Edward Lucas, Chloe
Colson, Mahima Chablani, etc.

> Sometimes fate is like a small sandstorm that keeps changing directions. You change direction but the
> sandstorm chases you. You turn again, but the storm adjusts. Over and over you play this out, like some
> ominous dance with death just before dawn. Why? Because this storm isn't something that blew in from
> far away, something that has nothing to do with you. This storm is you. Something *inside* of you. So all
> you can do is give in to it, step right inside the storm, closing your eyes and plugging up your ears so the
> sand doesn't get in, and walk through it, step by step. There's no sun there, no moon, no direction, no sense
> of time. Just fine white sand swirling up into the sky like pulverized bones. That's the kind of sandstorm
> you need to imagine.
>
> And you really will have to make it through that violent, metaphysical, symbolic storm. No matter how
> metaphysical or symbolic it might be, make no mistake about it: it will cut through flesh like a thousand
> razor blades. People will bleed there, and *you* will bleed too. Hot, red blood. You'll catch that blood in
> your hands, your own blood and the blood of others.
>
> And once the storm is over you won't remember how you made it through, how you managed to survive.
> You won't even be sure, in fact, whether the storm is really over. But one thing is certain. When you come
> out of the storm you won't be the same person who walked in. That's what this storm's all about.
> **from *Kafka on the Shore* by Haruki Murakami**

It took Plaintiff until late June 2021 to rid herself of all terrifying, recurring nightmares and to
achieve full, complete inner peace after focused effort and concentration. Finding calm out of
nonstop chaos was not easy, and cost a tremendous amount of tears, time, effort, and energy.
Plaintiff will not achieve an arranged marriage despite her hard work and consistent excellence.
Instead, Plaintiff has had to turn to $560,000 in elite matchmaking retainer fees (Exhibit L) to
achieve an MBA husband at the level she otherwise would have been able to obtain via arranged
marriage for the cost of $390. Specifically: $3 in chai, $39 in ingredients for her homemade
biscuits, $8 in tamarind and kosher salt ingredients for her homemade chutney, $40 in
ingredients for her homemade gluten-free samosas, and $300 in fabric for sewing and
embroidering her signature, big bow, princess seam, form fitting anarkalis.

## 4. THE FACTS ALLEGED IN THE THIRD AMENDED COMPLAINT ESTABLISH THAT PLAINTIFF IS ENTITLED TO THE RELIEF REQUESTED

At absolute minimum, Plaintiff requests the Court for monetary relief against Maini in
the amount of ten million six hundred fourteen thousand and five hundred dollars ($10,614,500)
as explained in the tables below and in the attached affidavit (Exhibit E). Below are the absolute
minimum amount of compensable damages, though Plaintiff deserves much more. Maini has a
net worth in the mid eight figures.

**MINIMUM Relief for Causes of Action: $7,800,000.**

| Cause of Action | Compensable Damages | Exemplary Damages |
|---|---|---|
| Fraudulent Misrepresentation | $500,000 | $1,000,000 |
| Defamation | $200,000 | $1,000,000 |
| Libel | $200,000 | $1,000,000 |
| Invasion of Privacy | $200,000 | $1,000,000 |
| Computer Fraud and Abuse | $100,000 | $1,000,000 *(Supported by Affidavit)* |
| Tortious Interference with Advantageous Business Relationship | $100,000 | $1,500,000 *(Supported by Affidavit)* |
| **SUM** | **$1,300,000** | **$6,500,000** |

**MINIMUM Further Relief for Plaintiff: $2,814,500.**

| Type of Relief | Amount of Relief |
|---|---|
| Extortive Removal Site Fees from 2017-2020 | $75,000 |
| SEO Campaign Services | $96,000 |
| Health, Wellbeing, and Medical Expenses | $560,000 |
| Private Investigator Expenses | $7,500 |
| Relationship Consultation Expenses | $60,000 |
| Costs as provided by 28 U.S.C. § 2412 | $16,000 |
| Stolen Cash and Gold Dowry | $2,000,000 |
| **SUM** | **$2,814,500** |

**MINIMUM TOTAL RELIEF REQUESTED: $10,614,500.**

| Compensable Damages | $1,300,000 |
|---|---|
| **Exemplary Damages** | **$6,500,000** |
| **Further Relief** | **$2,814,500** |
| **SUM** | **$10,614,500** |

Plaintiff requests judgment against Maini in favor of Plaintiff for each of the aforementioned Causes of Action. She seeks judgment that Maini and any other persons or entities working in concert or in participation with him be enjoined during the pendency of this action and thereafter permanently from extorting Plaintiff or Plaintiff's family; emailing, calling, or mailing Plaintiff or Plaintiff's family; using any image, word, phone number, or other identifying information collected from award websites, personal websites, news articles, or any websites whatsoever about Plaintiff for any purpose; accessing any of Plaintiff's private and business social media profiles now and in the future, including but not limited to LinkedIn,

Facebook, SoundCloud, Twitter, Vero, TikTok, SnapChat, Goodreads, and Instagram; otherwise competing unfairly with Plaintiff's design business endeavors in any manner; continuing to perform in any manner whatsoever any of the other acts complained of in her Third Amended Complaint. Plaintiff also seeks judgment that Maini, within fourteen (14) days after service of the judgment request herein, be required to file with this Court and to serve upon Plaintiff a written report under oath setting forth in detail the manner in which it has complied with the judgment, compensate Plaintiff for all costs relating to paying for Removal Websites between 2017 to the present. Plaintiff hopes judgments and orders will force Maini to refrain from posting and reposting anything about Plaintiff in the future. Plaintiff seeks restitution for all of her expenses relating to removal of prior posts, SEO campaign services, and psychotherapy bills arising from suicide attempts as a result of this situation, alongside all actual damages and/or statutory damages allowed, punitive damages, her costs as provided by 28 U.S.C. § 2412, and all other injunctive relief as the Court deems just and proper.

## 5. CONCLUSION

For the foregoing reasons, Plaintiff moves the Court to enter a final default judgment against Amar Chander Maini: (1) a civil monetary penalty, (2) an equitable monetary judgment, (3) civil penalties, (4) injunctive relief, and (5) costs. In compliance with Order (Docket No.), the proposed judgment and the proposed order have been emailed directly to Judge Robin Rosenberg in Microsoft Word format as per Local Rule 7.1(a)(2).

RESPECTFULLY SUBMITTED and DATED this 2nd day of July 2021.

By: _____
Jane Koe, Plaintiff *Pro Se*
7750 Okeechobee Blvd., Ste. 4-481
West Palm Beach, FL 33411
United States of America
janekoelitigation@icloud.com
Phone: (929) 400-7746

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served in person by process server on July 2, 2021 at the Southern District of Florida West Palm Beach Clerk of Court Office.  PACER electronic records will be updated in due course and sent to the party on record.

**International Service List:**

Amar Chander Maini, 9 Jamberoo Ave, Baulkham Hills, NSW 2153 Australia

Amar Chander Maini, Regus, Level 20 & 21, Tower 2, Darling Park, Sydney, NSW 2000 Australia

Amar Chander Maini, Lawpath, 2/23 Foster Street, Surry Hills, NSW 2010 Australia

Courtesy Email sent to amarchandermaini@gmail.com

By: _____

Jane Koe, Plaintiff *Pro Se*
7750 Okeechobee Blvd., Ste. 4-481
West Palm Beach, FL 33411
United States of America
janekoelitigation@icloud.com
Phone: (929) 400-7746

Exhibit A

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   9:20-cv-80147-RLR

<div align="center">

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

</div>

This summons for *(name of individual and title, if any)*   AMAR CHANDER MAINI

was received by me on *(date)*   28 JANUARY 2021

☐ I personally served the summons on the individual at *(place)*

_____  on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☒ Other *(specify):* •

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 29 JANUARY 2021

_____
*Server's signature*

SHAWN SALLESI
*Printed name and title*

C/- Servedoc Pty Ltd, Level 57, MLC Centre, 19-29 Martin Place,
Sydney, NSW AUSTRALIA 2000
*Server's address*

Additional information regarding attempted service, etc:

* On 29 January 2021, I served the summons on the individual by way of leaving the documents at 9 Jamberoo Avenue,
BAULKHAM HILLS, NSW 2153.

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   9:20-cv-80147-RLR

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   AMAR CHANDER MAINI

was received by me on *(date)*   28 JANUARY 2021 .

     ☐ I personally served the summons on the individual at *(place)*  _____
_____ on *(date)* _____ ; or

     ☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

     ☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

     ☐ I returned the summons unexecuted because _____ ; or

     ☒ Other *(specify)*:  •

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 29 January 2021    _____
                                         *Server's signature*

                                   SHAWN SALLESI
                               *Printed name and title*

                               C/- Servedoc Pty Ltd, Level 57, MLC Centre, 19-29 Martin Place,
                               Sydney, NSW AUSTRALIA 2000
                                   *Server's address*

Additional information regarding attempted service, etc:

• On 29 January 2021, I served the summons on the individual by way of leaving the documents with an employee at 'Lawpath',
2/23 Foster Street, SURRY HILLS, NSW AUSTRALIA 2010.

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   9:20-cv-80147-RLR

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*   AMAR CHANDER MAINI

was received by me on *(date)*   28 JANUARY 2021   .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____ _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

☒ Other *(specify):* •

_____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date:  29 JANUARY 2021                                         _____
                                                              *Server's signature*

                                                              SHAWN SALLESI
                                                              _____
                                                              *Printed name and title*

                                                              C/- Servedoc Pty Ltd, Level 57, MLC Centre, 19-29 Martin Place,
                                                              Sydney, NSW AUSTRALIA 2000
                                                              _____
                                                              *Server's address*

Additional information regarding attempted service, etc:

* On 28 January 2021, I served the summons on the individual by way of leaving the documents with an employee at 'Regus',
Level 20 & 21 Tower 2 Darling Park SYDNEY, NSW 2000.

# UNITED STATES DISTRICT COURT

### for the

### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:20-CV-80147-ROSENBERG/REINHART

JANE KOE,

      Plaintiff,

v.

AMAR CHANDER MAINI,

      Defendant.

_____

### **AFFIDAVIT OF SERVICE**

I, Shawn Sallesi, being duly sworn, state:

I am 18 years or older and not a party to this action. I reside at _11 THE ESPANADE  SYLVANA NSW AUSTRALIA_

I am a certified or appointed process server in the county in which this defendant or witness was served. *2224*

I received the following documents on January 28, 2020 at 11:15 am:

- (a) Civil Cover Sheet
- (b) Stamped Summons in a Civil Action
- (c) Complaint at Law
- (d) Exhibits
- (e) Receipt
- (f) Motion to Seal
- (g) First Amended Complaint at Law
- (h) Exhibits
- (i) Motion to Receive Notices by Electronic Filing
- (j) Motion to Proceed Under a Pseudonym
- (k) Order of Instructions to *Pro Se Litigants*
- (l) Answer Motion for Permission for Electronic Case Filing
- (m) Motion for Alternative Service
- (n) Second Amended Complaint at Law
- (o) Motion to Seal Exhibit in Filing 1-1
- (p) Proof of Service Attachments
- (q) Proof of Service
- (r) Motion for Extension of Time
- (s) Notice of Voluntary Dismissal of Only Defendant Michael Schern
- (t) Defendant Kevin Angileri – Motion to Dismiss
- (u) Defendant Marca Global – Motion to Dismiss
- (v) Defendant Marca Global – Memorandum of Law
- (w) Defendant Pierre Zarokian – Motion to Dismiss

    (x) Motion to Dismiss Only Defendant Pierre Zarokian
    (y) Motion to Dismiss Only Defendant RepZe
    (z) Motion to Submit 3rd Amended Complaint
    (aa) Order Granting Defendants' Motion to Dismiss for Lack of Personal Jurisdiction
    (bb) Order Granting Plaintiff's Motion to Amend
    (cc) Third Amended Complaint at Law
    (dd) Exhibits
    (ee) Plaintiff's Requests for Admission to Defendant Amar Chander Maini
    (ff) Plaintiff's Requests for Production to Defendant Amar Chander Maini
    (gg) Plaintiff's Interrogatories to Defendant Amar Chander Maini,
    (collectively, "**the Documents**").

On January 28 2021 at 3:24pm AEDT, I served the Documents on Amar Chander Maini, the Defendant, by leaving them with a female employee at 'Regus', Level 20 & 21 Tower 2 Darling Park, Sydney in the State of New South Wales in Australia.

On January 29 2021 at 10:35am AEDT, I served the Documents on Amar Chander Maini, the Defendant, by leaving them with a female employee at 'Lawpath', 2/23 Foster Street, Surry Hills in the State of New South Wales in Australia.

On January 29 at 11:38am AEDT, I served the Documents on Amar Chander Maini, the Defendant, by leaving them at 9 Jamberoo Avenue, Baulkham Hills in the State of New South Wales in Australia.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS HEREIN ARE TRUE AND CORRECT.
Notary not required pursuant to Florida Statute 92.525.

Executed in Sydney, NSW, Australia
on _29 - January_ 2021.

Signature of Process Server: _____

Name of Process Server: _SHAWN SALLESI_

**SD**

SERVEDOC
ServeDoc Address: Level 57, MLC Centre, 19-29 Martin Place, NSW, Australia
ServeDoc Phone Number: 1300 918 851
ServeDoc Email: admin@servedoc.com.au

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*      AMAR CHANDER MAINI

was received by me on *(date)*     29 January 2021    .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☒ Other *(specify)*:   On 29 January 2021 at 2:3 7   pm AEDT, I served the summons upon the Attorney-General's Department,
Private International Law Division at 3-5 National Circuit, Barton, ACT, Australia, by handing a copy to an
authorised employee at the address.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 29/1/21

_____
Server's signature

Naomi Woodward
_____
*Printed name and title*

3 Crofts Crescent Spence ACT 2615
_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
### for the
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:20-CV-80147-ROSENBERG/REINHART

JANE KOE,

      Plaintiff,

v.

AMAR CHANDER MAINI,

      Defendant.

_____/

## <u>AFFIDAVIT OF SERVICE</u>

I, Naomi Woodward, being duly sworn, state:

I am 18 years or older and not a party to this action.  I am employed at 3 Crofts Crescent, Spence in the Australian Capital Territory.  I am a certified and appointed process server in the Australian Capital Territory, Australia, which is the country in which this defendant was served.  I am a subcontractor of the Australian Capital Territory Division of ServeDoc, located at Level 1, The Realm, 18 National Circuit, Barton in the Australian Capital Territory. ServeDoc Pty Ltd. is a leading Australian process serving and document courier company with central processing offices on the Gold Coast of Queensland, Australia.  ServeDoc Pty Ltd serves court documents across Australia from any court jurisdiction in line with the following rules;

- Art. 5(1)(2), 10, 12, and 18 of the Hague Convention Methods of Service for Australia
- High Court Rules 2004 in the High Court of Australia
- Family Law Regulations 1984, Part JIAB in the Family Court of Australia and the Federal Circuit Court of Australia
- Federal Court Rules 2011, Part 10 in the Federal Court of Australia
- Uniform Civil Procedure Rules 2005 in New South Wales
- Supreme Court (General Civil Procedure) Rules 2015 in Victoria
- Uniform Civil Procedure Rules 1999 in Queensland
- Rules of Supreme Court 1971 in Western Australia
- Supreme Court Civil Rules 2006 in South Australia
- Supreme Court Rules 2000 in Tasmania
- Court Procedure Rules 2006 in Australian Capital Territory
- Supreme Court Rules in Northern Territory
- All Foreign Jurisdiction rules, including Rule 4 of the Federal Rules of Civil Procedure in the USA

I received the following documents on 29 January 2021 at 2:00pm AEDT:

Civil Cover Sheet
Stamped Summons in a Civil Action
Complaint at Law
Exhibits

Receipt
Motion to Seal
First Amended Complaint at Law
Exhibits
Motion to Receive Notices by Electronic Filing
Motion to Proceed Under a Pseudonym
Order of Instructions to *Pro Se Litigants*
Answer Motion for Permission for Electronic Case Filing
Motion for Alternative Service
Second Amended Complaint at Law
Motion to Seal Exhibit in Filing 1-1
Proof of Service Attachments
Proof of Service
Motion for Extension of Time
Notice of Voluntary Dismissal of Only Defendant Michael Schern
Defendant Kevin Angileri – Motion to Dismiss
Defendant Marca Global – Motion to Dismiss
Defendant Marca Global – Memorandum of Law
Defendant Pierre Zarokian – Motion to Dismiss
Motion to Dismiss Only Defendant Pierre Zarokian
Motion to Dismiss Only Defendant RepZe
Motion to Submit 3rd Amended Complaint
Order Granting Defendants' Motion to Dismiss for Lack of Personal Jurisdiction
Order Granting Plaintiff's Motion to Amend
Third Amended Complaint at Law
Exhibits
Plaintiff's Requests for Admission to Defendant Amar Chander Maini
Plaintiff's Requests for Production to Defendant Amar Chander Maini
Plaintiff's Interrogatories to Defendant Amar Chander Maini

I served these documents on the Attorney-General's Department, Private International Law Section on 29 January 2021 at 2:37 pm at 3-5 National Circuit, Barton in the Australian Capital Territory by handing the document to Matthew Snowbar, a male employee.

Additional Information: Geolocation of Serve is -35.30928039550781,149.13339233398438

I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS HEREIN ARE TRUE AND CORRECT.

Notary not required pursuant to Florida Statute 92.525.

Executed in Canberra, Australian Capital Territory, Australia on 29 January 2021.

Signature of Process Server:

Name of Process Server:     *Naomi Woodward*



SERVEDOC
ServeDoc Address: Level 1, The Realm, 18 National Circuit, Barton ACT
ServeDoc Phone Number: 1300 918 851
ServeDoc Email: admin@servedoc.com.au

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JANE KOE

                              CASE NUMBER
PLAINTIFF(S)                  9:20–cv–80147–RLR

v.

AMAR CHANDER MAINI, et al.,

                              **DEFAULT BY CLERK F.R.Civ.P.55(a)**

DEFENDANT(S).


# <u>Clerk's Default</u>

It appearing that the defendant(s) herein, is/are in default for failure to appear, answer, or otherwise plead

to the complaint filed herein within the time required by law.

Default is hereby entered against defendant(s)

**Amar Chander Maini**


as of course, on the date June 23, 2021.

                              **Angela E. Noble**
                              CLERK OF COURT

                              By  _/s/ Mary–Yves Etienne_
                              Deputy Clerk

cc: Judge Robin L. Rosenberg
    Jane Koe
    7750 Okeechobee Blvd
Suite 4–481

    West Palm Beach, FL
33411

DEFAULT BY CLERK F.R.Civ.P.55(a)

CV–37 (10/01)

Exhibit B

<center>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 9:20-CV-80147-ROSENBERG/REINHART**

</center>

JANE KOE,
     *Plaintiff*
v.
AMAR CHANDER MAINI,
     *Defendant.*
_____/

<u>**PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANT AMAR CHANDER MAINI**</u>

**INTERROGATORY 1**: Please state your full name, current residence address, current work address, work and home telephone number, date of birth, social security number, and all professional licensing numbers.

**ANSWER:**


**INTERROGATORY 2**: Please set forth in detail the treatment(s) you rendered to Plaintiff, stating:
(a)         When you entered into a patient-therapeutic relationship with the Plaintiff;

(b)         The treatment selected, and why it was selected, including any and all signs, symptoms, or conditions demonstrated by Plaintiff;

(b)         Alternative procedure/treatment modalities available and, if alternatives existed and were ruled out, why those alternatives were ruled out;

(c)         Every reason known to you for that care, treatment and/or operation.

**ANSWER:**


**INTERROGATORY 3**: Describe in detail all symptoms, physical signs, x-ray results, laboratory test results, electrocardiographic results, and other test results which you referred to, considered, and/or relied upon in making your decision to utilize the treatment(s) described in your response to the preceding Interrogatory.

**ANSWER:**


**INTERROGATORY 4**: Identify all health care providers, including physicians, nurses, and/or assisted you in rendering medical, psychological, and therapeutic services to Plaintiff.

**ANSWER:**

**INTERROGATORY 5**: At the time of the occurrence in question, if you were associated with, employed by, or involved in any way with any partnership, professional corporation, or other medical practitioner, please identify each such person or entity, the effective dates of the arrangement, whether such arrangement was oral or written, and details of such arrangement, including, for each professional corporation or professional association, the state of incorporation, the registered agent's name and address, the date of incorporation, and the date of dissolution, if applicable.

**ANSWER:**


**INTERROGATORY 6:** If you have been convicted, within the last forty-one (41) years, of a felony or a criminal offense, state the nature of each such offense, and the date and place where you were charged or convicted of each such offense.

**ANSWER:**


**INTERROGATORY 7:** State the name(s) and address(es) of each hospital, clinic, or other health professional facility or institution with which you hold or have ever held psychology or social work staff privileges or other affiliation, including your service as a student, house officer, social work, or psychology staff member, and as to each such hospital, clinic, or other health facility or institution, indicate the nature of your medical staff privileges or affiliation, the inclusive dates thereof and your title(s). Also state if any of your privileges have ever been denied, suspended, revoked, amended, restricted, altered, or modified in any manner whatsoever, regardless of whether the modification, amendment, etc., was in writing or oral.

**ANSWER:**


**INTERROGATORY 8:** If you have ever had a complaint or grievance filed against you with or drug licensing or certifying agency, board or entity or any medical, society, association or organization, then state:
(a)          the name(s), address(es) and telephone number(s) of the organization(s) where each complaint or grievance was filed, and the date(s) each complaint or grievance was filed;

(b)          the name(s), address(es) and telephone number(s) of each person or entity who filed each complaint or grievance against you;

(c)          a detailed description of the nature of each complaint or grievance against you; and

(d)          the final disposition of each complaint or grievance, and the date(s) of each such disposition.

**ANSWER:**


**INTERROGATORY 9**: List all scientific articles, journals, treatises, medical books, abstracts, speeches, and/or presentations that you have authored and/or contributed to, including the full library citation for each.

**ANSWER:**

**INTERROGATORY 10**: State the name and address of each and every medical doctor, osteopath, or other practitioner of the healing arts, specifically including but not limited to psychiatrists, psychologists, or other counselors seen by you in the forty-one (41) years period prior to the incident in question. This also includes records regarding child attraction and/or child pornography usage.

**ANSWER:**


**INTERROGATORY 11**: If you have been examined and/or treated for any alcohol-related, drug-related or substance abuse-related problem in any country—including India—within the past forty-one (41) years, then please state the nature of said problem and the dates of said examination and/or treatment.

**ANSWER:**


**INTERROGATORY 12**: State the following with regard to your qualifications as a doctor, and/or other professional status:

(a)        Name and addresses of all colleges and/or universities attended, dates of attendance, and whether you graduated or not; and

(b)        Name(s) and address(es) of social work school(s), medical school(s), business school(s), law school(s), psychology school(s), and/or other professional school(s) attended, date(s) of attendance, date of graduation if relevant, and any degree(s) or certificate(s) you received; and

(c)        Name(s) and address(es) of all hospitals or other institutions where you served a clinical social work or a clinical psychology internship and date(s) of internship training and completion; and

(d)        State and describe any other post-doctoral education and/or training, including any residency(ies), fellowship(s), preceptorship(s) or other training, which you have received in medicine or any other field, the date(s) of such education and/or training, the date(s) of completion, and any degree(s) and/or certificates) you received; and

(e)        State and describe any other medical, clinical social work, psychological, and/or other professional qualifications and training which you have acquired, and which is not described above, including, but not limited to, all continuing medical and/or professional education or development programs which you have attended or in which you have participated; and

(f)        Please state if you received a grade of "C," "D," or "F" (or their equivalent) while attending the LLB program at the University of Sydney Law School.

**ANSWER:**


**INTERROGATORY 13**: Please state the date on which you, or anyone acting in your behalf, first notified your professional liability insurance carrier of the occurrence in question, and/or the possibility that a claim arising out of the occurrence in question might be made.

**ANSWER:**

**INTERROGATORY 14**: Other than your lawyers and insurance company representatives, identify every person with whom you have discussed, or with whom you have corresponded, regarding Plaintiff's case, care, treatment, injuries, condition, and/or lawsuit.

**ANSWER:**

**INTERROGATORY 15**: If you consumed any alcoholic beverages or drugs within twenty-four (24) hours of interacting with Plaintiff while rendering "therapeutic treatments," then please state the nature of the alcoholic beverage and/or drugs, the quantity consumed, and the identity of those people present at the time of said consumption.

**ANSWER:**

**INTERROGATORY 16:** If you have ever been a party in a lawsuit, including a professional malpractice lawsuit, other than this case, then identify each lawsuit by name of the parties and the court number, the place (state and county) where each suit was filed, and the nature and date of each lawsuit.

**ANSWER:**

**INTERROGATORY 17:** State whether you or anyone in your office discussed the consultation or surgical procedure in question any member of the Patient's family, and, if so, please identify each person involved in each such conversation, state the time and place of each and every such occasion, and state what was said by each person involved in said conversation.

**ANSWER:**

**INTERROGATORY 18:** Identify any and all documents relating to the incident(s) described in Plaintiff's pleading that have been destroyed, lost, or altered (i.e., changed in any manner after the document was dated) since the incident(s) occurred, and state when and under what circumstances the destruction, loss, or alteration occurred.

**ANSWER:**

**INTERROGATORY 19:**
(a)          For each Board certification that you hold, state the specialty, the correct name and business address of the granting entity, the date you first achieved this status and dates of any subsequent renewals.

(b)        If you have ever unsuccessfully attempted Board certification, state the specialty, the correct name and business address of the corresponding certification entity, the date(s) of the unsuccessful attempt(s) and the reason each was unsuccessful.

(c)        For each certification that you hold (including, but not limited to, BCLS, ACLS, or ATLS), state the type of certification, the correct name and business address of the conferring entity, the date you first achieved the certification, and dates of any subsequent renewals.

(d)        If you have ever unsuccessfully attempted any certification (including, but not limited to, BCLS, ACLS, or ATLS), state the type of certification, the correct name and business address of the conferring entity, the date(s) of the unsuccessful attempt(s) and the reason each was unsuccessful.

**ANSWER:**

**INTERROGATORY 20:** Describe what if any criteria you use to assess whether a patient is of sound mind to request treatments, what your view of Plaintiff's state of mind was prior to rendering therapeutic treatments, and what steps you took to ascertain Plaintiff's state of mind.

**ANSWER:**

**INTERROGATORY 21:** Identify every writing associated with the patient-therapist relationship with Plaintiff and the custodian for each such writing.

**ANSWER:**

**INTERROGATORY 22:** Do you contend that your undertaking to treat Plaintiff was in any manner limited with Plaintiff's agreement at the time you were consulted? If so, describe that limitation. Include (a) the date the limitation was set forth; (b) whether it was set forth orally or in writing; and (c) identify any writing related to that limitation and the custodian of that writing.

**ANSWER:**

**INTERROGATORY 23:** State whether you discussed the consultation with any other medical professional or mental health professional, and, if so, please identify each person involved in each such conversation, state the time and place of each and every such occasion, and state what was said by each person involved in said conversation.

**ANSWER:**

**INTERROGATORY 24:** Concerning each talk therapy treatment you provided to Plaintiff, provide:
    (a) The nature of the treatment;
    (b) The date of the treatment;
    (c) The name of each person who was a witness to the procedure;

    (d) Set forth each step involved in the treatment that you provided;
    (e) Whether you observed any condition that increased the risk of proceeding with any next step;
    (f) Whether Plaintiff experienced any therapeutic complication, and if so, the nature of that complication and what you did to address that complication.

**ANSWER:**

**INTERROGATORY 25:** Set forth each procedure you undertook to manage Plaintiff's postoperative care, including:
    (a) The date that postoperative care was rendered;
    (b) The person who rendered postoperative care;
    (c) What, if any, complications developed that affected Plaintiff's postoperative care;
    (d) What you did to address these complications;
    (e) Any writing identifying the answer to subsections (a) - (d);

**ANSWER:**

**INTERROGATORY 26:** Did you obtain the consent of Plaintiff to the course of treatment you undertook?  If so, set forth:
    (a) The date the consent was obtained;
    (b) Each risk involved in the course of treatment that you disclosed to Plaintiff;
    (c) The frequency with which any such risk occurs;
    (d) Identify any writing that pertains to subsection (a)-(c).

**ANSWER:**

**INTERROGATORY 27:** Do you contend that Plaintiff failed to disclose to you any symptoms or conditions necessary for the performance of free-of-charge talk therapy services that Defendant forced Plaintiff to receive?

**ANSWER:**

**INTERROGATORY 28:** Do you contend that Plaintiff's injuries resulted from Plaintiff's failure to follow any directions you gave?  If so, specify the directions and how Plaintiff failed to follow them.

**ANSWER:**

**INTERROGATORY 29:** Do you contend that Plaintiff's recovery in this action should be reduced as a result of Plaintiff's receipt of any benefit received from any third party?  If so, please set forth the amount by which the recovery should be reduced.

**ANSWER:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:20-CV-80147-ROSENBERG/REINHART

JANE KOE,
        *Plaintiff*
v.
AMAR CHANDER MAINI,
        *Defendant.*
_____/

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANT AMAR CHANDER MAINI

Pursuant to Federal Rules of Civil Procedure Rules 33, 34, and 37, Plaintiff Jane Koe requests that Defendant Amar Chander Maini produce and permit Plaintiff to inspect and copy the following materials within sixty (60) days of formal service.

**REQUEST 1:** True, correct, and notarized copies of your birth certificate, citizenship status, passport, and drivers license.
**ANSWER:**

**REQUEST 2:** True, correct, and notarized copies of your curriculum vitae, work history, employment history, and citizenship history with details about any and all supervisors.
**ANSWER:**

**REQUEST 3:** A true, correct, and notarized copy of your license to practice psychodynamic talk therapy.
**ANSWER:**

**REQUEST 4:** A true, correct, and notarized copy of your training certificate to practice Dialectical Behavior Therapy.
**ANSWER:**

**REQUEST 5:** Any and all medical, psychological, chemical importation, academic, financial, receipt, and email records pertaining to Plaintiff which are in your possession or subject to your control, obtained via legitimate and illegitimate means.
**ANSWER:**

**REQUEST 6:** Any and all written statements made by the Plaintiff or Plaintiff's family members to you or any person in your family.
**ANSWER:**

**REQUEST 7:** Originals of any psychological diagnostic testing performed on Plaintiff.
**ANSWER:**

**REQUEST 8:** Any and all clinical social work and clinical psychology records generated in connection with the treatment given to Plaintiff, including but not limited to office notes, forms completed by you for submission to any third party (other than your attorney), diagnostic studies and reports, prescription records, any

correspondence from you or any person on your behalf, all statements of charges, invoices or receipts with respect to the treatment which Plaintiff received from you, Defendant.
**ANSWER:**

**REQUEST 9:** A true and correct copy or complete list of each license, certification, or accreditation issued to Defendant at any time from attending university, social work school, clinical psychology school, business school, law school, medical school, residency, and fellowship, including but not limited to information regarding staff privileges at any hospitals or other health care institutions. Official seals and notary public proof of verification are required in the event of graduation.
**ANSWER:**

**REQUEST 10:** A true and correct copy of each application for license to practice clinical social work and clinical psychology. As well, each application for membership in a professional association which Defendant has completed.
**ANSWER:**

**REQUEST 11:** A copy of Defendant's clinical social work and clinical psychology school transcripts showing the grades made by Defendant while attending both clinical social work and clinical psychology school.
**ANSWER:**

**REQUEST 12:** The complete medical records of Defendant for the last thirty (30) years, including all relevant stints in alcohol rehabilitation centers.
**ANSWER:**

**REQUEST 13:** License(s) or Certificate(s) to dispense and/or sell and/or prescribe controlled substances and/or other drugs issued to Defendant by regional authorities in New South Wales, Australia.
**ANSWER:**

**REQUEST 14:** Any and all certificates and other documents relating to Defendant's specialty and/or sub-specialty board certifications in any field of clinical social work, clinical psychology, medicine, law, business management, or other profession including, but not limited to the following:
(a)     Application for certification;
(b)     Certificate(s) or document(s) of Board Certification;
(c)     Suspension, revocation or refusal of renewal of any certificate(s);
(d)     By-laws, rules, regulations or ethical codes or standards of any specialty and/or sub-specialty board in which Defendant is or has applied for and/or been issued a certificate; and
(e)     Correspondence with specialty or sub-specialty boards regarding any of the above.
**ANSWER:**

**REQUEST 15:** Any and all documents, memoranda, records, manuals, booklets or written material of any kind used by, owned by you on or before the date you first decided to perform psychodynamic talk therapy and Dialectical Behavior Therapy on Plaintiff setting forth or pertaining to the procedures, methods, techniques, or guidelines with regard to treating patients exhibiting the signs and symptoms exhibited by Plaintiff.
**ANSWER:**

**REQUEST 16:** All documents which accurately reflect Defendant's present net worth, including the sum total of all assets located worldwide.
**ANSWER:**

**REQUEST 17:** Any audio recordings of any psychodynamic talk therapy and Dialectical Behavior Therapy treatments performed on Plaintiff.
**ANSWER:**

**REQUEST 18:** Any videotapes or recordings used to explain or demonstrate your talk therapy experience with your patients.
**ANSWER:**

**REQUEST 19:** All documents, notes, records, reports, or written materials of any kind pertaining to any investigation or inquiry into your conduct by any hospital committee, any healthcare examining board, any agency dealing with substance abuse, any alcohol rehabilitation center, and/or any government agency.
**ANSWER:**

**REQUEST 20:** Any and all published treatises, periodicals, books, or pamphlets (or portions or excerpts therefrom) that you refer to or referred to, concerning treatment of patients exhibiting signs and symptoms similar to those of Plaintiff.
**ANSWER:**

**REQUEST 21:** All documents, notes, records, reports, or written materials of any kind which support Defendant's contentions in this case, namely that Maini has a license in either clinical social work or clinical psychology and completed DBT Institute certifications to offer Dialectical Behavior Therapy as a service.
**ANSWER:**

**REQUEST 22:** Any and all office procedure manuals concerning patient care and treatment in Defendant's office at the times relevant to the lawsuit in question.
**ANSWER:**

**REQUEST 23:** All documents, notes, records, or written materials of any kind pertaining to the privileges granted you by any hospital (and in effect at the time of the occurrence made the basis of this suit).
**ANSWER:**

**REQUEST 24:** All documents pertaining to the reputation, character, credibility, arrest, trial, or conviction of the Patient or any Plaintiff or any member of the family of the Patient or any Plaintiff, or any person listed by any Plaintiff as a person with knowledge of relevant facts or as one of Plaintiff's witnesses.
**ANSWER:**

**REQUEST 25:** Every document and tangible thing (including all exhibits or demonstrative aids) you intend to offer into evidence or display before the jury during any phase of the trial of this case.
**ANSWER:**

**REQUEST 26:** A full list of names of Defendant's current and previous romantic, sexual, and flirtation partners, from age 17 to the present, under all aliases and utilizing various SIM cards.
**ANSWER:**

**REQUEST 27:** A full record of all communications Defendant has had with Sakhi for South Asian Women.
**ANSWER:**

**REQUEST 28:** Your personnel file with any entity with whom you were employed at the time of the incident in question.
**ANSWER:**

**REQUEST 29:** All correspondence between you and any other health care provider who treated Plaintiff.
**ANSWER:**

**REQUEST 30:** All correspondence between Plaintiff and you.

**ANSWER:**

**REQUEST 31:** All correspondence between mistresses throughout the relationship, as well as an accurate total of financial amounts spent by you on all of said mistresses, including but not limited to dinner receipts, shopping receipts, movie theater receipts, etc.

**REQUEST 32:** All learned treatises you may offer at the time of trial.
**ANSWER:**

**REQUEST 33:** Any and all contracts, agreements, documents, reports, memoranda, records, or written materials of any kind which specify the contractual relationship that existed on the date of the incident made the basis of this lawsuit between you and any other medical practitioner, health care institution, medical corporation, professional corporation, P.A., P.C., or health care practitioner.
**ANSWER:**

**REQUEST 34:** All documents, records, transcripts, recordings, and/or memoranda you provided gratuitously to any hospital committee, peer review committee, medical organization committee, or similar group that reviewed the medical records of Plaintiff and any documents, letters, or memoranda between you and any such committee.
**ANSWER:**

**REQUEST 35:** All incident reports, unusual occurrence reports or similar reports relating to the care and treatment of Plaintiff.
**ANSWER:**

**REQUEST 36:** All applications and renewal correspondence, including but not limited to, supporting information such as letters of recommendation and reference, submitted by you in applying and/or the maintaining of medical staff or other privileges at any hospital with whom you presently have privileges.
**ANSWER:**

**REQUEST 37:** All adverse Reaction Reports or similar reports relating to the care and treatment of Plaintiff.
**ANSWER:**

**REQUEST 38:** Written, taped or transcribed statements from Plaintiff and/or Plaintiff's family.
**ANSWER:**

**REQUEST 39:** All documents you contend bears Plaintiff's handwriting and/or signature which relate to the incident in question.
**ANSWER:**

**REQUEST 40:** All documents you contend bears the handwriting and/or signature of any member of Plaintiff's family.
**ANSWER:**

**REQUEST 41** Photographs, etc.: Photographs, slides, illustrations, motion pictures and/or video tapes which relate to or depict the following:
    a.      Any aspect of your care and treatment of Plaintiff throughout entire psychological and medical history;
    b.      The condition of Plaintiff, before and/or after the occurrence forming the basis of this lawsuit;
    c.      Demonstrating the occurrence forming the basis of this lawsuit;
    d.      Demonstrating any occurrence similar to the occurrence forming the basis of this lawsuit; and
    e.      Other operations, procedures or treatments like or similar to that performed on Plaintiff.

**ANSWER:**

**REQUEST 42:** A list, written inventory or other written record of the video tapes, slides, etc. which you maintain in your video/audio library.
**ANSWER:**

**REQUEST 43:** Any written medical, hospital, anesthetic or surgical information or literature given to Plaintiff by you, or available to Plaintiff, in your office. (Example: medical/hospital brochures).
**ANSWER:**

**REQUEST 44:** All lists of medical terminology abbreviations used by you, for the care of patients like or similar to Plaintiff with conditions like or similar to those for which they were admitted to the hospital.
**ANSWER:**

**REQUEST 45:** The following documents relating to your charges for professional services rendered and medical and drug products furnished to Plaintiff:
    a.    Bill or statement of fees;
    b.    Ledger;
    c.    Health insurance claim forms;
    d.    Charge slips, charge tickets, billing memoranda and other supporting documentation relating to the charges or bills assessed by you to Plaintiff; and
    e.    List of explanations of billing codes which you use in bills, ledgers, statement of fees, correspondence, checks, receipts or other materials relating to your billing system.
**ANSWER:**

**REQUEST 46** Insurance Agreements or Information Regarding Self-Insurance: Any policy or policies of liability or professional liability insurance, primary, excess or otherwise against which Defendant has made or may make a claim for a defense and/or coverage because of facts alleged by Plaintiffs on file in this cause, as well as any documentation or information regarding self-insurance arrangements of Defendant. If any such policy is an aggregate limits policy, then produce the correspondence from any claimant and suit papers for claims brought within the policy year.
**ANSWER:**

**REQUEST 47** Summaries and Voluminous Writings, Etc.: (a) Any charts, summaries or calculations of the contents of any voluminous writings, recordings or photographs as defined by TEX. R. EVID. 1001, which cannot conveniently be examined in court, and which you may offer as evidence at the trial of this cause pursuant to the TEX. R. EVID. 1006 or any other law; and (b) the contents of voluminous writings, recordings or photographs which you may present in the form of such summaries, charts or photographs as described in (a) above.
**ANSWER:**

**REQUEST 48:** If you are aware of any facts or information, or if you hold any opinion, which does or might implicate any pre-existing, co-existing or subsequently existing condition or conduct which caused or contributed to cause the occurrence(s) in question made the basis of this lawsuit, then any materials and documents including, but not limited to all letters, documents, reports, memos, notes, photographs, objects or other tangible thing which in any way relate(s) to the facts, information or opinion in question.
**ANSWER:**

**REQUEST 49:** All documents regarding, discussing, or pertaining in any way, to any policy or procedure manuals pertaining to any care procedure, care service, or medication administered to Plaintiff.
**ANSWER:**

**REQUEST 50:** All documents regarding, discussing, or pertaining in any way to any internal or external standards, policies, procedures, or requirements following by you or observed by you during the course of your care of Plaintiff.
**ANSWER:**

**REQUEST 51:** Any and all personal notes or log books kept by any person who treated or provided any therapeutic or medical care to Plaintiff.
**ANSWER:**

**REQUEST 52:** A copy of the personnel file of all nurses and technicians or other employees who cared for or were present during the psychodynamic talk therapy care of Plaintiff.
**ANSWER:**

**REQUEST 53:** A copy of any BDSM membership cards to attend group orgies, most notably during the same time as Plaintiff's ballet classes and Plaintiff's "Nutcracker" ballet recital where she performed a solo as the Sugar Plum Fairy to a standing ovation.
**ANSWER:**

**REQUEST 54:** A true, certified, and notarized copy of all BDSM activities participated in since age 17, particularly the bondage of underaged girls who were sexually trafficked into prostitution.
**ANSWER:**

**REQUEST 55:** True, certified, and notarized copies any marriage certificate(s), whether bigamy was committed or not.
**ANSWER:**

**REQUEST 56:** True, certified, and notarized copies of all keylogger computer programs used to stalk and harass Plaintiff, her family, her then-boss, and her colleagues.
**ANSWER:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:20-CV-80147-ROSENBERG/REINHART

JANE KOE,
     *Plaintiff*
v.
AMAR CHANDER MAINI,
     *Defendant.*
_____/

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSION TO DEFENDANT AMAR CHANDER MAINI

Pursuant to Federal Rules of Civil Procedure Rules 16(e), 26(b)(1), 29, 36, and 37, Plaintiff Jane Koe requests that Defendant Amar Chander Maini produce and permit Plaintiff to inspect and copy the following materials within sixty (60) days of formal service.

**REQUEST 1:** Admit that you, Amar Chander Maini, are a citizen of Australia and have never been a citizen of India.
**ANSWER:**

**REQUEST 2:** Admit that you, Amar Chander Maini, used one of your aliases, Vikram Kumar Mansingh, with accompanying usernames gallantvk and vikramkms, to dupe Plaintiff into a relationship.
**ANSWER:**

**REQUEST 3:** Admit that you, Amar Chander Maini, opened social media profiles on Skype, Instagram, Facebook, and Pinterest, to further dupe Plaintiff into a relationship.
**ANSWER:**

**REQUEST 4:** Admit that you, Amar Chander Maini, admitted to cheating on Plaintiff when she was hospitalized on bedrest between May 1 to 22, 2016, further verified by a Plenty of Fish dating profile you were using actively at that time.
**ANSWER:**

**REQUEST 5:** Admit that you, Amar Chander Maini, admitted to cheating on Plaintiff again during a July 4, 2016 conversation in a Darlinghurst, NSW, Australia Indian restaurant.
**ANSWER:**

**REQUEST 6:** Admit that you, Amar Chander Maini, claimed to be employed as an "investment analyst" for a bank.
**ANSWER:**

**REQUEST 7:** Admit that you, Amar Chander Maini, claimed to be employed as an "international spy" working for the "Indian government."
**ANSWER:**

**REQUEST 8:** Admit that you, Amar Chander Maini, claimed to be employed as an "experienced healer and savior with expertise in talk therapy."

**ANSWER:**

**REQUEST 9:** Admit that you, Amar Chander Maini, claimed to only "want what is best for" Plaintiff and would "keep all confidences," while going out of your way to backstab Plaintiff to her then-boss, then-colleagues, and other relevant parties.
**ANSWER:**

**REQUEST 10:** Admit that you, Amar Chander Maini, backstabbed Plaintiff to her then-boss by informing said boss that Plaintiff and her Australian intellectual property solicitor were working on a thermophilic anaerobes patent application.
**ANSWER:**

**REQUEST 11:** Admit that you, Amar Chander Maini, ignored over 300 cease and desist notices sent by Plaintiff and her family to you obtained between November 26, 2016 to the present.
**ANSWER:**

**REQUEST 12:** Admit that you, Amar Chander Maini, have violated over 18 different restraining orders, apprehended violence orders, stalking injunctions, and cyberstalking injunctions obtained between November 26, 2016 to the present.
**ANSWER:**

**REQUEST 13:** Admit that you, Amar Chander Maini, believe that men have "moral authority" over women.
**ANSWER:**

**REQUEST 14:** Admit that you, Amar Chander Maini, were unable to become a barrister.
**ANSWER:**

**REQUEST 15:** Admit that you, Amar Chander Maini, were unable to become an investment banker.
**ANSWER:**

**REQUEST 16:** Admit that you, Amar Chander Maini, were unable to become an international spy.
**ANSWER:**

Exhibit C

# FEDERATION DE LA HAUTE COUTURE ET DE LA MODE

## *CONSEIL DE DIRECTION*

Monsieur Ralph TOLEDANO – Président de la Fédération de la Haute Couture et de la Mode

Monsieur Pietro BECCARI - Maison CHRISTIAN DIOR

Madame Francesca BELLETTINI – Maison SAINT LAURENT

Monsieur Geoffroy de la BOURDONNAYE - Maison CHLOE

Monsieur Etienne BOURGOIS – Maison AGNES B

Monsieur Michael BURKE -- Maison LOUIS VUITTON

Monsieur Cédric CHARBIT – Maison BALENCIAGA

Madame Sophie DURUFLE - Maison ISABEL MARANT

Monsieur Didier GRUMBACH

Monsieur Jean-Philippe HECQUET -- Maison LANVIN

Monsieur Jean-Marc LOUBIER – Maison SONIA RYKIEL

Monsieur Bruno PAVLOVSKY - Maison CHANEL

Madame Isabel RIBEIRO – Maison PAUL SMITH

Monsieur Nicolas SANTI-WEIL – Maison AMI

Monsieur Guillaume de SEYNES - Maison HERMES

Monsieur Sidney TOLEDANO – LVMH Fashion Group représentant la maison CELINE

Monsieur Daniel TRIBOUILLARD -- Maison LEONARD

Monsieur Vincent VANTOMME – Maison DRIES VAN NOTEN

## CHAMBRE SYNDICALE DE LA HAUTE COUTURE

### *COMITE*

Monsieur Ralph TOLEDANO – Président de la Chambre Syndicale de la Haute Couture

Monsieur Pietro BECCARI - Maison CHRISTIAN DIOR

Madame Delphine BELLINI – Maison SCHIAPARELLI

Madame Riccardo BELLINI – MAISON MARGIELA

Monsieur Philippe FORTUNATO - Maison GIVENCHY

Monsieur Bruno PAVLOVSKY - Maison CHANEL

Madame Sophie WAINTRAUB – Maison JEAN PAUL GAULTIER



**From:** Alexia TREMBASIEWICZ alexia.trembasiewicz@fhcm.paris
**Subject:** Re : Membership
**Date:** February 12, 2019 at 10:29 AM
**To:** mkaura@mac.com

Dear Misha,

Thank you for your email.

The applications for the Official Couture Calendar of July 2019 are now open.

Do not hesitate to tell us if you are interested in receiving the application process.

Best regards,

 FÉDÉRATION
DE LA HAUTE COUTURE
ET DE LA MODE

**Alexia Trembasiewicz**
Pôle Développement, Communication et Évènements

100-102 rue du Faubourg Saint-Honoré
75008 Paris
www.fhcm.paris

**REDACTING FORMAL INVITATION
SENT IN MARCH 2019
FOR PRIVACY REASONS**



Exhibit D

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:20-CV-80147-ROSENBERG/REINHART**

</div>

JANE KOE,
     *Plaintiff,*

v.

AMAR CHANDER MAINI,
     *Defendant.*

_____/

<div align="center">

**AFFIDAVIT of SUM CERTAIN**

</div>

I, Misha Sophia Kaura, being first duly sworn, state that from my own personal knowledge, if called to testify, I can truly and competently testify to the following:

1. I, Misha Sophia Kaura, am the Plaintiff, Jane Koe, in this cause of action against the Defendant, Amar Chander Maini. I'm a mentally fit and competent adult.
2. I request a default judgment against Amar Chander Maini for failure to appear.  The claim against the defendant, Amar Chander Maini party is for a sum, which by computation can be made certain.  I request judgment for damages, costs, and fees as outlined below.  The amount requested for damages is not greater than the amount stated in the complaint.
3. The defaulted party, Amar Chander Maini, is neither an infant or incompetent person nor in the military service.
4. This request is made on my personal knowledge and, if sworn as a witness, I can testify competently to the facts in this request.
5. I declare under the penalties of perjury that this request has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

**MINIMUM Relief for Causes of Action: $7,800,000.**

| *Cause of Action* | *Compensable Damages* | *Exemplary Damages* |
|---|---|---|
| Fraudulent Misrepresentation | $500,000 | $1,000,000 |
| Defamation | $200,000 | $1,000,000 |
| Libel | $200,000 | $1,000,000 |
| Invasion of Privacy | $200,000 | $1,000,000 |
| Computer Fraud and Abuse | $100,000 | $1,000,000 *(Supported by Affidavit)* |
| Tortious Interference with Advantageous Business Relationship | $100,000 | $1,500,000 *(Supported by Affidavit)* |
| **SUM** | **$1,300,000** | **$6,500,000** |

**MINIMUM Further Relief for Plaintiff: $2,814,500.**

| Type of Relief | Amount of Relief |
|---|---|
| Extortive Removal Site Fees from 2017-2020 | $75,000 |
| SEO Campaign Services | $96,000 |
| Health, Wellbeing, and Medical Expenses | $560,000 |
| Private Investigator Expenses | $7,500 |
| Relationship Consultation Expenses | $60,000 |
| Costs as provided by 28 U.S.C. § 2412 | $16,000 |
| Stolen Cash and Gold Dowry | $2,000,000 |
| **SUM** | **$2,814,500** |

**MINIMUM TOTAL RELIEF REQUESTED: $10,614,500.**

| Compensable Damages | $1,300,000 |
|---|---|
| **Exemplary Damages** | **$6,500,000** |
| **Further Relief** | **$2,814,500** |
| **SUM** | **$10,614,500** |

RESPECTFULLY SUBMITTED and DATED on this 2nd day of July 2021.

FURTHER AFFIANT SAYETH NOT.

By: _____

Misha Sophia Kaura
Jane Koe, Plaintiff *Pro Se*
7750 Okeechobee Blvd., Ste. 4-481
West Palm Beach, FL 33411
United States of America
janekoelitigation@icloud.com
Phone: (929) 400-7746

# Exhibit E

HOME    KITS ▾    REAGENTS ▾    CONTACT ▾    POLICIES ▾    FAQ'S        🛒 0 item(s) - 0.00 €

FEEDBACKS



# 3,3-DIMETHYL-1-BUTANOL, 98%

CAS Number: 624-95-3

Molecular Formula: C6H14O

Molecular Weight: 102.17

IUPAC Name: 3,3-Dimethylbutan-1-ol

Other Names: 3,3-Dimethyl-1-butanol, tert-hexyl alcohol

CAS Number: 624-95-3

## 25,00 €

Product weight or volume

10ml

| - | 1 | + |
|---|---|---|

 **PAYMENT**

We accept Visa & MasterCard.

---

← **Prev**                                    ⌃ **Top**

🏆 **BEST PRICE GUARANTEE**



**frontiers in MICROBIOLOGY**

EDITORIAL
published: 05 February 2015
doi: 10.3389/fmicb.2015.00034

# Mechanisms of antibiotic resistance

*Jun Lin[1], Kunihiko Nishino[2], Marilyn C. Roberts[3], Marcelo Tolmasky[4], Rustam I. Aminov[5] and Lixin Zhang[6]\**

[1] Department of Animal Science, The University of Tennessee, Knoxville, TN, USA
[2] Institute of Scientific and Industrial Research, Osaka University, Osaka, Japan
[3] Department of Environmental and Occupational Health Sciences, University of Washington, Seatle, WA, USA
[4] Center for Applied Biotechnology Studies, Department of Biological Science, California State University, Fullerton, CA, USA
[5] Section for Bacteriology, Pathology, and Parasitology, National Veterinary Institute, Technical University of Denmark, Frederiksberg, Denmark
[6] CAS Key Laboratory of Pathogenic Microbiology and Immunology, Institute of Microbiology, Chinese Academy of Sciences, Beijing, China
*Correspondence: lzhang03@gmail.com

*Edited by:*
Charles W. Knapp, University of Strathclyde, UK
*Reviewed by:*
Stefania Stefani, University of Catania, Italy

Keywords: antibiotics, resistance, mechanisms, resistance reservoirs, metagenomics, combination therapy

Antibiotics represent one of the most successful forms of therapy in medicine. But the efficiency of antibiotics is compromised by a growing number of antibiotic-resistant pathogens. Antibiotic resistance, which is implicated in elevated morbidity and mortality rates as well as in the increased treatment costs, is considered to be one of the major global public health threats (www.who.int/drugresistance/en/) and the magnitude of the problem recently prompted a number of international and national bodies to take actions to protect the public (http://ec.europa.eu/dgs/health_consumer/docs/road-map-amr_en.pdf; http://www.who.int/drugresistance/amr_global_action_plan/en/; http://www.whitehouse.gov/sites/default/files/docs/carb_national_strategy.pdf). Understanding the mechanisms by which bacteria successfully defend themselves against the antibiotic assault represent the main theme of this eBook published as a Research Topic in *Frontiers in Microbiology: Antimicrobials, Resistance, and Chemotherapy*. The articles in the eBook update the reader on various aspects and mechanisms of antibiotic resistance. A better understanding of these mechanisms should facilitate the development of means to potentiate the efficacy and increase the lifespan of antibiotics while minimizing the emergence of antibiotic resistance.

The multidrug efflux systems contribute significantly to the increased resistance to multiple antibiotics in bacteria. A major challenge in developing efficacious antibiotics against drug-resistant pathogens is to identify compounds that can counteract the efflux functions. The wealth of bacterial genomics information available suggests the presence of a variety of efflux systems in bacteria. Even a single bacterium may possess multiple efflux transporters of different families, with the overlapping substrate spectra. Accumulating evidence has indicated that the MexXY multidrug efflux system is a primary determinant of aminoglycoside resistance in *Pseudomonas aeruginosa*. Morita et al. (2012) provided a timely review on the *P. aeruginosa* MexXY pump and other aminoglycoside efflux pumps in a range of different bacteria. The expression of bacterial multidrug efflux system is usually controlled by transcriptional regulators that either repress or activate the transcription of the multidrug efflux genes. The articles by Usui et al. (2013) and Deng et al. (2013) further illustrated the complexity of regulation of multidrug efflux systems. However, the importance of multidrug efflux system may not be overstated for a specific antibiotic or organism, which is supported by the findings of Baucheron et al. (2014).

β-lactam antibiotics, which inhibit the biosynthesis of bacterial cell wall, are the most widely available antibiotics used to treat a number of bacterial infections. Resistance to β-lactam antibiotics, however, has become a worldwide health care problem. Production of β-lactamases is a major and threatening resistance mechanism toward β-lactam antibiotics. Epidemiological work by Chuma et al. (2013) demonstrated a recent emergence of β-lactamase-mediated cefotaxime resistance in *Salmonella enetrica* Serovar Infantis. To counteract β-lactam resistance in pathogenic bacteria, extensive research in the past three decades has focused on the discovery of novel compounds inhibiting the β-lactamase function. Watkins et al. (2013) reviewed the novel β-lactamase inhibitors that are close to being introduced in the clinical practice. Despite the successful development of β-lactamase inhibitors for the combination therapy, the use of β-lactamase inhibitors is still challenged by the variable affinity of inhibitors to different β-lactamases and by the vast quantity of β-lactamases produced by the resistant strains. To address this issue and optimize the existing β-lactam-based therapy, Zeng and Lin (2013) proposed to inhibit the induction of β-lactamases by targeting the key players required for β-lactamase induction, such as lytic transglycosylase.

Aminoglycosides are another class of clinically important antibiotics for treating various bacterial pathogens. The increasing resistance of clinical isolates against aminoglycosides, however, has compromised the effectiveness of this class of antibiotics. A major mechanism of aminoglycoside resistance is the production of aminoglycoside-modifying enzymes. Two enzymes with aminoglycoside-modifying activities are discussed in this research topic. Shi et al. (2013) provided a comprehensive overview of the structure of aminoglycoside kinase and reported on the recent progress in the discovery of aminoglycoside phosphotransferase inhibitors using structure-guided strategies. Aminoglycoside 6'-*N*-acetyltransferase type Ib is another clinically important

enzyme prevalent in a wide variety of Gram-negative pathogens. Ramirez et al. (2013) reviewed the unique sequence, genomics and functional features of this type of aminoglycoside-modifying enzymes. They also provided an insightful discussion on the development of innovative antisense technologies to combat this type of aminoglycoside resistance.

Several articles are focused on the discovery of innovative antimicrobials by harnessing our knowledge in bacterial physiology and pathogenesis. Quorum sensing is a unique cell-to-cell communication that modulates the expression of antibiotic resistance as well as virulence genes. Thus, the key compounds mediating quorum sensing such as acylated homoserine lactone have been attractive targets for antimicrobial chemotherapy. Hirakawa and Tomita (2013) reviewed recent progress in the discovery of acylated homoserine lactone inhibitors/modulators and discussed the feasibility of targeting other molecular components involved in signal transduction (e.g., regulatory elements) to modulate quorum sensing. Olivares et al. (2013) provided a timely review to analyze recent works on the intrinsic resistome, that is the concerted activity of elements required for the intrinsic resistance in *E. coli* and *P. aeruginosa*. The feasibility of using intrinsic resistome inhibitors for potentiating the effects of clinical drugs is also discussed in this review. Iino et al. (2013) used a large-scale femtoliter droplet array for single-cell analysis to assess the heterogeneity among the individual cells, enabling the identification of the novel or unconventional mechanisms of antibiotic resistance or resistance against novel antibiotics.

This research topic also includes a panel of articles focused on specific resistance mechanisms in different pathogens. Tuberculosis (TB) is notoriously known for its resistance to multiple drugs. Green and Garneau-Tsodikova (2013) focused on various mechanisms of resistance to the currently available anti-TB drugs and provided perspectives for novel strategies and lead scaffolds/compounds that are aimed at deterring these resistance mechanisms. In an effort to reduce emerging resistance, combinations of small molecules and a high-throughput synergy screening have been also explored (Zhang et al., 2007). Ilina et al. (2013) observed that a mutation in the ribosomal protein S5 is responsible for the resistance of *Neisseria gonorrhoeae* strains against multiple drugs including the decreased susceptibility to spectinomycin, cefixime and ceftriaxone. Zaheer et al. (2013) found that both therapeutic and subtherapeutic macrolide administration significantly increased the proportion of erythromycin resistant enterococci but had no effect on the development of macrolide resistance in *Mannheimia haemolytica*, both isolated from the nasopharynx. Sun et al. (2013) reported that sterol C-22 desaturase ERG5, which is highly conserved among various fungal species, is involved in azole resistance and may serve as a novel target for antifungal drugs, in particular against *Neurospora crassa* and *Fusarium verticillioides*. Using the population-based multivariate analysis, Abbes et al. (2013) observed that fluconazole resistance in *Candida glabrata* involves complex interactions between drug resistance gene expression and/or copy number.

Recent metagenomics and functional genomics studies have provided a compelling evidence that antibiotic resistance genes are widespread and the natural reservoirs of potential antibiotic resistance include many ecosystems such as in agriculture

(e.g., animal manure, soil, water, wastewater lagoons), the gut of humans and food animals, and even ancient soils. The diverse range of novel antibiotic resistance genes could be accessible to clinically relevant bacteria and play a critical role in the emergence of antibiotic resistance among pathogens. Pehrsson et al. (2013) provided an insightful review for the novel resistance functions uncovered using the functional metagenomic examination of various resistance reservoirs. Municipal biosolids that are produced during the activated sludge treatment are also a significant reservoir of antibiotic resistance as assessed by Kaplan et al. (2013). Burch et al. (2013) explored an alternative approach, aerobic digestion, to reduce the quantity of antibiotic resistance genes in wastewater solids. The occurrence of antibiotics resistance genes in finfish aquaculture environments is further discussed by Miranda et al. (2013). The presence of antibiotic resistance genes in the aquatic environment is also demonstrated by Fahrenfeld et al. (2013) and Suzuki et al. (2013). To address the key issue concerning the role of environmental resistance gene reservoir in the emergence of clinically important resistant pathogens, Perry and Wright (2013) reviewed recent works suggesting genetic exchange between the environmental and clinical resistomes. Community-acquired methicillin-resistant *Staphylococcus aureus* (MRSA) has emerged as a major cause of disease in the general population. Roberts et al. (2013) examined 55 environmental MRSA isolates from 805 samples and found that 98% of them are also resistant to other classes of antibiotics in addition to methicillin, thus most likely representing the antibiotic resistance gene pool in the environment. Clearly, with the aid of high-throughput sequencing and metagenomics approaches, recent studies of natural antibiotic resistance gene reservoirs have revealed a much higher level of diversity and novelty than anticipated. However, there is still a significant knowledge gap regarding the mechanisms of horizontal gene transfer that are involved in the exchange of genes among different ecological compartments. A better understanding of these *in situ* processes is required in order to control the development, transmission, and evolution of antibiotic resistant genes.

In summary, the articles within this eBook address various timely issues related to antibiotic resistance mechanisms. Clearly, discovery of new antimicrobials as well as finding strategies to expand the useful life of existing antibiotics is important to combat the ever-increasing antimicrobial resistance. Bacteria, however, possess an enormous diversity of genes that allow them, sooner or later, to counteract the action of newly invented antibiotics. As reflected in many articles in this eBook, the natural resistomes are common and exist in diverse environmental niches. Misuse of antibiotics, in terms of application and dosage, is an additional contributing factor for the development of antibiotic resistance (Nosanchuk et al., 2014). Consequently, to mitigate antibiotic resistance, we should cautiously use antibiotics from a One Health perspective (http://www.onehealthinitiative.com/). On the other hand, as it is also reflected in this Research Topic, in parallel to the development of new of antibiotics, it is imperative to study the molecular basis of resistance development so that we can prevent and overcome antibiotic resistance by targeting resistance mechanisms, which will make the existing and novel antibiotics more effective and sustainable.

## ACKNOWLEDGMENTS

This work was supported in part by grants from the 973 program 2013CB734000, and the National Natural Science Foundation of China 31125002.

## REFERENCES

Abbes, S., Mary, C., Sellami, H., Michel-Nguyen, A., Ayadi, A., and Ranque, S. (2013). Interactions between copy number and expression level of genes involved in fluconazole resistance in *Candida glabrata*. *Front. Cell. Infect. Microbiol.* 3:74. doi: 10.3389/fcimb.2013.00074

Baucheron, S., Monchaux, I., Le, H. S., Weill, F. X., and Cloeckaert, A. (2014). Lack of efflux mediated quinolone resistance in *Salmonella enterica* serovars Typhi and Paratyphi A. *Front. Microbiol.* 5:12. doi: 10.3389/fmicb.2014.00012

Burch, T. R., Sadowsky, M. J., and Lapara, T. M. (2013). Aerobic digestion reduces the quantity of antibiotic resistance genes in residual municipal wastewater solids. *Front. Microbiol.* 4:17. doi: 10.3389/fmicb.2013.00017

Chuma, T., Miyasako, D., Dahshan, H., Takayama, T., Nakamoto, Y., Shahada, F., et al. (2013). Chronological change of resistance to beta-Lactams in *Salmonella enterica* serovar infantis isolated from broilers in Japan. *Front. Microbiol.* 4:113. doi: 10.3389/fmicb.2013.00113

Deng, Z., Shan, Y., Pan, Q., Gao, X., and Yan, A. (2013). Anaerobic expression of the *gadE-mdtEF* multidrug efflux operon is primarily regulated by the two-component system ArcBA through antagonizing the H-NS mediated repression. *Front. Microbiol.* 4:194. doi: 10.3389/fmicb.2013.00194

Fahrenfeld, N., Ma, Y., O'Brien, M., and Pruden, A. (2013). Reclaimed water as a reservoir of antibiotic resistance genes: distribution system and irrigation implications. *Front. Microbiol.* 4:130. doi: 10.3389/fmicb.2013.00130

Green, K. D., and Garneau-Tsodikova, S. (2013). Resistance in tuberculosis: what do we know and where can we go? *Front. Microbiol.* 4:208. doi: 10.3389/fmicb.2013.00208

Hirakawa, H., and Tomita, H. (2013). Interference of bacterial cell-to-cell communication: a new concept of antimicrobial chemotherapy breaks antibiotic resistance. *Front. Microbiol.* 4:114. doi: 10.3389/fmicb.2013.00114

Iino, R., Matsumoto, Y., Nishino, K., Yamaguchi, A., and Noji, H. (2013). Design of a large-scale femtoliter droplet array for single-cell analysis of drug-tolerant and drug-resistant bacteria. *Front. Microbiol.* 4:300. doi: 10.3389/fmicb.2013.00300

Ilina, E. N., Malakhova, M. V., Bodoev, I. N., Oparina, N. Y., Filimonova, A. V., and Govorun, V. M. (2013). Mutation in ribosomal protein S5 leads to spectinomycin resistance in *Neisseria gonorrhoeae*. *Front. Microbiol.* 4:186. doi: 10.3389/fmicb.2013.00186

Kaplan, E., Ofek, M., Jurkevitch, E., and Cytryn, E. (2013). Characterization of fluoroquinolone resistance and qnr diversity in Enterobacteriaceae from municipal biosolids. *Front. Microbiol.* 4:144. doi: 10.3389/fmicb.2013.00144

Miranda, C. D., Tello, A., and Keen, P. L. (2013). Mechanisms of antimicrobial resistance in finfish aquaculture environments. *Front. Microbiol.* 4:233. doi: 10.3389/fmicb.2013.00233

Morita, Y., Tomida, J., and Kawamura, Y. (2012). MexXY multidrug efflux system of *Pseudomonas aeruginosa*. *Front. Microbiol.* 3:408. doi: 10.3389/fmicb.2012.00408

Nosanchuk, J. D., Lin, J., Hunter, R. P., and Aminov, R. I. (2014). Low-dose antibiotics: current status and outlook for the future. *Front. Microbiol.* 5:478. doi: 10.3389/fmicb.2014.00478

Olivares, J., Bernardini, A., Garcia-Leon, G., Corona, F., Sanchez, B., and Martinez, J. L. (2013). The intrinsic resistome of bacterial pathogens. *Front. Microbiol.* 4:103. doi: 10.3389/fmicb.2013.00103

Pehrsson, E. C., Forsberg, K. J., Gibson, M. K., Ahmadi, S., and Dantas, G. (2013). Novel resistance functions uncovered using functional metagenomic

investigations of resistance reservoirs. *Front. Microbiol.* 4:145. doi: 10.3389/fmicb.2013.00145

Perry, J. A., and Wright, G. D. (2013). The antibiotic resistance "mobilome": searching for the link between environment and clinic. *Front. Microbiol.* 4:138. doi: 10.3389/fmicb.2013.00138

Ramirez, M. S., Nikolaidis, N., and Tolmasky, M. E. (2013). Rise and dissemination of aminoglycoside resistance: the aac(6′)-Ib paradigm. *Front. Microbiol.* 4:121. doi: 10.3389/fmicb.2013.00121

Roberts, M. C., Soge, O. O., and No, D. (2013). Comparison of multi-drug resistant environmental methicillin-resistant *Staphylococcus aureus* isolated from recreational beaches and high touch surfaces in built environments. *Front. Microbiol.* 4:74. doi: 10.3389/fmicb.2013.00074

Shi, K., Caldwell, S. J., Fong, D. H., and Berghuis, A. M. (2013). Prospects for circumventing aminoglycoside kinase mediated antibiotic resistance. *Front. Cell. Infect. Microbiol.* 3:22. doi: 10.3389/fcimb.2013.00022

Sun, X., Wang, W., Wang, K., Yu, X., Liu, J., Zhou, F., et al. (2013). Sterol C-22 desaturase ERG5 mediates the sensitivity to antifungal azoles in *Neurospora crassa* and *Fusarium verticillioides*. *Front. Microbiol.* 4:127. doi: 10.3389/fmicb.2013.00127

Suzuki, S., Ogo, M., Miller, T. W., Shimizu, A., Takada, H., and Siringan, M. A. (2013). Who possesses drug resistance genes in the aquatic environment?: sulfamethoxazole (SMX) resistance genes among the bacterial community in water environment of Metro-Manila, Philippines. *Front. Microbiol.* 4:102. doi: 10.3389/fmicb.2013.00102

Usui, M., Nagai, H., Hiki, M., Tamura, Y., and Asai, T. (2013). Effect of antimicrobial exposure on AcrAB Expression in *Salmonella enterica* subspecies enterica serovar choleraesuis. *Front. Microbiol.* 4:53. doi: 10.3389/fmicb.2013.00053

Watkins, R. R., Papp-Wallace, K. M., Drawz, S. M., and Bonomo, R. A. (2013). Novel beta-lactamase inhibitors: a therapeutic hope against the scourge of multidrug resistance. *Front. Microbiol.* 4:392. doi: 10.3389/fmicb.2013.00392

Zaheer, R., Cook, S. R., Klima, C. L., Stanford, K., Alexander, T., Topp, E., et al. (2013). Effect of subtherapeutic vs. therapeutic administration of macrolides on antimicrobial resistance in *Mannheimia haemolytica* and enterococci isolated from beef cattle. *Front. Microbiol.* 4:133. doi: 10.3389/fmicb.2013.00133

Zeng, X., and Lin, J. (2013). Beta-lactamase induction and cell wall metabolism in Gram-negative bacteria. *Front. Microbiol.* 4:128. doi: 10.3389/fmicb.2013.00128

Zhang, L., Yan, K., Zhang, Y., Bian, J., Zheng, C., Sun, H., et al. (2007). High-throughput synergy screening identifies microbial metabolites as combination agents for the treatment of fungal infections. *Proc. Natl. Acad. Sci. U.S.A.* 104, 4606–4611. doi: 10.1073/pnas.0609370104

**Conflict of Interest Statement:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

*Received: 23 October 2014; accepted: 11 January 2015; published online: 05 February 2015.*

*Citation: Lin J, Nishino K, Roberts MC, Tolmasky M, Aminov RI and Zhang L (2015) Mechanisms of antibiotic resistance. Front. Microbiol. 6:34. doi: 10.3389/fmicb.2015.00034*

*This article was submitted to Antimicrobials, Resistance and Chemotherapy, a section of the journal Frontiers in Microbiology.*

*Copyright © 2015 Lin, Nishino, Roberts, Tolmasky, Aminov and Zhang. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) or licensor are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

Unfortunately funding has not been found for this proposal.

| Study component | Year 1 | | Year 2 | | Year 3 | |
|---|---|---|---|---|---|---|
| Development of urinary quantitation of TMA & TMAO | X | X | | | | |
| Development of molecular screening of *FMO3* gene | X | X | | | | |
| Generation of the mouse model for FMO3 deficiency, & biochemical and phenotypic characterisation | X | X | X | X | | |
| Generation of a range of *FMO3* nonsense mutations, & their functional analysis in a cell culture system | X | X | | | | |
| Evaluation of the efficacy of PTC124 in our *in vitro* cell culture system | | | X | X | | |
| Evaluation of the efficacy of PTC124 in our mouse model system | | | | | X | X |
| Evaluation of the therapeutic utility of *Methylophilus methylotrophus* in our mouse model system | | | | | X | X |

**Research Proposal**
**Development of Diagnostic and Therapeutic Approaches to Trimethylaminuria**

John Christodoulou[1]

Patrick Tam[2]

Kevin Carpenter[1]
March 2009


1 Western Sydney Genetics Program, The Children's Hospital at Westmead, Sydney, Disciplines of Paediatrics and Child Health & Genetic Medicine, University of Sydney, Sydney, New South Wales 2006, Australia.


2 Children's Medical Research Institute, University of Sydney, Westmead, New South Wales 2145, Australia.


**Address for Correspondence**: Professor John Christodoulou, Western Sydney Genetics Program, Children's Hospital at Westmead, Locked Bag 4001, Westmead, New South Wales 2145, Australia.
Tel.: 612-9845 3452

Fax: 612-9845 1864
E-mail: johnc@chw.edu.au

**Background:**
**Clinical and laboratory diagnosis of trimethylaminuria:**

The consequences of trimethylaminuria (TMAU) were recognized by Shakespeare (*The Tempest*, Act 2. Scene 2), and as elegantly stated in Trinculo's monologue, once the diagnosis has been made it is like a bolt from the blue for affected individuals and their families.

Excess dietary choline is metabolised by anaerobic micro-organisms in the large intestine to trimethylamine, which in turn is converted to odourless trimethylamine *N*-oxide by the last step in the choline degradative pathway, flavin mono-oxygenase 3 (FMO3)[1]. Primary or secondary accumulation of trimethylamine has no deleterious physical effect, but can cause devastating social debilitation, because trimethylamine when eliminated in urine, sweat or breath, saliva and other body fluids has a very distinctive odour of decaying fish. The odour becomes more prominent during periods of stress, with fever and with strenuous exercise as a consequence of increased sweating[1]. In addition, dietary intake of marine fish exacerbates symptoms since these animals contain large amounts of trimethylamine-N-oxide (which is believed to have antifreeze properties), which can be converted back to trimethylamine by gut bacteria[2].

Primary TMAU is most often caused by a functional defect of FMO3[3], and the genetic disorder is inherited in an autosomal recessive manner as a consequence of mutations in the *FMO3* gene. At least 30 different mutations have been reported within the 9 coding exons of the *FMO3* gene, which is located on the short arm of chromosome 1[4-6], and of those about a quarter are nonsense mutations[7], although the proportion of patients with nonsense mutations is unknown. The incidence of TMAU due to FMO3 deficiency is not precisely known, but it has been suggested that it may range between 1 in 100 and 1 in 1000[5]. What is certain is many people remain undiagnosed for unacceptably long periods of time[8].

Secondary TMAU has been described in patients with severe liver disease (which is the major site of activity of the FMO3 enzyme)[9], chronic renal disease (as a consequence of bacterial overgrowth in the gut)[10], and in patients treated with large doses of betaine for disorders of cobalamin or homocysteine metabolism or possibly L-carnitine for organic acidopathies and fatty acid oxidation disorders[1]. In addition, transient TMAU has been reported in a preterm infant who was fed with choline-rich food supplements, such as egg yolk. Soy and liver[11], and has been reported in some women just at the onset of menstruation[9].

The key to establishing the diagnosis is suspecting it in the first place. TMAU sufferers have endured their disorder for years or even decades, often subject to ridicule by their peers and

doubted by their health care professions, before the diagnosis has finally been established. Quantitation of trimethylamine and timethylamine-N-oxide in a random urine sample will confirm clinical suspicions, however it should be remembered that excessive trimethylamine excretion may be intermittent, so a normal single result does not rule out the disorder[9]. The diagnosis can be more firmly established by conducting a choline or marine fish load test[1], or by *FMO3* mutational analysis. Currently, there is only one laboratory in Australia offering biochemical testing for trimethylaminuria, but we believe this is suboptimal because this laboratory does not routinely quantitate trimethylamine-N-oxidase, potentially missing cases of the disorder. Best practice guidelines suggest that both trimethylamine and trimethylamine-N-oxidase should be measured[1]. Similarly, mutation screening of the *FMO3* gene is not routinely available in Australia.

***We propose to develop a comprehensive national service for the accurate biochemical and molecular screening for trimethylaminuria.***

## Current approaches to the management of trimethylaminuria:

The optimum management of TMAU usually needs to include a combination of approaches[1, 9, 12] including:

- dietary restriction of choline-containing foods (including egg yolk, liver and other organ meats, legumes, and products containing lecithin [322] and choline [1001], which are put into processed foods as emulsifiers) and marine fish (including cephalopods like octopus and squid and crustaceans like lobster, crab, prawns and balmain bugs)

- low pH (5.5 – 6.5) soaps (eg goat's milk soap), deodorants and body lotions (eg Lactcyd™)

- copper-chlorophyll or activated charcoal, which are not absorbed across the gut, and which can irreversibly bind to trimethylamine in the gut thereby limiting its systemic absorption

- probiotics to change the balance of gut flora

- intermittent oral antibiotics to reduce the gut bacterial load

These treatments, however, are not perfect, and can be difficult to maintain consistently. No new approaches to the treatment of trimethylaminuria have been developed in recent decades. An important component of the development of new therapies is to have appropriate cell biological and animal models of the disorder, so that efficacy and safety of proposed new treatments can be tested.

## New strategies for the treatment of trimethylaminuria:
Read through of premature termination mutations:

Premature termination or nonsense mutations arise as a result of a single nucleotide change in a gene where the change leads to the conversion of an amino acid in the protein sequence to a

premature stop codon. Such mutations often result in the protein losing most if not all of its functional capacity. It was recognised a number of years ago that aminoglycoside antibiotics can force the transcriptional machinery to read through the premature stop mutations, and allow the normal protein to be made, restoring activity of the protein[13]. However, aminoglycoside antibiotics have significant side effects and are not a viable therapeutic option. More recently a new class of drugs has been developed that has the capacity to promote read through of premature termination mutations, and which appear to be totally non-toxic (Welch ref). One in particular, PTC124, has been shown to result in the production of normal dystrophin in the mdx mouse model of Duchenne muscular dystrophy[14], and has been used in clinical trials in human subjects with cystic fibrosis, with clear benefits being found[15]. An inborn error of metabolism like TMAU would be an excellent candidate for this type of therapy, as an increase of enzyme activity to perhaps as little as 10% of normal should be enough to overcome the biochemical block.

*We propose to use an in vitro (cell culture model) approach to determine whether PTC124 is of potential therapeutic value in this proportion of TMAU patients. If we demonstrate potential in vitro efficacy, we will then go on to study the efficacy of PTC124 in the mouse model.. This mouse model will have a premature termination mutation of FMO3 deficiency for testing of new therapies for trimethylaminuria.*

## Other strategies for metabolising TMA in the small intestine:

Anaerobic gut bacteria can contribute to the trimethylamine load in patients with TMAU by enhancing the metabolism of choline in food to trimethylamine in the gut[1]. As stated above, one form of therapy of TMAU, albeit in more extreme cases, is to treat patients with antibiotics aiming to reduce the intestinal load of these bacteria. However, the antibiotics that need to be used have potentially serious side effects, and so can only be used for short periods of time.

An alternative strategy for reducing the gut trimethylamine load would be to colonise the gut with harmless bacteria that are capable of metabolising trimethylamine. One such micro-organism is *Methylophilus methylotrophus*. This is an aerobic monoflagellate bacterium that uses methanol as the sole source of carbon and energy[16]. It was initially thought to be of potential commercial value in the single-cell protein production industry, but it proved to be a nonfinancial venture. When cultured in trimethylamine, the enzyme trimethylamine dehydrogenase is induced, which converts trimethylamine to dimethylamine and formaldehyde[17]. Extensive studies have shown that this micro-organism is non-pathogenic and non-toxic in animals[18, 19]. Therefore colonisation of the gut with *Methylophilus methylotrophus* in individuals with TMAU could be of potential therapeutic utility.

*We propose to study the potential therapeutic benefit of Methylophilus methylotrophus in our mouse model of TMAU.*

## Research Plan:
## Aims:

### 1.  To develop comprehensive biochemical screening for trimethylaminuria

Previous methods have used an HPLC approach to quantitated trimethylamine in urine samples. This is a labour intensive method that has the added disadvantage that it does not easily lend itself to the quantitation of trimethylamine-N-oxide as well. We plan to use a mass spectrophotometric approach similar to that described by Johnson[20]. Co-chief investigator, Kevin Carpenter, head of the NSW Biochemical Genetics Service based at the Children's Hospital at Westmead, is an international authority on the use of mass spectrometric techniques in the diagnosis of inborn errors of metabolism. He will oversee the development of the new more complete biochemical testing for TMAU. We have urine samples from patients with TMAU already in storage, and these will be used as positive controls for the development phase.

This new testing procedure, coupled with a marine fish or choline load as needed[1], will provide a very powerful means for diagnosis of the majority of TMAU patients.

### 1.  To develop complete molecular genetic screening of the FMO3 gene for individuals suspected of having trimethylaminuria.

John Christodoulou has nearly two decades of experience in the analysis of gene mutations, and his research laboratory has all of the facilities to be able to develop comprehensive mutation testing of the *FMO3* gene. Once this testing has been developed to a robust stage, the methodology will be transferred to the molecular genetics diagnostic laboratory at the Children's Hospital at Westmead, for which he is the administrative head, and so will be available as a routine diagnostic test on referral by clinicians in Australasia.

### 1.  To develop an in vitro system for testing whether PTC124 can correct the functional consequences of premature termination mutations of the FMO3 gene.

Using standard cloning techniques that are well established in our laboratories, we will generate a human *FMO3* expression vector, and then use site-directed mutagenesis to generate all of the reported *FMO3* nonsense mutations. We will then express them in a mammalian cell system (such as COS or HEK293 cells). We will develop a functional assay of the FMO3 enzyme, using previously reported spectrophotometric methods[21], and then confirm that the mutations cause non- or dysfunctional FMO3 enzyme. CI Christodoulou and Carpenter have extensive experience in the use of spectrophotometric enzyme assays, have the necessary equipment to be able to establish this specific assay, and do not anticipate any major hurdles in establishing this method.

We will also perform western analysis of the wildtype and mutant proteins using commercially available antibodies (both Abcam and Abnova have an antibody against the human FMO3 protein which has been successfully used for western analyses) to identify those mutations which result in a stable but truncated protein and those mutations which result in the production of an unstable protein. Western analysis is a standard technique, and is very well established in the Christodoulou and Tam laboratories.

Having done these initial functional studies, we will then expose cells to varying concentrations of PTC124, and assay for improvement in functional activity, and perform westerns to determine whether full length protein is now being made. Initial discussions with senior staff from Genzyme Therapeutics, the current patent holder of PTC124, suggest that we will be able to obtain as supply of the drug for our studies.

1. *To develop a mouse model with a premature termination mutation of FMO3 deficiency, and to study the biochemical and phenotypic consequence of this mutation in the mouse.*

The outcome of the cell culture study in Aim 3 will inform us of the most specific nonsense mutation that will cause a premature termination of transcription and can respond to the read-through activity mediated by PTC124 to restore the normal protein function. We will create a similar mutation in the mouse genome by inserting the specific single-nucleotide change into the *Fmo3* gene. This will be achieved by gene targeting techniques on mouse embryonic stem cells. The engineered cells will be used to generate live mice that carry the specific mutation. The genetically modified mice will be assessed for the levels of trimethylamine and trimethylamine-N-oxide, using the mass spectrometric techniques developed for Plan 1, to ascertain that they display the clinical features of trimethylaminuria.

1. *To test the in vivo efficacy of PTC124 in our mouse model of FMO3 deficiency.*

Having developed a mouse model with a nonsense mutation of the *Fmo3* gene and demonstrating that recapitulates the human TMAU disorder, we will be in an excellent position to explore the *in vivo* efficacy of PTC124.

We will quantitate trimethylamine and trimethylamine-N-oxide levels in urine samples from wildtype and mutant mice fed on normal chow, and if necessary a chow rich in choline. We will also careful monitor the health and behaviour of the mice, although we do not expect to find any physical or behavioural abnormalities in the mutant mice. The mice will then be euthanised, livers harvested, and we will go on to then evaluate FMO3 enzyme activity in the livers of wildtype and mutant mice, the organ which primarily expresses FMO3[22], and quantitate FMO3 the level of and the size of the wildtype and mutant FMO3 protein extracted from liver samples.

We will then inject PTC124 intraperitoneally into wildtype and mutant mice at varying doses and time intervals. During this time we will monitor the health of the mice, and collect urine samples for quantitation of trimethylamine and trimethylamine-N-oxide. We will then euthanise the mice, collect their livers, and assay for FMO3 activity and examine the FMO3 protein by western to test whether mutant mice are now able to generate a full length functional FMO3 protein.

### 1. To test the therapeutic efficacy of *Methylophilus methylotrophus* as a therapeutic adjunct in our mouse model of FMO3 deficiency.

An aliquot of the *Methylophilus methylotrophus* micro-organism will be sourced and culture stocks will be established. We will apply the same methodology as in aim 5 to examine the potential therapeutic effects of intragastrically delivered *Methylophilus methylotrophus*, again given at varying doses and intervals.

### Conclusions:

As a result of the research program outlined in this proposal we will have established a comprehensive national diagnostic service for TMAU. In addition, we will have developed the unique resource of a mouse model for TMAU, which will be of great value in assessing new therapeutic approaches to the disorder. We will also have demonstrated whether PTC124 is able to correct functional defects of FMO3 for subset of mutations, and will have shown whether it is also of *in vivo* efficacy in our mouse model. Finally, we will have examined whether the micro-organism *Methylophilus methylotrophus* is of potential therapeutic value in our mouse model for TMAU. We believe that these outcomes will represent a major advance on the current state of play with regards to the diagnosis and treatment of patients with TMAU in Australia.

### Time-lines for the project (at half-yearly milestones):

| Study component | Year 1 | | Year 2 | | Year 3 | |
|---|---|---|---|---|---|---|
| Development of urinary quantitation of TMA & TMAO | X | X | | | | |
| Development of molecular screening of *FMO3* gene | X | X | | | | |
| Generation of the mouse model for FMO3 deficiency, & biochemical and phenotypic characterisation | X | X | X | X | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Generation of a range of *FMO3* nonsense mutations, & their functional analysis in a cell culture system | X | X | | | | |
| Evaluation of the efficacy of PTC124 in our *in vitro* cell culture system | | | X | X | | |
| Evaluation of the efficacy of PTC124 in our mouse model system | | | | | X | X |
| Evaluation of the therapeutic utility of *Methylophilus methylotrophus* in our mouse model system | | | | | X | X |

### References:

1 Chalmers RA, Bain MD, Michelakakis H, Zschocke J, Iles RA. Diagnosis and management of trimethylaminuria (FMO3 deficiency) in children. J Inher Metab Dis 2006; 29: 162-172

2 Arseculeratne G, Wong AK, Goudie DR, Ferguson J. Trimethylaminuria (fish-odor syndrome): a case report. Arch Dermatol 2007; 143: 81-84

3 Ayesh R, Mitchell SC, Zhang A, Smith RL. The fish odour syndrome: biochemical, familial and clinical aspects. Br Med J 1993; 307: 655-657

4 Hernandez D, Addou S, Lee D, Orengo C, Shephard EA, Phillips IR. Trimethylaminuria and a human FMO3 mutation database. Human Mut 2003; 22: 209-213

5 Cashman JR. The implications of polymorphisms in mammalian flavin-containing monooxygenases in drug discovery and development. Drug Discov Today 2004; 9: 574-581

6 Yamazaki H, Fujita H, Gunji T, Zhang J, Kamataki T, Cashman JR, Shimizu M. Stop codon mutations in the flavin-containing monooxygenase 3 (FMO3) gene responsible for trimethylaminuria in a Japanese population. Molec Genet Metab 2007; 90: 58-63

7 Phillips IR, Shephard EA. Flavin-containing monooxygenases: mutations, disease and drug response. Trends Pharmacol Sci 2008; 29: 294-301

8 Mountain H, Brisbane JM, Hooper AJ, Burnett JR, Goldblatt J. Trimethylaminuria (fish malodour syndrome): a "benign" genetic condition with major psychosocial sequelae. Med J Aust 2008; 189: 468

9 Mitchell SC, Smith RL. Trimethylaminuria: the fish malodor syndrome. Drug Metab Dispos 2001; 29: 517-521

10 Rehman HU. Fish odor syndrome. Postgrad Med J 1999; 75: 451-452

11 Blumenthal I, Lealman GT, Franklyn PP. Fracture of the femur, fish odour and copper deficiency in a preterm infant. Arch Dis Child 1980; 55: 229-231

12 Busby MG, Fischer L, da Costa KA, Thompson D, Mar MH, Zeisel SH. Choline- and betaine-defined diets for use in clinical research and for the management of trimethylaminuria. J Amer Diet Assoc 2004; 104: 1836-1845

13 Hermann T. Aminoglycoside antibiotics: old drugs and new therapeutic approaches. Cell Mol Life Sci 2007; 64: 1841-1852

14 Welch EM, Barton ER, Zhuo J, Tomizawa Y, Friesen WJ, Trifillis P, Paushkin S, Patel M, Trotta CR, Hwang S, Wilde RG, Karp G, Takasugi J, Chen G, Jones S, Ren H, Moon YC, Corson D, Turpoff AA, Campbell JA, Conn MM, Khan A, Almstead NG, Hedrick J, Mollin A, Risher N, Weetall M, Yeh S, Branstrom AA, Colacino JM, Babiak J, Ju WD, Hirawat S, Northcutt VJ,

Miller LL, Spatrick P, He F, Kawana M, Feng H, Jacobson A, Peltz SW, Sweeney HL. PTC124 targets genetic disorders caused by nonsense mutations. Nature 2007; 447: 87-91

15 Kerem E, Hirawat S, Armoni S, Yaakov Y, Shoseyov D, Cohen M, Nissim-Rafinia M, Blau H, Rivlin J, Aviram M, Elfring GL, Northcutt VJ, Miller LL, Kerem B, Wilschanski M. Effectiveness of PTC124 treatment of cystic fibrosis caused by nonsense mutations: a prospective phase II trial. Lancet 2008; 372: 719-727

16 Dawson MJ, Jones CW. Respiration-linked proton translocation in the obligate methylotrpph *Methylophilus methylotrophus*. Biochem J 1981; 194: 915-924

17 Shi W, Mersfelder J, Hille R. The interaction of trimethylamine dehydrogenase and electron-transferring flavoprotein. J Biol Chem 2005; 280: 20239-20246

18 Hambleton P, Melling J, Salusbury TT. Biosafety in Industrial Biotechnology. London: Springer, 1994

19 Stringer DA. Industrial development and evaluation of new protein sources: micro-organisms. Proc Nutr Soc 1982; 41: 289-300

20 Johnson DW. A flow injection electrospray ionization tandem mass spectrometric method for the simultaneous measurement of trimethylamine and trimethylamine N-oxide in urine. J Mass Spectrom 2008; 43: 495-499

21 Zhang J, Cerny MA, Lawson M, Mosadeghi R, Cashman JR. Functional activity of the mouse flavin-containing monooxygenase forms 1, 3, and 5. J Biochem Mol Toxicol 2007; 21: 206-215

22 Krueger SK, Williams DE. Mammalian flavin-containing monooxygenases: structure/function, genetic polymorphisms and role in drug metabolism. Pharmacol Ther 2005; 106: 357-387

## Proposed Budget:
## Staffing:

Given to wide range of techniques, their complexity and the volume of work that will need to be undertaken, funding for two postdoctoral research scientists is required. It is expected that these individuals will have at least five years postdoctoral research experience, and will be adept in general molecular and cloning techniques, mouse experimental work, bacterial and mammalian cell culture work, and the various biochemical and protein based studies that will need to be undertaken.

Each scientist will be employed at Research Officer HSM1 level:
Annual salary (including base salary, and all on costs) $88,573

[$177,146 per year]

## Molecular Biological Reagents:

dNTPs, Taq polymerase, restriction enzymes, ligases, kinases, agarose, "clean-up" kits, antibodies for westerns, plasmid miniprep kits, MW markers, oligos for sequencing and

PCR [$12,000 per yr]

**General Cell Culture Reagents:**
Plasticware and tissue culture reagents: for culturing mammalian cell lines and their
manipulation, including DMEM/F12 media, PBS, FBS, etc. [$7,500 per year]

**General Laboratory Reagents:**
Buffers, solvents, salts, acrylamide, microfuge tubes, pipette tips, foil, cleaning supplies, gloves,
syringes, parafilm, reagents for FMO3 enzyme assays, etc. [$5,500 per yr]

**Mouse Agistment Costs:**
1 large box (houses 10 mice) = $8.00/week
1 small box (houses mating pair or pregnant mice) = $5.50/week
15 small boxes (to house neonatal, juvenile and adult mice) for 20 weeks - 15 x $5.50/week x 15
= $1650
6 large boxes (to house female mice in preparation for breeding) for 52 weeks - 4 x $8.00 x 52 =
$2496
10 small boxes (to house a breeding pair then the pregnant mouse) for 52 weeks - 10 x $5.50 x
52 = $2860
Total holding cost $7006
Animal health monitoring costs $2214/yr
[Total Animal Cost = holding + health monitoring = $ 9220/yr]
Mouse experimental work will take place over 3.0 yr (total cost = $27660).

Annual budget requested: $211,266

**Total budget requested for the life of this 3-year research proposal: $633,798**

Exhibit F



# Dyslexia

## Overview

Dyslexia is a learning disorder that involves difficulty reading due to problems identifying speech sounds and learning how they relate to letters and words (decoding). Also called reading disability, dyslexia affects areas of the brain that process language.

People with dyslexia have normal intelligence and usually have normal vision. Most children with dyslexia can succeed in school with tutoring or a specialized education program. Emotional support also plays an important role.

Though there's no cure for dyslexia, early assessment and intervention result in the best outcome. Sometimes dyslexia goes undiagnosed for years and isn't recognized until adulthood, but it's never too late to seek help.

## Symptoms

Signs of dyslexia can be difficult to recognize before your child enters school, but some early clues may indicate a problem. Once your child reaches school age, your child's teacher may be the first to notice a problem. Severity varies, but the condition often becomes apparent as a child starts learning to read.

**Before school**

Signs that a young child may be at risk of dyslexia include:

- Late talking
- Learning new words slowly
- Problems forming words correctly, such as reversing sounds in words or confusing words that sound alike
- Problems remembering or naming letters, numbers and colors
- Difficulty learning nursery rhymes or playing rhyming games

**School age**

Once your child is in school, dyslexia signs and symptoms may become more apparent, including:

- Reading well below the expected level for age

- Problems processing and understanding what he or she hears
- Difficulty finding the right word or forming answers to questions
- Problems remembering the sequence of things
- Difficulty seeing (and occasionally hearing) similarities and differences in letters and words
- Inability to sound out the pronunciation of an unfamiliar word
- Difficulty spelling
- Spending an unusually long time completing tasks that involve reading or writing
- Avoiding activities that involve reading

**Teens and adults**

Dyslexia signs in teens and adults are similar to those in children. Some common dyslexia signs and symptoms in teens and adults include:

- Difficulty reading, including reading aloud
- Slow and labor-intensive reading and writing
- Problems spelling
- Avoiding activities that involve reading
- Mispronouncing names or words, or problems retrieving words
- Trouble understanding jokes or expressions that have a meaning not easily understood from the specific words (idioms), such as "piece of cake" meaning "easy"
- Spending an unusually long time completing tasks that involve reading or writing
- Difficulty summarizing a story
- Trouble learning a foreign language
- Difficulty memorizing
- Difficulty doing math problems

**When to see a doctor**

Though most children are ready to learn reading by kindergarten or first grade, children with dyslexia often can't grasp the basics of reading by that time. Talk with your doctor if your child's reading level is below what's expected for his or her age or if you notice other signs of dyslexia.

When dyslexia goes undiagnosed and untreated, childhood reading difficulties continue into adulthood.

# Causes

Dyslexia tends to run in families. It appears to be linked to certain genes that affect how the brain processes reading and language, as well as risk factors in the environment.

# Risk factors

Dyslexia risk factors include:

- A family history of dyslexia or other learning disabilities
- Premature birth or low birth weight
- Exposure during pregnancy to nicotine, drugs, alcohol or infection that may alter brain development in the fetus
- Individual differences in the parts of the brain that enable reading

## Complications

Dyslexia can lead to a number of problems, including:

- **Trouble learning.** Because reading is a skill basic to most other school subjects, a child with dyslexia is at a disadvantage in most classes and may have trouble keeping up with peers.
- **Social problems.** Left untreated, dyslexia may lead to low self-esteem, behavior problems, anxiety, aggression, and withdrawal from friends, parents and teachers.
- **Problems as adults.** The inability to read and comprehend can prevent a child from reaching his or her potential as the child grows up. This can have long-term educational, social and economic consequences.

Children who have dyslexia are at increased risk of having attention-deficit/hyperactivity disorder (ADHD), and vice versa. ADHD can cause difficulty sustaining attention as well as hyperactivity and impulsive behavior, which can make dyslexia harder to treat.

By Mayo Clinic Staff

Any use of this site constitutes your agreement to the Terms and Conditions and Privacy Policy linked below.

Terms and Conditions
**Privacy Policy**
**Notice of Privacy Practices**
Notice of Nondiscrimination

Mayo Clinic is a nonprofit organization and proceeds from Web advertising help support our mission. Mayo Clinic does not endorse any of the third party products and services advertised.

Advertising and sponsorship policy
Advertising and sponsorship opportunities

A single copy of these materials may be reprinted for noncommercial personal use only. "Mayo," "Mayo Clinic," "MayoClinic.org," "Mayo Clinic Healthy Living," and the triple-shield Mayo Clinic logo are trademarks of Mayo Foundation for Medical Education and Research.

© 1998-2021 Mayo Foundation for Medical Education and Research (MFMER). All rights reserved.

# Exhibit G

Home    Today    Following    Q Search

  

# V

## Vikram Kumar

@vkmansingh

**1 follower** · 0 following

Message    Following

Vikram Kumar hasn't saved any Pins yet

+

?

## EXHIBIT A – MAINI'S OKCUPID PROFILE

gallantvk / 28 / Sydney, Australia I OkCupid

https://www.okcupid.com/profile/gallantvk?cf=messages

Browse Matches        Quickmatch        Go Premium

  

**gallantvk** ♂

28 · Sydney, Australia · 23% Match

They've been blocked:        Unblock

### My self-summary

I was a hippie coming out of school, and spent some time as a Himalayan Yogi...barefoot and all. Now I wear shoes, and work as an investment analyst for a bank. I grew up in Sydney and just returned after a few years away in London, Singapore & Mumbai.

Straight, Man, Single, 6' 1", Fit

Indian, Speaks English and Hindi, Attended Post grad, Hindu

Never smokes, Drinks socially, Doesn't do drugs, Doesn't have kids

### What I'm doing with my life

Well, I just got back to Sydney. It is a bit like time travel as I am just trying to process all the changes in my childhood home.

Looking for single women, near me, ages 21-42, for short & long term dating and new friends.

### I'm really good at

I just recently came out of the closet- I am a macho geek.

People are much more open minded these days.

Browse invisibly

### Favorite books, movies, shows, music, and food

Movie- Dead Poets Society
Book- Heart of Darkness
Show- Seinfeld
Music- Motown
Food- Korean

I'm Old School.



### The six things I could never do without

I try to stay in a state of non-attachment to the material world.

Ok, old habits die hard...

But if pressed...

1. The complete works of Joseph Conrad
2. ESPNCricinfo

You might like



♥ 2    ☺ Loveinthebuildin

1 of 3

4/16/16, 1:41 PM

1

gallantvk / 28 / Sydney, Australia I OkCupid

https://www.okcupid.com/profile/gallantvk?cf=messages

3. The Financial Times
4. The Best of Marvin Gaye
5. Hollywood Action films (which are really comedies...the older and fatter the action hero the better...and the more unrealistic the action, the more I love the movie).
6. Safari by Ralph Lauren.

**I spend a lot of time thinking about**

The future of the global economy (9-5).

Which is the very best little restaurant in Chinatown. (on my way home).

The Clash of Civilisations (if I am feeling intellectual).

How to rip a cross-court backhand winner (on the tennis court).

How to dance like a butterfly and sting like a bee (in the boxing ring).

Karma (as I doze off).

**On a typical Friday night I am**

That's what I am trying to find out...what to do in Sydney on a Friday night??

**You should message me if**

You are stylish and smart and funny and fragrant.

**The two of us**                            See questions

| 20% | 20% | -- |
|-----|-----|-----|
| Lifestyle | Dating | Ethics |

**Personality**

| ↑ More Wholesome | ↑ More Adventurous |
|------------------|--------------------|

See graph

❤ 2    🐸 Loveinthebuildin

4/16/16, 1:41 PM

2

### EXHIBIT B – MAINI'S PLENTY OF FISH PROFILE



Maini sent Plaintiff a love letter at 5:32 AM and by 9:59 PM, he was on a dating app.

Vikram KMS                                                                May 2, 2016 at 5:32 AM
To: ██████████████████████                                                Details

Dearest Husnvaali

I am just going to stay in karmayogi mode. Acting without thoughts of the fruit of such actions.

That is, I am dedicating myself to you and the prospect of us without any thought of the joy which we would share, and without imposing any demands on you at all.

"Still" is an important word. You have never really let go of that sense of caution with me since day one. I tend to think that "caution" is really a euphemism for a range of other things. The thing is though that I am not and have never been cautious with you. I never will be. I can never tell you how to feel about me, all I can say is that this "caution" is a big obstacle to our happiness. It is difficult to understand how you can love, cautiously. How you can be soul mates, cautiously. How you can have this ever present sense of caution, with your future husband. But maybe you can enlighten me, I am from Mars after all.

But it's OK, none of this will stop me trying.

I trust you. I have never, and will never not trust you.

You know, I have always tried to communicate with you in the most clear and open way at all times. But there are a couple of things I am not going to say. Don't worry, I am not really keeping anything from you. It is just that I would like you to come to some realisations at some point, unprompted by me. It is not that I don't want to say these things. Sometimes I just feel like blurting them out. It is just that I have never heard them from you so far. I look forward to the day that I hear it all from your mind and heart.

You know what has been keeping me going this past while? There was a split second, a delightful image when we were on skype the last time, and I was flat on my back, and we were talking about surprises and you flashed this huge smile and rolled your eyes to one side and your whole face lit up. It was pure and wholesome lovely loveliness.

3

## EXHIBIT C – MAINI'S SHAADI.COM PROFILE



A screenshot of his Shaadi.com profile taken 26 August 2016 where he is posing as a medical doctor when he is not a medical doctor.  He remains an unemployed former marketing executive.

4

### EXHIBIT D – MAINI'S EMAIL INTRODUCTION TO PLAINTIFF'S PARENTS

From: ███████████████████████████
Subject: Fw: Namaste
Date: 17 October 2016 at 16:04
To: ███████████████████████████

—— Forwarded Message ——
From: Vikram KMS <vikramsingh@outlook.com>
To: ███████████████████████
Sent: Wednesday, June 15, 2016 10:00 AM
Subject: Namaste

Namaste Mrs ████████████████████

I would like to take this opportunity to introduce myself.

As you know, I have developed a friendship with your daughter ██████ over recent months.

She is a truly wonderful young woman, and I feel very lucky to have met her.

I turns out we share a lot in common, particularly a similar family and cultural background. I was born and raised in Sydney Australia to a Punjabi Khatri family. We are Hindus, however, also maintain close ties with the Sikh community. Like most Punjabi families, we are spread out around the world, with the larger part of the family based in England. Whilst I was raised in Australia, we would spend our vacations in England with family there. My family is quite traditional, and has managed to keep the old time Punjabi culture alive. My father was an IT consultant throughout his career however, recently had to retire due to poor health. My mother has been a homemaker.

My background is in finance and economics. i am currently working in the private sector, although I would also like to be involved in public policy in the future. I am working on some academic research at the moment with a view to doctoral studies. I have traveled and worked around the world, and particularly valued my time in India after college. I lived and worked there and took the opportunity to re-connnect with my Indian roots and learn about Hindu spirituality and culture. In fact I am trying to steer ██████ away from Aristotle and towards Krishna and Arjun!

██████ always speaks very warmly of yourself and Dr █████ I would like to seek your permission and blessings to continue and develop our friendship in the coming months. I would only request a little time and space for us to continue to get to know each other and grow our relationship for the future.

I have attached a photo of myself taken a couple of weeks ago with my Naniji at a family event in London.

Jai Mata Di

Vikram

5





**Elite Surveillance**
Group

Suite 86, 125 Oxford Street, Bondi Junction NSW 2022 | Phone: 1300 365 883
ABN: 81 161 852 704 | Master License No: 410944186

**TAX INVOICE**

**INVOICE TO:**

NAME:

ADDRESS:
USA

DATE:          30 Jun 2016
INVOICE NO:     INV-1491
MATTER:         Mansingh / Sydney
INVOICE DUE:    30 Jun 2016

| DESCRIPTION | QUANTITY | UNIT PRICE | TOTAL |
|---|---|---|---|
| Tuesday, 28th June 2016 - OP1 | | | |
| Surveillance Hours (Hrs.) | 4.50 | 80.00 | 360.00 |
| Travel Time (Hrs.) | 1.00 | 80.00 | 80.00 |
| Kilometers (Kms) | 20.00 | 0.80 | 16.00 |
| Tuesday, 28th June 2016 - OP2 | | | |
| Surveillance Hours (Hrs.) | 4.50 | 80.00 | 360.00 |
| Travel Time (Hrs.) | 1.00 | 80.00 | 80.00 |
| Kilometers (Kms) | 20.00 | 0.80 | 16.00 |
| Administration Fee (15% of Field Hours) | 1.00 | 54.00 | 54.00 |

**Payment Details**

Commonwealth Bank of Australia
Account Name: Cryptico Consulting Pty Ltd
BSB: 062 124
Account Number: 11 11 5579

| | |
|---|---|
| SUB TOTAL | 966.00 |
| GST 10% | 96.60 |
| TOTAL | 1,062.60 |
| LESS PAYMENTS | 0.00 |
| **TOTAL DUE** | **1,062.60** |

Plaintiff had to retain a private investigation company to discover Maini's true identity.

7

## EXHIBIT E – MAINI'S FAKE SOCIAL MEDIA PROFILES



Maini continued using the gallantvk username on a fake Instagram account to dupe Plaintiff into believing he was a real age 28 investment banker.

8



Email or Phone Passw

Forgot

**Amar Maini is on Facebook.**

To connect with Amar, s

Sign Up Log In

## Amar Maini

Friends Photos Videos

### About Amar Maini

EDUCATION

**University of Sydney**
Class of 2001 · Economics · Sydney, Australia

**The Hills Grammar School**
Class of 1997 · Kenthurst, New South Wales, Australia

CURRENT CITY AND HOME TOWN

**Sydney, Australia**
Current city

**Sydney, Australia**
Home Town

**Photos**

See

**Others named A**

Amar Devi

Amar Mair

Amar Devi



## Vikram Kumar

Message      More

Lives in Sydney, Australia

From Sydney, Australia

**About**         **Photos**         **Friends**

Photos · Nothing to show

Friends · Nothing to show

10

●●●●○ Optus  4G          2:20 PM          ☾ ⊕ ✳ 40% 🔋

🔒 amar mansingh sydney          ↻

# Google

amar mansingh sydney          ✕   🔍

ALL          MAPS          NEWS          IMAGES          VIDEOS

**Amar Vikram Kumar Mansingh, Sydney | ...**
https://www.zomato.com › users › amar-...

Mobile-friendly - Podívej se na Amar Vikram Kumar
Mansingh recenze restaurací, oblíbené restaurace,
seznam přání a další činnosti v ...

**Mughal Room, Agra - Restaurant Reviews,**
**Phone Number & Photos - TripAdvisor**
https://www.tripadvisor.com.au › Restaur...

★★★★☆ Rating: 4.5 - 75 reviews
Mobile-friendly - Mansingh Palace, Agra. 3.5 out of
5, 689 reviews ... Hotel Amar. 3.0 out of 5, 472 ....
Sydney, Australia. Level Contributor.

**Man Singh I - Wikipedia, the free**
**encyclopedia**

‹          ›          ⬆          📖          ⧉

11





Amar Mansingh, Sydney | Zomato                          https://www.zomato.com/users/amar-mansingh-713593/foodjourney

◀ Sydney                    🔍 Search for restaurant, cuisine or a dish...

Search          ▼

Reserve a Table      Log in

## Amar Mansingh
◎ Sydney

🏅 4  BIG FOODIE
**25 POINTS TO LEVEL UP**

Dineline

Reviews                                                      19

Photos                                                        0

Followers                                                    54

Bookmarks                                                     0

Been There                                                   12

**Dineline**

**Sagar Ratna**
Sector 35, Chandigarh

1 of 12                                                  6/29/16, 12:43 PM

14

## EXHIBIT F – MAINI'S PROPOSAL TO PLAINTIFF



## EXHIBIT G – MAINI'S MULTIPLE SKYPE ACCOUNTS



16

Exhibit H

**From: Dr. Jennifer Rhodes** Jennifer@RapportRelationships.com 
**Subject:** Re: Question
**Date:** September 5, 2016 at 10:03 PM
**To:** Misha Kaura mkaura@mac.com

Perfect. Speak to you then.

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!


FACEBOOK   |   INSTAGRAM   |   TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Sep 5, 2016, at 8:47 PM, Misha Kaura <mkaura@mac.com> wrote:

Not a problem. Weds at 8 am work for you?

On Sep 6, 2016, at 9:39 AM, Dr. Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

Hi Misha -

I'm so sorry! I'm not sure what happened but i just got your email. I will be available around 11:30 am your time Tuesday. Or Wednesday at 9 am.

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

&lt;PastedGraphic-12.tiff&gt;   FACEBOOK   |   INSTAGRAM   |   TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Sep 2, 2016, at 7:23 PM, Misha Kaura &lt;mkaura@mac.com&gt; wrote:

Yes, please!!

On Sep 03, 2016, at 08:05 AM, "Dr. Jennifer Rhodes" &lt;Jennifer@RapportRelationships.com&gt; wrote:

No problem.  Let's just re-schedule.  Shall we revert back to the original time - Monday at 8am?

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web:  rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

FACEBOOK   |   INSTAGRAM   |   TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Sep 2, 2016, at 5:27 PM, Misha Kaura &lt;mkaura@mac.com&gt; wrote:

Hi Jennifer
I cannot talk this morning as my dorm is having this weird dorm meeting thing that will run from now until 9:30. Any way we could just talk on Monday of next week? happy to pay a cancellation fee due to the last minute nature of this

the last-minute nature of this.

Staying calm,
Misha

On Sep 03, 2016, at 01:29 AM, "Dr. Jennifer Rhodes" <Jennifer@RapportRelationships.com> wrote:

Okay. Sounds good. Talk soon.

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Sep 1, 2016, at 6:50 PM, Misha Kaura <mkaura@mac.com> wrote:

Saturday at 8 am is perfect.

On Sep 2, 2016, at 1:28 AM, Dr. Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

Okay. I can do Saturday at 8 am. Would that work?

Jennifer

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

<PastedGraphic-12.tiff>   <u>FACEBOOK</u>   |   <u>INSTAGRAM</u>   |   <u>TWITTER</u>

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This
information is intended solely for the addressee; access by anyone else is unauthorized. No
confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended
recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified
that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any
other action is strictly prohibited. If you have received this electronic message in error, please
delete it and any attachments, and notify the sender at the telephone number listed above.

On Sep 1, 2016, at 6:03 AM, Misha Kaura <<u>mkaura@mac.com</u>> wrote:

Hi Di Rhodes,
Would it be possible to schedule a weekend appointment? I've been doing some thinking and
think it's odd that he only wants to see me at 8 pm most days, and only to do specific tasks. He
doesn't respect me, my views, or my ideas, and I am fed up with him not giving me enough
affection or attention throughout the day. He's gone totally cold and the only reason I'm with him
right now is because he lost his job. I was ready to dump him when I got back from Korea, but it
wasn't until he told me about his job situation that I decided to stay. I don't see a future with him,
cannot stand his constant wandering eye and tendency to just ignore my feelings/needs, and need
some help building up a social life outside of him so it's easier to leave him. I don't want to leave
him right now, possibly by the end of this month. I definitely need to get more adjusted. Any
advice or feedback you have would be much appreciated as I absolutely need every piece of
support I can get.

Best,
Misha

<PastedGraphic-12.tiff>



**From:** **Dr. Jennifer Rhodes** Jennifer@RapportRelationships.com 📎
**Subject:** Re: Update!! I need help!
**Date:** August 31, 2016 at 8:46 PM
**To:** Misha Kaura mkaura@mac.com

Just sent you a request. I am here and will be around for the next couple of hours.

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call
now!

          FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access
by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient,
or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure,
copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it
and any attachments, and notify the sender at the telephone number listed above.

On Aug 31, 2016, at 8:33 PM, Misha Kaura <mkaura@mac.com> wrote:

Hi,
Are we still on for today? I'm mishaskaura on Skype.

Best,
Misha

Sent from my iPhone

Begin forwarded message:

**From:** "Dr Jennifer Rhodes" <Jennifer@RapportRelationships.com>
**Date:** September 1, 2016 at 5:18:40 AM GMT+10
**To:** Misha Kaura <mkaura@mac.com>
**Subject:** Re: Update!! I need help!

Hi Misha -

My schedule today is running way late. Can you do 10:30AM? Shoot me an email when you wake up.

Sorry about that!

Jennifer

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary
call now!

<PastedGraphic-12.tiff>  FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Aug 28, 2016, at 9:42 AM, Misha Kaura <mkaura@mac.com> wrote:

Yes, that works perfectly!! Thank you.

Sent from my iPhone

On Aug 28, 2016, at 9:44 PM, Dr. Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

I can do 9 am Thursday morning AEST time. Would that work?

Jennifer

**Jennifer B. Rhodes, Psy.D.**
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

<PastedGraphic-12.tiff>  FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Aug 28, 2016, at 8:31 PM, Misha Kaura <mkaura@mac.com> wrote:

Hi Dr Rhodes
My apologies regarding yesterday. I just got back from out of town. Are you available anytime on Monday-Tuesday Sydney time?

Thanks
Misha

On Aug 27, 2016, at 4:00 AM, Dr. Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

Ok. Take care of yourself

**Jennifer B. Rhodes, Psy.D.**
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

<PastedGraphic-12.tiff>  FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any

are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Aug 25, 2016, at 11:35 PM, Misha Kaura <mkaura@mac.com> wrote:

Hi Jennifer
My parents are bucking down on me for other issues and I can't make Sunday. I'll let you know when I can.

Thanks
Misha

On Aug 26, 2016, at 5:44 AM, Dr. Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

Let's shoot for 8:30 AEST on Sunday.  Let me know if you want to do it by phone or via video.  We can use Skype either way.

Hang in there!  Looking forward to chatting with you soon!

Jennifer

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

<PastedGraphic-12.tiff>   FACEBOOK  |   INSTAGRAM  |   TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Aug 25, 2016, at 1:32 PM, Misha Kaura <mkaura@mac.com> wrote:

Hi Jennifer
Thank you very much!! I'm free all day Saturday after 2 pm AEST, Sunday after 8 am AEST, and Tuesday between 8 am AEST and 11 am AEST. Let me know if any of those times work. I'm really desperate to talk to someone!

Best
Misha

On Aug 25, 2016, at 2:14 AM, Dr. Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

Oh my goodness!  Let's get you some support ASAP.

What does your schedule look like over the next few days?

Jennifer

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

<PastedGraphic-12.tiff>   FACEBOOK  |  INSTAGRAM  |   TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Aug 24, 2016, at 11:46 AM, Misha Kaura <mkaura@mac.com> wrote:

Jennifer!
Lots of updates.

I dated Matt just that one time and we fizzled out due to incompatibility after my disastrous TEDx talk.

Two days after that breakup, I met an Indian boy who was perfect on paper but completely not the right one in practice. We were long distance for four months, had a very tumultuous ride, and have been seeing each other the past two months. Today he told me that he no longer has that loving fueling but wants to support my DBT program. My gut is telling me we're heading towards a breakup. I want to reach out for support because upon moving to Australia and being isolated from everyone in my dorm, I have no friends, no family, and no support system to navigate this new change. I'm really desperate for some advice on how to handle what I see as the end of our relationship that I was so sure was going to end up in our marriage. If we could restart the search for someone else once the breakup is finalized on his end, that would be good as well. I want to be faithful until the bitter end, but that end was supposed to come at death and not in the middle. I made a lot of mistakes and broke his trust, costing him both his career and a lot of his money, but he can't forgive me as I think the trust is too damaged. We're both hanging on a thread and have both checked out emotionally. I was just about falling in love with him when all of this went down. I don't have the skills to navigate everything and I don't know how I'm going to deal with the ending of the very first serious-serious relationship of my life, or if it can even be salvaged. (He says he still wants to marry me, but I'm off the pedestal. He's with me more out of obligation because he promised he would never leave me and he said he already thinks of me as his wife.)

I can't divulge too many details due to the nature of our relationship and the exact sort of work he does, but I know you were of great assistance to me before, and I trust that you will give me excellent guidance on how to proceed further.

Best
Misha

On Feb 29, 2016, at 12:28 PM, Dr Jennifer Rhodes <Jennifer@RapportRelationships.com> wrote:

No problem! Hope you have been well!

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

Join me on Feb 11th in SF for the Science of Seduction with INFORUM

<PastedGraphic-12.tiff>  FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Feb 28, 2016, at 8:42 PM, Misha Kaura <mkaura@mac.com> wrote:

Sorry for the extended delay!!

Misha

Begin forwarded message:

From: "service@paypal.com" <service@paypal.com>
Subject: You sent a payment
Date: February 28, 2016 at 8:42:14 AM EST
To: Dormetal <mkaura@mac.com>

**You sent a payment**                      Transaction ID: 4HF25660H34863111

Dear Dermetel,

You sent a payment for $975.00 USD to Rapport, A Boutique Relationship Agency LLC.

Please note that it may take a little while for this payment to appear in the Recent Activity list on your Account Overview.

View the details of this transaction online

Your monthly account statement is available anytime; just log in to your account at https://www.paypal.com/us/cgi-bin/webscr?cmd=_history. To correct any errors, please contact us through our Help Center at https://www.paypal.com/us/cgi-bin/webscr?cmd=_contact_us.

| | |
|---|---|
| Amount you have sent: | $975.00 USD |
| Your total charge: | $975.00 USD |
| Rapport, A Boutique Relationship Agency LLC will receive: | $975.00 USD |
| Sent on: | February 28, 2016 |
| Message in your payment email: | Couldn't figure out how to make Intuit work. |

Sincerely,
PayPal

Help | Resolution Center | Security Center

This email was sent by an automated system, so if you reply, nobody will see it. To get in touch with us, log in to your account and click "Contact Us" at the bottom of any page.

Copyright © 2016 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

From: **Dr. Jennifer Rhodes** Jennifer@RapportRelationships.com 
Subject: Re: You sent a payment
Date: February 28, 2016 at 10:28 PM
To: Misha Kaura mkaura@mac.com

No problem! Hope you have been well!

Jennifer B. Rhodes, Psy.D.
Founder and CEO
Licensed Psychologist (PSY 23201 - CA; #18122 - NY)
web: rapportrelationships.com
phone: 415.735.6150 SF
phone: 646.952.3715 NYC
email: jennifer@rapportrelationships.com

If you or someone you know could benefit from a free mini dating/relationship consultation, schedule a complimentary call now!

Join me on Feb 11th in SF for the Science of Seduction with INFORUM

    FACEBOOK  |  INSTAGRAM  |  TWITTER

CONFIDENTIALITY NOTICE:
This email message and accompanying attachments are confidential and privileged. This information is intended solely for the addressee; access by anyone else is unauthorized. No confidentiality or privilege is waived or lost by erroneous transmission. If you are not the intended recipient, or the agent responsible for delivery to the intended recipient, you are hereby notified that any forwarding, opening of attachments, disclosure, copying, distribution of contents, or any other action is strictly prohibited. If you have received this electronic message in error, please delete it and any attachments, and notify the sender at the telephone number listed above.

On Feb 28, 2016, at 8:42 PM, Misha Kaura <mkaura@mac.com> wrote:

> Sorry for the extended delay!!
>
> Misha
>
> Begin forwarded message:
>
> **From:** "service@paypal.com" <service@paypal.com>
> **Subject: You sent a payment**
> **Date:** February 28, 2016 at 8:42:14 AM EST
> **To:** Dermetel <mkaura@mac.com>
>
> 
>
> ## You sent a payment                    Transaction ID: 4HF25660H34863111
>
> Dear Dermetel,
>
> You sent a payment for $975.00 USD to Rapport, A Boutique Relationship Agency LLC.
>
> Please note that it may take a little while for this payment to appear in the Recent Activity list on your Account Overview.

View the details of this transaction online

Your monthly account statement is available anytime; just log in to your account at
https://www.paypal.com/us/cgi-bin/webscr?cmd=_history. To correct any errors, please
contact us through our Help Center at https://www.paypal.com/us/cgi-bin/webscr?
cmd=_contact_us.

|  |  |
|---|---|
| Amount you have sent: | $975.00 USD |
| Your total charge: | $975.00 USD |
| Rapport, A Boutique Relationship Agency LLC will receive: | $975.00 USD |
| Sent on: | February 28, 2016 |
| Message in your payment email: | Couldn't figure out how to make Intuit work. |

Sincerely,
PayPal

Help | Resolution Center | Security Center

This email was sent by an automated system, so if you reply, nobody will see it. To get in touch with us, log in to your account and click "Contact Us" at the bottom of any page.

Copyright © 2016 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

PayPal Email ID PP110   071b349327361

# Exhibit I

Pinterest: Discover and save creative ideas                     https://www.pinterest.com/mishaskaura/vs-favorites/

| Search | |  Misha |
|---|---|---|

# V's Favorites!

Add recipes you want here. So far, I have kerala, tandoori, bhindi, Korean, and sweet corn soup withou
pork.

**This board is secret**
**Learn more**

 **Misha Kaura**    **Invite**                    **31**
Pins

**Move Pins**     **Edit bo**


**Add a Pin**





 from My Korean Kitchen

**Bibimbap - Korean Mixed Rice with Meat and Assorted Vegetables**

I know a Korean place that makes amazinggg bibimbap, love it really spicy ♥

**Pinned from**
mykoreankitchen.com

Traditional Bibimbap recipe - can simplify to only a few top you'd like!

**Pinned from**
koreanbapsang.com





Exhibit K

Amar Chander Maini                                                                    9/13/19, 7:50 PM



More ▼                                                          Create Blog   Sign In

**Wednesday, September 4, 2019**

## Dr Sitaram Kaura MD

What an ugly and fat old man. Dr Sitaram Kaura MD ignores emails. He ignored my emails. You don't ignore emails from me. Son of a bitch old man needs to respond or else

Posted by Amar Chander Maini at 9:12 AM    No comments:    

**Tuesday, September 3, 2019**

## Misha Kaura Will Die

That fucking bitch Misha Kaura is now suing me. Oh I'm so scared. I'm shaking and scared. I will kill this bitch before she even gets anywhere. I have acid and I'm ready to throw it.

Posted by Amar Chander Maini at 9:19 AM    No comments:    

**Saturday, August 31, 2019**

## Misha Kaura IS A GODDAMN BITCH

BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH
BITCH

Posted by Amar Chander Maini at 10:03 AM    No comments:

**About Me**

Amar Chander Maini

View my complete profile

**Blog Archive**

▼ 2019 (7)
  ▼ September (2)
    Dr Sitaram Kaura MD
    Misha Kaura Will Die
  ► August (3)
  ► July (1)
  ► June (1)

Amar Chander Maini

9/13/19, 7:50 P

## Fucking Anorexic Bitch Cunt Misha Kaura

Misha Kaura is an anorexic bitch. Her parents bought her success. Fucking goddamn bitch Misha NEEDS TO DIE. SHE NEEDS TO FUCKING DIE. THE GODDAMN KNOW IT ALL BITCH MISHA ACTS SO HELPLESS WHEN SHE'S REALLY JUST A SPOILED RICH BRAT. Goddamn bitch Misha and her fat cow dad DOCTOR Sitaram are both GOING TO END UP IN HELL. BOTH OF THEM. I emailed her Dad and he never responded. No. I'm not "good enough" for his daughter or a response. Fucking asshole family. The WHOLE FAMILY is obnoxious and elitist and rude. Misha is no different from her elitist family. Goddamn asshole family.

Posted by Amar Chander Maini at 10:29 AM        No comments:        

Tuesday, August 27, 2019

## Goddamn Bitch Misha Kaura

Misha Kaura is a goddamn bitch. The cunt Misha is now taking this to US federal court. I'm entitled to write anything I want about her and her family. Obviously she never went to UNSW but that doesn't mean I deserve to be sued. Misha is a fucking bitch who does not realise that suing me and reporting me is only making me angry. I have the right to write whatever I want about anyone. It's not a "false statement of fact," it's me expressing myself. Misha needs to die. I want to kill her. If I see her again I intend to kill her.

Posted by Amar Chander Maini at 5:48 PM        No comments:        

Friday, July 12, 2019

## That bitch Misha Kaura just sued me

Apparently, I am now being sued for libel and now face charges for criminal libel...all thanks to Misha Kaura, also known as The Bitch of the Century. Instead of just paying for removals she's dragging me to court.

Posted by Amar Chander Maini at 4:51 PM        No comments:        

Wednesday, June 19, 2019

## I will murder Misha Kaura

I will murder Misha Kaura if it is the last thing I do.

MISHA WILL BE DEAD BY MY HANDS
MISHA WILL HAVE ACID THROWN BY MY HANDS
MISHA WILL BE RUINED BY MY HANDS

I'm not done with this bitch. I will make sure nobody else marries her, arranged or love.

Posted by Amar Chander Maini at 10:04 PM        No comments:        

Home

Subscribe to: Posts (Atom)

Simple theme. Powered by Blogger.



**Thursday, November 29, 2018**

# Why I hate Misha Kaura

I lied to Misha. I catfished Misha. I conned Misha.

But I don't care.

She broke my heart into pieces when she left me waiting at the altar.

So my mission is to get my revenge. It doesn't matter if what I say or write is true or false.

I want her to feel the same pain I feel.

I want her career to be in shambles.

I want her to die.



**Monday, May 20, 2019**

## I want to murder Misha Kaura

My name is Amar Chander Maini and I want to murder Misha Kaura. I can't stand her. Everything about her makes me furious. I hate her. I wish she had married me. I'm so angry at her.

# Exhibit L

SELECTIVE ⬤ SEARCH®

EXECUTIVE SEARCH MEETS PERSONAL MATCHMAKING

THIS EXECUTIVE CLIENT SERVICES AGREEMENT (this "Agreement") is made and entered into as of the date executed by Client (as set forth on the signature page hereto, the "Effective Date"), by and between Selective Search Holdings, LLC, d/b/a Selective Search LLC ("Selective Search"), and the undersigned executive client (the "Client" and together with Selective Search, collectively, the "Parties" and each, a "Party").

Client desires to engage and retain Selective Search to provide the matchmaking services more fully described in this Agreement upon the terms and conditions hereinafter set forth, and Selective Search is willing to perform and provide such services to Client. In consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Scope of Agreement. The terms of this Agreement establish the rights and obligations of the Parties with respect to the provision of the Matchmaking Services (as defined below) by Selective Search. This Agreement (including any and all schedules, exhibits, addendums and attachments hereto, the terms of which are hereby incorporated by reference), contains the entire agreement of the Parties with respect to the Matchmaking Services and supersede any and all prior understandings, agreements, representations and warranties between the Parties.

2.      Term.      Except as it may be earlier terminated in accordance with Section 10 below, the term of this Agreement (the "Term") will commence on the Effective Date and will continue in effect for the period of time set forth on Exhibit A to this Agreement (the "Service Attachment") and identified as the "Term".

3.      Services.

(a)      During the Term, Selective Search will provide Client with the matchmaking services described in this Agreement and on the Service Attachment (the "Matchmaking Services"). In performing the Matchmaking Services, Selective Search has, or will hereafter, interview Client to identify the (i) type of relationship he/she is looking for; and (ii) criteria that an individual must meet for purposes of engaging in a personal relationship with Client (collectively, the "Matchmaking Criteria"). During the Term, Selective Search will present Client with the profiles of individuals that have been reviewed by Selective Search, and are deemed to meet the Matchmaking Criteria, and that reside in the geographic markets set forth on the Service Attachment  (each such individual, a "Candidate"). Client may, in his/her sole discretion, request to be introduced to any Candidate. If Client is introduced to a Candidate and the Client and Candidate engage in some form of video communication, then the introduction and communication will qualify as an "Introduction" for purposes of this Agreement. Client acknowledges that Selective Search will use its skill and experience in an effort to provide Client with the Candidates and Introductions necessary to meet Client's goals, but in no event will the number of Introductions provided by Selective Search during the Term exceed the maximum amount specified on the Service Attachment (the "Total Introductions"). Client may choose not to meet a Candidate or pursue a formal Introduction with a Candidate, and such Candidate will not count towards the Total Introductions; provided, however, Client agrees that he/she shall, in good faith, diligently and thoughtfully consider each Candidate presented by Selective Search. If Client fails to comply with the foregoing and/or consistently rejects or fails to follow-up on potential meetings with Candidates, then Selective Search will be entitled to count any or all such Candidates and/or potential meetings towards the Total Introductions. Client understands that no Candidate has any obligation of any kind to meet or communicate in any way with Client, and neither Selective Search nor any Candidate will have any liability of any kind arising out of or in connection with any decision by any Candidate to reject or discontinue meetings with and/or communications to/from Client.

(b)      Client acknowledges that although Selective Search works to ensure that Client has a positive matchmaking experience, personal relationships are complex and Selective Search does not guarantee that the Matchmaking Services will result in Client finding a suitable partner for marriage, companionship or any other similar type of relationship. Client further acknowledges and agrees that while Selective Search does complete focused interviews and screenings of its clients (including Client) and Candidates, Selective Search has no obligation to and has not agreed to (i) complete any background check or formal evaluation regarding; or (ii) disclose or divulge to Client or any Candidate, any medical, criminal, psychological or other similar conditions affecting Client or any Candidate. Client agrees that Client is solely and exclusively responsible for his/her interactions with any Candidates and assumes all risk associated with any such interactions.

4.      Privacy. Selective Search respects Client's privacy and the need to provide the Matchmaking Services in a discrete manner. If Client desires that any of his/her personally identifiable information (a) not be disclosed to any actual or potential Candidate; or (b) only be disclosed at a certain time or upon the satisfaction of certain conditions, then Client must provide prior notice to Selective Search, describing in detail (i) the information that should not be disclosed, or (ii) the conditions that must be met before the information is disclosed. Upon receipt of any such notice, the Parties shall meet to discuss and mutually agree with respect to any adjustments to be made to the Matchmaking Services in light of Client's request. Except as otherwise agreed to by the Parties as contemplated in this Section 4, Client authorizes Selective Search to use and release the Matchmaking Criteria and personally identifiable information provided by Client in connection with the performance of the Matchmaking Services.

5.      Client Obligations and Representations.

(a)      Client covenants and agrees that Client shall (i) cooperate with Selective Search in all matters relating to the Matchmaking Services or otherwise pertaining to this Agreement; (ii) respond promptly to any request from Selective Search to provide

direction, information, approvals, authorizations, or decisions that are necessary for the Matchmaking Services; and (iii) not disclose any confidential information provided to Client with respect to any Candidate or Selective Search without the prior consent of such Candidate or Selective Search (as the case may be).

(b)     Client represents and warrants that (i) he/she has never been convicted of a felony; (ii) he/she is not and never has been required to register as a sex offender with any local, state or national governmental entity; and (iii) all information provided by Client to Selective Search, whether prior to or after the Effective Date, is and will be true, correct and complete in all material respects. If any information previously provided to Selective Search by Client changes or otherwise becomes untrue, Client shall, as promptly as possible, provide Selective Search with notice of such change.

(c)     Client covenants and agrees that he/she (i) will not (and will not attempt to) exploit, abuse or use the Matchmaking Services to harass any person, or for any illegal, immoral or other similar purpose; and (ii) will, at all times in connection with the Matchmaking Services, conduct himself/herself appropriately, and refrain from engaging in any disrespectful, abusive, indecent, illegal or otherwise inappropriate behavior with any Candidate or any employee, agent or representative of Selective Search.

6.     Fee for Services. As consideration for Selective Search's willingness to enter into this Agreement and performance of the Matchmaking Services, on the Effective Date, concurrently with the execution of this Agreement, Client shall pay a fee to Selective Search in the amount set forth on the Service Attachment and identified thereon as the "Client Service Fee". Client acknowledges and agrees that, as of the Effective Date, Selective Search has already commenced preparing for and actually performing the Matchmaking Services, and that the Client Service Fee will be deemed to have been earned on the Effective Date and will thereafter be non-refundable.

7.     Limited Warranty; Limitation of Liability.

(a)     Selective Search represents and warrants that it will perform the Matchmaking Services in accordance with the terms and subject to the conditions in this Agreement, and in a professional manner in accordance with recognized industry standards for similar services. Selective Search's sole and exclusive liability, and Client's sole and exclusive remedy with respect to any breach of the warranty set forth in this Section 7(a), is to terminate this Agreement in accordance with Section 10(c)(ii), or by written notice, require Selective Search to use commercially reasonable efforts to cure any such breach.

(b)     EXCEPT AS EXPRESSLY SET FORTH IN SECTION 7(A), TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW (i) THE MATCHMAKING SERVICES ARE PROVIDED "AS IS", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND; AND (ii) NEITHER SELECTIVE SEARCH, NOR ANY OTHER PERSON OR ENTITY ON ITS BEHALF, HAS MADE ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS, IMPLIED, WRITTEN, ORAL, STATUTORY, OR OTHERWISE, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTIES THAT MAY ARISE OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, OR TRADE PRACTICE.

(c)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL (I) SELECTIVE SEARCH, ITS AFFILIATES AND/OR ANY OF ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "SSH PARTIES") BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR ENHANCED DAMAGES OF ANY KIND ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PROVISION OF THE MATCHMAKING SERVICES, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE; (B) WHETHER OR NOT SELECTIVE SEARCH WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; AND (C) THE LEGAL OR EQUITABLE THEORY UPON WHICH ANY CLAIM OR THE DAMAGES ARE BASED; AND (II) THE AGGREGATE LIABILITY OF THE SSH PARTIES ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PROVISION OF THE MATCHMAKING SERVICES, EXCEED THE CLIENT SERVICE FEE PAID TO SELECTIVE SEARCH.

(d)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL THE SSH PARTIES (OR ANY ONE OF THEM) BE LIABLE FOR ANY DAMAGES WHATSOEVER, WHETHER DIRECT, INDIRECT, GENERAL, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE AND/OR ENHANCED, ARISING OUT OF OR RELATING TO THE ACTS, OMISSIONS OR OTHER CONDUCT OF CLIENT, ANY CANDIDATE OR ANY OTHER PERSON IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PROVISION OF THE MATCHMAKING SERVICES, INCLUDING WITHOUT LIMITATION, BODILY INJURY, EMOTIONAL DISTRESS, AND/OR ANY OTHER DAMAGES RESULTING FROM COMMUNICATIONS OR MEETINGS BETWEEN CLIENT AND ANY CANDIDATE.

(e)     The limitation of liability provisions set forth in this Section 7 will apply even if Client's remedies under this Agreement fail of their essential purpose, and Client acknowledges and agrees that the Parties entered into this Agreement in reliance upon the limitations of liability set forth in this Section 7, that the same reflect an allocation of risk between the Parties (including the risk that a contract remedy may fail of its essential purpose and cause consequential loss), and form an essential basis of the bargain between the Parties.

8.     Indemnification. Client agrees to indemnify, defend and hold harmless the SSH Parties from and against any and all losses, costs, liabilities, fines, penalties, damages or expenses of any kind (including reasonable attorneys 'fees) arising out of or related to (a) Client's breach or other violation of this Agreement; (b) the acts or omissions of Client; and (c) the Matchmaking Services (except to the extent proximately caused by the gross negligence of Selective Search).

9.     Force Majeure. Selective Search will not be deemed to have defaulted or breached this Agreement for any failure or delay in fulfilling or performing any term of this Agreement to the extent such failure or delay is caused by or results from acts or

circumstances beyond the reasonable control of Selective Search, including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, civil unrest or other similar events.

10.   <u>Termination</u>. This Agreement will terminate upon the expiration of the Term. Prior to the expiration of the Term, this Agreement may only be terminated: (a) by mutual agreement of the Parties; (b) by either Party upon written notice to the other Party following Client receiving the Total Introductions; (c) by Client (i) for any reason, upon thirty (30) days prior written notice to Selective Search; or (ii) effective immediately upon written notice to Selective Search if Selective Search breaches this Agreement; or (d) by Selective Search effective immediately upon written notice to Client if Client breaches this Agreement. Provisions of this Agreement, which by their nature should apply beyond their terms, will remain in force after termination or expiration of this Agreement including, but not limited to, Sections 5, 7, 8 and 10 through 13.

11.   <u>Notices</u>. All notices, consents, claims, waivers, and other communications hereunder (each, a "<u>Notice</u>") must be in writing and addressed to the Parties at the mailing address or email address set forth beneath their signatures to this Agreement. Any Notice will be deemed to have been rightfully given (a) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (b) on the third day after the date mailed, by certified or registered mail (return receipt requested, postage prepaid); or (c) on the date sent by email (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient.

12.   <u>Governing Law</u>.      The Parties agree that all matters arising out of or relating to this Agreement will be governed by the internal laws of the State of Delaware, and if any suit or proceeding is brought in connection with or arising out of this Agreement, such suit or proceeding will be brought in the state or federal courts located in New Castle County, Delaware, and the Parties shall submit to the exclusive jurisdiction of such courts and waive any and all jurisdictional, venue and inconvenient forum objections to such courts.

13.   <u>Miscellaneous</u>. If any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability will not affect any other provision of this Agreement or invalidate or render unenforceable such provision in any other jurisdiction. This Agreement may only be amended or modified by an agreement in writing signed by all Parties. No waiver by any Party of any of the provisions of this Agreement will be effective unless set forth in writing and signed by the Party so waiving. Client may not assign any of its rights hereunder without the prior written consent of Selective Search, and any purported assignment in violation of this Section will be null and void. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement; and a signed copy of this Agreement delivered by email or other means of electronic transmission will have the same legal effect as delivery of an original signed copy of this Agreement.

<p align="center">*      *      *      *      *      *</p>

<p align="center">**Thank you for this opportunity to serve you. We look forward to working with
you and introducing you to someone truly exceptional.**</p>

| CLIENT | | SELECTIVE SEARCH LLC |
|---|---|---|
| Signature: | *MKau* | By: *nicole wall* |
| Print Name: | **Misha Kaura** | Name:  Nicole Wall, Senior Vice President |
| Email Address: | <u>mkaura@mac.com</u> | Date:  24 February 2021 |
| Date Signed: (Effective Date) | Feb 25, 2021 | Address: 35 E. Wacker Drive, Suite 1920, Chicago, Illinois 60601 Attn: Client Relations |

3

**EXHIBIT A: SERVICE ATTACHMENT**

The terms set forth in this Exhibit A: Service Attachment will apply with respect to that certain EXECUTIVE CLIENT SERVICES AGREEMENT by and between Selective Search Holdings, LLC d/b/a Selective Search LLC and the undersigned executive client (the "Client") as of the Effective Date set forth below. In the event of any conflict between this Service Attachment and the Agreement, this Service Attachment will control.

| Client Information | |
|---|---|
| Client Name: Misha Kaura | |
| Contact Information: mkaura@mac.com | |

| Matchmaking Services Details | | | |
|---|---|---|---|
| Term: One Year \| Four Month Hold | Total Introductions: Up to Ten | Personal Recruiter Level: Founder and President's Executive Team | Meet Your Future Process: Yes |
| No. of Markets: National | Market List: National | | |
| Other Considerations: SSL Meet Your Future Process: prospect vetting, written presentations, bios and photos. Research and Support Team, Customized Coaching Program, Ongoing Relationship Coaching, Concierge Support (Assistance with travel management and date scheduling), Photography Session \| Portfolio Review. Pre and Post Introduction Coaching. Post Introduction Feedback. | | | |

| Payment Details | | | |
|---|---|---|---|
| Client Service Fee: $500,000 | | | |
| Method of Payment: | Credit/Debit (service fee) | Wire | Check |
| Notes: | | | |

**CLIENT**

Signature: _MKa..._

Print Name: Misha Kaura

Date Signed: Feb 25, 2021
(Effective Date)

**SELECTIVE SEARCH LLC**

By: _nicole wall_

Name: Nicole Wall, Senior Vice President

Date: 24 February 2021

4

## SELECTIVE SEARCH EXECUTIVE CLIENT SERVICES AGREEMENT
## NEW YORK STATE LAW ADDENDUM

THIS NEW YORK STATE LAW ADDENDUM TO EXECUTIVE CLIENT SERVICES AGREEMENT (this "Addendum") supplements that certain Executive Client Services Agreement (as the same may be amended, modified, supplemented, extended or restated from time to time, the "Agreement") dated as of 24 February 2021 by and between Selective Search and Client (both as defined in the Agreement).

1.      Terms of this Addendum.  This Addendum shall supplement and serve as an adjunct to the Agreement, which is and shall hereafter remain in full force and effect; provided, however, in the event of any conflict between the terms of this Addendum and the Agreement, the terms of this Addendum shall control.  Capitalized terms used and not otherwise defined in this Addendum shall have the meaning ascribed to such terms in the Agreement.

2.      Terms Applicable to Clients Residing in New York.  The terms and conditions set forth in this Section 2 shall only apply to and supplement the Agreement in the event that Client is, as of the Effective Date, a resident of New York, and in all other cases, this Section 2 shall be disregarded and have no force or effect on the Agreement:

**Client may cancel the Agreement, without any penalty or obligation, at any time prior to midnight of the third business day following the date of the Agreement by providing written notice to Selective Search at: Selective Search LLC, 35 E. Wacker Drive, Suite 1920, Chicago, Illinois 60601, Attn: Client Communications. Any such notice should be provided in accordance with Section 11 of the Agreement, and upon timely receipt thereof, Selective Search shall refund the Client Service Fee to Client.**

**If, during the Term, Client dies or is disabled and cannot thereafter use the Matchmaking Services, (i) Client and/or Client's estate may, by written notice to Selective Search, elect to be relieved of the obligation to make any additional payments in respect of the Matchmaking Services; and (ii) upon written notice to Selective Search, Client shall be entitled to a refund of that portion of the Client Service Fee, if any, which is allocated to the period after Client's death or disability.**

**The Matchmaking Services do not guarantee any number of Candidates or Introductions. The Matchmaking Services may be provided to our Clients in locations across the United States.  If Client is concerned that it has or is planning to move to a location outside of where Selective Search does or can provide the Matchmaking Services, please contact Selective Search at: Selective Search LLC, 35 E. Wacker Drive, Suite 1920, Chicago, Illinois 60601, Attn: Client Communications.  Any such communication should be provided in accordance with Section 11 of the Agreement.**

*       *       *       *       *



# BERKELEY
## INTERNATIONAL

# I N V O I C E

**V.A.T NUMBER:   821 2774 43**

3rd April, 2020

**Misha Kaura**

| | |
|---|---|
| Professional Services | £15,000.00 |
| VAT @20% | £3,000.00 |
| Total | £18,000.00 |

Payment can be made by credit card (not American Express)

Overseas: Berkeley International
IBAN: GB39NWBK60101487009951
BIC: NWBKGB2L
NatWest Farnham, Surrey England
Sort Code:  60-10-14  Account Number: 87009951

Berkeley International Ltd.
Company Registration No. 04698672 (England and Wales) Registered address – Harrow House, 23 West Street, Haslemere, Surrey, GU27 2AB



# I N V O I C E

## V.A.T NUMBER:   821 2774 43

8th March, 2021

**Misha Kaura**

| | |
|---|---|
| Professional Services | £20,000 |
| VAT @ 20% | £4,000 |
| Total | £24,000.00 |

Payment can be made by credit card (not American Express)

Overseas: Berkeley International
IBAN: GB39NWBK60101487009951
BIC: NWBKGB2L
NatWest Farnham, Surrey England
Sort Code:  60-10-14  Account Number: 87009951

Berkeley International Ltd.
Company Registration No. 04698672 (England and Wales) Registered address – Harrow House, 23 West Street,
Haslemere, Surrey, GU27 2AB
Vat No. 821277443



THIS AGREEMENT dated the          day of                    2021

BETWEEN

(1) BERKELEY INTERNATIONAL LIMITED of 23 Berkeley Square, London W1J 6EJ (hereinafter called 'Berkeley')

and

(2)   Misha Kaura

(hereinafter called the 'Client')

**Client personal information**

Marital Status:
Date of Birth:
Nationality:
Occupation:
Mobile No:
E Mail address:
Residential Address:

**Preamble**

WHEREAS the Client is seeking a Partner and wishes to subscribe to the Berkeley match-making agency to enable Berkeley to introduce the Client to prospective Partners and Berkeley agrees to do so upon the terms and conditions as set out below

NOW IT IS AGREED as follows:

The total amount payable at commencement of the Berkeley UK and US membership is £20,000 plus VAT.

**Definitions**

For the purposes of this Agreement the following expressions will have the meanings set against them.

'Subscription' means the sum of £10,000  plus VAT the payment of which entitles the Client to remain a Member and to receive Berkeley's Partner introduction services for the Membership Period for a term of 12 months which shall commence from the date of this Agreement.

The first Subscription payment will be made on signature of this Agreement and if the Client wishes to renew this Agreement for a further period, he/she can do so by paying subsequent Subscriptions on the anniversary date of the signing of this Agreement.

This Subscription payment is subject to change providing notice is given to the Client. The initial 'Joining Fee' (see below) is non-refundable.

'Joining Fee' means the once-only fee of £10,000 plus VAT payable by the Client on the signing of this Agreement to become a Member.

'Client Profile' means the information provided by the Client to the Berkeley questionnaire and/or any additional information regarding profile provided to the Client by Berkeley prior to the Client interview which information is noted by the Client Manager during the interview so as to establish a range of the Client's essential characteristics and criteria that Berkeley reasonably considers pertinent to sourcing an appropriate Partner.

'Introduction' means Berkeley 'providing' the Client, in accordance with clause 2.3 with the Member's Profile of a potentially compatible Partner to whom Berkeley has provided the Client's personal profile and who has expressed the wish to contact, or to be contacted by the Client. For the purposes of clarity it is agreed that for the purposes of this Agreement Berkeley has chosen profiles using their knowledge, expertise and professionalism and that providing a profile to the Client is deemed to be an appropriate and valid introduction - for example when numbers are exchanged, when a Client refuses a profile of someone Berkeley deemed suitable or when one party refuses a profile and the other has accepted - unless circumstances beyond either party's reasonable control preclude it.

'Members' means those persons who are active paid up subscribers to the Berkeley dating agency or persons whom it has specifically headhunted. From time to time, Berkeley may find it necessary to seek introductions outside its database to satisfy particular or unusual Client criteria. Such headhunted introductions typically form part of the Berkeley service and do not effect the fees payable by the Client unless the Client gives prior approval.

'Membership Period' means a period of 12 months plus an additional extension period of up to 6 months in the event the Client elects to suspend provision of introductions further to clause 1.7 below.

'Member's Profile' means the same categories of information about the relevant Member as is provided by the Client Profile.

'Partner' means any person who, being a Member as defined in 'Members' above, is introduced by Berkeley to the Client.

'Partner Profile' means the Partner profile completed by the Client for Berkeley after completion of the questionnaire by the Client at interview. See clause 1.7 below for changes made to Partner Profile's after commencement of membership.

**Preamble**

Attractive human qualities and characteristics in a partner are subject to the Client's personal taste. Interpreting that personal taste is not an exact science. Clients will provide Berkeley with criteria or qualities they are looking for in a potential partner for indicative purposes only.

Berkeley will use its reasonable endeavours to introduce clients to potential partners who meet as many criteria as possible but are not under any obligation to ensure that each and every potential or actual introduction has any or all of the criteria. Any criteria specified by a client will be for guidance purposes only and should not form a fundamental requirement of any potential introduction. Furthermore, the client recognises that Berkeley's skill and expertise lies in identifying and recommending introductions based on both objective and subjective factors where Berkeley believe that there is the possibility of the client forming a relationship.

**1. Introductions**

1.1 Berkeley reserves the absolute discretion and right to introduce to the Client Partners who Berkeley considers might be acceptable to the Client notwithstanding that the prospective Partner may only match the Partner Profile to a degree.

1.2 Berkeley will make unlimited suitable Introductions.

1.3 Berkeley does not accept any responsibility or liability for the accuracy or completeness of the Member's Profile of the Client or of any Partner or any other Member or for any offensive or other behaviour or actions of the Client or of any introduced Partner or any other Member.

1.4 Berkeley reserves the right to terminate this Agreement with immediate effect at any time by giving the Client written notice if the Client is in breach of this Agreement or if Berkeley has reasonable cause in its absolute opinion and discretion to do so.

1.5 Berkeley will not be liable to the Client for compensation or for the return of any portion of the Subscription or Joining Fee or otherwise, if:

(a) Partners introduced to the Client by Berkeley in good faith do not match the Client's expectation;
(b) The Client notifies Berkeley that the Client no longer wishes to receive Introductions;
(c). Berkeley terminates this Agreement under clause 1.4 above.

1.6 Subject only to clause 2.2 membership does not entitle the Client to receive Berkeley's list of Members or any details of Members otherwise than by an Introduction.

1.7 In the event a Client wishes to change the criteria of their Partner profile after his/her membership has started, depending on the scope of those changes, this may mean additional fees become payable and/or affect the number of introductions made to the Client.

1.8 If the Client requests that Berkeley suspend the provision of Introductions for a period of time (because, for example, the Client believes they have found a compatible partner) Berkeley will extend the initial 12 month period for a period equivalent to the period(s) of the suspension subject to a maximum extension of 6 months.

1.9 In the event that the Client requests that Berkeley suspend the provision of Introductions (in accordance with clause 1.8 above) for a period in excess of 6 months and subsequently decides to lift the suspension of the membership, Berkeley will make reasonable endeavours to fulfil the minimum number of Introductions to the Client (if agreed further to clause 1.2) within the Membership Period. However, if the length of the Client's suspension period renders Berkeley incapable of fulfilling the minimum number of Introductions within the Membership Period, the Client agrees to waive Introductions Berkeley might otherwise be required to make. Berkeley will make as many introductions as it can be reasonably expected to do so taking into account the amount of time remaining within the Membership Period until the expiry of the membership.

## 2. Obligations

2.1 Berkeley hereby acknowledges the receipt of the payment by the Client of the Joining Fee and the first Subscription and in consideration of those payments and of the Client agreeing to the terms set out herein Berkeley confirms that the Client is a Member with effect from the date of this Agreement.

2.2 The Client agrees to complete the Client Profile truthfully (together with the Client's contact details) and the Client agrees to complete the Partner Profile realistically. Any photograph provided by the Client to Berkeley for the Client Profile must be up to date. The Client will promptly notify Berkeley in writing of any changes to the Client Profile, including any changes in relationship status.

2.3 The Client authorises Berkeley to provide a copy of the Client Profile to any Member who Berkeley considers could be suitable as a Partner and Berkeley will introduce to the Client on a one-by-one basis Members who notify Berkeley that they would like to be introduced to the Client.

2.4 If the Client does not wish to contact that 'Introduced Partner' Berkeley will effect the Introduction of another Partner, when available, who would like to be introduced to the Client.

2.5 The Introduction process will continue for so long as the Client is a paid up Member or until the Client notifies Berkeley in writing that he/she no longer wishes to receive Partner Introductions or the contract expires.

2.6 Where the Client or any Partner reasonably requests, Berkeley will use its reasonable endeavours to facilitate any aspect of the Introduction. Berkeley will also be available to assist the Client in reviewing any aspect of his/her Client Profile and any aspect of his/her expectations contained in the Partner Profile that he/she has produced or talked about.

2.7 The Client undertakes at all times to treat his/her Partner with respect and courtesy at all times during the term of this Agreement and not to disclose any details to any other party.

2.8 Berkeley will provide to the Client a copy of Berkeley's internal complaints handling procedure upon written request by the Client.

2.9 The Client undertakes to treat Berkeley and its staff with courtesy and respect at all times. In the event that a client does not treat Berkeley and its staff with courtesy and respect by engaging in a hostile, aggressive, or abusive communication style or there being actions by the Client causing a fundamental breakdown of trust and confidence between Berkeley and the Client, then Berkeley reserves the right to terminate this agreement with immediate effect and the Client understands that no financial recourse will be available.

2.10 The Client understands that the Berkeley service is deeply personal and that the Client must keep the identity of the individuals who are suggested as potential introductions or to whom the client is introduced totally confidential.

2.11. If the Client follows Berkeley's internal complaints handling procedure and is still not satisfied, Berkeley is prepared to have the dispute submitted for mediation as method of alternative dispute resolution. It is the Client's obligation to initiate such proceedings and should only be undertaken should Berkeley's internal complaints procedure (see 2.8 above) have been followed. Berkeley's selected mediation provider is:

MEDIATELEGAL
Suite 3
4c Exchange Court
1 Dale Street
Liverpool
L2 2PP

Email : help@mediatellegal.co.uk
Website: www.mediatelegal.co.uk
Telephone: 0151 363 3972

2.12 In the absence of resolution following 2.11 this Agreement will be interpreted and enforced in accordance with English law and in the absence of any other agreed forum for dispute resolution any dispute arising hereunder will be submitted to the County Court nominated by Berkeley.

2.13 Do you have any unspent convictions  YES / NO (please indicate)

Guidance: please tick 'YES' if you have any convictions that are not yet spent. The term 'convictions' is used to refer to any sentence or disposal issued by a court. If all your convictions are spent you should tick 'NO'. If you are unsure then please advise us and we can refer you to the appropriate tool to check.

## 3. Confidentiality

3.1 Both Parties acknowledge the sensitive, personal and private nature of the introduction services provided pursuant to this Agreement and the importance of confidentiality and discretion as regards the manner in which an Introduction is facilitated.

3.2 Accordingly, both Berkeley and the Client agree that each party to this Agreement shall not, either directly or indirectly, at any time during the period of the Agreement or for a period of 2 years after termination, make, publish, transmit or communicate to any person or entity or internet site or other forum any disparaging or derogatory remarks, comments or statements concerning either Berkeley its employees or the Client and or the performance of this Agreement which would reasonably be expected to lead to unwanted or unfavourable publicity or damage to reputation of Berkeley its employees or the Client whether or not those remarks, comments or statements represent honestly held beliefs of either party.

3.3 Any breach of clause 3.2 above by one Party will entitle the other Party to seek damages and or injunctive relief. For the avoidance of doubt, this clause will not restrict the legal rights of either party under common law, contract or statute to commence or defend any legal proceedings arising from a breach or alleged breach of the Agreement. By signing this Agreement, both parties acknowledge that this clause has been sufficiently brought to their respective attention.

3.4 It is also understood by the Client that the reputation of Berkeley International is built upon the trust and respect of its members. For this reason, Berkeley takes any and all claims of dissatisfaction with our service extremely seriously. As one of the world's pre-eminent introduction agencies which prides itself on professionalism, discretion and confidentiality, it is inappropriate to discuss private client matters in a public forum, with persons unverified by ourselves. The Client therefore agrees not to discuss any matters pursuant to this Agreement, whether positive or negative, on any public forum, notably any social media platform.

## 4. Data Protection

The Client understands that Berkeley uses Client's personal data primarily to provide matchmaking services to the Client but also for related purposes including:

Conducting identity checks to verify identity and screen for financial or other information; gathering and providing information required by or relating to audits, enquiries and investigations by regulatory bodies; complying with professional, legal and regulatory obligations that apply to our business; ensuring business policies are adhered to, eg policies covering security and internet use; operational reasons, such as improving efficiency, training and quality control; ensuring the confidentiality of commercially sensitive information; statistical analysis to help us manage our business; updating client records; preventing unauthorised access and modifications to systems; preparing and filing statutory returns; ensuring safe working practices, monitoring and managing staff absences and staff access to systems and facilities; staff administration and assessments, monitoring staff conduct, and disciplinary matters; marketing our services; credit reference checks via external credit reference agencies; external audits and quality checks, eg for ISO or Investors in People accreditation.

Any use of Client personal data is subject to his/her instructions, the EU General Data Protection Regulation (GDPR), other relevant UK and EU legislation and our professional duty of confidentiality.

Berkeley is a data controller for the purpose of the GDPR and other relevant data protection legislation. For any queries, Stevie Higginson is the company's representative for the purpose of the GDPR.

We take your privacy very seriously. Please read the Privacy Policy on www.berkeley-international.com as it contains important information, including:

What personal data we collect about you and how that data is collected; how, why and on what grounds we use your personal data; who we share your personal data with; where your personal data is held and how long it will be kept; whether your personal data may be transferred out of the European Economic area and, if so, the measures taken to protect that data; your rights in relation to the personal data we hold or use; the steps we take to secure your personal data; how to make a complaint in relation to our use of your personal data; how to contact us with any queries or concerns in relation to your personal data.

It is also agreed between the Parties that:

The Client hereby acknowledges they have not relied on any other statement or representation made outside the pre-contract information or the terms of this Agreement.

This Agreement and attached documents constitute the entire agreement between the Client and Berkeley and supersede and extinguish all previous agreements, promises, assurances, warranties, representations and understandings between them, whether oral or in writing relating to the subject matter.

Subject to clause 2.2 the Parties agree and confirm that they will not make any unauthorised use or disclosure of any secret or confidential information relating to the other party. Berkeley also agrees that at no time will they disclose any member's personal and private information to any third party without the express agreement and permission of the member.

**Force Majeure (Post Coronavirus)**

Unless otherwise agreed in the contract between the parties, where a party fails to perform one or more of its contractual duties, the consequences set out in this clause will follow if and to the extent that that party proves: (a) that its failure to perform was caused by an impediment beyond its reasonable control; (b) that it could not reasonably have been expected to have taken the occurrence of the impediment into account at the time of the conclusion of the contract; and (c) that it could not reasonably have avoided or overcome the effects of the impediment.

A party invoking this Clause shall be presumed to have established the conditions described in the preceding paragraph in the case of the occurrence of one or more of the following impediments: epidemic, pandemic, outbreaks of infectious disease or any other public health crisis including quarantine or other employee restrictions, compliance with any law or government order, an act of God or other event not subject to the reasonable control of the subject party.

☐ Please tick to confirm that you have read and understood this Agreement.

SIGNED for and on behalf of                    SIGNED by the Client
BERKELEY INTERNATIONAL LIMITED


.................................                    .................................

Dated:                                          Dated:

Exhibit M

**Revised List of Expert Witnesses**

1. Ms. Minal Shah, LPC
2. Dr. Horst Griesser, MD
3. Mrs. Heather Collins Grattan Floyd
4. Mrs. Kim Evazians
5. Dr. Anna Salter, PhD
6. Dr. Paul Ekman, PhD expert witness
7. Ms. Donna Anderson
8. Dr. Marsha Linehan, PhD
9. Dr. Willard Harley, PhD
10. Dr. George Simon, PhD
11. Dr. Daniel Langer, PhD
12. Dr. Sitaram Kaura, MD
13. Ms. Sasha Leah Kaura
14. Mrs. Monika Chopra Kaura

Exhibit N

# Sancta Sophia College
*walk in wisdom*

## Casual Accommodation – Key Information

Please find detailed information for you to read prior to arriving at Sancta Sophia College. This information is vital for when you arrive and depart.

CHECK-IN AND CHECK-OUT

| | |
|---|---|
| Check-in | We encourage check-in between business hours (9-5pm) – if check-in is required after this time please let the Events and Accommodation department know. After hours check-in is dealt with by a Resident Attending (RA) of the College and **must** be done only before 9pm. If you cannot check-in by this time please notify the Events and Accommodation department as other arrangements **may** be able to be made. |
| Check-out | Strictly by 10am. Should this not happen a further night's charge will be applied. |

Please be aware of the following when checking out:
- When checking out during business hours please hand your keys/access cards to Reception.
- If checking out at the weekend or out of hours, or if the Receptionist is not available please place your keys/access cards in the slot on the door of Reception.
- Please do not leave keys in rooms.

ACCESS TO THE COLLEGE

The College address is:
8 Missenden Road
Camperdown
2050

On arrival you can access the College via the pedestrian entrance or the driveway through the main gates on Missenden Road.

INSTRUCTIONS ON ARRIVAL

If arriving during business hours, Monday to Friday 9am-5pm please make your way to our main Reception. The Reception office is located within the foyer area to the left of the glass doors at the main entrance. You will be able to check-in here during these times only.

If you are checking in out of these hours you will need to follow these special instructions:
- When you arrive you are to make your way to either the Graduate House building or the main Sancta building (location will be displayed on booking confirmation). The Graduate House building is located on the left hand side as you walk down the drive way and if you continue round the driveway you will get to the main building.
- If staying at the main building dial 7777 on the keypad and provide your name to the RA who will respond.
- If staying at the Graduate House building dial #8 on the keypad and provide your name to the RA who will respond.
- The RA will greet you at the door and provide you with your card which allows you into your room and around the buildings.

BREAKFAST

Breakfast is available during 7am – 9.30am in our Dining Hall located in the main building.

PARKING

Parking is only available during the Summer Break (December, January and part of February). Should you require parking please notify the Events and Accommodation department prior to arrival. There is a fee of $10 a day. This must be paid before arriving at the College. A permit will then be ready for you when you check-in. You will need to contact the Events and Accommodation department prior to arrival to acquire the code to gain access through the gate onto the College grounds.

SMOKING

Please note that Sancta Sophia is a non-smoking College and is not permitted anywhere on the grounds.

SANCTA SOPHIA COLLEGE PRIMARY PURPOSE

We would like to make all guests aware that the main purpose of the College is a residential home for our students. We hope to operate the casual accommodation business alongside, but we have to make sure this does not conflict the purpose of our student business.

*Established 1926 within the University of Sydney*
8 Missenden Road, Camperdown 2050 (ABN 32 684 514 418)
T +61 2 9577 2333 | F +61 2 9577 2388 | E conf@sancta.usyd.edu.au | W www.sanctasophiacollege.edu.au



**From: Louise Sunderland** conference@sancta.edu.au
**Subject:** RE: misha kaura
**Date:** March 2, 2017 at 8:44 PM
**To:** MONIKA KAURA mkaura22@yahoo.com
**Cc:** Misha Kaura mkaura@mac.com

Hi Monika & Misha,

I have booked you in from 6th-13th March 2017 and taken payment of $665 from the credit card you supplied.

Below are some details for you arrival. Do you know what time you will be checking in?

*Please find attached your Check In Information for your upcoming stay at Sancta Sophia College as well as your payment receipt. There is someone in our reception office between the hours of 9am to 5pm Monday to Friday. If you arrive outside of these hours you will need to contact Guest Manager on 0498 000 855 or our Resident Assistant on 0428 661 157 and they will assist you with check in. The College Ground Floor Map shows where reception is located for Check In.*

*Please let me know if you have any questions.*

Kindest regards

LOUISE SUNDERLAND
*Functions, Events and Casual Accommodation Department*

*(Please note that I am in the office Monday, Tuesday and Friday from 8am-4pm)*



8 Missenden Road Camperdown NSW 2050 Australia (within University of Sydney)
**T** +61 2 9577 2100  **F** +61 2 9577 2388  **D** +61 2 9577 2346
conference@sancta.edu.au  www.sanctasophiacollege.edu.au

  

**PRIVACY** The contact information you provide may be used to maintain contact and keep you up-to-date with information about Sancta Sophia College, its services, events, achievements and alumni. If you do not wish to receive this information, please contact the College at registrar@sancta.edu.au. The College abides by the ³NSW Privacy and Personal Information Protection Act². This email, and attachments, is confidential. If you have received it in error, please delete it from your system, do not use or disclose the information in any way and notify me immediately. The contents of this message may contain personal views which are not the views of Sancta Sophia College, unless specifically stated.

Think. Green. Do.
Please think before printing this email.

**From:** MONIKA KAURA [mailto:mkaura22@yahoo.com]
**Sent:** Friday, 3 March 2017 9:45 AM

**To:** Louise Sunderland <conference@sancta.edu.au>
**Subject:** misha kaura

Hello my name is Monika Kaura  I am MIsha's mom can you please use my credit card for my daughter I will really appreciate it

it is visa mailing add should be



please do not give my card information to anyone

and email me asap

thanks
m



**Casual Accommodation – Key Information**

Please find detailed information for you to read prior to arriving at Sancta Sophia College. This information is vital for when you arrive and depart.

CHECK-IN AND CHECK-OUT

Check-in        We encourage check-in between business hours (9-5pm) – if check-in is required after this time please let the Events and Accommodation department know. After hours check-in is dealt with by a Resident Attending (RA) of the College and must be done only before 9pm. If you cannot check-in by this time please notify the Events and Accommodation department as other arrangements may be able to be made.

Check-out       Strictly by 10am. Should this not happen a further night's charge will be applied.

Please be aware of the following when checking out:
*   When checking out during business hours please hand your keys/access cards to Reception.
*   If checking out at the weekend or out of hours, or if the Receptionist is not available please place your keys/access cards in the slot on the door of Reception.
*   Please do not leave keys in rooms.

ACCESS TO THE COLLEGE
The College address is:
8 Missenden Road
Camperdown
2050

On arrival you can access the College via the pedestrian entrance or the driveway through the main gates on Missenden Road.

INSTRUCTIONS ON ARRIVAL
If arriving during business hours, Monday to Friday 9am-5pm please make your way to our main Reception. The Reception office is located within the foyer area to the left of the glass doors at the main entrance. You will be able to check-in here during these times only.

If you are checking in out of these hours you will need to follow these special instructions:
*   When you arrive you are to make your way to either the Graduate House building or the main Sancta building (location will be displayed on booking confirmation). The Graduate House building is located on the left hand side as you walk down the drive way and if you continue round the driveway you will get to the main building.

- If staying at the Student Housing use 7777. We are responsible provided your name to and any RA who will respond.
- If staying at the Graduate House building dial #8 on the keypad and provide your name to the RA who will respond.
- The RA will greet you at the door and provide you with your card which allows you into your room and around the buildings.

BREAKFAST
Breakfast is available during 7am – 9.30am in our Dining Hall located in the main building.

PARKING
Parking is only available during the Summer Break (December, January and part of February). Should you require parking please notify the Events and Accommodation department prior to arrival. There is a fee of $10 a day. This must be paid before arriving at the College. A permit will then be ready for you when you check-in. You will need to contact the Events and Accommodation department prior to arrival to acquire the code to gain access through the gate onto the College grounds.

SMOKING
Please note that Sancta Sophia is a non-smoking College and is not permitted anywhere on the grounds.

SANCTA SOPHIA COLLEGE PRIMARY PURPOSE
We would like to make all guests aware that the main purpose of the College is a residential home for our students. We hope to operate the casual accommodation business alongside, but we have to make sure this does not conflict the purpose of our student business.

Established 1926 within the University of Sydney
8 Missenden Road, Camperdown 2050 (ABN 92 694 614 410)
T +61 2 9577 2333 | F +61 2 9577 2388 | E conf@sancta.usyd.edu.au | W www.sanctasophiacollege.edu.au



Sancta Sophia College Ground Floor Plan

From: **Misha Kaura** mkaura@mac.com
Subject: Re: Move appointment today
Date: February 27, 2017 at 7:30 PM
To: Louise Sunderland conference@sancta.edu.au



Hi Ms Sunderland,
So random! The rain just stopped! Well, let's just go with tomorrow at 12 since I already changed it, haha. I guess if you don't like Sydney weather, just wait 30 minutes, and it changes again!

Kind regards,
Misha

On Feb 28, 2017, at 11:29 AM, Louise Sunderland <conference@sancta.edu.au> wrote:

Hi Misha,

12pm ok tomorrow?

Cheers

LOUISE SUNDERLAND
Functions. Events and Casual Accommodation Department

(Please note that I am in the office Monday, Tuesday and Friday from 8am-4pm)

8 Missenden Road Camperdown NSW 2050 Australia (within University of Sydney)
T +61 2 9577 2100  F +61 2 9577 2388  D +61 2 9577 2346
conference@sancta.edu.au  www.sanctasophiacollege.edu.au

PRIVACY  The contact information you provide may be used to maintain contact and keep you up-to-date with information about Sancta Sophia College, its services, events, achievements and alumni. If you do not wish to receive this information, please contact the College at  registrar@sancta.edu.au. The College abides by the ³NSW Privacy and Personal Information Protection Act². This email, and attachments, is confidential. If you have received it in error, please delete it from your system, do not use or disclose the information in any way and notify me immediately. The contents of this message may contain personal views which are not the views of Sancta Sophia College, unless specifically stated.

Think. Green. Do.
Please think before printing this email.

-----Original Message-----
From: Misha Kaura [mailto:mkaura@mac.com]
Sent: Tuesday, 28 February 2017 11:07 AM
To: Louise Sunderland <conference@sancta.edu.au>
Subject: Move appointment today

Dear Ms. Sunderland,
Due to the rain, would it be possible to reschedule the viewing to later today or sometime tomorrow? I don't have an umbrella on me, and it would be very dangerous to walk to SSC and carry my laptop bag with such rain.

Please let me know.

Kind regards.
Misha



**From:** **Louise Sunderland** conference@sancta.edu.au
**Subject:** RE: Never mind
**Date:** March 12, 2017 at 5:14 PM
**To:** Misha Kaura mkaura@mac.com
**Cc:** Mom Kaura mkaura22@yahoo.com

Hi Misha,

Not a problem to extend your stay until 4th April. As I mentioned we are fully booked on the 23rd March (1 night only now). If this changes we will of course let you know.

Therefore I will book you in from 13th-23rd March (10 nights) and 24th March - 4th April (11 nights). Total cost at $95 per night is $1995.

I will take payment from your mum's credit card which you mentioned in a previous email.

You will need to come to reception so we can extend your card as it expires today.

Kindest regards


LOUISE SUNDERLAND
Functions, Events and Casual Accommodation Department

(Please note that I am in the office Monday, Tuesday and Friday from 8am-4pm)



8 Missenden Road Camperdown NSW 2050 Australia (within University of Sydney)
T +61 2 9577 2100  F +61 2 9577 2388  D +61 2 9577 2346
conference@sancta.edu.au  www.sanctasophiacollege.edu.au


PRIVACY  The contact information you provide may be used to maintain contact and keep you up-to-date with information about Sancta Sophia College, its services, events, achievements and alumni. If you do not wish to receive this information, please contact the College at  registrar@sancta.edu.au. The College abides by the ³NSW Privacy and Personal Information Protection Act². This email, and attachments, is confidential. If you have received it in error, please delete it from your system, do not use or disclose the information in any way and notify me immediately. The contents of this message may contain personal views which are not the views of Sancta Sophia College, unless specifically stated.

Think. Green. Do.
Please think before printing this email.

-----Original Message-----
From: Misha Kaura [mailto:mkaura@mac.com]
Sent: Saturday, 11 March 2017 4:50 PM
To: Louise Sunderland <conference@sancta.edu.au>
Cc: Mom Kaura <mkaura22@yahoo.com>
Subject: Never mind

Hi Louise
I have to meet with a professor here, so I will stay until the 4th of April. It's not ideal but there's no way to get out of it.

Kind regards
Misha

Sent from my iPhone

# Sancta Sophia College Ground Floor Plan

